**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| The City of New Bedford, Massachusetts, et al., ) | |
| ) | |
| *Plaintiffs*, ) | |
| ) | |
| v. ) | |
| ) | **CIVIL ACTION** |
| The Honorable Gary W. Locke, et al., ) | **NO. 1:10-cv-10789-RWZ** |
| ) | |
| *Defendants*, ) | |
| ) | |
| & ) | |
| ) | |
| Conservation Law Foundation, Inc., ) | |
| ) | |
| *Intervenor-Defendant*. ) | |
| ) | |

## MEMORANDUM IN SUPPORT OF FOOD & WATER WATCH, INC's. MOTION TO INTERVENE AS PLAINTIFF

Food & Water Watch, Inc. ("FWW") moves to intervene as plaintiff in the above-captioned consolidated cases.  FWW seeks to intervene as of right under Federal Rule of Civil Procedure ("F.R.C.P.") 24(a), or, alternatively, by permission under F.R.C.P. 24(b) and submits this memorandum in support pursuant to F.R.C.P. 24(c) and Local Rule 7.1(b).  FWW has provided its proposed complaint, which sets forth the claims it wishes to assert.  In support of the motion, FWW also provides two accompanying affidavits, one from the Director of its Fish Program, Marianne Cufone, and one from a dues-paying member and commercial fishermen from Massachusetts, Dave Marciano.

### I. STATEMENT OF THE CASE AND FWW'S CLAIMS

FWW is a national, non-profit public interest consumer-advocacy organization.  It works to ensure safe food and clean water by advocating for wholesome food produced in a humane

and sustainable manner, and public rather than private control of water resources.  The FWW

Fish Program promotes safe and sustainable seafood for consumers while helping to protect the

environment and supporting the long-term well-being of coastal and fishing communities.  There

are more than 3,2000 FWW members in New England, New York and New Jersey, including

conservationists, consumers, and commercial and recreational fishermen and fisherwomen

(collectively "fishermen"), who care about the sustainability of the product they produce.

(Declaration of Marianne Cufone ("Cufone Dec."), attached as Exhibit 2, at ¶2).  Many of

FWW's members are directly reliant on the continuous viability of the world's fisheries for food,

jobs, and income as well as cultural and traditional practices.

On April 9, 2010, the National Marine Fisheries Service ("NMFS") published the

regulations implementing Amendment 16 to the Northeast Multispecies Fishery Management

Plan in the Federal Register (the Amendment and all of its related implementing regulations will

be referred to collectively as "Amendment 16" or "the Amendment").  75 Fed. Reg. 18,262;

codified at 50 C.F.R. § 648.87.  Three sets of plaintiffs filed separate actions in three federal

district courts seeking judicial review of Amendment 16.[1]  In this Court, the Cities of New

Bedford and Gloucester, Massachusetts, individuals, businesses, and organizations (collectively

"New Bedford Plaintiffs") filed a complaint against Secretary of Commerce Gary Locke and

Administrator of the National Oceanic and Atmospheric Administration ("NOAA") Jane

Lubchenco.  (Clerk's Dkt. #4).  In the New Jersey District Court, James Lovgren filed a

complaint on behalf of himself and other New Jersey fisherman (collectively "New Jersey

---

[1] These actions were brought under the judicial review provision of the Magnuson-Stevens Fishery Conservation and Management Act.  16 U.S.C. § 1855(f)(1)(B).

Plaintiffs") against Locke, NOAA, and NMFS[2] (collectively with Lubchenco, "Defendants").

Both sets of Plaintiffs assert, *inter alia* that Defendants' adoption of Amendment 16 violated

various provisions of the Magnuson-Stevens Fishery Conservation and Management Act

("MSA"), as amended, and the National Environmental Policy Act ("NEPA").   FWW seeks to

intervene and join Plaintiffs in challenging Amendment 16.

As FWW alleges in the attached complaint, Defendants' development and approval of

Amendment 16 did not comply with requirements of the MSA, 16 U.S.C. §§1801 *et seq*, and

NEPA ("NEPA"), 42 U.S.C. §§ 4321-4370f.   Specifically, Defendants failed to:  (1) submit the

Amendment to a referendum prior to its final approval by the Secretary in violation of 16 U.S.C.

§ 1853a(c)(6)(D); (2) adequately assess the Amendment's socioeconomic impacts in violation of

16 U.S.C. §§ 1853(a)(9) & 1853(b)(6); and (3) adequately analyze the Amendment's

environmental impacts, in violation of 42 U.S.C. § 4332(2)(C)(i).

