**UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| The City of New Bedford, Massachusetts, et al.,<br><br>*Plaintiffs*,<br><br>v.<br><br>The Honorable Gary W. Locke, et al.,<br><br>*Defendants*,<br><br>&<br><br>Conservation Law Foundation, Inc.,<br><br>*Intervenor-Defendant*. | **CIVIL ACTION<br>NO. 1:10-cv-10789-RWZ** |

**COMPLAINT BY APPLICANT-INTERVENOR FOOD & WATER WATCH, INC. FOR DECLARATORY AND INJUNCTIVE RELIEF**

**I. SUMMARY OF THE CASE**

1. This is an action by proposed plaintiff-intervenor Food & Water Watch, Inc. ("FWW") against federal defendants the National Marine Fisheries Service ("NMFS"), Gary Locke, in his official capacity as Secretary of Commerce, the National Oceanic and Atmospheric Administration ("NOAA"), and Jane Lubchenco, in her official capacity as Administrator of NOAA (collectively "Defendants"). FWW brings this action to challenge Defendants' failure to comply with procedural requirements in implementing Amendment 16 to the Northeast Multispecies Fishery Management Plan ("Amendment 16" or "the Amendment").

2. FWW seeks a declaratory judgment that Defendants violated the Magnuson-Stevens Fishery Conservation and Management Act ("MSA"), 16 U.S.C. §§ 1801 et seq., and the

National Environmental Policy Act ("NEPA"), 42 U.S.C §§ 4321-4370f, in designing, approving, and implementing Amendment 16. FWW also seeks injunctive relief to enjoin the management program established under Amendment 16 until Defendants have fully complied with their legal duties in conducting a referendum, and adequately analyzing the socio-economic and environmental impacts of the Amendment.

## II. JURISDICTION

3. This Court has jurisdiction under 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 2201 (declaratory relief) and 5 U.S.C. § 702 (judicial review of agency action under the APA).

4. This Court also has jurisdiction under the MSA, 16 U.S.C. § 1861(d), which provides that "[t]he district court of the United States shall have exclusive jurisdiction over any case or controversy arising under [the MSA]."

## III. VENUE

5. Venue is appropriate in the District of Massachusetts under 28 U.S.C. § 1391(e)(2) because the claim is brought against agencies of the United States and "a substantial part of the events or omissions giving rise to the claim" occurred in Massachusetts.

6. The fishery at issue, the Northeast Multispecies Fishery, is primarily located in New England waters and is managed by the New England Fishery Management Council, headquartered in Massachusetts.

## IV. PARTIES

### PLAINTIFFS AND STANDING

7. Plaintiff-Intervenor FWW is a national, non-profit, public-interest consumer advocacy organization with over 3,200 members in New England, New York, and New Jersey. FWW members include conservationists, consumers, and commercial and recreational

fishermen and fisherwomen (collectively "fishermen"). The FWW Fish Program promotes safe and sustainable seafood for consumers, while helping to protect the environment and supporting the long-term well-being of coastal and fishing communities. FWW is incorporated in Washington, D.C. and its registered address is in Washington, D.C.

8. FWW has actively participated in monitoring and commenting on the development of Amendment 16. FWW submitted written comments on Amendment 16 on January 20, 2009. FWW attended a Fisheries Leadership & Sustainability Forum in October 2009 at the start of a two-day workshop on catch shares organized by the New England Fishery Management Council. FWW has provided updates to the media regarding the development of Amendment 16 and has been a public opponent of the catch share system implemented by Amendment 16.

9. FWW members are and will continue to be aggrieved and adversely affected by the Defendants' failure to satisfy the requirements mandated by the MSA and NEPA.

10. The MSA mandates that in New England individual fishing quota ("IFQ") systems must be submitted to referendum and approved by a two-thirds majority of those voting.

11. Amendment 16 implements the functional equivalent of an IFQ system.

12. Defendants did not submit the program to referendum prior to its adoption.

13. As a result, FWW fishermen members were harmed because they were denied their rights under the MSA to vote and organize others to vote in opposition to a system that harms their interests.

