**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| THE CITY OF NEW BEDFORD, *et al*.,<br>Plaintiffs,<br>v.<br>GARY LOCKE, *et al*.,<br>Defendants. | )<br>)<br>)<br>)<br>)<br>) |
| | ) |
| JAMES LOVGREN, *et al.,*<br>Plaintiffs,<br>v.<br>GARY LOCKE, *et al.,*<br>Defendants. | )<br>)<br>)<br>)<br>) |

Case No. 1:10-CV-10789-RWZ

## MEMORANDUM OF THE CITIES OF NEW BEDFORD AND GLOUCESTER AND OTHERS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

Now come the Plaintiffs, The City of New Bedford, City of Gloucester and others,[1] and challenge regulations promulgated by the Secretary of Commerce referred to as Amendment 16, AR 56485, 75 Fed. Reg. 12862 (April 9, 2010) and Framework 44 AR 56715, 75 Fed Reg. 18356 (April 9, 2010) to the Northeast Multispecies Fishery Management Plan (NMFMP). Plaintiffs seek to set aside so much of the plan as violates the Magnuson Stevens Fishery Conservation Management Act (FCMA) and other applicable statutes and for the Court to order the Secretary to bring the fishery management plan ("FMP") into compliance with statutory requirements. The nature and scope of relief shall reflect the multiple aspects of the Amendment and Framework found non-compliant, as set forth herein.

1.     FACTUAL AND REGULATORY BACKGROUND

---

[1]     New Hampshire Commercial Fishermen's Association, Paul Theriault, Chuck Weimer, David Aripotch, F/V Lydia & Maya, Inc., Tempest Fisheries, LTD, Grace Fishing, Inc., Richard Grachek, Roanoke Fish Co., Inc., Atlantic Coast Seafood, Inc., The American Alliance of Fishermen and Their Communities, John & Nicholas, Inc., Bergie's Seafood, Inc., Nordic, Inc., Lyman Fisheries, Inc., The Hope II, Inc., Reidar's Manufacturing, Inc., Diamond Dog Fishing Corp., Atlantic Enterprises, LLC, Wanchese Fish Company, Easter Joy, Inc., New Bedford Fish Lumpers Pension Plan, Local 1749, ILA and AFL-CIO, New Bedford Fish Lumpers Pension Plan.

This action centers on regulations governing the Northeast Multispecies,[2] or groundfish fishery. This fishery was the first industry in New England, bringing settlers from Europe, and it represents an important part of the heritage and culture of the region.[3] The fishery has been characterized as a small business fishery, with vessels owned by individuals or families. Fishing here has been a multigenerational occupation. AR 901, 052783-4. Based on seasonal cyclical variations in fishery resources and the vagaries of New England weather, many fishermen participate in diverse fisheries, with a small percentage of fishermen limiting themselves to a single fishery, such as groundfish. The fleet includes larger, offshore vessels, ("trip boats") and smaller, inshore boats, which land their catch on a daily basis ("day boats"). The primary gear types are trawl gear, gillnet and hook gear. Amendment 16 and Framework 44 reduce participation in the fishery by as much as 60%.

The FCMA created the Exclusive Economic Zone, closing fisheries off the United States to foreign fleets and setting policy to foster healthy commercial and recreational fisheries, governed by a set of National Standards. 16 USC §1851. The statute also created eight regional Fishery Management Councils to present recommendations to the Secretary of Commerce for regulation of fishery resources. As government-sponsored investment in U.S. fisheries increased in the 1980's stocks became overfished, requiring regulation to protect and rebuild fisheries to ensure maximum benefit to the Nation, called Maximum Sustainable Yield (MSY), or Optimum Yield (OY). 1996 Sustainable Fisheries Act (SFA) amendments, *inter alia*, required overfished fisheries to be rebuilt in most instances within ten years. The Magnuson Reauthorization Act of 2006 (MRA) imposed new requirements that all FMPs include new deadlines for stopping

---

[2]       The Northeast Multsipecies fishery refers to twenty stock, including cod, haddock, flounders, redfish, Pollack, hale, pout, halibut and wolfish.

[3]       A comprehensive historical view of the fishery is documented in <u>Cod</u> by Mark Kurlansky.

overfishing and setting Annual Catch Limits (ACLs) and Accountability Measures (AMs) to ensure that fisheries do not exceed scientifically set limits.  The MRA also set forth requirements for establishing Limited Access Privilege Programs (LAPPs) where the right to harvest quantities of fish are allocated to individuals or entities.

The New England Fishery Management Council (NEFMC) has primary responsibility for making management recommendations on the NMFMP.  The Secretary of Commerce (the Agency) may approve or disapprove measures proposed by the Fishery Management Councils, and may take action should Councils fail to act.  Major developments since the NMFMP was adopted include[4] Amendment 5, implemented in 1994, which imposed  a limited access permitting system and limiting fishing effort based on the number of Days at Sea (DAS)[5] a vessel could fish, vessel and permit upgrade restrictions (baselines), gear restrictions, net mesh size increases, monitoring requirements, logbooks, closed areas, etc.  Vessels were either issued individual DAS based on historical effort or 176 fleet DAS.  In 2007, Amendment 7 significantly accelerated DAS reductions (by 50%), imposed new restrictions on smaller vessels, increased closed areas, and revised gear requirements.  These measures resulted in significant rebuilding, see Attachment A, an NEFMC chart showing rebuilding progress.  In 2003, following litigation in the United States District Court of the District of Columbia, interim measures were imposed to implement provisions of the SFA, later incorporated into and supplanted by Amendment 13.  Amendment 13 DAS reductions, reduced fleet DAS to 46 DAS, but allowed vessels to lease DAS to one another, in effect allowing limited consolidation.  Amendment 13 also closed

---

[4]        The NMFMP has had many other Amendments and Framework modifications, all detailed in the FEIS, summarized in AR 773at pages  047761-047762 and detailed at pages 047809-047816.
[5] DAS management was plagued by one major flaw-since some fisheries had strict trip limits, fishermen were often required to either remain at sea for days so their DAS used correspond to the amount of fish they had caught, or  to discard fish to remain within their daily limits.

additional areas and placed more restrictions on the fishery to achieve rebuilding on all groundfish stocks within the time constraints of the SFA.

Amendment 13 created a new concept called Sectors, whereby one group of fishermen, the Cape Cod Commercial Hook Fishermen's Association (CCCHFA) received an allocation of the fleetwide Total Allowable Catch (TAC) of George's Bank cod based on its participating members' historical catch.  This allowed the sector members to adjust their harvesting practices (avoiding such issues as trip limits) to best suit their own fishery.  The allocation was justified, in part, by its members' use of hooks, argued to be a more ecologically friendly method of harvesting cod fish than trawl or gillnet.

