## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| THE CITY OF NEW BEDFORD, *et al*., | ) ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:10-CV-10789-RWZ |
| | ) | |
| GARY LOCKE, *et al*., | ) | |
| Defendants. | ) | |
| —————————————— | ) | |
| | ) | |
| JAMES LOVGREN, *et al.,* | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| GARY LOCKE, *et al*., | ) | |
| Defendants. | ) | |
| —————————————————— | ) | |

## MEMORANDUM OF *AMICI CURIAE* REPRESENTATIVES BARNEY FRANK AND JOHN TIERNEY IN SUPPORT OF THE PLAINTIFFS AND PROSPECTIVE PLAINTIFF-INTERVENOR ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

Eldon V. C. Greenberg
D.C. Bar No. 159558
*Pro Hac Vice Pending*
GARVEY SCHUBERT BARER
1000 Potomac Street, N.W.
Suite 500
Washington, D.C. 20007
Ph:  (202) 965-7880
FAX: (202) 965-1729

John M. Stevens
BBO No. 480140
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, MA 02210
Ph.: (617) 832-1000

Attorneys for *Amici Curiae*
Reps. Barney Frank and John Tierney

M. Pilar Falo
Office of Cong. Barney Frank
2252 Rayburn House Office Bldg.
Washington, D.C. 20515
Ph.: (202) 225-3581

Of Counsel

Dated: November 22, 2010

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS .................................................................................................i

TABLE OF AUTHORITIES ..........................................................................................ii

INTRODUCTION ........................................................................................................1

THE INTEREST OF *AMICI* .......................................................................................3

ARGUMENT ...............................................................................................................6

    1.    Amendment 16 Frustrates the Achievement of Optimum Yield and Improperly Discounts Community Needs .............................................................................7

        (a)    Amendment 16 Violates National Standard No. 1...............................7

        (b)    Amendment 16 Violates National Standard No. 8............................. 12

    2.    Amendment 16 Creates a Limited Access Privilege Program Without Regard to the Requirements of the Magnuson-Stevens Act ................................................. 13

CONCLUSION............................................................................................................ 17

## TABLE OF AUTHORITIES

**Page**

**Cases**

*Commonwealth of Massachusetts v. Gutierrez,*
    594 F. Supp. 2d 127 (D. Mass. 2009) .............................................................. 12

*Maine v. Kreps,*
    563 F.2d 1043 (1st Cir. 1977)..................................................................................8

*North Carolina Fisheries Ass'n v. Daley,*
    1997 WL 916347 (E.D. Va. 1997)....................................................................... 12

*North Carolina Fisheries Ass'n v. Daley,*
    27 F. Supp. 2d 650 (E.D. Va. 1998) ....................................................................7

*NRDC v. Daley,*
    209 F.3d 747 (D.C. Cir. 2000)......................................................................9, 12

*Oceana v. Evans,*
    2005 WL 555416 (D.D.C. 2005) .................................................................. 12, 13

**Statutes**

Magnuson-Stevens Fishery Conservation and Management Act, 16 U.S.C. § 1801, *et seq.* .........2

        Section 2(b)(3), 16 U.S.C. § 1801(b)(3) ...........................................................8

        Section 2(b)(4), 16 U.S.C. § 1801(b)(4) ...........................................................8

        Section 3(11), 16 U.S.C. § 1802(11) ...............................................................2

        Section 3(13)(A), 16 U.S.C. § 1802(13)(A) .................................................. 11

        Section 3(23), 16 U.S.C. § 1802(23) ............................................................ 15

        Section 3(26)(A), 16 U.S.C. § 1802(26)(A) .................................................. 15

        Section 3(26)(B), 16 U.S.C. § 1802(26)(B).................................................... 15

        Section 3(27), 16 U.S.C. § 1802(27) ............................................................ 16

Section 3(33), 16 U.S.C. § 1802(33) ...................................................................8

Section 3(34), 16 U.S.C. § 1802(34) ................................................................ 11

Section 301, 16 U.S.C. § 1851.......................................................................2, 3

Section 301(a)(1), 16 U.S.C. § 1851(a)(1)..........................................................8

Section 301(a)(5), 16 U.S.C. § 1851(a)(3)........................................................ 11

Section 301(a)(5), 16 U.S.C. § 1851(a)(5)........................................................ 16

Section 301(a)(8), 16 U.S.C. § 1851(a)(8)........................................................ 12

Section 302, 16 U.S.C. § 1852..........................................................................2

Section 303, 16 U.S.C. § 1853..........................................................................2

Section 303A, 16 U.S.C. § 1853a .............................................................. 14, 16

Section 303A(b), 16 U.S.C. § 1853a(b)............................................................ 14

Section 303A(b)(1), 16 U.S.C. § 1853a(b)(1) ................................................... 15

Section 303A(b)(2), 16 U.S.C. § 1853a(b)(2) ................................................... 15

Section 303A(c), 16 U.S.C. § 1853a(c) ............................................................ 14

Section 303A(c)(5)(A), 16 U.S.C. § 1853a(c)(5)(A)........................................... 14

Section 303A(c)(5)(B), 16 U.S.C. § 1853a(c)(5)(B) .......................................... 14