Amendment 16 institutes major changes to the fishing permitting system in the Northeast

groundfish fishery ("the fishery").   Most notably for FWW's complaint, the Amendment

introduces a brand new "catch share" management regime for the fishery.[3]   Under this system,

each fisherman is assigned a quota, called a "Potential Sector Contribution" ("PSC"), which

represents the percentage of the fish the fisherman is entitled to catch in a year.   This quota

"remain[s] with the limited access permit indefinitely."  75 Fed. Reg. 18,262 at 18,276.

To access their PSC, fishermen must join a "sector," which is a fishing group comprised of three

or more fisherman.   FWW contends that this system of granting each individual fisherman the

---

[2] Lovgren originally included defendants the Atlantic coastal Cooperative Statistics Program and the Atlantic States
Marine Fisheries Commission, but voluntarily agreed to dismiss these defendants with prejudice on June 7, 2010.
(10-cv-2162-FLW, Clerk's Dkt. #6).
[3] "Catch share" is a general term for several fishery management strategies that allocate a specific portion of the
total allowable fishery catch to individuals, cooperatives, communities, or other entities.  Each recipient of a catch
share is directly accountable to stop fishing when its specific quota is reached.  *See* National Oceanic and
Atmospheric Administration, Draft Catch Share Policy, 2009 at 1, located at
http://www.nmfs.noaa.gov/sfa/domes_fish/catchshare/docs/draft_noaa_cs_policy.pdf.

exclusive right to fish a portion of the total allowable catch is the functional equivalent of an "individual fishing quota" ("IFQ") program.[4]

FWW has long opposed IFQ programs on behalf of its fishermen and consumer members because of their potential negative environmental and socio-economic impacts.  As explained below, among FWW's concerns are that the Amendment as designed will benefit only the largest commercial fishermen and will have serious adverse socioeconomic effects on smaller-scale fishermen and fishing communities; that it is an improper giveaway of public resources; that it will harm consumers; and that it will not actually have the conservation benefits Defendants claim it will have.  (*Id.*).

Under Amendment 16, in some cases smaller-scale fishermen will receive a disproportionately smaller allocation because weather prevents small boats from fishing four months out of the year.  (*See, e.g.*, Declaration of Dave Marciano ("Marciano Dec."), attached as Exhibit 3, at ¶ 12).[5]  Restricted to a much lower amount of catch, groundfish fishing becomes no longer profitable for smaller-scale fishermen, and they are forced to give up their allocation to larger-scale operations. (*See, e.g.*, Marciano Dec. at ¶¶ 13-14).  The consolidation of the fishery generally reduces the number of boats, but can also increase the average size of the boats.

FWW contends that the resulting domination of the fishery by industrial scale vessels due to IFQ management systems can generally lead to a lower quality product for consumers, as fish can be crushed through mechanic sorting and by being pulled up in large nets with thousands of other fish and marine wildlife.  (Cufone Dec. at ¶¶ 3-4).  Fish are then processed *en masse* –

---

[4]  "Individual Fishing Quota" means a Federal permit under a limited access system to harvest a quantity of fish, expressed by a unit or units representing a percentage of the total allowable catch of a fishery that may be received or held for exclusive use by a person."  MSA, 16 U.S.C. § 1802(23).
[5] The new allocations are based on catch history records, which are determined by comparing the amount of fish caught as a percentage of landings among permit holders.  50 C.F.R. § 648.87(b)(1)(i)(E)(1).  Also, unlike the former system, in which fishing permits were tied to specific boats, Amendment 16 allows for boats to "stack" permits within a sector, such that one boat can own many permits and the right to fish the allocations associated with them. 50 C.F.R. § 648.87(a)(4).

sometimes shipped across the world to places with lower food safety standards for filleting and packaging, then shipped back to the United States for sale. (*Id.*). It also ultimately affects the product consumers receive compared to the product offered by smaller-scale fishermen who focus more on quality and not just quantity. *Id.*

In terms of environmental impacts, FWW believes that IFQ systems do not necessarily promote conservation. (Cufone Dec. at ¶ 5). Assertions of ecological benefits are usually based on the errant assumption that a fewer number of commercial fishing vessels is directly proportional to a lesser harm to the marine environment. (*Id.*). FWW believes that this assumption needs to be more fully analyzed because, among other reasons, a smaller number of certain types of vessels can cause a greater amount of harm either because of their impacts to seafloor habitat or bycatch (unintentionally caught species). (*Id.*). Rather than promoting conservation, IFQs can reward those fishermen who fish the hardest and fastest, while squeezing out many smaller-scale fishermen that use gear associated with less damage. (*Id.*).

FWW has been very involved in monitoring and commenting on the development of Amendment 16. For example, FWW submitted written comments on the proposed Amendment on January 20, 2009. (Cufone Dec. at ¶ 6). FWW also attended a Fisheries Leadership & Sustainability Forum in October 2009 as part of a workshop on catch shares organized by the New England Fishery Management Council. (*Id.*). Additionally, FWW has provided updates to media during the development process of Amendment 16 that created the IFQ system and has been turned to by the media as an expert opponent of that system. (*Id.*).