14. A court order compelling Defendants to submit Amendment 16 to a referendum would redress FWW fishermen members' harm by allowing them to have their voice heard in opposition to a system that damages their social, environmental, and economic interests.

15. FWW members are also injured by the Defendants' violation of the MSA in failing to adequately analyze the socioeconomic impacts of Amendment 16. The Amendment disproportionately favors industrial-scale fishermen at the expense of smaller-scale fishermen, some of whom have already been financially necessitated to sell their fishing permits due to the inequitable distributive result of the Amendment.

16. A court order compelling the agency to analyze and consider the proper factors, as identified by the MSA, would redress this grievance by granting the members of FWW the procedural safeguard to their interests that is established in the MSA.

17. FWW members are injured by the Defendants' violation of NEPA and the APA in failing to take a "hard look" at the direct and indirect environmental impacts of Amendment 16.

18. The program is openly designed to promote consolidation of the fishery.

19. The result of consolidation is that the industrial-scale fishermen obtain a substantially increased amount of the fishing rights while smaller-scale fishermen are pushed out.

20. The system implemented under Amendment 16 tends to reward and promote the use of more environmentally-damaging fishing vessels.

21. Consolidation of the fishery can lead to lower quality fish for market because the fish may be crushed by mechanical sorting and by being pulled up in large nets with thousands of other fish. The fish are then processed *en masse*—sometimes shipped across the world to places with lower food safety standards for filleting and packaging, and then shipped back to the United States for sale.

22. The resultant lower quality of seafood harms FWW's members and is directly in opposition to FWW's mission to ensure safe food for consumers.

23. A court order enjoining further implementation of Amendment 16 pending compliance with NEPA will redress the injuries of FWW's members by informing their members of the direct and indirect impacts of Amendment 16 on the marine environment from the reasonably foreseeable use of environmentally harmful fishing gear.

## DEFENDANTS

24. Defendant Gary Locke is sued in his official capacity as Secretary of the United States Department of Commerce. The Secretary is responsible for the administration, operations, and activities of the federal agencies charged with managing the United States' marine fisheries.

25. Defendant NOAA is the agency within the United States Department of Commerce to which the Secretary of Commerce has delegated authority and stewardship duties over fisheries management under the MSA.

26. Defendant Jane Lubchenco is the Administrator of NOAA and is responsible for carrying out duties established by the MSA concerning approval and implementation of fishery management plans.

27. Defendant NMFS is the agency within the United States Department of Commerce's NOAA to which NOAA has delegated authority and stewardship duties of fisheries management under the MSA.

## V. STATUTORY AND REGULATORY BACKGROUND

### A. The Magnuson-Stevens Fishery Conservation and Management Act

28. The MSA, enacted in 1976, 16 U.S.C.S. §§ 1801- 1891d (2009), and most recently amended in 2007 by the Magnuson-Stevens Fishery Conservation and Management Reauthorization Act of 2006, 109 P.L. 479, 120 Stat. 3575 (2007), has a mission of "provid[ing] for the conservation and management of fisheries."

29. The MSA designates eight regional councils ("councils" or "council") to advise on fisheries management for United States fisheries, 16 U.S.C. § 1852, one of which is the New England Fishery Management Council, which manages the Northeast Multispecies Groundfish Fishery. 16 U.S.C. § 1852(a)(1)(A).

30. Under the MSA, the councils prepare Fishery Management Plans ("FMPs"). *Id.* § 1852(h)(1). After developing a fishery management or plan amendment, the council submits the FMP to the Secretary of Commerce for approval. The contents of the FMP are governed by the MSA, *id.* § 1853, and "shall contain the conservation and management measures . . . which are consistent with the national standards, the other provisions of this Act . . . and any other applicable law." *Id.* § 1853(a)(1)(C). If the Secretary determines that the FMP is consistent with the applicable law, the Secretary approves the FMP. Otherwise, the Secretary must disapprove the FMP in whole or in part. *Id.* §1854(a).