Subsequent Amendments have been designed to primarily accelerate the rate of rebuilding to meet the arbitrary 10 year rebuilding requirements of SFA and adjust measures to reflect developing science.  As the FMP has developed, a number of "data poor" stocks have been declared overfished and in need of rebuilding, often requiring significant fishery-wide measures, see Framework 44.  Measures imposed to rebuild individual stocks ("choke stocks") within the multispecies complex have prevented the fleet from achieving anything approaching MSY or OY on healthy stocks.  Plaintiffs contend that the Agency misconstrues the Act and ignores Congressional intent by prioritizing the rebuilding of individual stocks in the Multispecies complex over achieving MSY or OY from the entire complex on a continuing basis.  Since implementation of Amendment 13 in 2004 the fleet has been unable to harvest as much as 60% of the groundfish TACs, AR 1001 at 056728, 75 Fed. Reg. 18368, resulting in annual lost harvests worth hundreds of millions of dollars, and many times that to the local economy.  This underfishing has resulted in lost jobs and infrastructure, declines in fishing

communities and loss of a healthy protein source for consumers.  Amendment 16 accelerates this trend.

The Amendment 16 process began in 2006 to adjust Amendment 13 measures and added measures to implement ACLs and AMs required by the MRA of 2006.  The MRA imposed compliance deadlines dependent on the status of fisheries.  The NEFMC-conducted scoping hearings produced some options to replace the DAS system and avoid proposed draconian DAS reductions, additional closures and other restrictions deemed necessary to stop overfishing and rebuild fisheries.  These included Sectors and an industry preferred alternative, Point System, which allocated resource points to vessels which were then charged based on the relative health of stocks they landed, area management and others.  A major concern was that MRA-mandated ACLs and AMs would turn the fishery into a derby, with all vessels rushing to catch as much as they could before fleetwide ACLs were reached or "choke stocks" prematurely halted fishing on healthier stocks.  The only alternative that appears to have been analyzed and even then not adequately, was expansion of the Sector concept.  The Agency claimed it could not commit resources to analyze the Point System; the Sector system became the only seriously considered alternative to a system of hard TACs.  The result is a system that violates law and still fails to solve the problems of derby fishing and closures based on choke stocks, and penalizes non-participating vessels left in the common pool.

In the middle of the Amendment 16 process, NMFS announced a new "Draft Catch Share Policy," evidencing this Agency's intent to encourage fishery management councils to adopt allocation schemes, LAPPs, such as Individual Fishing Quotas (IFQs), Individual Transferable Quotas (ITQs) and sectors, NOAA also announced a high-level Catch Share Task Force to

promote the use of catch shares in US fisheries.[6]  Catch share (ITQ or IFQ) systems are strongly

advocated by Environmental Non-Governmental Organizations (ENGOs or NGOs); see

generally comments on Amendment 16 at AR 864, comments by Conservation Law Foundation

at 050474, Pew Charitable Trust at 050510-050512, Oceana at 050513, The Nature Conservancy

at 05030 and Ocean Conservancy at 05045.   But see Food & Water Watch comments at 050492-

050499 raising objections to individual quota systems and how they have failed worldwide. [7]

Systems which privatize resources are suspiciously viewed by fishermen in the Northeast, such

that Congress added a referendum requirement to approve quota systems in the region.  Sectors

are exempted but not defined), 16 USC § 1853a (c) 6)(D)(i).  The Agency's actions advance its

political agenda of implementing Catch Shares, violating FCMA and the MRA amendments with

almost deliberate disregard for the disastrous consequences for fishermen, fishing communities

and consumers.[8]

        The Sector system allows vessels to join into "voluntary" associations, to which the

Agency allocates a portion of the TAC based on the percentage of the total catch landed by each

vessel in the sector relative to the fleetwide catch, referred to as their Potential Sector

Contribution (PSC).  A sector's Annual Catch Entitlement (ACE) is the aggregate of its

members' PSC expressed as a percentage of all PSC applied to the fleetwide TAC (collectively

referred to as quotas).  Annual landings are calculated by applying the ACE percentage to the

ACL for the fleet.  Sector members are exempt from some limitations on the Common Pool,

primarily vessel trip limits.  Sector members are required to land all legal sized fish and reduce

---

[6] http://www.nmfs.noaa.gov/sfa/domes_fish/catchshare/docs/catch_share_task_force_member_062209.pdf

[7] Plaintiff's motion to supplement the Administrative Record with  the Agency's literature review prepared
by Julia Olson of the Northeast Fishing Science Center on these issues remains outstanding, see attached motion.
[8]         Plaintiffs' motions seeking discovery into the influence of NMFS catch share policy on the
Amendment 16 process remain outstanding.

wasteful regulatory discard.  Sectors must be established, at a cost of $50,000-$150,000, and require a permanent management structure, including a Sector manager.  The Sector assumes responsibility for monitoring - both dockside offloads (50% of offloads) and mandated observer coverage (20% of trips),[9] which costs are estimated to be between $17,000 and $35,000 per vessel, AR 1001 at 056728, 75 Fed. Reg. 18368.  Sector quota can be to traded, bartered or sold at the direction of the member whose history generated the quota.  Fishermen without sufficient quota had no opportunity to join a sector and were banished to the Common Pool.

In setting TACs and associated ACL for the 2010 fishing year, the NEFMC adopted measures in Framework 44, AR 882, which set landings limits well below that allowed (usually 75% of the permitted catch level).  In the case of some stocks, measures accelerated the rebuilding schedule to achieve rebuilding in less than the statutorily required time, reducing prospective landings not only on those stocks, but also on healthier ones.

Common Pool vessels continue under the old DAS and trip limit system, with additional closures, DAS reductions, trip limits, etc.  Even as Amendment 16 was being finalized, results of the Groundfish Assessment Review Meeting (GARM) were being finalized, and indicated that reduced TACs might be exceeded by the Common Pool.  The NEFMC added measures to Amendment 16 to allow the Agency's Regional Administrator to make in-season adjustments to the Common Pool.[10]  The changes to the common pool measures were so dramatic and created so much uncertainty due to the latitude given the Regional Administrator to adjust common pool measures that NMFS reopened the window of opportunity for vessels to opt into sectors.

---

[9]     NMFS has obtained funding for dockside monitoring and observers for the current fishing year, but once funding is stopped, these costs will fall on vessel owners.  In 2012, common pool vessels will also be responsible for these costs.)

[10]     Since referred to as either the "cesspool" or the "common grave."  Not surprisingly, within 3 months of implementation of Amendment 13, common pool measures became so restrictive as to effectively close that portion of the fishery, even though fewer than 40 of hundreds of common pool vessels, actually fished.