Section 303A(c)(5)(D), 16 U.S.C. § 1853a(c)(5)(D)........................................... 14

Section 303A(c)(6)(D), 16 U.S.C. § 1853a(c)(6)(D)............................................5

Section 303A(c)(6)(D)(vi), 16 U.S.C. § 1853a(c)(6)(D)(vi) ............................... 14

Section 303A(d), 16 U.S.C. § 1853a(d)............................................................ 14

Section 303A(e), 16 U.S.C. § 1853a(e) ............................................................ 14

Section 303A(f), 16 U.S.C. § 1853a(f) ............................................................. 14

Section 304(b), 16 U.S.C. § 1854(b) ..................................................................2

Section 304(e). 16 U.S.C. § 1854(e) .................................................................. 10

Section 305(d), 16 U.S.C. § 1855(d) .................................................................. 2

Magnuson-Stevens Reauthorization Act of 2006, Pub. L. No. 109-479, 120 Stat. 3575 (January 12, 2007) ......................................................................................................... 4

Section 103(c) ................................................................................................... 10

Section 104(a)(10) ........................................................................................... 13

Section 104(c) ........................................................................................... 10, 13

Regulatory Flexibility Act, 5 U.S.C. § 601, *et seq.* ........................................... 7

## Legislative History

152 Cong. Rec. H. 9233 (daily ed., December 8, 2006) ..................................... 11, 13

H. R. Rep. No. 109-567, 109th Cong., 2d Sess. (2006) ...................................... 14

S. Rep. No. 109-229, 109th Cong., 2d Sess. (2006) ........................................... 14

## Rules and Regulations

50 C.F.R. Part 600, Subpart D ............................................................................... 3

Section 600.310(e)(3)(B)(ii) .............................................................................. 9

Section 600.310(m) ............................................................................................ 12

Section 600.320 ................................................................................................. 11

Section 600.345(b)(1) ....................................................................................... 12

50 C.F.R. Part 648, Subpart F ............................................................................. 16

Section 648.87(a)(4) ......................................................................................... 16

## Federal Register

74 Fed. Reg. 69382 (December 31, 2009) .......................................................... 17

75 Fed. Reg. 18262 (April 9, 2010) ............................................... 2, 13, 14, 15, 16, 17

75 Fed. Reg. 18356 (April 9, 2010) .......................................................... 2, 3, 7

**Other**

Nat'l Oceanic and Atmospheric Admin., U.S. Dep't of Commerce, *New Bedford, Mass. and Dutch Harbor-Unalaska, Alaska Remain Top Fishing Ports* (2010) ........................................3, 6

Richard Gaines, *Fishing Leaders Target NOAA Data*, Gloucester Times, Aug. 24, 2010 ......... 10

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

THE CITY OF NEW        )
BEDFORD, *et al.*,            )
                         )
           Plaintiffs,      )
                         )
            v.           )      Case No. 1:10-CV-10789-RWZ
                         )
GARY LOCKE, *et al.*,      )
                         )
           Defendants.    )
                         )
_____ )
                         )
JAMES LOVGREN, *et al.*,    )
                         )
           Plaintiffs,      )
                         )
            v.           )
                         )
GARY LOCKE, *et al.*,      )
                         )
           Defendants.    )
                         )
_____ )

## MEMORANDUM OF *AMICI CURIAE* REPRESENTATIVES BARNEY FRANK AND JOHN TIERNEY IN SUPPORT OF THE PLAINTIFFS AND PROSPECTIVE PLAINTIFF-INTERVENOR ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

*Amici curiae*, Representatives Barney Frank (D-MA) and John Tierney (D-MA), respectfully submit this memorandum of points and authorities in support of the Plaintiffs and the prospective Plaintiff-Intervenor in connection with the Plaintiffs' and the prospective Plaintiff-Intervenor's motions and the Federal Defendants' and the Defendant-Intervenor's cross-motions for summary judgment in this litigation.

**INTRODUCTION**

This case presents a challenge to management measures governing the New England groundfish fishery adopted and implemented under the Magnuson-Stevens Fishery Conservation and Management Act, 16 U.S.C. § 1801, *et seq.* (the "Magnuson-Stevens Act"), the Federal law which provides for the management and conservation of fisheries in the U.S. "Exclusive Economic Zone" (3-200 miles offshore) (the "EEZ").[1]  The rules at issue, promulgated by the National Marine Fisheries Service ("NMFS") on April 9, 2010, implement "Amendment 16" to the Northeast Multispecies Fishery Management Plan (the "FMP").[2]  *See* 75 *Fed. Reg.* 18262 (April 9, 2010) (AR 56485); *see also* 75 *Fed. Reg.* 18356 (April 9, 2010) (AR 56715).[3]  They constitute a major restructuring of the groundfish fishery which will irrevocably alter the fabric of the fishing communities in New England.

The adverse economic impacts of the management measures are substantial.  Indeed, Amendment 16  itself, which generally underestimates economic and social impacts, acknowledges that this regulatory action "is likely to have a negative effect on . . . important social factors" and that "[t]he economic impacts of this action [on] communities are expected to be severe and in some cases may threaten the existence of fishing businesses in some

---

[1] The EEZ is defined in Section 3(11) of the Magnuson-Stevens Act, 16 U.S.C. § 1802(11).