FWW contends that by labeling Amendment 16 a "sector" based approach, Defendants circumvented the referendum requirements of the MSA, undermining the intent of Congress, and thereby preventing the organization's fishermen members from being able to vote and organize

others to vote in a referendum that would determine whether Amendment 16 should move forward.  (Marciano Dec. at ¶¶ 19-20).  FWW believes that sectors, if designed without significant community input, could be problematic.  Referenda and impact analyses are a critical measure that Congress mandated to ensure that IFQ approaches are only implemented if they are seen as fair and equitable to the affected fishermen in the fishery.  (Cufone Dec. at ¶ 7).  As Amendment 16 implements a system that threatens to harm the health and livelihood of FWW's members and its general interest in sustainability of the ocean's resources, FWW asks the Court to grant its motion for intervention-as-of-right, or alternatively, by permission, so that it may protect these interests.

## II. INTERVENTION-AS-OF-RIGHT

A court must permit a movant to intervene as a matter of right under Federal Rule of Civil Procedure 24(a), if the movant:  (1) files a timely application; (2) makes a showing of an interest in the action; (3) demonstrates that its ability to protect that interest may be impaired by the disposition of the action; and (4) shows that the movant's interest is not protected adequately by the parties to the action.  F.R.C.P. 24(a); *R & G Mortgage Corp. v. Fed. Home Loan Mortgage Corp.*, 584 F.3d 1, 7 (1st Cir. 2009).  An applicant who fails to meet any one of these requirements cannot intervene.  *Pub. Serv. Co. of N.H. v. Patch*, 136 F.3d 197, 204 (1st Cir. 1998).  FWW satisfies all the criteria and is entitled to intervene as-of-right.

a. FWW's Motion Is Timely

The determination of timeliness is case-specific and based on the totality of the circumstances.  *NAACP v. New York*, 413 U.S. 345, 366 (1973); *R & G Mortgage Corp.,* 584 F.3d at 7 (citing *Banco Popular de P.R. v. Greenblatt*, 964 F.2d 1227, 1230-31 (1st Cir. 1992)). The First Circuit analyzes four factors in determining timeliness:

> (i) the length of time that the putative intervenor knew or reasonably should have
> known that his interests were at risk before he moved to intervene; (ii) the
> prejudice to existing parties should intervention be allowed; (iii) the prejudice to
> the putative intervenor should intervention be denied; and (iv) any special
> circumstances militating for or against intervention.

*R & G Mortgage Corp.*, 584 F.3d at 7.   The timeliness analysis is not "designed to penalize

prospective intervenors for failing to act promptly; rather, it insures that existing parties to the

litigation are not prejudiced by the failure of would-be intervenors to act in a timely fashion."

*Garrity v. Gallen*, 697 F.2d 452, 455 (1st Cir. 1983).   Each of these factors is analyzed in light of

the posture of the case at the time the motion to intervene is brought.   *Id.* at 7 (citing *Geiger v.*

*Foley Hoag LLP Ret. Plan*, 521 F.3d 60, 65 (1st Cir. 2008)).

When a suit has not progressed beyond the early stages of litigation, the amount of time

that has elapsed since the litigation began is less important, and the potential prejudice to the

existing parties is much lower.   *See Greenblatt*, 964 F.2d at 1231 (scrutinizing a timeliness

inquiry in proportion to the progression of the litigation); *see also Maine v. Norton*, 203 F.R.D.

22, 26 (D. Me. 2001) (finding that the timeliness of a motion to intervene was "not an issue"

when it was filed prior to "any significant substantive motions").   Thus, the length of the delay

before moving to intervene is "measured in relative, not absolute, terms."   *R & G Mortgage*

*Corp.*, 584 F.3d at 8.   When a party is able to enter a suit in the same position as existing parties,

prejudice does not result.   *See United States v. ExxonMobil Corp.*, 2007 WL 456349, at *2

(D.N.H. Dec 20, 2007) (finding that the relevant prejudice in a timeliness inquiry does not

include disruption or delay caused by the motion to intervene itself) (citing *United States v.*

*Union Elec. Co.*, 64 F.3d 1152, 1159 (8th Cir. 1995)).

This action is still at the early stages of litigation.   No dispositive motions have been

filed, and the configuration of the parties and issues has been in flux until recently.   Although the

original complaints were filed about four months ago, the actions were only consolidated in one forum less than eight weeks ago, on August 3, 2010.[6]  Indeed, FWW waited to make this motion after consolidation of at least two of the cases, as it hoped to conserve resources and not file more motions than necessary. (Cufone Dec. at ¶ 7).