31. In 2007, Congress amended the MSA to lay out a new set of procedures and criteria for councils to adopt Limited Access Privilege Programs ("LAPPs"), including IFQ programs. *Id.* § 1853a. IFQ means a federal permit under a limited access system to harvest a quantity of fish, expressed by a unit or units representing a percentage of the

total allowable catch of a fishery that may be received or held for exclusive use by a person." 16 U.S.C. § 1802(23).

32. LAPPs, including IFQs, were and still are controversial.

33. The new standards were codified after a six-year moratorium on the measures creating LAPPs to allow time for the National Academy of Sciences to conduct a comprehensive final report on IFQs. *See* 104 P.L. 297; 110 Stat. 3559.

34. The measures that were adopted as a result of the National Academy of Sciences study attempted to provide a policy framework that incorporates fairness and equity considerations into the law. These include the requirement to include robust analyses of the impacts of LAPPs, like IFQs, on fishermen and fishing communities.

35. The new provisions of the MSA attempted to limit the controversy associated with LAPPs by requiring that certain areas establish IFQ programs through referenda. The New England Fishery Management Council, in particular, is not allowed to approve or implement an FMP or amendment to an FMP establishing an IFQ program unless that system has been approved by more than two-thirds of those voting in a referendum. 16 U.S.C. § 1853a(c)(6)(D)(i). For a referendum in the New England region, voting eligibility is statutorily restricted to "eligible permit holders" and crew members who "derive a significant percentage of their total income from the fishery," as determined by the Secretary. *Id*. § 1853(c)(6)(D)(v).

36. The MSA also requires that FMPs contain a fishery impact statement "which shall assess, specify, and analyze the likely effects, if any, including the cumulative conservation, economic, and social impacts, of the conservation and management measures on, and

Case 1:10-cv-10789-RWZ   Document 38-1   Filed 10/08/10   Page 8 of 15

possible mitigation measures for-- (A) participants in the fisheries and fishing communities affected by the plan or amendment." 16 U.S.C. § 1853(a)(9).

37. The commitment to ensuring minimal impact on fishing communities was reflected in the MSA through the ten national standards that an FMP (or plan amendment) must conform to under the MSA. For example, National Standard 8 requires that all conservation and management measures "take into account the importance of fishery resources to fishing communities by utilizing economic and social data... in order to provide for the sustained participation of such communities, and to the extent practicable, minimize adverse economic impacts on such communities." 16 U.S.C.S. § 1851(a)(8).

38. Likewise, when designing an FMP aimed at establishing a limited access system in order to achieve an optimum yield, a council and the Secretary must take into account the following factors:

   (A) present participation in the fishery;

   (B) historical fishing practices in, and dependence on, the fishery;

   (C) the economics of the fishery;

   (D) the capability of fishing vessels used in the fishery to engage in other fisheries;

   (E) the cultural and social framework relevant to the fishery and any affected fishing communities;

   (F) the fair and equitable distribution of access privileges in the fishery; and

   (G) any other relevant considerations;

16 U.S.C. § 1853(b)(6).

8

## B. The National Environmental Policy Act

39. NEPA, as amended, declares at Section 101(a), 42 U.S.C. § 4331(a), that "it is the continuing policy of the Federal Government, in cooperation with State and local governments, and other concerned public and private organizations, to use all practical means and measures . . . to create and maintain conditions under which man and nature can exist in productive harmony[.]"

40. To achieve this goal, Congress directed federal agencies to produce a detailed environmental impact statement ("EIS") disclosing the environmental impact of "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C)(i).

41. Regulations promulgated by the Council for Environmental Quality ("CEQ") tell federal agencies "what they must do to comply with the procedures and achieve the goals of [NEPA]." 40 C.F.R. § 1500.1(a). CEQ's regulations are "binding on all federal agencies." 40 C.F.R. § 1500.3.

42. Federal agencies conducting an EIS must, at minimum, analyze the direct and indirect environmental consequences of their actions to ensure that federal agencies fully consider potential environmental consequences before making decisions. 40 C.F.R. § 1508.16.