Fish were allocated to individual vessels based on their historical landings of each species from 1996 to 2006 for most commercial vessels; however the CCCHFA Hook Sector and recreational interests were given a shorter qualifying timeframe, which significantly and inequitably increased their relative allocations.  This increased the recreational allocation of Gulf of Maine cod, the primary fish for most commercial groundfish boats, from 25% to 37%, thereby significantly constraining commercial landings.   According to news reports, the CCCHFA is not fishing its allocation, but has now leased it out to certain trawler owners.

Plaintiffs have filed this action because Amendment 16 threatens the viability of the fishing industry and fishing communities.  By managing to the lowest stock component of the Multispecies fishery, and then further restricting TACs by setting ACLs at 75% of scientifically justified landings, landings are being arbitrarily restricted.  In response, fishermen holding 98% of the total quota have entered sectors, leaving the 40% of vessels in the common pool without opportunity.  Even those who sought sanctuary under the sector system face reduced quotas and unbearable costs, forcing unconstrained consolidation.  Businesses are being lost, jobs eliminated, fishing infrastructure lost, fishing undermined and consumers are being forced to substitute less healthy foods, or rely on imports from nations who are doing nothing to preserve marine resources.  All this, while Amendment 16 perpetuates chronic underfishing, with as much as 60% of even the restrictive TACs going unharvested.  Plaintiffs contend that this result is not only illogical; it violates the spirit and intent of the Magnuson Act.  The Agency's refusal to correctly interpret FCMA and its amendments appears driven by its intent to force all fisheries into "catch shares," regardless of the consequences and in violation of the law.

**SUMMARY OF THE ARGUMENT**

1.       **The Agency is improperly managing the multispecies fishery on a stock by stock basis in violation of the Magnuson Act.**
2.       **Amendment 16 improperly allocates fish to various users based on different criteria.**
3.       **Amendment 16 rules improperly charge vessels for assumed bycatch while failing to include bycatch in history used to establish quotas.**
4.       **The restrictive ACLs established under Amendment 16 violate the FCMA.**
5.       **Sectors Are LAPPs and the Agency violated MRA requirements by implementing Amendment 16 Sectors without complying with LAPP provisions.**
6.       **Amendment 16 sectors are ITQs and the Agency failed to conduct a Referendum in violation of the FCMA.**
7.       **The Agency has failed to assess the economic and social implications of Amendment 16 on the fishing industry and fishing communities.**
8.       **Defendants failed to adequately consider alternatives or assess the full environmental impact of Amendment 16 as required by NEPA.**
9.       **The Agency acknowledges but does not even attempt to justify the extraordinary costs associated with the Amendment 16 Sector Plan.**

**1.  The Agency is improperly managing the multispecies fishery on a stock by stock basis in violation of the Magnuson Act.**

The Agency requires that the landings of the Multispecies fishery be limited by the

rebuilding needs of the weakest stock despite plain language in the FCMA that requires

interrelated stocks to be managed as a unit, or a *fishery*, as defined under the Act.  The goal of

the Act is to obtain Optimum Yield from each *fishery*.  As noted in the various preambles to the

Magnusson Act, as Amended, the primary purpose of the Act is:

> "to provide for the preparation and implementation, in accordance with National Standards, of fishery management plans which will achieve and maintain, on a continuing basis, the optimum yield from each fishery."
> 16 USC Sec. 1801 (b)(3)

The Act defines the term fishery as:

> "(13) The term "fishery" means—

> (A) one or more stocks of fish which can be treated as a unit for purposes of conservation and management and which are identified on the basis of geographical, scientific, technical, recreational, and economic characteristics; and
>   (B) any fishing for such stocks."
> 16 USC Sec. 1801(b)(13)

The distinctions between *overfished* and *overfishing* in the FCMA illustrate the intent of

Congress as follows:

> "(34) The terms "overfishing" and "overfished" mean a rate or level of fishing mortality that jeopardizes the capacity of a fishery to produce the maximum sustainable yield on a continuing basis."
> 16 USC Sec. 1801 (b)(34)

The Magnuson Act specifies various standards which govern all fishery management

plans.  The first of these provides that:

> "(1) Conservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry."
> 16 USC Sec. 1851 (a)(3).

The term optimum yield is defined in the Act as:

> "(33) The term "optimum", with respect to the yield from a fishery, means the amount of fish which—
>   (A) will provide the greatest overall benefit to the Nation, particularly with respect to food production and recreational opportunities, and taking into account the protection of marine ecosystems;
>   (B) is prescribed on the basis of the maximum sustainable yield from the fishery, as reduced by any relevant social, economic, or ecological factor; and
>   (C) in the case of an overfished fishery, provides for rebuilding to a level consistent with producing the maximum sustainable yield in such fishery."

Also instructive is the requirement of National Standard Three that:

> "(3) To the extent practicable, an individual stock of fish shall be managed as a unit throughout its range, and interrelated stocks of fish shall be managed as a unit or in close coordination.
> 16 USC Sec. 1851 (a)(3)."

Nothing indicates Congress intended weaker stocks in a multispecies complex to be

separately managed or to preclude harvesting optimum yield from a fishery as a whole. The focus is on a *fishery* as a whole. NMFS recognized this in its 1998 Guidelines. Although achieving maximum sustainable yield (MSY) on each stock in a multispecies complex is desired, it is not required, and in reality virtually unattainable. A mixed stock rule or exception is a practical approach to balance the issues surrounding stocks at different stages within a multispecies complex. It prevents measures protecting one weak stock from overly restricting fishing and causing loss of optimum yield.

### A. <u>Section 304 does not indicate intent to elevate concerns of weaker stocks over the requirement to obtain optimum yield from a fishery on an ongoing basis.</u>

In past analyses, NMFS asserted that the language of Section 304 overrides National Standards, and requires immediate rebuilding of any one stock determined to be overfished. Review of Section 304(e), 16USCS1854 (set forth in part below) reveals that the trigger is an overfished *fishery*, not "an overfished stock" within a *fishery*. The Agency interpretation contained in its 1998 guidelines recognized that practically speaking weaker stocks could, as the ratios of interrelated stocks changed, result in temporary overfishing, or overfished status of a stock, without causing an overfished condition in the fishery which would trigger a rebuilding requirement. A reading of the section does not support NMFS' interpretation, as the Section only requires rebuilding of affected stocks once a *fishery* is determined to be overfished.[see note below explaining referenced language added to section for ease of reading][11]:

> (3) Within one year of an identification under paragraph (1*) ["**fisheries that are overfished or are approaching a condition of being overfished**"]* or notification under paragraphs (2*) ["**fishery is overfished**"]* or (7) *["**plan, amendment, or regulations have not resulted in adequate progress toward ending overfishing and rebuilding affected fish stocks**"],* the appropriate Council (or the Secretary, for fisheries under section 302(a)(3) 16 USCS Sec. 1853(a)(3) shall prepare a fishery management plan, plan