[2] Amendment 16 is found in the Administrative Record for this case at pages 47757-48807. Citations to the Administrative Record are hereinafter set out as "AR [page number]" in parentheses.

[3] Amendment 16 was adopted in the first instance by the New England Fishery Management Council (the "Council"), a mixed body of State and Federal officials and representatives of the private sector, which is charged with devising conservation and management measures applicable to EEZ fisheries within its jurisdiction. Magnuson-Stevens Act, Sections 302, 303, 16 U.S.C. §§ 1852, 1853. After adoption by the Council, measures are submitted to NMFS for approval.  When NMFS finds that the measures are consistent with the National Standards set out in Section 301, other provisions of the Magnuson-Stevens Act and other applicable law, it approves the measures and issues implementing, Federal regulations. Magnuson-Stevens Act, Sections 304(b), 305(d), 16 U.S.C. §§ 1854(b), 1855(d).

communities." Amendment 16 at 15 (AR 47771). It notes that the action will result in a reduction in total revenues in Massachusetts of 11.5% and a reduction in groundfish trip revenues in Massachusetts of 14.3%. *Id*. NMFS' rules implementing groundfish specifications for FY 2010 estimate that groundfish revenues, assuming no changes in fishing behavior, may be expected to decline from $85 million in FY 2007 and FY 2008 to $63 million in FY 2010. *See* 75 *Fed. Reg*. at 18368, cols. 1-2 (AR 56728). Losses of between $3 million and $27 million in FY 2010 are expected to rise to between $26.9 million and $53.8 million in FY 2011 and $27.6 million and $54.8 million in FY 2012. *Id*. at 18369, col. 1 (AR 56729). The Mayor of New Bedford has publicly stated that he fears the loss of as much as 50% of the fleet as a result of the new fishing restrictions embodied in Amendment 16.

The Plaintiffs and the prospective Plaintiff-Intervenor challenge Amendment 16 on a variety of grounds. Most importantly, from the perspective of Representatives Frank and Tierney, they claim that Amendment 16 violates National Standards Nos. 1 and 8 of the Magnuson-Stevens Act[4] and that Amendment 16's so-called "sector allocation" program is unlawful. As set forth below, these claims have substantial merit.

## THE INTEREST OF *AMICI*

Representative Frank is a Democratic Member of Congress, representing the Fourth District of Massachusetts. His District includes the City of New Bedford, the lead plaintiff in this action, which is one of the most historic and important fishing ports in the United States. Indeed, in 2009, New Bedford was the leading port in the United States in terms of value,

---

[4] The National Standards -- the substantive heart of the Act -- are ten guiding principles set forth in Section 301, 16 U.S.C. § 1851, applicable to FMPs and their implementing regulations. National Standards Guidelines, developed by NMFS, provide guidance for application of the National Standards. *See* 50 C.F.R. Part 600, Subpart D.

accounting for $249.2 million in landings, while it was the eighth leading port in terms of volume of landings, with 170 million pounds landed. *See* NOAA Press Release, "New Bedford, Mass. and Dutch Harbor-Unalaska, Alaska Remain Top Fishing Ports" (September 9, 2010), available at  http://www.nmfs.noaa.gov/mediacenter/docs/fus_2009_top_ports.pdf.  As documented in Amendment 16, New Bedford and Fairhaven accounted for 15,150,104 pounds of groundfish landed in FY 2007, valued at $19,828,362.  Amendment 16 at 474 (AR 48230).  156 vessels were responsible for these landings. *Id*. (AR 48230).  Fish from New Bedford seafood processors is not only sold throughout the United States but is also exported throughout the world.

The common economic extrapolation for the fishing industry is $1 of caught fish is worth $4-5 dollars to the local and regional economy.  The Port of New Bedford thus creates a one billion dollar industry in an area of high unemployment.  It supports a vibrant infrastructure of processors, settlement houses, shipyards, fuel and ice houses, among others.  The fishing industry in New Bedford also has a close collaboration with the University of Massachusetts Dartmouth's School for Marine Science and Technology, and Representative Frank, along with the Senators from Massachusetts, has earmarked nearly $20 million for fisheries research, leading to better marine science, increased catch and the education of a significant number of both graduate and undergraduate marine scientists.

Representative Frank's involvement with fishing issues has been extensive.  Among other things, he was deeply involved in Congressional deliberations leading to enactment of the Magnuson-Stevens Reauthorization Act of 2006, Pub. L. No. 109-479, 120 Stat. 3575 (January 12, 2007) ("MSRA"), which established new requirements to end and prevent overfishing through the use of Annual Catch Limits ("ACLs") and Accountability Measures ("AMs") that are

at issue in this case.  He has consistently and strongly supported flexibility in implementation of the Magnuson-Stevens Act's conservation requirements during times of economic stress. Representative Frank was also instrumental in including language in Section 106 of MSRA requiring a referendum before any individual fishing quota ("IFQ") program could be adopted in New England.  *See* Magnuson-Stevens Act, Section 303A(c)(6)(D), 16 U.S.C. § 1853a(c)(6)(D). He did so, because IFQ programs, which allow the transfer of quota from one permit holder to another, tend to create consolidation through the transfer of effort from one or several vessels to another, thus transforming the structure of the industry and resulting in a significant loss of jobs.