Defendants did not lodge the administrative record until earlier this month, on September 1, 2010.  In addition, it was only three weeks ago, on September 7, 2010, that this Court entered an order granting a motion by the Conservation Law Foundation ("CLF") to permissively intervene as a defendant, thus indicating the timeliness of the present motion.  As no substantive litigation has occurred since that time, there is no prejudice in allowing FWW to intervene at this stage, and the motion should be deemed timely.  At a scheduling conference held on September 9, 2010, the Court set deadlines for dispositive and non-dispositive motions.[7]

FWW would not seek to conduct discovery or unsettle any prior determinations made by the Court.  Rather, FWW would readily assimilate into the case fully prepared to meet all existing deadlines for dispositive motions and replies.  Because FWW is moving to intervene at a sufficiently early stage in the litigation and will not disrupt the litigation, no party would be prejudiced due to any delay on FWW's part.  *Compare Tutein v. Daley*, 43 F. Supp. 2d 113, 127 (D. Mass. 1999) (granting intervention after three-month delay when intervenor would proceed on the same timeline as the existing parties, would not seek discovery, and sought resolution based on the administrative record) *and Greater Boston Chamber of Commerce v. City of Boston*, 772 F. Supp. 696, 700 (D. Mass. 1991) (granting motion to intervene after an eight-

---

[6] Consolidation with a third case may also be a distinct possibility. On July 2, 2010 NOAA filed a motion to transfer *Oceana v. Locke*, currently pending in the District Court for the District of Columbia, to this District, with the express intent to consolidate it with this action. ( *See* 1:10-CV-00744, Clerk's Dkt. # 9).

[7] The Court set the following relevant deadlines:  (1) October 13, 2010 for Plaintiffs' Motions for Summary Judgment; (2) December 13, 2010 for Defendants' Cross-Motions for Summary Judgment and Briefs in Opposition to Plaintiffs' Motions for Summary Judgment; (3) January 10, 2011 for Plaintiffs' Opposition to Defendants' Cross-Motions for Summary Judgment; and (4) January 27, 2011 for Defendants' Reply in Support of Cross-Motion for Summary Judgment.  A Motion Hearing is scheduled for February 9, 2011.

month delay when intervenor would enter suit in same position as existing plaintiffs) *with R & G Mortgage Corp.*, 584 F.3d at 7-9 (denying motion to intervene made after two-and-a-half month delay when it would disturb settlement entered into by original parties).

Denial of this motion, however, would prejudice FWW.  As discussed below, FWW's interests in this case differ materially from those of the existing Plaintiffs, and an adverse ruling would impair FWW's ability to protect its interests.  For the reasons set forth above, and because there are no unusual circumstances that weigh against granting intervention, FWW's motion to intervene is timely.

b. FWW Has a Sufficient Interest to Justify Intervention-As-of -Right

While "[t]here is no precise and authoritative definition of the interest required to sustain a right to intervene," a party seeking to intervene must have interests that are "significantly protectable."  *Conservation Law Found. of New England, Inc. v. Mosbacher*, 966 F.2d 39, 41-42 (1st Cir. 1992) (quoting *Donaldson v. United States*, 400 U.S. 517, 531 (1971)).  Thus, the First Circuit has stated that "the intervenor's claims must bear a 'sufficiently close relationship' to the dispute between the original litigants" and "[t]he interest must be 'direct, not contingent.'"  *Id*. at 42 (quoting *Travelers Indem. Co. v. Dingwell*, 884 F.2d 629, 637 (1st Cir. 1989).  Further, determination of whether an interest is sufficient is "colored to some extent by the [subsequent] factor – whether disposition of the action may, as a practical matter, impair or impede the applicant's ability to protect its interest."  *Id.* Thus, where changes in a regulatory program would "affect the proposed intervenors' business both immediately and in the future" the First Circuit has found an interest sufficient for intervention-as-of-right.  *See Mosbacher*, 966 F.2d at 43 (granting intervention to local fishermen subject to regulations at issue).

FWW has significant interests in the disposition of Amendment 16, because its New England fishermen members have a direct economic stake in the regulatory scheme, and all its members have interests in the environmental sustainability of fishery management programs.