43. Direct effects are effects that are "caused by the action and occur at the same time and place." 40 C.F.R. § 1508.8(a).

44. Indirect effects are those "caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." 40 C.F.R. § 1508.8(b).

45. Agencies must consider the action in "several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality." 40 C.F.R. § 1508.27(a).

### C. Amendment 16

46. On April 9, 2010, NMFS published Amendment 16 to the Northeast Multispecies (Groundfish) Fishery Management Plan in the Federal Register. 75 Fed. Reg. 18,262, codified at 50 C.F.R. § 648.87. (The Amendment and all of its related implementing regulations will be referred to collectively as "Amendment 16" or "the Amendment.")

47. Amendment 16 institutes major changes to the fishing permitting system in the Northeast groundfish fishery ("the fishery").

48. Amendment 16 introduces a brand new management regime for the fishery, which it titles a "catch share" system.

49. Under the catch share system, for the first time, each fisherman is assigned a quota, based on his or her historical catch levels during the relevant selected years. The quota, labeled a Potential Sector Contribution ("PSC"), is a percentage of the total amount of fish allowed to be caught for the year, known as the Total Allowable Catch ("TAC") or Annual Catch Limit ("ACL"), for each regulated groundfish species. 50 C.F.R. § 648.87(b)(1)(i)(E) (2010).

50. The quota represents the entire amount a fisherman may catch of these fish, unless he buys or leases more quota from another fisherman. The quota attaches to each individual fishing permit indefinitely. 75 Fed. Reg. 18,262, at 18,276; *see* 50 C.F.R. § 648.87(b)(1)(iv).

51. A fisherman's quota only becomes active—binding him to his assigned quota level and allowing him to sell it—when that fisherman joins with two or more other fishermen to form a "sector." Permit owners in a sector are able to acquire more quota by purchasing other vessels' fishing permits and the quota attached to it. 75 Fed. Reg. 18,262, 18,308.

52. Under Amendment 16, the prior existing management system is still ostensibly in place. This management system permits fishermen to fish within the "common pool," subject to days and gear restrictions. The "common pool" represents the TAC of a fishery, and when the TAC has been met, fishing is prohibited across the board for that species.

53. While fishermen ostensibly can continue fishing in the common pool, 50 C.F.R. § 648.87(a)(3), under Amendment 16, only fishermen in sectors can access their quota and purchase more.

54. After 2012, all fishermen who choose to stay in the common pool face fishing closures if they come close to fishing the total amount that they are allowed to fish as a group.

55. Even smaller fishermen who have limited their fishing are faced with fishing closures if they come close to fishing the total amount they are allowed to fish as a group.

56. Fishermen who fish the hardest and the fastest have strong incentive to join sectors to access and purchase more quota , while smaller fishermen are pushed out of the fishery completely.

57. Each sector must catch no more than their aggregate quota for each year, also known as their Annual Catch Entitlement ("ACE"). 75 Fed. Red. 18262, 18267.

58. Amendment 16 allows vessels to "stack" permits. Stacking permits allows one boat to own many permits and have the right to fish the allocations associated with them.

59. The management system implemented by Amendment 16, as outlined above, is the functional equivalent of an IFQ program because it gives individual fisherman the exclusive right to fish a portion of the TAC.

60. Defendants did not submit Amendment 16 to a referendum prior to its final approval.

## VI. ENVIRONMENTAL IMPACTS OF AMENDMENT 16

61. Amendment 16 is a major federal action that requires an EIS.

62. NMFS prepared an EIS on Amendment 16.

63. Depending on design, IFQ management measures such as Amendment 16 can encourage consolidation and industrialization of the fishing industry by benefiting the largest-scale commercial fishermen at the expense of the small-scale commercial fishermen.

64. Fishermen receiving the largest initial allocations of quota represent those who have the ability to purchase more quota and benefit the most under this management system.

65. Smaller-scale fishermen who receive a low amount of quota do not have the capital to buy enough to maintain profitability, and may sell their quota to the large boats that can afford to buy more.