---

[11]     NOTE:*[Italicized bracketed bold language]* is quoted and inserted from referenced language in other subparts of Section 304 for the reader's ease.

amendment, or proposed regulations for the fishery to which the identification or notice applies

(A) to end overfishing in the fishery and to rebuild affected stocks of fish; or
(B) to prevent overfishing from occurring in the fishery whenever such fishery is identified as approaching an overfished condition.
(4) For a fishery that is overfished, any fishery management plan, amendment, or proposed regulations prepared pursuant to paragraph (3) or paragraph (5) for such fishery shall

(A) Specify a time period for ending overfishing and rebuilding the fishery that shall

(i) be as short as possible, taking into account the status and biology of any overfished stocks of fish, the needs of fishing communities, recommendations by international organizations in which the United States participates, and the interaction of the overfished stock of fish within the marine ecosystem; and
(ii) not exceed 10 years, except in cases where the biology of the stock of fish, other environmental conditions, or management measures under an international agreement in which the United States participates dictate otherwise;
16 USC Sec. 1854

The plain language refers to *fishery* status, not individual *stock* status.  This is consistent with the stated intent of the FCMA, which is to achieve Optimum Yield from fisheries and confer the greatest benefit to the Nation in terms of food.  To argue and assert that the FCMA prohibits fishing whenever any one stock appears to be weak holds entire fisheries hostage to a single individual stock.  "Affected stocks" must be rebuilt once a fishery has been determined to be overfished, 16 USC §1854 (e)(7).  This appears to require monitoring of those stocks in an overfished fishery that must be rebuilt - presumably to prevent the *fishery* from remaining in an overfished condition.  Nothing elevates the needs of a weaker and perhaps insignificant individual stock over the requirement to obtain Optimum Yield from the fishery as a whole.

**B.  <u>The Agency interpretation conflicts with statements of intent contained in the Congressional Record.</u>**

The Mixed Stock Exception is really an expression of the interrelated stock rule contained within the Magnuson Act, and the 1998 NMFS Guideline was appropriate and

accurately reflected the flexibility, and in fact, obligation, to balance the need to achieve

optimum yield from a mixed stock fishery, with the need to stop overfishing on and rebuild

weaker stocks.   There has been no statutory change which justifies NMFS's continued refusal to

impose a true mixed stock rule to achieve OY from healthy stocks despite slower rebuilding on

some components of a multispecies fishery.   Congressional intent as to the importance of

continuing to achieve OY from multispecies fisheries was clearly set forth in a statement in the

Congressional Record by Congressman Young of Alaska, before the House vote approving the

MRA.

> **I am also concerned that the provision requiring that harvest levels be set to prevent overfishing not be interpreted to shut down entire fisheries if one stock of a multi-species complex is experiencing overfishing. The purpose of the act is to provide a healthy fishery resource, but it is also to promote commercial and recreational fishing and support communities dependent on the fishery resources. The act should not be used as a tool for stopping all fishing activities in U.S. waters. The keys to achieving these goals are balance, flexibility, and common sense by the fishery managers. The provisions dealing with ending overfishing, rebuilding overfished fisheries, and setting harvest levels to prevent overfishing all need to be taken in the context of the National Standards and need to be viewed with an eye toward balance, flexibility, and common sense.**
> Excerpted from the Congressional Record, December 8, 2006, H9206-H9235
> Statement by Representative Young

Statements in the Congressional Record are relevant to aid in interpreting a statute.  *See*

John W. Atherton, Jr., Petitioner v. Federal Deposit Insurance Corporation, as Receiver for City

Savings, F. S. B., 519 US 213 (1997), citing statements on the Congressional Record for

interpretation of a statute.   Congressman Young's statements were made to the House prior to

enactment of MRA, without response or disagreement, and should be given considerable weight.

The language of the statute and the Congressional Record support the conclusion that Congress

is seeking the best result for the Nation, including its hard working fishermen and the many

Americans dependent on their catch for wholesome and healthy food products.

**C.** **The Agency's stated interpretation of the Act violates the absurd result doctrine and does not withstand judicial scrutiny.**

A general rule of statutory interpretation is that the interpretation by an agency charged with implementing an act is generally given great deference, but Courts will reverse an agency regulation based on an interpretation that is arbitrary, capricious, or manifestly contrary to the statute. <u>Chevron U. S. A. Inc. v. Natural Resources Defense Council, Inc.</u>, et al**.,** 467US 837 (1984). Courts abhor absurd results and will look to the plain language of a statute, and if necessary construe it to avoid an absurd result. <u>United States v. X-Citement Video, Inc.</u>, *513 U.S. 64, 68-71 (1994);* <u>United States v. Ron Pair Enters</u>*, 489 U.S. 235, 242 (1989);* <u>United States v. Brown</u>*, 333 U.S. 18, 27 (1948);* <u>Holy Trinity Church v. United States</u>, 143 U.S. 457, 459 (1892). In this case, the Agency has changed its interpretation of the Act without justification, from the reasonable to the absurd, and prevents the statute from achieving its stated goal of rebuilding *fisheries* and returning optimum yield to the nation on an ongoing basis. NMFS's deviation from the plain language of the statute causes an absurd result, and is thus arbitrary and capricious and manifestly contrary to the statute.

NMFS's interpretation already has proven that regulatory changes based on fluctuations in weaker stocks have a disastrous effect on the ability of the fishery to harvest optimum yield on healthy stocks. Under Amendment 16, choke stocks will continue to widen the gap between TACs and actual landings, resulting in losses for fishermen and their communities. Changing relative stock sizes within the Multispecies fishery will result in constant regulatory adjustments and closures based on stocks that may represent an insignificant portion of overall yield in a *fishery.* This type of constant upheaval in the fishery, with its negative impact on the fishing industry, fishing communities, infrastructure and consumers, makes it  virtually certain that the

Act can NEVER achieve its purpose of returning optimum yield from any mixed stock fishery - a truly absurd result.

In short, it is not only appropriate for fishery managers to manage based on a "Mixed Stock Rule," it is mandated by the Act if the fishery is ever to return optimum yield to the Nation on an ongoing basis.  While NMFS *desires* optimum yield from each stock, Congress does not *require* it.  Congress expressed its intent to rebuild and manage *fisheries,* not to manage on a stock by stock basis.  As such, this Court should order the Secretary to implement fishery-wide TACs and ACLs based on rebuilding of the entire Multispecies Fishery, not individual stocks.