During the course of agency consideration of Amendment 16, Representative Frank commented on several occasions on the Amendment, focusing on the need properly to implement MSRA to take into account the needs the industry and dependent communities, such as New Bedford.  In fact, interim rules for Amendment 16 that allowed more fishing were extended at Representative Frank's request in order to ensure that these new regulations would coincide with Amendment 16's final implementation.

Of greatest concern to Representative Frank has been NMFS' effort to create a sector management system for New England groundfish.  This system allows groups of fishing boats to join together in sectors based on similar boat size, gear type, etc. and, based upon the sector's collective history, be allocated a share of the Total Allowable Catch ("TAC").  The catch is then apportioned to the sector's members in the form of catch shares.  Those who choose not to participate in sectors still fish under the old management system in what is now called a "common pool" fishery, but common pool participants have not faired well under this system, and many feel they have been and are being punished for not declaring into the NMFS-supported sector program.

5

Representative Frank is opposed to catch shares/sectors because this system causes consolidation similar to IFQs. If there are twenty boats in a sector, the incentive is to fish fewer than half those vessels as it is clearly more cost effective to do so. If eight boats from that sector fish, the other twelve lease their catch to those boats. Ultimately, that means the crew on twelve of those boats are now out of work. Fewer boats purchase food, ice, fuel, repairs, etc. In other words, there is a significant economic blow to the industry infrastructure and those businesses that rely on fishing. Representative Frank, like the fishermen in New Bedford, believes that this system favors a few, wealthy participants at the expense of others and will inevitably lead to the contraction of the industry.

Also joining in this memorandum is Representative Tierney, a Democratic Member of Congress who represents the Sixth District of Massachusetts. His District includes the City of Gloucester, also a plaintiff in this litigation. In 2009, Gloucester was the tenth leading port in the United States in terms of the volume of fish landed, accounting for 122.3 million pounds. *See* NOAA Press Release*, supra*. In 2009, Gloucester was the twelfth leading port in terms of value, with $50.4 million in product landed. Representative Tierney has been actively involved with the Gloucester fishing community in understanding how the requirements of the Magnuson-Stevens Act affect the fishermen and the associated businesses in the City, such as processors, fuel and repair shops and ice houses. Congressman Tierney has consistently supported increased flexibility in the implementation of the Magnuson-Stevens Act's conservation requirements by submitting official Congressional comments to NMFS, participating in hearings and meetings with Administration officials and supporting legislative initiatives. He is deeply concerned that, under the catch share/sector allocation program, fishermen are faced with decreases in income, unfair consolidation and job loss.

6

## ARGUMENT

Amendment 16 suffers from two fundamental deficiencies.  First, it fails properly to provide for the productivity of the fishery and to balance the economic and social needs of participants and communities against the conservation needs of the resource.  Second, it was adopted without regard to the statutory requirements for instituting Limited Access Privilege Programs ("LAPPs").

### 1.    Amendment 16 Frustrates the Achievement of Optimum Yield and Improperly Discounts Community Needs.

In devising the management measures at issue in this case, the Council and NMFS lost their way and failed to achieve the balanced regulation required by the Magnuson-Stevens Act, constraining the operation of the groundfish fishery at the unnecessary expense of participants and dependent communities.  Under Amendment 16, excessively low ACLs are established that, in conjunction with the sector allocation program, will likely result in underharvesting of the available yield.  Indeed, NMFS itself "agrees that low ACLs for some stocks will constrain the fishery's ability to catch other stocks with larger ACLs, and may result in the closure of some sectors in specific stock areas for prolonged periods of time." 75 *Fed. Reg.* at 18365, col. 3 (AR 56725).  These results, however, which will entail substantial injury to the industry, can't be squared with the agency's obligations under the law, in particular, under National Standards Nos. 1 and 8.[5]

---

[5] NMFS' analysis of the effects of its actions on small businesses, as required under the Regulatory Flexibility Act, 5 U.S.C. § 601, *et seq.*, is also problematic.  The sector allocation program, in particular, promises to impose overly burdensome costs of compliance which in some cases appear likely to exceed the value of the catch to individual participants.  This is readily apparent just by comparing vessel revenue data against program cost estimates.  However, NMFS largely finesses these problems by asserting that impacts are too uncertain to quantify in a reliable way.  Amendment 16 at 862, 863 (AR 48618, 48619).  Where NMFS has ignored readily available data, relied upon "flawed methodology" and "obscured the findings . . . in order to try and justify an untenable position," its action cannot stand. *E.g., North Carolina Fisheries Ass'n v. Daley*, 27 F. Supp. 2d 650, 660 (E.D. Va. 1998).

(a)      **Amendment 16 Violates National Standard No. 1**.