FWW's fishermen members have a direct, personal stake in the disposition of Amendment 16.  Groundfish catch represents a substantial portion of these members' income, and Amendment 16 affects their ability to continue participating in the groundfish fishery. Massachusetts fishermen as a whole generated nearly one-fifth of their income from groundfish in 2007.  Table 74 and Table 75, *Northeast Multispecies Fishery Management Plan Amendment 16* at 336-337.[8]  David Marciano ("Marciano"), for example, who is an independent fisherman and FWW member, derived eighty-percent of his income from groundfish prior to Amendment 16.  (Marciano Dec., at ¶¶ 2, 8).  Following the implementation of Amendment 16, Marciano was allocated a quota of groundfish so small that he could no longer afford to continue catching groundfish, and he had to sell his permit.  (*Id*. at ¶¶11-14).  Marciano primarily relies on tuna-fishing now, but the loss in income from not being able to catch groundfish has caused hardship to him and his family.  (*Id*. at ¶¶ 15, 18).  Furthermore, because Marciano had to sell his permit, he can no longer make use of the equipment he had purchased for catching groundfish, and has lost the value of this equipment while incurring expenses in maintaining and storing it.  (*Id*. at ¶¶ 16-17).  This direct economic interest is sufficient to justify intervention.  *See Mosbacher*, 966 F.2d at 39 (granting intervention to local fishermen, where adverse effect of new rules was "certain").

In addition, FWW is a consumer advocacy group.  Its members are those who want a seafood supply that has been caught in a socially and environmentally responsible manner.

---

[8] Available at:
http://www.nefmc.org/nemulti/planamen/Amend16/final%20amendment%2016/6.0_091016_Final_Amendment_16-3.pdf

(Cufone Dec. at ¶¶ 2-3). Fishermen are members of FWW because they share the organization's strong beliefs that adverse environmental impacts from fishing can be mitigated when the fishery's resources are not consolidated in the hands of the largest fishing and/or fastest fishing vessels. Such vessels do not have the same incentives as smaller-scale fishermen to promote conservation to ensure the long-term viability of the fishery by protecting against depletion of local fish stocks. (Marciano Dec. at ¶ 1; Cufone Dec. at ¶ 4). Smaller-scale fishermen cannot just pick up and move elsewhere whenever local fish have been depleted. Financial necessity forced Marciano to sell his quota to a large steel dragger boat that employs devices that can severely harm the seafloor. (Marciano Dec. at ¶ 14). Therefore, all of FWW's members, regardless of their occupation, have a direct interest in Amendment 16, as its new catch share system may have a profound impact on the makeup of, and resulting environmental damage to, the New England groundfish fishery.

Finally, FWW's participation during the development of Amendment 16 is sufficient to confer an interest. *See Tutein v. Daley*, 43 F. Supp. 2d at 127 (conservation group's active participation in enacting the statute at issue and advocacy programs directed to the matter constituted an "undoubtedly 'significantly protectable' interest") (citing *Mosbacher*, 966 F.2d at 41).

c. FWW's Ability to Protect Its Interest Will Be Impaired by Disposition of This Case.

Rule 24(a)(2) does not require that an applicant's interests be legally impaired; rather a court must determine "whether disposition, may, *as a practical matter*, impair or impede the applicant's ability to protect its interests." *Mosbacher*, 966 F.2d at 42 (emphasis added).

Disposition of this case will significantly impair or impede the ability of FWW to advocate on behalf of its members. The resolution of this case will affect the continuation of a

program that threatens the livelihood and well-being of FWW members, and it may establish precedent harmful to FWW's interests before FWW has a chance to defend them. This is enough to satisfy 24(a)(2)'s requirement that the intervenor's ability to protect his interest be practically impaired. *Daggett v. Comm'n on Governmental Ethics & Election Prac.*, 172 F.3d 104, 110 (1st Cir. 1999) (in granting intervention, court observed that disposition on campaign finance reform statute would have practical effect on candidates in upcoming election, even if candidates later brought their own suit).

Additionally, in certain circumstances, "the adverse impact of *stare decisis* standing alone may be sufficient to satisfy the practical impairment requirement." *Int'l Paper Co. v. Inhabitants of Town of Jay, Me.*, 887 F.2d 338, 345 (1st Cir. 1989). This is especially true when a court is deciding questions of first impression on a matter of federal law, as the district court's decision may be entitled to great weight. *Id.*; s*ee also Nuesse v. Camp*, 385 F.2d 694, 702 (D.C. Cir. 1967) (finding significant that district court decision on case of first impression could hamper intervenor's ability to vindicate his approach in another court). This case represents one of the first chances a court will have to make a determination regarding this approach to fishery management, which is in effect, an IFQ system. Hence, this Court's decision is likely to be given considerable weight. Even if Amendment 16 is vacated pending further administrative action, the Court may issue a decision interpreting the agency's statutory duties regarding the Amendment, and such a decision without a specific finding as to the referendum requirement creates a risk that the interests of FWW's members will be impaired in any future litigation.