66. IFQ programs can therefore lead to an increase in the average size of boats.

67. Large boats are more likely than small boats to use environmentally-destructive fishing gear.

68. Amendment 16 allocates the most quota to large boats that use equipment that catches large amounts of fish quickly, but also damages the ocean floor and increases bycatch (unintentional catch), thus killing other wildlife in the process.

69. It is reasonably foreseeable that Amendment 16, as designed, will result in greater environmental damage to the ocean floor and wildlife.

70. NMFS' EIS failed to analyze the direct and reasonably foreseeable indirect impacts of Amendment 16's initial allocation of quota to fishermen using environmental harmful gear types.

## VII. CLAIMS FOR RELIEF

### COUNT I
### (violation of MSA Referendum requirement)

71. Plaintiffs repeat and incorporate by reference all preceding paragraphs.

72. Defendants violated 16 U.S.C. § 1853a(c)(6)(D) of the MSA and NMFS' implementing regulations, 50 C.F.R. § 600.1310, by approving Amendment 16 without submitting it to a referendum and receiving the requisite two-thirds majority approval of the Amendment.

### COUNT II
### (violation of MSA socioeconomic analysis requirement)

73. Plaintiffs repeat and incorporate by reference all preceding paragraphs.

74. Defendants violated MSA provisions 16 U.S.C. §§ 1853(a)(9) & (b)(6) and NMFS' implementing regulations, 50 C.F.R. § 600.345, by failing to include a fishery impact statement adequately assessing, specifying, and analyzing the social and economic impacts of Amendment 16 on smaller-scale fishermen and fishing communities, specifically the likely future impacts of the Amendment's allocations of quota to different types of fishermen using different types of fishing gear.

### COUNT III
### (violation of NEPA's environmental analysis requirement)

75. Plaintiffs repeat and incorporate by reference all preceding paragraphs.

76. Defendants violated NEPA provision 42 U.S.C. § 4332(2)(C)(i) and CEQ's implementing regulations, 40 C.F.R. §§ 1500.1, 1508.16, 1508.8, by failing to adequately analyze the Amendment's direct and reasonably foreseeable indirect environmental

impacts resulting from the initial allocations of quota, which will likely lead to consolidation of the fishery and an increase in the size of boats that use more environmentally-damaging fishing gear.

77. Defendants' failure to take a hard look at the direct and reasonably foreseeable indirect impacts of Amendment 16's initial allocation of quota was arbitrary and capricious, an abuse of discretion, and not in accordance with law.  5 U.S.C. § 706(2)(A).

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff-intervenor respectfully requests that this Court:

(1) Declare that Defendants violated the MSA and NMFS' implementing regulations by failing to submit Amendment 16 to a referendum and by failing to adequately analyze the socioeconomic impacts of Amendment 16.

(2) Declare that Defendants have violated NEPA and CEQ's implementing regulations by failing to adequately analyze the environmental impacts of Amendment 16.

(3) Vacate Amendment 16 and enjoin its implementation until Defendants submit Amendment 16 to a referendum and amend the socioeconomic analysis to consider the effects of quota allocations on different fishermen using different gear types in accordance with the MSA and NMFS' regulations.

(4) Vacate Amendment 16 and enjoin its implementation until Defendants comply with NEPA by amending the EIS to consider the direct and reasonably foreseeable indirect environmental effects of initial quota allocations on different gear types.

(5) Award plaintiff-intervenor all costs and expenses related to this action, including reasonable attorney fees, pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412(d); and

(6) Order any other remedy this Court finds proper.

DATED this 8th day of October, 2010.

                                          Respectfully Submitted,

                                          /s/ Arthur P. Kreiger
                                        ARTHUR P. KREIGER, Esq.
                                        BBO No. 279870
                                        ANDERSON & KREIGER LLP
                                        One Canal Park, Suite 200
                                        Cambridge, MA 02141
                                        Tel: 617-621-6540
                                        akreiger@andersonkreiger.com