**2. Amendment 16 improperly allocates fish to various users based on different criteria**

As noted above, Amendment 16 allocates the TAC among three groups, using different criteria.  The majority of commercial fishing vessels are allocated a percentage of the TAC based on their respective landings averaged from 1996-2006.  The CCCHFA Hook Sector and Fixed Gear Sectors received allocations based on their landings from 1996 to 2001 and the recreational sector received allocations based on 2001-2006, giving them each a higher average.  In the case of Gulf of Maine cod, the recreational sector quota increased from 25% to 37%, to a point where even factoring in the cuts in TAC envisioned by Amendment 16, the recreational sector would be allocated more than its projected catch.  AR 773 at 047769.  The Act provides specific guidance on allocation in National Standard Four:

> (4) Conservation and management measures shall not discriminate between residents of different States. If it becomes necessary to allocate or assign fishing privileges among various United States fishermen, such allocation shall be (A) fair and equitable to all such fishermen; (B) reasonably calculated to promote conservation; and (C) carried out in such manner that no particular individual, corporation, or other entity acquires an excessive share of such privileges.
> 16 USC 1851 (a)(4)

The Act also requires that "[a]ny fishery management plan which is prepared by any

Council, or by the Secretary, with respect to any fishery, shall…"

> (14) to the extent that rebuilding plans or other conservation and management measures which reduce the overall harvest in a fishery are necessary, allocate, taking into consideration the economic impact of the harvest restrictions or recovery benefits on the fishery participants in each sector, any harvest restrictions or recovery benefits fairly and equitably among the commercial, recreational, and charter fishing sectors in the fishery.
> 16 USC §1853(a)(14)

The Act also requires that:

> "(4) For a fishery that is overfished, any fishery management plan, amendment, or proposed regulations prepared pursuant to paragraph (3) or paragraph (5) for such fishery shall…
> (B) allocate both overfishing restrictions and recovery benefits fairly and equitably among sectors of the fishery…"
> 16 USC §1854 (a)(4)

The more favorable timeframe used for these two fleets appears to have been nothing

more than political.  Regulations that are "a product of pure political compromise" in the absence

of scientific justification will generally be viewed as arbitrary and capricious. Midwater Trawlers

Co-operative v. Dep't of Commerce, 282 F.3d 710, 720-21 (9th Cir. 2002).  Under Amendment

16, the Cape Cod Hook Sector was allowed to utilize its 1996-2001 landings history, which was

obviously higher (FEIS at AR 773, 047861), while the Recreational Sector was allocated Gulf of

Maine Cod and Gulf of Maine Haddock based on its proportionate landings in the 2001-2006

time frame, giving them 33.7% of Gulf of Maine cod and 27.5% of Gulf of Maine Haddock.

Using different time frames for different groups is particularly troublesome with regard to

the recreational sector.  During the 1996 to 2001 time frame, recreational vessels were under

significantly less restrictive measures than the commercial fleet, resulting in an increase in their

proportionate share.  They have not borne the same burden of conservation, yet get a

disproportionate benefit.  There is no consideration of the negative impact on the commercial

fishermen dependent upon Gulf of Maine cod and haddock that have now seen their allocations reduced proportionately by this allocation to the recreational fleet, AR 773, at 048439.

The CCCHFA Hook Sector allocation similarly raises equity issues.  This sector started in 2004 for the express purpose of targeting Georges Bank cod - perhaps the most overfished and slowest to rebuild stock in the Multispecies complex - based on the use of hooks.  The sector has not been able to harvest its entire ACE.  Yet through favorable allocation provisions, it was allowed to preserve its ACE for the purpose of leasing it to other sectors.  One stated, but unsubstantiated rationale for the differential treatment given the CCCHFA was that it had invested in the Sector and had some financial expectation that would be lost.  AR 773, at 048434. In contrast, nothing in Amendment 16 even remotely attempts to determine the extent of loss, no less compensate fishermen, for DAS permits that have been rendered valueless by insufficient quota and consequent banishment to the common pool.[12]

Under the "arbitrary and capricious" standard, the court must determine whether the agency examined the pertinent evidence, considered the relevant factors, and articulated a satisfactory explanation for its action, including a rational connection between the facts found and the choice made.  See Penobscot Air Services, Ltd. v. Federal Aviation Admin., 164 F.3d 713, 719 (1st Cir. 1999).  Despite this deferential standard, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'"  Motor Vehicle Mfrs. Ass'n, Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43, 103 S. Ct. 2856, 77 L. Ed. 2d 443 (1983) (quoting Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168, 83 S. Ct. 239, 245-

---

[12]     One Plaintiff purchased a larger vessel to allow him to access healthier stocks offshore.  Because he needed a larger vessel, he sold his permit to purchase a permit with a larger baseline.  Although the new permit had adequate DAS, it is now essentially valueless because it had insufficient landings during the timeframe upon which individual quotas were based.  There is no consideration of this inequitable result in the plan.

246, 9 L. Ed. 2d 207 (1962)).  Thus, the agency must "explain its result . . . and respond to

relevant and significant public comments."  Penobscot, 164 F.3d at 719, n.3.  Other than the fact

that preferential treatment for one group works to its economic benefit, there is no justification

for these differential time frames for establishing allocation baselines.  These differential

qualifying periods also appear to violate the NEFMC's Sector Baseline Policy.  AR 91, 009470.

     The EIS details the positive effect of the inequitable treatment given the  recreational

fishery, but does not discuss the adverse effect of reducing the commercial Gulf of Maine cod

catch from 75% to 65%.  This is a reduction of 13% for each commercial vessel, in addition to

quota cuts resulting from reduced TACs, AR 773 at 048439, accompanied by the increased costs

of sector participation.  David Goethel, an NEFMC member, was sufficiently concerned about

the lack of justification for the disparate treatment given these two user groups that he voted

against approving the Amendment and issued a dissenting opinion.  AR 621, pages 044992-

044994.  The controversial nature of this differential treatment was clearly known throughout the

process, as reflected in the internal approval documents issued by the Agency.  AR 970, Pages

056265-056269.  The Agency made no attempt to justify the differential treatment in the context

of the applicable statutory provisions, and a subsequently issued letter by the NOAA Assistant

Administrator for Fisheries, Eric Schwab does not provide any basis for the different qualifying

baselines.  AR 970, Pages 056265-6

     Allocating natural fishing resources is the most controversial action the Agency can take.

Despite clear statutory protections, the Agency failed to enforce the protections, leaving

important decisions to be governed by political prowess rather than law.  The disparate allocation

is wholly arbitrary and capricious and violates the letter of the law, Council Policy, and the

Congressional intent of FCMA and its amendments.