In order to manage fishing within the EEZ, the Magnuson-Stevens Act calls for "the preparation and implementation, in accordance with national standards, of fishery management plans [FMPs] which will achieve and maintain, on a continuing basis, the optimum yield from each fishery." Magnuson-Stevens Act, Section 2(b)(4), 16 U.S.C. § 1801(b)(4).  The Magnuson-Stevens Act is designed, among other purposes, "to promote domestic commercial and recreational fishing under sound conservation and management principles."  Magnuson-Stevens Act, Section 2(b)(3), 16 U.S.C. § 1801(b)(3).  It is not surprising, therefore, that National Standard No. 1, the first and foremost of the Act's ten overarching standards, is not just about conservation of the resource but is also about preserving and enhancing opportunities for the fishing industry.

National Standard No. 1 provides, "Conservation and management measures shall prevent overfishing, while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry."  Magnuson-Stevens Act, Section 301(a)(1), 16 U.S.C. § 1851(a)(1).  In other words, this Standard calls for both the prevention of "overfishing" and the achievement of "optimum yield" ("OY") in fisheries under management.  OY, in turn, is defined in Section 3(33) of the Act, 16 U.S.C. § 1802(33), to mean:

> with respect to the yield from a fishery, . . . the amount of fish which – (A) will provide the greatest overall benefit to the Nation, particularly with respect to food production and recreational opportunities, and taking into account the protection of marine ecosystems; (B) is prescribed as such on the basis of the maximum sustainable yield from the fishery, as reduced by any relevant economic, social or ecological factor; and (C) in the case of an overfished fishery, provides for rebuilding to a level consistent with producing the maximum sustainable yield in such fishery.

---

Thus, the goal of the Magnuson-Stevens Act is not to "protect" fishery resources from use but rather to maximize food production -- to achieve the "full utilization" of fishery resources -- as long as that is done within acceptable biological limits. *See Maine v. Kreps*, 563 F.2d 1043, 1049-50 (1st Cir. 1977) ("Congress underscored that priority was to be given to food requirements").  In the balancing scheme of National Standard No. 1, while conservation first must be achieved, *see NRDC v. Daley*, 209 F.3d 747, 753 (D.C. Cir. 2000), once the resource is adequately protected against "overfishing," then management measures must facilitate the operation of the fishery.

The National Standards Guidelines, which reflect NMFS' interpretation of the National Standards, emphasize that FMPs must be implemented and enforced so that OY is achieved, *i.e.*, so that the harvest is allowed to reach the OY level.  50 C.F.R. § 600.310(e)(3)( B)(ii). Management measures are condemned under National Standard No. 1 if they are "too restrictive' as well "not rigorous enough."  *Id*.

Contrary to National Standard No. l, the allocation of certain "choke stocks," *e.g*., pollock, yellowtail flounder, winter flounder, is so conservative that it will impede fishermen's ability to harvest the species for which they have a substantial allocation.  As Representatives Frank and Tierney stated in a September 22, 2008, letter to NMFS, "At the present time, expecting all the stocks in the New England fishery to be at their maximum level simultaneously is the principle on which this multi-species fishery is managed. *That method does not work*. * * *  The final regulations need to have more flexibility, so that there is a greater ability to differentiate between various component stocks of the multi-species complex" (emphasis added).

Most ecologists would agree that it is impossible for all stocks to be at their maximum level simultaneously.  If this were true, the biomass of fish would exceed the carrying capacity of

9

the environment.  The final Amendment 16 regulations should have provided more flexibility, so there would be greater ability to land the available TAC.  For example, only about 20% of the allowable catch has been caught each year over the past several years.  Only 10% of the abundant haddock stock has been caught each year.  As Congressmen Frank and Tierney noted in an April 21, 2010 letter to the Secretary of Commerce, "In 2007 (the last year for which we have data) only 27% of the total allowable catch was harvested, because of regulatory measures designed to protect the weakest stocks.  Thus, 73% of the allowable sustainable catch was left in the ocean, costing our fishermen and our coastal economies approximately $500 million."  Management-induced failure to harvest OY, in short, has wasted, and will continue to waste, hundreds of millions of dollars in economic and social benefits.

That achievement of OY is hindered by Amendment 16 seems to be borne out by the most current data.  NMFS recently released quarterly reports that showed that there was less fish caught, *i.e.*, landings were down, under the catch share system this year compared to the same time last year, but, because the price is up, more money has been made to date than at the same time last year under the old management system.  NMFS points to this as a success scenario. However, with lower landings, more boats are tied to the docks, and fewer people are making most of the money, fewer boats fish and infrastructure suffers.  *See* Richard Gaines, "Fishing Leaders Target NOAA Data," *Gloucester Times*, August 24, 2010, available at http://www.gloucestertimes.com/local/x531502821/Fishing-leaders-target-NOAA-data.

While NMFS may claim that catch restrictions are necessary to meet rebuilding deadlines for some overfished stocks in this complex, multi-species fishery or to comply with harvest level recommendations of the Council's Scientific and Statistical Committee (the "SSC"), it can't be the rule under the Magnuson-Stevens Act that, for example, OY can be frustrated for the majority

of the stocks in order to achieve rebuilding goals for the lagging few, *e.g*., the so-called choke stocks.[6]  Nor can or should inexact science be used to impose unduly harsh measures that harm the economic and social infrastructure of New England, and even management measures based upon SSC recommendations, like all else in the Magnuson-Stevens Act, must remain subject to the National Standards.