### d. FWW's Interests Are Not Adequately Represented by Plaintiffs

To intervene as of right, a party "need only show that representation *may* be inadequate, not that it *is* inadequate." *Mosbacher*, 966 F.2d at 44 (citing *Trbovich v. United Mine Workers*,

404 U.S. 528, 538 n.10 (1972)) (emphasis added).   The burden on potential intervenors in making that showing "should be treated as minimal."   *Trbovich*, 404 U.S. at 538, n.10. However, where the intervenor's ultimate objective is the same as that of a named party, a rebuttable presumption of adequate representation applies.   *Daggett*, 172 F.3d at 111; *Moosehead Sanitary Dist. v. S. G. Phillips Corp*., 610 F.2d 49, 54 (1st Cir. 1979).   There is no exclusive list of what a party may show to rebut this presumption.   *B. Fernandez & Hnos., Inc. v. Kellogg USA, Inc.,* 440 F.3d 541, 546 (1st Cir. 2006).   Rather, overcoming the presumption of adequacy requires no more than "an adequate explanation as to why" the intervenor's interest is not sufficiently represented by the named parties.   *Id.* (citing *Maine v. U.S. Fish & Wildlife Serv.,* 262 F.3d 13, 19 (1st Cir. 2001).   The First Circuit has emphasized that this determination requires "fact-sensitive judgment calls" made on a case-specific basis.   *Fernandez*, 440 F.3d at 546.   Due to the differences in legal claims and intensity of interests, FWW's interests are not adequately represented by the named parties.

### i. New Bedford Plaintiffs

One way to show inadequacy of representation is a potential adversity of interests. *Moosehead*, 610 F.2d at 54.   Although New Bedford Plaintiffs also represent the interests of Massachusetts fishermen, adversity may exist on certain issues.

As stated in the attached complaint, FWW makes three claims with regard to Defendants' failure to comply with the following requirements: failure to submit the Amendment to a referendum, failure to adequately assess socioeconomic factors, and failure to adequately assess environmental impacts.   (FWW Compl.; *see also* p. 5).   New Bedford Plaintiffs' complaint asserts broadly that Amendment 16 fails to conform to the ten national standards provided under the MSA for fishery conservation and management, but makes no reference to a referendum.

(NB Amd. Compl., Clerk's Dkt. #4, at ¶¶ 53-57).   This potential disparity in legal goals is enough to demonstrate inadequate representation.

Furthermore, New Bedford's Plaintiffs' interests and goals may differ from FWW in the context of the NEPA claims.  New Bedford Plaintiffs' complaint focuses on Defendants' failure to adequately analyze the social and economic impacts on fishing communities associated with Amendment 16.   (NB Amd. Compl. at ¶¶ 39, 70).   FWW is a consumer group that is also concerned about sustainable seafood production and protection of the marine environment; it therefore focuses its claims on Defendants' failure to adequately analyze impacts on the environment.  (See FWW Compl. at ¶¶ 61-70).

ii. New Jersey Plaintiffs

New Jersey Plaintiffs bring claims regarding socioeconomic and environmental impacts, and, unlike New Bedford Plaintiffs, a claim regarding the lack of a referendum.  (NJ Compl. at ¶¶ 60-61, 75-77, 79-81).   While the interests of FWW's fishermen members and New Jersey Plaintiffs might seem superficially similar with respect to the shared claims, the interests and goals of the two parties may be asymmetrical.

An intervenor may show inadequate representation by "demonstrat[ing] that its interests are sufficiently different in *kind or degree* from those of the named party."  *Fernandez,* 440 F.3d at 546 (emphasis added); *Glancy v. Taubman Ctrs., Inc.*, 373 F.3d 656, 675 (6th Cir. 2004) ("Asymmetry in the intensity . . . of interest can prevent a named party from representing the interests of the absentee.").

FWW is a consumer group whose goal is ensuring the environmentally-sustainable and socially-responsible management of fisheries.   New Jersey Plaintiffs are fishing businesses

whose interest is primarily economic.[9]   While some FWW members, such as Marciano, have an economic interest in the fishery as well, economics is not their sole concern; FWW members have a broad interest in the environmental, health, and social impacts of Amendment 16.   Thus, FWW's interests are of a different *kind* than the New Jersey Plaintiffs.   *See Tell v. Trs. of Dartmouth Coll.,* 145 F.3d 417, 419 (1st Cir. 1998) ("[W]ithout a perfect identity of interests, a court must be very cautious in concluding that a litigant will serve as a proxy for an absent party.").

The interests of New Jersey Plaintiffs and FWW do not completely align partially due to the geographic-centric aspect of New Jersey Plaintiffs' complaint.   New Jersey Plaintiffs focus on the impact of Amendment 16 in the New York/New Jersey geographic region and fishermen in that geographic area.   (NJ Compl. at ¶¶ 54, 57-58, 61, 64, 67, 71, 74, 80).   FWW's membership includes fishermen from Massachusetts and other New England states.   The different geographic areas affected by Amendment 16 have similar, but not identical, interests. For example, the economic stakes of the regions are different.   *See* Table 74 and Table 75, *Northeast Multispecies Fishery Management Plan Amendment 16* at 336-37.   Thus, the related socioeconomic impacts of Amendment 16 may differ between Massachusetts/New England and New York/New Jersey.   Similarly, New Jersey Plaintiffs focus their NEPA claim on the social and economic effects on the New Jersey/New York region, and allege that Defendants failed to consider the impacts outside the geographical area of New England.   (NJ Compl. at ¶ 80, 81). FWW's NEPA claim, by contrast, does not focus on this geographic region nor on these types of impacts; FWW bases their NEPA complaint on impacts to the natural environment.