**3.   Amendment 16 rules improperly charge vessels for assumed bycatch while failing to include bycatch in history used to establish quotas.**

Amendment 16 commercial vessel allocations are based on each vessel's individual landings during the applicable time qualifying period.  While bycatch and discards are charged against a vessel under Amendment 13, they were not credited to a vessel's allocation, AR 773 at 047865.  A vessel that fishes exclusively for cod and has no landings of yellowtail flounder is now presumed to have a bycatch of yellowtail flounder.  Amendment 16 EIS, AR 773 at page 047865.  Unless that vessel is able to acquire quota from vessels that landed fish, they do not have sufficient quota to cover species they are not catching.  Amendment 16 fails to consider or address this problem by, for example, allocating a baseline amount of every species to keep fishermen from being shut down before they start based on a presumption that they will catch what they have not previously caught.  Presuming bycatch without similarly allocating quota based on the same assumption is arbitrary and capricious.

**4.   The Restrictive ACLs Established under Amendment 16 violate the FCMA.**

As noted above, the FCMA, sets MSY as its goal and in National Standard One requires that FMPs achieve OY.  While eliminating overfishing and rebuilding stocks are certainly central to the concept of sustainable fisheries, overly precautious approaches can have dire and irrevocable consequence for fishermen, fishing communities and consumers.  Under Amendment 16 and prior rules, limited TACs (ACLs) for overfished or rebuilding stocks severely limit access to healthy stocks, limiting effort to the point where short term losses become long term losses with no long term positive effect.  Illustrative of this are the economic projections under Amendment 13, set forth in the limited TACs (ACLs) compared to the actual landings, see Attachment B hereto, AR 3 at 000692 with actual landings added subsequent to the Amendment appearing in red.  The materials assembled to justify the Amendment 16 measures purport to

allow vessels to land higher percentages of abundant stocks while reducing catch of stocks that are still rebuilding. However nowhere does the EIS actually quantify this, and the Agency indicates landings are expected to decline, AR 05678, 75 Fed. Reg. 18368 (April 9, 2010). Given the difficulty landing any percentage of the TACs when vessels were allowed to discard bycatch down to trip limits, it is difficult to comprehend how even the most careful fisherman would be able to land the same quantity of target species he did in prior years, where TACs for choke stocks have been reduced, he will be charged for actual and assumed bycatch and discard, and he will suffer a virtual shut down once his quota for any of the multispecies stocks is caught. The result is chronic underfishing. AR 05678, 75 Fed. Reg. 18368 (April 9, 2010).

**5.  Amendment 16 sectors are ITQs and the Agency failed to conduct a Referendum in violation of the FCMA.**

The Agency advised the NEFMC that although sectors were catch shares, they were not LAPPs as defined by the MRA because sectors only receive allocation based on the permits held by their members and are not issued "permits." Kurkul Letter at AR 103, Page 010137. The argument requires reading the definition of an LAPP set forth at 16 USC § 1802 (26), but ignores the substantive language of the statute that

> Limited access privilege, quota share, or other limited access system authorized established, implemented, or managed under this Act-
> > (1) shall be considered a permit for the purposes of sections 307, 308 and 309.
> > 16 USC § 1853a(b)

Any allocation of quota is a LAPP, unless excluded. Notably, in the LAPP provisions, Congress specifically excluded sectors from the Northeast referendum requirement required for ITQs, indicating Congress clearly understood that sectors in the Northeast are LAPPs. By improperly failing to classify Amendment 16 sectors as LAPPs, the Agency improperly failed to include requirements for US ownership at 16 USC §1853 (c) (1)(d), allocation considerations at 16 USC

§1853(c)(5)(A) and prevention of excess consolidation and protection of community interests at 16 USC §1853(c)(5)(B).  These provisions set more stringent procedures than those set forth under other FCMA provisions.  Lawmakers and affected community leaders raised concern about the speed with which the Agency was pressing for implementation of Amendment 13's sector plan, Congressman Frank Letter, AR 319 at 018971 to 018977 and New Bedford Mayor Scott Lang Letter, AR 1010 at 056758-056766.  The Agency, having pre-ordained that catch shares be implemented, railroaded the measures through, ignoring statutory protections for both LAPPs and ITQs, cognizant that judicial review would occur too late to help many of the hundreds of businesses disenfranchised by the plan.

> **6.   Amendment 16 Sectors are ITQs and the Agency was failed to conduct a referendum in violation of the FCMA.**

As noted above, MRA added a referendum requirement for implementation of quota systems in the Northeast, but excluded sectors, without further definition, from the referendum requirement.  The initial Hook Gear and Fixed Gear Sectors constituted quotas and undoubtedly served as the basis for the exception.  This begs the question whether complete conversion of almost an entire system to an individual quota system presents the same issues as the small, experimental sector(s) formed under Amendment 13, which drew only a small amount of the TAC for the use of a small group of fishermen.  In contrast to the original sectors in place at the time the exception was included, Amendment 16 allocates 95% of all groundfish TACs to sectors, which in turn distribute them to the permit holders, in accordance with their individual contribution to the sector TAC, with many fishermen receiving little or no quota.  These are unquestionably ITQs.

> **7.   The Agency has failed to assess the economic and social implications of Amendment 16 on the fishing industry and fishing communities.**

The National Environmental Policy Act (NEPA) sets forth a number of requirements for agencies to fully examine a range of alternatives and to assess the impacts of proposed action on the human environment, including social and economic results.  42 USC §§ 4331(a), 4331(b), 4332(1), 4332(1)(C), and 4332(A).  The FCMA[13] requires similar evaluation to ensure compliance with the National Standards.  These standards require that:

> (7) Conservation and management measures shall, where practicable, minimize costs and avoid unnecessary duplication.
> (8) Conservation and management measures shall, consistent with the conservation requirements of this Act (including the prevention of overfishing and rebuilding of overfished stocks), take into account the importance of fishery resources to fishing communities by utilizing economic and social data that meet the requirements of paragraph (2), in order to (A) provide for the sustained participation of such communities, and (B) to the extent practicable, minimize adverse economic impacts on such communities.
> 16 USC § 1851

The Amendment 16 EIS at AR 773 details significant economic losses and concludes that "[t]he economic impacts of this action [on] communities are expected be severe and in some cases may threaten the existence of fishing businesses in some communities."  AR 773 at 47771. The overall impact is expected to reduce groundfish landings from $85M in 2007 and 2008 to some $63M.  At the same time, the Agency acknowledges that the potential harvest, if available TACs could be fully utilized, would be as high as $190M.  In effect, the "underharvest[14]" will be approximately $130M, or approximately 66% of the total TACs will remain uncaught.  AR 05678, 75 Fed. Reg. 18368 (April 9, 2010).  In its Social Sciences Branch decisional documents, the Agency asserts that it could not analyze economic impact because it could not determine how many vessels were going to enter sectors.  AR 754, Page 047512.  Prior to final publication of the Final Amendment 16 rule, the Agency was clearly aware that 55% of the permitted vessels

---

[13]     As does the Regulatory Flexibility Act.