OY must be achieved "for each fishery," which is defined in Section (3)(13)(A) of the Magnuson-Stevens Act, 16 U.S.C. § 1802 (13)(A), to mean "one or more stocks of fish which can be treated as a unit for purposes of conservation and management."[7]  Managing for weakest stock in a multi-stock fishery effectively cannot be squared with the goal of achieving OY for the fishery as a whole embodied in National Standard No. 1.[8]  Nothing in the Magnuson-Stevens Act

---

[6] The argument has been made that changes made to the Magnuson-Stevens Act in 2007 by Pub. L. No. 109-479, 120 Stat. 3575, 3585 (January 12, 2007), Sections 103(c), 104(c), somehow alter the application of National Standard No. 1.  However, Congressman Young (R-AK) made it crystal clear that the 2007 modifications in particular to Section 304(e) of the Magnuson-Stevens Act (relating to rebuilding of overfished fisheries) did not eliminate the need to consider the goals for the fishery as whole (and not just the status of individual stocks) in light of National Standard No. 1.  As Congressman Young stated:

> I am also concerned that the provision requiring that harvest levels be set to prevent overfishing not be interpreted to shut down entire fisheries if one stock of multi-species complex is experiencing overfishing.  The purpose of the act is to provide a healthy fishery resource, but it is also to promote commercial and recreational fishing and support communities dependent on fishery resources.  The act should not be used as a tool for stopping all fishing activities in U.S. waters. The keys to achieving these goals are balance, flexibility and common sense by the fishery managers.  The provisions dealing with ending overfishing, rebuilding overfished fisheries, and setting harvest levels to prevent overfishing all need to be taken in the context of the National Standards and need to be viewed with an eye toward balance, flexibility and common sense.

152 *Cong. Rec*. H. 9233 (daily ed., December 8, 2006).

[7] The terms "overfishing and "overfished" are likewise defined with respect to a "fishery," not individual stocks.  Magnuson-Stevens Act, Section 3(34), 16 U.S.C. § 1802(34).

[8] Managing to rebuild the weakest stock also raises questions under National Standard No. 3, 16 U.S.C. § 1851(a)(3), which specifies, "To the extent practicable, an individual stock of fish shall be

11

evidences an intent that OY for the fishery as a whole should be ignored in an attempt to protect the weakest stocks.[9]

      **(b)**      **Amendment 16 Violates National Standard No. 8.**

National Standard No. 8 provides, "Conservation and management measures shall, consistent with the conservation requirements of this chapter (including the prevention of overfishing and the rebuilding of overfished stocks), take into account the importance of fishery resources to fishing communities by utilizing economic and social data that meet the requirements of paragraph (2), in order to (A) provide for the sustained participation of such communities, and (B) to the extent practicable, minimize adverse economic impacts on such communities." Magnuson-Stevens Act, Section 301(a)(8), 16 U.S.C. § 1851(a)(8).  The National Standards Guidelines specify, "All other things being equal, where two alternatives achieve similar conservation goals, the alternative that provides the greater potential for sustained participation of such communities and minimizes the adverse economic impacts on such communities would be the preferred alternative."  50 C.F.R. § 600.345(b)(1).  Case law underscores that this is the rule. *E.g.*, *Oceana v. Evans*, 2005 WL 555416, at *8 (D.D.C. 2005); *NRDC v. Daley*, 209 F.3d 747, 753 (D.C. Cir. 2000).  As the Court stated in *Oceana*, "[I]nsofar as various plans achieve similar conservation results, the approach least economically disadvantageous for fishing communities is the preferable alternative."  2005 WL 555416, at *8.  *See generally North Carolina Fisheries Ass'n v. Daley*, 1997 WL 916347, at *5 (E.D. Va. 1997) (holding that NMFS must harmonize its

---

managed as unit throughout its range, and interrelated stocks of fish shall be managed as a unit or in close coordination."  *See generally* 50 C.F.R. §600.320.

[9] The National Standards Guidelines recognize a "mixed stock exception" that would *allow* but not require the Council to permit overfishing on particular stocks when certain conditions are satisfied. *See* 50 C.F.R. § 600.310(m).  However, the Guidelines are advisory only, *Commonwealth of*

duty to rebuild stocks with the need to provide for sustained community participation).  Indeed, NMFS may even "allow overfishing for a time in order to take account of fishing communities' needs, so long as, *inter alia*, the MSA's [Magnuson-Stevens Act's] conservation goals are achieved and the MSY [maximum sustainable yield] amount by weight is never exceeded and OY is achieved on average."  *Oceana v. Evans*, 2005 WL 555416, at *15.[10]

Contrary to National Standard No. 8, Amendment 16 will significantly and adversely impact fishery-dependent communities.  Indeed, Amendment 16 acknowledges that "landings and revenues are likely to decline for many participants in the upcoming years of the rebuilding program, [and] [i]n the short term, these declines will probably have negative impacts on fishing communities throughout the region, but particularly on those ports that rely heavily on groundfish."  Amendment 16 at 839 (AR 48595).  While Amendment 16 asserts that such impacts are "unavoidable" because of statutory requirements to rebuild overfished stocks, *id*. (AR 48595), the assertion begs the question whether less draconian measures were available to the agency to achieve the same or equivalent conservation benefits.