For these reasons, New Jersey Plaintiffs may maintain a different representative posture,

---

[9]   Indeed, NJ Plaintiffs state that they "primarily [seek]"equitable relief in the form of a "re-calculation of NMFS' data on landing history for groundfish catch."   (NJ Compl. at ¶ 36).

emphasize different goals, and advance different arguments than FWW.  This is enough to demonstrate inadequacy of representation.  *See Sw. Ctr. for Biological Diversity v. Berg*, 268 F.3d 810, 824 (9th Cir. 2001) ("It is not Applicants' burden at this stage in the litigation to anticipate specific differences in trial strategy.  It is sufficient for Applicants to show that, because of differences in interests, it is likely that Defendants will not advance the same arguments as Applicants.").

Moreover, FWW's interest may differ in *degree* from that of New Jersey Plaintiffs.  As stated above, Massachusetts fishermen generally derive a greater percentage of income from New England groundfish than do New Jersey fishermen.  *See* Table 74 and Table 75, *Northeast Multispecies Fishery Management Plan Amendment 16* at 336-37.  The potential for the litigation to have a greater adverse impact on an intervenor is a sufficient basis for concluding that the existing plaintiff may not serve as an adequate proxy.  *Fernandez,* 440 F.3d at 547. (finding representation inadequate because subsidiary "almost certainly has more to lose" than parent corporation, despite superficially similar interests).

Finally, whether a party has met its burden is proportional to the strength of its interests, and courts require a lesser showing of inadequacy where a party has a tangible and substantial stake in the outcome of a case.  *See Daggett*, 172 F.3d at 113-14 ("Courts might require very little 'inadequacy' if the would-be intervenor's home were at stake and a great deal if the interest were thin and widely shared."); *see also Pub. Serv. Co. of N.H. v. Patch*, 136 F.3d 197, 204 (1st Cir. 1998) (endorsing a "holistic" approach to a Rule 24(a)(2) inquiry).  As demonstrated above, the interest of FWW's members is substantial.  Amendment 16 threatens certain members' economic livelihoods.  This direct, serious interest mandates a lower threshold of inadequacy, and FWW clearly meets its burden in demonstrating inadequacy of representation.  *See*

*Fernandez,* 440 F.3d at 546 (where movant had "direct interest" as evidenced by "tangible and substantial stake" in case's outcome, burden to show inadequate representation was lighter than if interest were "thin and widely shared").

e. FWW's Presence In This Case Will Clarify Rather Than Complicate Matters

FWW recognizes concerns the Court may have about adding another party to litigation at this time.  The parties are many, the administrative record is voluminous, and the issues are complex.  However, FWW's presence in this case will not further complicate matters, but will help clarify the issues.  FWW's complaint contains three claims, which it will develop aided by its experience with the MSA in general and IFQ programs in particular.

FWW's knowledge of fishery management policy under the MSA and experience in environmental litigation specifically pertaining to the MSA could aid the Court in fully exploring the issues brought in the complaints.  In exercising their discretion on motions to intervene, courts have taken into account whether an applicant may help develop the issues and lead to a more informed appraisal of the competing interests.  *See Animal Prot. Inst. v. Merriam*, 242 F.R.D. 524, 529 (D. Minn. 2006) (in granting intervention, court noted applicants were subjects of regulations in dispute regarding trapping and thus in a unique position to contribute factually to action).

FWW's expertise in fishery management systems would contribute to a full presentation of the referendum issue.  It is not disputed that the MSA requires NMFS to submit to a referendum any fishery management plan or amendment that creates an IFQ program.  Nor is it an issue whether a referendum was held; Defendants admit they did not conduct a referendum. (Def. Ans. at ¶ 77, *Lovgren v. Locke*, 1:10-cv-11168-GAO, Clerk's Dkt. #16).  However, as noted above and in comments submitted to NOAA, FWW contends that Amendment 16 is

effectively an IFQ program, thus triggering the referendum requirement. *See* pp. 3-4. Since its inception, FWW has closely monitored federal fishery policy and opposed IFQ programs. Moreover, FWW's members make their livelihood catching groundfish, and thus have detailed first-hand knowledge of how Amendment 16 has affected groundfish fishermen, and why, as a practical matter, Amendment 16 is an IFQ program by a different name. Thus, FWW would provide a more fully-developed explanation of why Defendants should not hold out Amendment 16 as exempt from the referendum requirement.