[14]     Also called "chronic underfishing."

were entering sectors and taking approximately 98% of the commercial quota with them.  The

EIS estimates the high costs of creating sectors at between $60,000 and $150,000, with

monitoring costs estimated at $27,000 to $35,700 per vessel.  See the EIS, AR 773, Pages 04385-

04386 and EIS, AR 753, Page 048436.  The costs of at sea observers and dockside monitoring

were given as $17,000 to $27,000 annually per vessel.  Federal Register listing for the

Amendment 16 Proposed Rule, AR 874, Pages 050686.  These costs do not include the expenses

of maintaining a sector manager, office space, and other administrative costs required for annual

operation of the sector, including completion of all necessary reports, interaction with NMFS and

the like.  Nor does it include the time and expense of owners to report their expected departures

and landings to coordinate observer coverage and offloading, file weekly (as opposed to

monthly) trip reports, and so on.

It would have been a simple task for the Agency to look at the fleetwide landings,

determine how much they would decline and review the sector costs and determine whether

vessels in the fleet could withstand the costs. It is difficult to see how vessels barely paying their

bills can survive with the cuts in TACs envisioned under Amendment 16, never mind the

additional annual costs of sector operation and monitoring costs.  See Table 63 in the EIS, AR

773 at 048084, showing that Individual DAS Vessels, the primary class entering sectors with the

highest groundfish revenue, had average groundfish revenue of $117, 907.  Since TACs will be

reduced by Framework 44, landings will decline by additional amounts as "choke stocks"

prevent achievement of TACs, according to the Agency, by as much as one third.  Framework

44, Final Rule, AR 1001 at 05678, 75 Fed. Reg. 18368.  This will potentially reduce average

groundfish landings from $117,907 to $78,000, and impose monitoring costs of $17,000 to

$35,000 per vessel, in addition to sector operations costs.  By estimates based on the CCCHFA

sector, these appear to be around $10,000 per vessel per year.  Sector costs and monitoring costs

will increase to an even higher percentage of the value of the fishery.  The effect will be

disastrous for smaller businesses and their crews, and will have broad impact on shoreside

infrastructure and fishing communities.  The only option for marginal operations to survive is to

rapidly acquire more quota, causing smaller concerns to exit the fishery.  This will effect massive

consolidation to offset quota reductions and monitoring costs, a result fully anticipated by the

Agency.  AR 1001 at 056728, 75 Fed. Reg. 18368.  Consolidation and not "mitigation" was

apparently the real intended effect of the sector system, as the Amendment 13 SEIS (AR 3 at

000167) reveals the agency citing sectors as a method of encouraging capacity reduction through

consolidation.

　　　　While anti-fishing proponents are quick to encourage capacity reduction, this negatively

impacts communities, as less efficient harvesting employs more workers and renders

communities more economically stable.  As businesses consolidate, they tend to move to

centralized locations, rely more on mechanical efficiency, and maximize profits for a smaller

group of owners.  Whether this model is the intent of Congress in drafting the FCMA is highly

questionable, given National Standard 5 which requires that

> Conservation and management measures shall, where practicable, consider efficiency in
> the utilization of fishery resources; except that no such measure shall have economic
> allocation as its sole purpose.
> 16 USC § 1851 (5)

　　　　FCMA adds additional requirements for the development of voluntary capacity reduction

programs that involve a wider range of the public participation in consolidation decisions due to

the broader social implications than most fishery management measures.  18 USC § 1861a (B).

Plaintiffs contend that a non-voluntary capacity reduction program has even greater implications,

since the effect on communities is more severe as vessels are forced out without compensation.

The sector program further threatens communities as not only will the number of vessels and persons employed on them decline along with the infrastructure, but sectors themselves, with dockside monitoring requirements and observer demands will force vessels to relocate to centralized ports that have localized monitoring services.  The concerns of the smaller ports, as evidenced in the EIS are well substantiated.  While losses to vessels in the ports of Gloucester and New Bedford may be offset as vessels move to those ports, smaller ports along the Eastern seaboard will see their commercial fishing industries disappear permanently.

**8. Defendants failed to adequately consider alternatives or assess the full environmental impact of Amendment 16 as required by NEPA.**

Defendants failed to provide a detailed statement of alternatives to the proposed action as required by 42 U.S.C. Sec. 4332(1)(C)(iii).  The importance of analyzing the full range of alternatives is underscored by NEPA regulations at 40 CFR 1502.14, which state that the analysis of alternatives is "the heart of the environmental impact statement."   Agencies must also "…study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternatives uses of available resources."  42 USC Sec. 4332(2)(E).  Defendants failed to adequately consider other alternatives despite the fact that stakeholders offered reasonable alternatives to the expanded catch share and sector system.  One reasonable alternative offered but not adequately considered was the so called "Point System."   This alternative was developed by industry, and even a conservation group was enthusiastic about it.  AR 47.  Numerous comments and petitions from many different stakeholders throughout the decision making process supported this alternative. See, e.g., the FEIS at AR 773, 047821.  An independent economic analysis of this system concluded that it was reasonable, economically robust, and flexible enough to adapt to various changes in the fishery and to accommodate the management difficulty posed by the fact that

some stocks in the fishery were abundant and others were not.  See analysis supervised by
NEFSC scientist Eric Thurnberg at A.R. 421.

However, NOAA obstructed this alternative, as it was not the agency's preferred
alternative.  For example, [NOAA attorney] Mr. Martin said the point system proposed by the
Northeast Seafood Coalition might be considered an IFQ and thus require a referendum under
Magnuson.  AR 51 at 5737.  In response to a request by the NEFMC through John Pappalardo
for an answer as to whether or not the point system required a referendum, Regional
Administrator Patricia Kurkul wrote in a letter dated March 8, 2007 that this issue would be
studied and NEFMC would be notified of an answer.  AR 55, 005854-5.  The record does not
appear to contain this answer.

Despite the reasonableness and feasibility of the point system and its wide-spread support
across different constituencies, the push was on to approve only the agency-preferred catch
share/sector system.  The Point system alternative disappeared altogether from Amendment 16,
and was not analyzed in the EIS.  The reason asserted: "limited time and resources."  FEIS at AR
773 at 047822.  The record contradicts this excuse, as it demonstrates that enough time and
resources to show that this alternative was feasible and reasonable had already been spent.  "The
existence of a viable but unexamined alternative renders an environmental impact statement
inadequate."  Westlands Water District v. US Dept. of the Interior, 376 F3d 853, 868 (9th Cir.
2004), citing Morongo v. FAA, 161 F.3d 569, 575 (9th Cir. 1998), internal citations omitted.
Omitting the point system from the EIS arbitrarily evaded informed public comment and
decision-making.  Comparing the treatment and priority given to the catch share/sector system at
the highest levels to the treatment and priority given to this reasonable alternative leads to the
conclusion that the agency was not really interested in engaging in the "individualized

consideration and balancing of environmental factors – conducted fully and in good faith" that is

required by NEPA.  Calvert Cliffs v. U.S. AEC, 449 F.2d 1109, 1115 (DC Cir. 1971).