### 2.   Amendment 16 Creates a Limited Access Privilege Program Without Regard to the Requirements of the Magnuson-Stevens Act.

Amendment 16, building upon sector measures originally established in 2004 under Amendment 13 to the FMP, creates an elaborate "sector allocation" program.  Under this

---

*Massachusetts v. Gutierrez*, 594 F. Supp. 2d 127, 129 (D. Mass. 2009), and cannot override the requirements embodied in the National Standards themselves.

[10] Congress adopted MSRA in 2006, in part, to enhance science-based controls to prevent overfishing from occurring and to set firm deadlines to end overfishing.  *See* Pub. L. No. 109-479, 120 Stat. 3575, 3585 (January 12, 2007), Sections 104(a)(10), 104(c).  However, Congress did not alter the substance of National Standard No. 8 (or, for that matter, even touch National Standard No. 1).  *See* statement of Cong. Don Young, *supra*, note 6.  Thus, earlier case law interpreting these Standards remains good.

program, individual fishermen participating in sectors are assigned a "Potential Sector Contribution" ("PSC"), representing the amount of the sector's allocation they are entitled to harvest, while the sector as a whole receives an Annual Catch Entitlement ("ACE"). *See* 75 *Fed. Reg.* at 18276, col. 2 (AR 56500). NMFS states that it "does not consider sectors to be LAPPs and they are not subject to the referendum or cost recovery requirements of the Magnuson-Stevens Act." 75 *Fed. Reg.* at 18275, col. 3 (AR 56499). *See also id*. at 18292, col. 2-3 (AR 56516). It goes on to explain that "no permit" is issued and there is "no permanent allocation," and "sectors are temporary, voluntary, [and] fluid." 75 *Fed. Reg.* at 18275, col. 3 (AR 56499). It adds that "sectors are not issued a permit, they are not allocated a portion of the TAC, and they are not clearly 'persons' eligible to hold a LAPP." *Id*. at 18292, col. 2 (AR 56516). Congressmen Frank and Tierney believe that NMFS' analysis is misguided.[11]

Congress was concerned in 2006, when the LAPP provisions of the Magnuson-Stevens Act were adopted, about the "privatization" of fishery resources. *See* S. Rep. No. 109-229, 109th Cong., 2d Sess. 25-30 (2006); H. R. Rep. No. 109-567, 109th Cong., 2d Sess. 88-89 (2006). It thus developed a complex series of strict requirements, embodied in Section 303A of the Magnuson-Stevens Act, 16 U.S.C. § 1853a, to ensure, among other things, that such systems are "fair and equitable" (Section 303A(c)(5)(A)), take into account "the basic cultural and social framework of the fishery" (Section 303A(c)(5)(B)) and "ensure that limited access privilege holders do not acquire an excessive share of the total limited access privileges" (Section

---

[11] While the Magnuson-Stevens Act contains a specific exemption for "sector allocation[s]" from the requirement for a referendum to adopt any individual fishing quota program in New England, 16 U.S.C. § 1853a(c)(6)(D)(vi), even if that exemption applies here, it is limited to the referendum requirements only and does not extend to other requirements for LAPPs in specified in Section 303A of the Magnuson-Stevens Act.

303A(c)(5)(D)).[12]  It did not distinguish "voluntary" from "mandatory" systems, and nothing in the Act says that a LAPP cannot coexist in a fishery with "common pool" fishermen.  Likewise, it did not distinguish "permanent" allocations from those that might be characterized as "temporary."  Indeed, not only does a PSC "remain with the limited access permit indefinitely," *see* 75 *Fed. Reg.* at 18276, col. 2 (AR 56500), but also all allocations by their very nature are temporary, in that they can be "revoked, limited or modified at any time" by the Government. Magnuson-Stevens Act, Section 303A(b)(2), 16 U.S.C. § 1853a(b)(2).  While Congress referred to the issuance of "permits," it did not define just what constitutes a "permit" in such a system, and nothing in the statute requires that authorizations expressly denominated as "permits" be issued.[13]  To the contrary, Section 303A(b)(1), 16 U.S.C. § 1853a(b)(1), provides that "[l]imited access privilege, quota share, or other limited access system authorization . . . shall be considered a permit" for purposes of the Act.  Congress further focused on the harvest privileges of individual fishermen, so that whether a sector is eligible to hold a LAPP permit or not is irrelevant.

In 2006, Congress broadly defined the term "limited access privilege" to "mean[] a Federal permit, issued as part of a limited access system under section 303A to harvest a quantity of fish expressed by a unit or units representing a portion of the total allowable catch of the

---

[12] LAPP requirements are extensive.  For example, limitations on LAPPs, in terms of creating any right, title or interest, are imposed by Section 303A(b); Section 303A(c) lays down requirements which have to be met by all LAPPs, specifying terms that must be included, how allocations should be made and how programs can be initiated; Section 303A(d) requires the Council to consider auction and other programs; Section 303A(e) requires consideration of "cost recovery;" and Section 303A(f) spells out "characteristics" which all LAPPs must have.  NMFS did not evaluate the sector allocation program against these requirements.  *See* Amendment 16, Ch. 9.1 (AR 48591).  As a result, there is no assurance that the sector allocation program is compliant, and, in some instance, *e.g.*, protection against acquisition of excessive shares, it clearly is not.