Moreover, FWW, as a consumer organization that advocates for environmentally-sustainable seafood production, is in a unique position to contest the assertions that Amendment 16 will necessarily benefit the fishery and the environment made by permissive intervenor CLF, a conservation organization. As CLF has taken a position in defense of the Amendment, FWW would be the only conservation-focused plaintiff bringing claims against the government and would materially contribute to the Court's informed resolution of the environmental issues.[10]

Additionally, the New Jersey Plaintiffs' support of FWW's motion can also be a factor to consider in granting the motion. The position of the original plaintiffs in supporting intervenor's position is "entitled to some weight in the Rule 24 equation." *Daggett*, 172 F.3d at 114 (Lynch, J. concurring).

In sum, FWW's presence in the case would offer a significant contribution to the development of the arguments already brought forth and would offer a unique perspective on the environmental issues in this case, thus supporting intervention.

---

[10] FWW has previously been involved in actions brought under the MSA and NEPA. *See Gulf Restoration Network, Inc. v. NMFS*, 2010 WL 3184327 (D.D.C. Aug. 12, 2010) (challenge to offshore marine aquaculture under MSA and NEPA); *Coastal Conservation Assoc. v. Locke*, 2010 WL 1439071 (M.D. Fla., Apr. 12, 2010) (filed amicus brief challenging Gulf Fishery Management Plan under MSA and NEPA); *Food & Water Watch, Inc. v. U.S. Army Corps of Eng'rs*, 570 F. Supp. 2d 177 (D. Mass. 2008) (NEPA claim challenging permit for fish containment structure); *Ranchers Cattlemen Action Legal Fund v. USDA*, 566 F. Supp. 2d 995 (D.S.D. 2008) (NEPA claim).

## III. PERMISSIVE INTERVENTION

In the alternative, FWW requests permissive intervention under F.R.C.P. 24(b).  A court may allow permissive intervention, provided that the applicant files a timely application and the applicant "has a claim or defense that shares with the main action a common question of law or fact."  F.R.C.P. 24(b)(1).  In exercising its discretion, a court must consider whether the permissive intervention will unduly delay or prejudice the adjudication of the original parties' rights.  *Id*. 24(b)(3).

FWW's motion is timely for the reasons outlined above. *See* pp. 6-9.  As previously noted, this Court entered an order granting CLF permissive intervenor status on September 7, 2010, and no substantive litigation has occurred since that time.  Further, FWW's claims are directly related to the main action factually and legally.  FWW's challenge to Amendment 16 will be based on a common set of facts with the main action, as FWW will rely on the same administrative record.  The claims are also legally-related; like the existing Plaintiffs, FWW brings claims under the MSA and NEPA.

Moreover, adding FWW as a party would not cause any undue delay or prejudice to the existing parties.  FWW is fully prepared to conform to the deadlines set in the scheduling conference, as noted previously.  *See* p. 8.  Finally, the participation of FWW may prove helpful by providing the court with full briefing on the referendum issue, as argued above.  *See* pp. 15-17; *Daggett*, 172 F.3d at 113 ("The fact that the applicants may be helpful in fully developing the case is a reasonable consideration in deciding on permissive intervention.")

For these reasons, should the Court determine that FWW is not entitled to intervene in this action as a matter of right, FWW respectfully requests that the Court exercise its discretion and allow FWW to permissively intervene.

## IV. CONCLUSION

FWW is the only entity that represents the interests of New England fishermen with regard to their right to participate in a referendum, and is the only entity representing the interests of consumers and the public with regard to their interests in sustainable seafood. The resolution of this case will determine the continued implementation of Amendment 16 and affect those interests. For these reasons, and because FWW's motion meets all the requirements for intervention-as-of-right, FWW's motion to intervene as plaintiff as of right in this action should be granted.

In the alternative, FWW should be granted permissive intervention as plaintiffs in this proceeding.

DATED this 8th day of October, 2010.

 /s/ Arthur P. Kreiger
ARTHUR P. KREIGER, Esq.
BBO No. 279870
ANDERSON & KREIGER LLP
One Canal Park, Suite 200
Cambridge, MA 02141
Tel: 617-621-6540
akreiger@andersonkreiger.com

**CERTIFICATE OF SERVICE**

I hereby certify that these documents filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on October 8, 2010.

 /s/ Arthur P. Kreiger
ARTHUR P. KREIGER, Esq.
BBO No. 279870
ANDERSON & KREIGER LLP
One Canal Park, Suite 200
Cambridge, MA 02141
Tel: 617-621-6540
akreiger@andersonkreiger.com