The EIS does nothing to analyze, and does not even recognize, the impact that restrictive

catch measures will have on the environment by limiting the fleet to landing less than one third

of the available groundfish.  For example, the Agency ignored:

> 1.      The loss of 130,000,000 pounds of high protein food for consumers, including the
> adverse health impacts and costs as consumers turn to less healthy protein sources, and
> the diminishing likelihood that they will reacquire a taste for fish if NMFS ever permits
> the fleet to land its full TACs.
> 2.      The need to increase land based protein production, primarily poultry, pork and
> beef, including potential loss of rain forests and accompanying run off from agricultural
> production into streams, rivers and oceans.
> 3.      The negative impact of increased domestic demand for foreign seafood, much of
> which is not harvested sustainably.

In approving Amendment 16 the Agency failed to fully assess the environmental impacts

on the human environment and in the process violated both NEPA and FCMA.

### 9.  The Agency acknowledges but does not even attempt to justify the extraordinary costs associated with the Amendment 16 sector plan.

The Regulatory Flexibility Act required the Defendant to publish for public comment an

Initial Regulatory Flexibility Analysis (IRFA) addressing the impacts of a proposed rule on small

entities.  5 USC Sec. 603(a).  The IRFA must contain, among other things, a description and

estimate of the number of small entities to which the proposed rule will apply (5 USC Sec.

603(b)(3)), a description of the projected reporting, recordkeeping and other compliance

requirements of the proposed rule (5 USC Sec. 603(b)(4)), and "a description of any significant

alternatives to the proposed rule which accomplish the stated objectives of applicable statutes

and which minimize any significant economic impact of the proposed rule on small entities."  5

USC Sec. 603(c).

The IRFA must also address alternatives "…such as- (1) the establishment of differing compliance or reporting requirements … that take into account the resources available to small entities, (2) the clarification, consolidation, or simplification of compliance … for … small entities, (3) the use of performance rather than design standards; and (4) an exemption from … the rule, or any part thereof, for such small entities."  5 USC Sec. 603(c)(1)-(4).

Both FCMA and the Paperwork Reduction Act also require the Agency to minimize the reporting burden placed on small businesses.  44 USC Sec. 3506(b).   To make sure this happens, NOAA's designated Chief Information Officer must evaluate, independently of a program's primary responsibility, that a proposed collection of information is (i) needed, (ii) functionally described, (iii) described in a plan for collection, (iv) accompanied by a specific, objectively supported estimate of the burden of collection, (v) tested through a pilot program, if appropriate, and (vi) accompanied by a plan for the efficient and effective management and use of the information to be collected.  44 USC Sec. 3506(c)(1)(A).

Amendment 16 places an enormous burden on vessels of up to $17,000 to $35,000 per year for monitoring costs, as well as annual costs of maintaining sectors in the face of predicted declines in landings.  At present many of these costs are being subsidized by the Agency, but it is unclear that the funding will continue, and once stopped, these costs fall on the vessels.  With dockside monitoring required for 50% of landings, small boats offloading in home ports must pay monitors to travel to the port and observe the offload, and then follow the trucked fish to a dealer.  At $60-70 per hour, offload monitoring costs will often approach or exceed a day boat's earnings forcing vessels to abandon day fishing or move to larger ports to reduce monitoring costs.  Handgear vessels, limited to 300 pounds, will cease to be viable.  Only those vessels that can increase volume, extend trips and land in major ports with monitors already present will be

able to survive, ending almost four centuries of small boat fishing from most of New England's ports.  The costs are clearly excessive and not justifiable.


**Conclusion**

The effect of recent regulations has been clear – the fishing fleet is being inalterably devastated by Amendment 16.  Many traditional fishermen are being forced out by the new sector allocation scheme.  Traditional fishing ports in the Northeast are losing not only their fishing industry and infrastructure, but the very fabric of their identity.  The slashing and burning of the fishing industry and gutting of coastal communities to achieve accelerated rebuilding will gut the FCMA of its very basis - sustainable fisheries for the benefit of the Nation and fishing communities.  Neither accelerated rebuilding of stocks, nor the Agency's catch share agenda justify this result, and the apparent disregard for the economic and social consequences of Amendment 16 violates the spirit and intent of the FCMA.

Wherefore, the Plaintiffs pray that this Honorable Court must find that Amendment 16 and Framework 44 violate the Fishery Conservation Management Act, and enter orders accordingly mandating the Defendants bring the Northeast Multispecies Fishery Management Plan into compliance with the Act.  The nature of the remedy can only be chosen once the scope of the Agency's non-compliances has been determined.  Plaintiffs further seek award of their fees and costs pursuant to the Equal Access to Justice Act, and such further relief as this Court deems just and proper.

Dated:  November 22, 2010

Respectfully submitted,
Plaintiffs, By their attorneys,


*/s/ Stephen M. Ouellette*
Stephen M. Ouellette, Esquire
BBO No.: 543752
OUELLETTE & SMITH
127 Eastern Ave., Suite 1
Gloucester, MA 01930
Tel:  (978) 281-7788
Fax:  (978) 281-4411
stephen.ouellette@fishlaw.com

New Bedford Fish Lumpers Pension Plan
and New Bedford Fish Lumpers Union,
Local 1749, ILA,AFL-CIO,
By their attorney,


*/s/ Gigi D. Tierney*
Gigi D. Tierney, Esq.
BBO#655128
Lang, Xifaras & Bullard
115 Orchard Street
New Bedford, MA 02740
(508) 992-1270
gdtierney@lxblaw.com

*/s/ Pamela Lafreniere*
Pamela Lafreniere, Esquire
BBO No.: 553853
888 Purchase Street
Suite 217
New Bedford, MA 02740
Tel:  (508) 979-5911
Fax:  (508) 993-3117
pamelalafreniere@verizon.net

City of New Bedford
By its attorneys,


*/s/ Julie K. Peterson*
Julie K. Peterson, Esq.
BBO# 564874
26 Little River Road
South Dartmouth, MA 02748
Tel. 508-996-6071
juliepetersonlaw@hotmail.com

*/s/ John F. Folan*
John F. Folan, Esquire
Folan & McGlone, PC
401 County
New Bedford, MA 02741
folan.mcglone@verizon.net

Certificate of Service
I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on November 22, 2010.

*/s/ Stephen M. Ouellette*
Stephen M. Ouellette