[13] Of course, all participants in the New England groundfish fishery do, in any event, fish under the terms of a Federal permit.

15

fishery that may be received or held for exclusive use by a person." Magnuson-Stevens Act, Section 3(26)(A), 16 U.S.C. § 1802(26)(A). It includes an "individual fishing quota" or IFQ, *id*., Section 3(26)(B), 16 U.S.C. 1802(26)(B), which was defined to mean "a Federal permit under a limited access system to harvest a quantity of fish, expressed by a unit or units representing a percentage of the total allowable catch of a fishery that may be received or held for exclusive use by a person." Magnuson-Stevens Act, Section 3(23), 16 U.S.C. § 1802(23). Finally, the Act defined "limited access system" to mean "a system that limits participation in a fishery to those satisfying certain eligibility criteria or requirements contained in a fishery management plan or associated regulation." Magnuson-Stevens Act, Section 3(27), 16 U.S.C. § 1802(27).

Notwithstanding NMFS' position, just asserting that the sector allocation program, with its PSCs and ACEs, is not a LAPP does not make it so. When one steps back and looks holistically at the system embodied in Amendment 16, there can be no question that what is going on is the allocation of exclusive, individual harvest privileges to participants in sectors under the terms of the FMP. When fishermen satisfy eligibility criteria, they are allowed to join a sector and to harvest, on an exclusive basis, a particular amount of fish -- a portion of the TAC -- and when that amount has been reached, they are no longer permitted to continue fishing. They are allowed "stack" permits within a sector, so that one boat can own many permits and the right to fish the allocations associated with those permits. *See* 50 C.F.R. § 648.87(a)(4), 75 *Fed. Reg*. at 18339, col. 1 (AR 56563). Form must not trump substance. Whether a fisherman's allocation is expressly called a "permit," a "privilege" or something else in the FMP does not matter; it is, however one looks at it, an authorization to harvest a specific quantity of fish held for the exclusive use of the sector participant. Congressmen Frank and Tierney submit that this is a LAPP, as Congress envisioned it, and the failure of NMFS to comply with the manifold

requirements of Section 303A thus cannot be countenanced.  Further, NMFS' unrelenting

pressure to move the New England fisheries to a "catch share" program seems to run directly

counter to the Magnuson-Stevens Act's proscription in National Standard No. 5 against

management measures which have "economic allocation as . . . [their] sole purpose."  *See*

Magnuson-Stevens Act, Section 301(a)(5), 16 U.S.C. § 1851(a)(5).

Finally, it is worth underscoring that the adoption of the sector allocation program

imposes real burdens on the fleet.  NMFS itself acknowledges, "Amendment 16 anticipated a

number of costs associated with sectors, including costs to join a sector and pay for a sector

manager, and costs associated with monitoring and reporting provisions."  75 *Fed. Reg*. at 18291,

col. 1 (AR 56515).  Dockside and at-sea monitoring alone are estimated to have a cost potential

ranging from $13,500 to $27,000 per vessel.  Amendment 16 at 709  (AR 48465).  *See also* 74

*Fed. Reg*. 69382, 69409, col. 3 (December 31, 2009) (AR 50686).  This is a significant

proportion of total gross revenues for many vessels -- average gross revenues for sector

participants were only $112,000 in 2008, Amendment 16 at 863 (AR 48619) -- and, as a practical

matter, may make fishing uneconomic for these vessels and create overwhelming incentives to

cease fishing and transfer quota, thus resulting in substantial restructuring of the fishery.  NMFS

itself admits that the burden is "large enough that it is a legitimate question whether sector

vessels will be able to operate efficiently enough to cover these additional costs."  Amendment

16 at 709 (AR 48465).

## <u>CONCLUSION</u>

For all the reasons stated above, Representatives Frank and Tierney respectfully submit

that this Court should grant the Plaintiffs' and the prospective Plaintiff-Intervenor's motions for

summary judgment and deny the Federal Defendants' and the Defendant-Intervenor's cross-motions for summary judgment.

Respectfully submitted,

GARVEY SCHUBERT BARER

    Eldon V. C. Greenberg
    D.C. Bar No. 159558
    *Pro Hac Vice Pending*
    1000 Potomac Street, N.W.
    Suite 500
    Washington, D.C. 20007
    Ph:  (202) 965-7880
    FAX: (202) 965-1729
    E-mail: egreenberg@gsblaw.com

FOLEY HOAG LLP

By:    /s/ John M. Stevens_____
    John M. Stevens
    BBO No. 480140
    155 Seaport Boulevard
    Boston, MA 02210
    Ph.: (617) 832-1000
    E-mail: jstevens@foleyhoag.com

M. PILAR FALO
Office of Cong. Barney Frank
2252 Rayburn House Office Building
Washington, D.C. 20515
Ph.: (202) 225-3581

Of Counsel

Dated: November 22, 2010

Attorneys for *Amici Curiae*
Reps. Barney Frank and John
Tierney