# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

_____

|  |  |  |
|---|---|---|
| The City of New Bedford, Massachusetts, *et al.*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | |
| | ) | **CIVIL ACTION** |
| The Honorable Gary W. Locke, *et al.* | ) | **NO. 1:10-cv-10789-RWZ** |
| | ) | |
| *Defendants*, | ) | Leave to File granted on 12/1/10 |
| | ) | |
| & | ) | |
| | ) | |
| Conservation Law Foundation, Inc., | ) | |
| | ) | |
| *Intervenor-Defendant*. | ) | |

_____

## MEMORANDUM IN SUPPORT OF PROSPECTIVE
## INTERVENOR-PLAINTIFF FOOD & WATER WATCH, INC.'S
## PROPOSED MOTION FOR SUMMARY JUDGMENT

This case challenges the adoption of Amendment 16 to the Northeast Multispecies Groundfish Fishery Management Plan ("A16"). Prospective intervenor-plaintiff Food & Water Watch, Inc. ("FWW") claims that the federal defendants failed to comply with the Magnuson-Stevens Fishery Conservation and Management Act ("MSA") and the National Environmental Policy Act ("NEPA") in promulgating A16's implementing regulations.[1] Specifically, Defendants failed to: (1) submit A16 to a referendum prior to its final approval in violation of the MSA, 16 U.S.C. §1853a(c)(6)(D); (2) adequately analyze A16's environmental impacts in

_____

[1] FWW moved to intervene as a plaintiff on October 8, 2010, (Court's Dkt. #37), and filed a proposed complaint pursuant to Federal Rule of Civil Procedure 24(c) (Court's Dkt. #38, Att. 1). That motion is pending.

violation of NEPA, 42 U.S.C. § 4332(2)(C); and (3) adequately analyze A16's socioeconomic impacts in violation of the MSA, 16 U.S.C. § 1853(a)(9) & (b)(6).[2]

## I. STATUTORY AND REGULATORY BACKGROUND

### A.    The Magnuson-Stevens Fishery Conservation and Management Act

The MSA, as amended, 16 U.S.C. §§ 1801-1891d (2009), establishes an elaborate system for managing fisheries to promote conservation while protecting fishermen and fisherwomen (collectively "fishermen") and their communities.  The MSA designates eight regional councils to help manage United States fisheries, one of which is the New England Fishery Management Council ("NEFMC"), which has authority over the Northeast Multispecies Groundfish Fishery (the "fishery").   16 U.S.C. § 1852(a)(1)(A).   Councils prepare Fishery Management Plans ("FMPs") and amendments thereto.  *Id.* § 1852(h)(1).  The FMPs and amendments do not become effective, however, until the Secretary of Commerce ("Secretary") approves them. *Id.* §§ 1854(a)-(b) & 1855. The Secretary has delegated this responsibility to the National Marine Fisheries Service ("NMFS"), which may promulgate the FMPs and amendments as regulations only after ensuring that they are consistent with the MSA's ten National Standards, 16 U.S.C. § 1851(a)(1)-(10), and any other applicable laws, and only after a period of public comment.  *Id.* §§ 1853(a)(1)(C), 1854(a)(1)(B) & (b)(1)(A).

In 2007, Congress set a firm statutory obligation for NMFS to put in place Annual Catch Limits ("ACLs") and accountability measures in all fisheries subject to overfishing by May 1, 2010.  16 U.S.C. § 1853(a)(15); P.L. 109-479, § 104(b) (Jan. 12, 2007).  NMFS' most recent assessment of stocks in the fishery indicated that several regulated species are overfished and

---

[2]  FWW understands that the Court waived the requirement for filing a Statement of Undisputed Facts in this case. This is an administrative appeal, and all factual citations are to the administrative record.

subject to overfishing.[3]   Northeast (NE) Multispecies Fishery, Amendment 16, 75 Fed. Reg. 18,262 (Apr. 9, 2010) (AR Doc. 997 at 56485-56577).   Pursuant to the congressional deadline, the NEFMC prepared A16 and submitted it to the Secretary for approval.   *Id*.   The Secretary, acting through the National Oceanic and Atmospheric Association ("NOAA") and NMFS, approved A16, and it was published in the Federal Register on April 9, 2010.   *Id*.   A16 is implemented through regulations at 50 C.F.R. § 648 *et seq*.

### B.      The National Environmental Policy Act

NEPA, 42 U.S.C. § 4321 *et seq*., declares a broad national commitment to protecting and promoting environmental quality.   42 U.S.C. § 4331; *Dubois v. U.S. Dep't of Agric.*, 102 F.3d 1273, 1285 (1st Cir. 1996) (citing *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 348 (1989)).   To further this commitment, NEPA establishes "action-forcing" procedures that require federal agencies to take a "hard look" at the environmental consequences of their actions. *Dubois*, 102 F.3d at 1284-85 (citing *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council,* 462 U.S. 87, 97 (1983) & *Kleppe v. Sierra Club,* 427 U.S. 390, 410 n.21 (1976)).   Chief among these procedures is the preparation of an environmental impact statement ("EIS").   42 U.S.C. § 4332(2)(C).   Agencies must analyze "direct and indirect effects (secondary impacts) of a proposed project" and "reasonably foreseeable" future impacts.   40 C.F.R. § 1502.16(b); *Dubois*, 102 F.3d at 1285.   In addition, agencies must study all alternatives to the proposed action that appear "reasonable and appropriate." 42 U.S.C. § 4332(2)(c)(iii); *Dubois*, 102 F.3d at 1286.

---

[3]   "Stock" means "a species, subspecies, geographical grouping, or other category of fish capable of management as a unit." 16 U.S.C. § 1802(42).

Pursuant to NEPA and the MSA, Defendants published an EIS for A16 in October 2009. AR Doc. 773 ("EIS").[4]

## II. AMENDMENT 16

A16 institutes major changes to the fishery regulatory scheme, most notably through its significant expansion of "sector management measures." *See* 50 C.F.R. § 648.8 (2010). A16 establishes an ACL for each stock, representing the total amount in pounds that all fishery participants can collectively catch in a year. 75 Fed. Reg. 18,276. To ensure the ACL is not exceeded, A16 imposes a Total Allowable Catch ("TAC") to limit the catch of fishermen that join "sectors."[5] *Id.* A16 defines "sector" as a "group of persons holding limited access [Northeast] multispecies permits who have voluntarily entered into a contract and agree to certain fishing restrictions for a specified period of time, and that have been allocated a portion of the TACs of species managed under the [FMP]."[6] 50 C.F.R. § 648.2. The portion of the TAC allocated to a sector is known as that sector's "Annual Catch Entitlement" ("ACE"), and it is calculated by summing the quotas assigned to each individual permit holder who joins that sector. *Id.* The quota assigned to an individual permit holder is known as a Potential Sector Contribution ("PSC").[7] *Id.*

A PSC is assigned to each permit based purely on the permit holder's landings history (total fish caught) for the stock associated with that permit. *Id.* PSCs are determined by first

---

[4]  To facilitate access to the information contained in A16's Final EIS, AR Doc. 773 at 47979-48585, all citations to the EIS will refer to the internal page number of the EIS document rather than the Bates stamp.

[5]  "Total allowable catch" means "the annual domestic harvest targets for regulated species." 50 C.F.R. § 648.2. "Annual catch limit" generally means the same as "total allowable catch," but ACL is considered to be more binding. 74 Fed. Reg. 3,183.

[6]  A16 specifically approves 17 sectors and provides for the creation of more sectors. AR Doc. 134 at 11161.

[7]  PSC "with respect to the NE multispecies fishery, means an individual vessel's share of the ACL for each stock of regulated species or ocean pout [an eel-like species] that is derived from the fishing history associated with the permit issued to that particular vessel for the purposes of participating in a sector and contributing to that sector's ACE for each stock allocated to sectors under the NE Multispecies FMP." 50 C.F.R. § 648.2.

calculating the sum of the landings from 1996 to 2006.  Administrative Record ("AR") Doc. 773 at 47765-66 (A16 EIS at 9-10).  This value is then divided by the total landings during the same period by all sector-eligible permits.  75 Fed. Reg. 18,276.  In other words, the initial allocation is determined by the permit holder's landings *as a percentage* of the total landings.  PSCs remain tied to permits indefinitely, even if the original permit holder sells the permit to another vessel. *Id.*  Those who have had smaller catches over the relevant time frame will receive a low initial allocation, and the only way that a fisherman can obtain more PSC is by buying or leasing PSC from others' permits.  *Id.*  To do this, the fisherman must join a sector.  *Id.*  In addition, A16 removes a restriction that limited the ACE available to any one sector at 20% of the yearly TAC "to further facilitate participation in sectors."[8]  75 Fed. Reg. 18,276, 18,296.

Sectors represent a drastic shift from the traditional days-at-sea ("DAS") management program that has been used to manage the fishery since 1994.  AR Doc. 169 at 12270.  Under the DAS approach, catch is restricted by means of "effort controls" consisting of trip limits, gear restrictions, and other comparable limitations.  75 Fed. Reg. 18,309.  All individual permits will be assessed and granted a fixed PSC under A16.  *Id.* at 18,276.  Fishermen can ostensibly choose not to join a sector and to fish under the DAS system in what A16 terms the "common pool" of fishery resources.  *Id.* at 18,273.  The common pool is allocated the portion of the ACL for each stock that is not allocated to sectors.  AR Doc. 990 at 56439.  Although under A16, fishermen are still provided the "option" to stay in the common pool, new management measures make it economically impractical to do so.

---

[8]  The NEMFC adopted a sector approach in 2004 via Amendment 13 to the FMP ("A13"), which created two fixed-gear sectors for Georges Bank cod and allocated a large percent to a sector that then distributed it among its members. 69 Fed. Reg. 22,906 (Apr. 27, 2004).  A13 limited the size of an individual sector's allocation to no more than 20% of the yearly TAC for any regulated stock.  *Id.*

First, vessels who remain in the common pool ("common pool vessels") have significantly limited DAS allocations compared to previous years.[9]  75 Fed. Reg. 18,273. Second, DAS will now be counted in 24-hour increments; under the former system, DAS were counted in increments of minutes.  *Id*.  Every trip a fisherman makes will now count as one day-at-sea, even if the trip is only three hours.  *Id*.  Smaller-scale fishermen, who may not possess the staff or equipment to stay out for an entire 24 hours, can no longer bank the remaining hours, and they will thus have their overall fishing-time drastically reduced if they remain in the common pool.  Because of the fixed costs associated with each fishing trip, large vessels that can stay out longer will yield a larger return on their investment.  Third, after 2012, all common pool vessels face fishing closures, if they come close to fishing the total amount they are allowed to fish as a group.  EIS at 148.  Sector vessels, on the other hand, have the ability to purchase more quota and are not subject to many of the effort controls imposed under the DAS system.  75 Fed. Reg. 18,273; EIS at 118.  This combination of policies effectively forces vessels to join a sector. Indeed, Defendants state that under A16 the scale of sector participation "will increase nearly ten-fold," and preliminary estimates suggest "nearly two-thirds of the fishery may choose to join sectors."  EIS at 481.

By effectively ensuring that sectors will become the primary means of fishery management, A16 opens the door for large industrial-scale vessels to dominate the fishery. Because smaller-scale fishermen' landings are much lower compared to these larger vessels, they receive insufficient initial PSC allocations.  *See* EIS at 636 (estimating PSC by vessel length group).  Moreover, because A16 bases PSC on landings history only, under A16 the fishermen that leased their DAS have lost the value of that DAS allocation because it is not reflected in

---

[9]  Under A16, new DAS allocations will be reduced 50% from each vessel's 2006 DAS allocation and by approximately 32% from each vessel's 2009 allocation.  75 Fed. Reg. 18,273.

their landings history.[10]  Smaller-scale fishermen may find that their assigned PSC falls short of the amount of fish they must catch to earn a living, and that it makes more sense to sell or lease their quota than struggle with their insufficient allocations.[11]  By contrast, the permit holders who receive the largest initial allocations of quota represent those who have the ability to purchase more quota and thus thrive under the system.

In sum, the combined impact of low initial PSC allocations, transferrable PSC, and the ability of sector participants to combine multiple PSCs will force out smaller-scale fishermen. Defendants tout A16 as an effective tool to increase consolidation of the fishery, allowing vessels to "pool harvesting resources and consolidate fishing effort onto fewer vessels to increase the flexibility and economic efficiency of fishing operations."  75 Fed. Reg. 18,308.  It is clear that consolidation is A16's goal and will be its outcome.  However, for the reasons stated below, Defendants abjectly failed in their statutory duty to consider and adequately protect against the negative consequences of this consolidation.

### III.  STANDARD OF REVIEW

In reviewing regulations implementing FMPs or amendments thereto, the MSA requires a court to apply the standards of review prescribed by the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(A)-(D); *see* 16 U.S.C. § 1855(f)(1); *Conservation Law Found. v. Evans*, 360 F.3d 21, 27 (1st Cir. 2004).  Likewise, a NEPA claim is reviewed under the APA standards.  *Town of Norfolk v. U.S. Army Corps of Eng'rs,* 968 F.2d 1438, 1445 (1st Cir. 1992).

---

[10]  *See* Letter from Garden State Seafood Association to NOAA Regional Administrator Patricia Kurkul, AR Doc. 591 at 32596 (expressing concern that it would be unfair to allocate quota based upon history only because of the necessity for some fishermen to lease their initially-low DAS allocations).

[11]  *See, e.g.,* Letter from New Bedford Mayor Scott Lang, AR Doc. 1010 at 56763-66; Letter from several New Bedford fishery support industry companies, AR Doc. 964 at 56198, Letter from Northeast Seafood Coalition to NEFMC, AR Doc. 158 at 11902-04.

Under the APA, a court may set aside an administrative action if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.   5 U.S.C. § 706(2)(A).   Agency actions are arbitrary and capricious "if the agency has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of the agency's expertise."   *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 658 (2007); *see Associated Fisheries of Me., Inc. v. Daley,* 127 F.3d 104, 109 (1st Cir. 1997).

A court may review only the evidence that was before the agency at the time the decision was made.   *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 420 (1971); *Lobsters, Inc. v. Evans*, 346 F. Supp. 2d 340, 343 (D. Mass. 2004).   Although the standard of review is narrow, the court "must undertake a thorough, probing, in-depth review and a searching and careful inquiry into the record."   *NLRB v. Beverly Enter.-Mass., Inc.*, 174 F.3d 13, 24 (1st Cir. 1999) (citing *Citizens to Preserve Overton Park*, 401 U.S. at 415).   An agency's ultimate decision is entitled to deference, but the record supporting the decision must reveal that the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made."   *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983) (internal citations omitted).   Thus, the court may not simply "rubber stamp" the agency action.   *Penobscot Air Serv., Ltd. v. Fed. Aviation Admin.*, 164 F.3d 713, 718 n.2 (1st Cir. 1999).

In conducting this analysis with respect to an FMP, this court has held that it should be particularly cognizant of the ten National Standards contained in the MSA.   *Commonwealth of*

*Mass. by Div. of Marine Fisheries v. Daley*, 10 F. Supp. 2d 74, 76 (D. Mass. 1998) (citing 16 U.S.C. § 1851(a)(1)-(10)).

In reviewing FWW's first claim regarding Defendants' failure to submit A16 to a referendum, a court must apply the two-step test articulated in *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984). First, it must inquire whether Congress has spoken to the precise question at issue; if it has, the court must give effect to Congress's unambiguously expressed intent. *Id*. A court may look to the statute's language, history, and purpose, and may apply canons of statutory construction in ascertaining whether Congress has spoken directly and unambiguously to a particular issue. *Id*. at 843 n.9; *Me. Ass'n of Interdependent Neighborhoods v. Comm'r, Me. Dep't of Human Servs.*, 946 F.2d 4, 6 (1st Cir. 1991). Second, if the statute is ambiguous, a court must determine whether the agency's interpretation of the statute is permissible. *Chevron*, 467 U.S. at 843. It must give deference to the agency's interpretation unless it is arbitrary, capricious, or manifestly contrary to statute. *Id*. at 844. A regulation is arbitrary or capricious in this context, if it conflicts with the statute or if the "agency has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of the agency's expertise." *State Farm*, 463 U.S. at 43.

## IV.  ARGUMENT

### A.  Defendants' Failure to Submit A16 to a Referendum Prior to Its Final Approval Violated the MSA.

Defendants implemented A16 without conducting a referendum, one of the required ten National Standards, thus depriving New England fishermen of their statutory right to participate in determining the fate of their fishery. The MSA requires that, in New England, "the Secretary

may not approve or implement, an [FMP] or amendment that creates an individual fishing quota

program ["IFQ"] ... unless such a system, as ultimately developed, has been approved by more

than 2/3 of those voting in a referendum among eligible permit holders."   16 U.S.C. §

1853a(c)(6)(D)(i).  It is undisputed that Defendants failed to conduct a referendum.  Defs. Ans.

at ¶ 77, *Lovgren v. Locke*, 10-cv-11168-GAO, Court' Dkt. #16 (July 23, 2010).  Defendants

attempt to evade this requirement by using the new term "PSC" instead of "IFQ."  However, the

substance of A16 demonstrates that PSCs are the functional equivalent of IFQs and are,

therefore, subject to the MSA's referendum requirement.

The MSA defines an IFQ as "a Federal permit under a limited access system to harvest a

quantity of fish, expressed by a unit or units representing a percentage of the [TAC] of a fishery

that may be received or held for exclusive use by a person."[12]  16 U.S.C. § 1802(23).  The

"assignment of a *percentage* of the [TAC]" is the "key component" of an IFQ system.  AR Doc.

55 at 05854 (letter from NOAA Regional Administrator Patricia Kurkul ("Kurkul") to NEFMC

Chairman John Pappalardo ("Pappalardo") explaining why a proposed-and-rejected plan may

have been considered an IFQ program).  Established IFQ systems have most commonly used

landings history as the mechanism for allocating each individual's initial quota.[13]

Like IFQs, PSCs represent the percentage of the TAC an individual is permitted to catch.

Like IFQs, this percentage is calculated in terms of pounds of a stock.  75 Fed. Reg. 18,275-76.

And, like IFQs, PSCs are based on individuals' catch history over a specified number of years.

*Id.* at 18,276.  Moreover, PSCs are assigned to a permit holder for his exclusive use.  PSCs

---

[12]  It is undisputed that the fishery is managed as a "limited access system," which is a "system that limits
participation in a fishery to those satisfying certain eligibility criteria or requirements contained in an FMP or
regulation."  16 U.S.C. § 1802(27); *see* 75 Fed. Reg. 18,275.

[13]  *See NOAA Catch Share Policy*, NOAA Office of Sustainable Fisheries, *available at*:
http://www.nmfs.noaa.gov/sfa/domes_fish/catchshare/index.htm (describing catch share systems generally and
providing links to specific IFQ programs).

"remain with the limited access permit indefinitely" and permit holders can move, with their PSCs, both between sectors and between a sector and the common pool. *Id.* at 18,276. Any utilization of PSC is completely within the control of the permit holder, who can choose when, how, and if he will access his quota. The fact that PSCs can be sold or leased does not negate this fact. An "individual transferable quota" ("ITQ") is an IFQ that can be transferred subsequent to initial allocations, and Defendants use the terms ITQ and IFQ interchangeably, even within the context of A16.[14] *See* 75 Fed. Reg. 18,275; 18,302 (referring to "the ITQ referendum requirement"); *see also* S. Rep. 104-276 at 10 (1996) ("The commonly-used term 'individual transferable quota' would therefore mean a type of IFQ that is transferable."). The term PSC, like ITQ, is merely indicative of a type of IFQ. While "ITQ" is an IFQ that may be transferred to other fishermen, PSC is a transferrable IFQ that can be accessed by joining a sector, making PSCs the functional equivalent of IFQs.

The MSA exempts "sector allocations" from the referendum requirement, 16 U.S.C. § 1853a(c)(6)(D)(vi), and Defendants appear to improperly rely on this exemption with respect to A16. 75 Fed. Reg. 18,292 (responding to public comments that Defendants should have held a referendum, Defendants first cite the sector allocation exemption). Although the MSA does not define "sector" or "sector allocation," Defendants' invocation of these terms to avoid submitting A16 to a referendum is impermissible. Indeed, Defendants seem unclear as to whether they themselves are implementing a sector allocation. *Compare* 75 Fed. Reg. 18,292 ("Individual sectors … are not allocated a portion of the TAC.") *and id.* at 18,295 (A16 "does not directly or deliberately allocate any fishing privileges") *with id.* at 18,339 ("Each sector shall be allocated a

---

[14] *See Glossary of Catch Share Terms*, NOAA Fisheries Service Office of Policy (Nov. 2009), *available at* http://www.nmfs.noaa.gov/sfa/domes_fish/catchshare/docs/glossary_of_cs_programs.pdf (defining ITQ).

TAC in the form of an ACE.") *and id.* at 18,309 (defining ACE as the share of the ACL "allocated to an individual sector").[15]

Moreover, nationally, and under Amendment 13, "sectors" have historically referred to groups of fishermen formed around a unifying characteristic of the members, *e.g.* type of gear used, targeted stock, or purpose (recreational versus commercial).[16]  By contrast, the "sectors" under A16 are unified only by the members' individual desires to access their quota.[17]  50 C.F.R. § 648.2; *see* 75 Fed. Reg. 18,295 ("Sectors themselves are merely vehicles for allowing individual fishermen to voluntarily enter into an arrangement to fish under certain exemptions to the FMP based on their individual fishing histories.").

Additionally, Defendants failed to provide a rational basis for why PSCs are not IFQs.  In response to public comments from FWW and others raising the concern that PSCs are IFQs, Defendants instead addressed why *sectors* are not IFQs.  *See* AR Doc. 887 at 51653 (FWW Comments); 75 Fed. Reg. 18,275 & 18,292 (responding to comments).  Defendants state that

---

[15] Whether A16 implements a sector *program* or a sector *allocation* is an important distinction.  Congress did not exempt sector *programs* from the referendum requirement; the statute specifically exempts sector *allocations*.  16 U.S.C. § 1853a(c)(6)(D)(vi). At the time the referendum requirement and exemption were added, Defendants used "sector allocation" to describe the management scheme under A13 radically different from A16's plan. 69 Fed. Reg. 22,906 (Apr. 27 2004).  Most importantly, A13's quota allocations were to the sector *as a unit.  Id.* at 22,914.  The subsection exempting sector allocations from the referendum requirement was not part of either bill passed out of the Senate and House committees of jurisdiction; the exemption language appeared as a last minute change just prior to passage, and thus no legislative history is available.  *See* 152 Cong. Rec. S11507, 11511 & 11535 (Dec. 7, 2006). In the absence of direct legislative history, the only reasonable conclusion is that Congress intended "sector allocation" to be defined as used at the time in existing regulatory schemes.  Thus, it is not unreasonable to infer that Congress intended to exempt only the already existing sector allocation, or future programs that implement similar sector allocations.  This interpretation aligns with other provisions of the bill that prevented the new limited access provisions of the MSA from disrupting existing programs.  16 U.S.C. § 1853a(h).

[16] *See, e.g.,* 75 Fed. Reg. 10,450 (Mar. 8, 2010) (dividing sectors based on commercial or recreational fishermen); 75 Fed. Reg. 32,994 (June 10, 2010) (dividing sectors between whiting [a type of fish] and non-whiting fishermen); 73 Fed. Reg. 15,674, 15,675 (Mar. 25, 2008) (dividing sectors into charter, private, and headboat type).  Defendants also use the term "sector" in a more general sense in the context of A16.  *See* EIS at 312 (stating that the fishery is comprised of a commercial sector and a recreational sector).

[17] A16's sector program bears a striking resemblance to programs called "cooperatives" in regions where IFQs do not call for a referendum (and thus styling a program a "sector allocation" has no legal effect).  *See* AR Doc. 175 at 12326 (summary of West Coast multispecies management measure based on cooperatives, which closely resemble A16's sector program).

there is no permit issued to a sector, and that sectors are "transient entities" with "no permanent or long-term allocation." 75 Fed. Reg. 18,275. Yet the traits that Defendants argue differentiate *sectors* from IFQs are the traits that make *PSCs* similar to IFQs. Thus, Defendants' explanation for interpreting the statute the way it did is not well-reasoned.

The referendum requirement is of the utmost importance to the MSA-mandated considerations of fairness and equity. Limited access privilege programs ("LAPPs"), including IFQ programs, are highly controversial measures in large part due to their potential impact on smaller-scale fishermen and coastal communities.[18] *See* S. Rep. 109-229, at 9 (2006) (explaining the need for measures to protect these groups from adverse impacts of LAPPs). The referendum requirement, one of the binding national guidelines established by Congress in 2006 to govern LAPPs, ensures that individual fishermen have equal rights to determine the fate of the fishery and protect against the adverse effects of consolidation.[19] *Id.* Through voting in a referendum, smaller-scale fishermen are able to have a voice in the fishery management scheme to determine how—and whether—the fishery's resources should be distributed.

Defendants' interpretation ignores Congress's focus on protecting fishermen's rights when *individuals* are allocated a portion of the TAC and leads to absurd results by allowing subversion of a congressionally-mandated requirement through semantic maneuvering. Indeed,

---

[18] "Limited access privilege" means "a Federal permit, issued as part of a limited access system … to harvest a quantity of fish expressed by a unit or units representing a portion of the [TAC] of the fishery that may be received or held for exclusive use by a person; and … includes an [IFQ]. 16 U.S.C. § 1802 (26). Congress created specific provisions concerning LAPPs at 16 U.S.C. § 1853a.

[19] NMFS' own data show a dramatic reduction in fleet numbers wherever an IFQ program has been implemented. *See* Catch Share Spotlight: Alaska halibut and sablefish fisheries (IFQ program resulted in 70%  reduction in the number of vessels from 1994 to 2008), *available at*
http://www.nmfs.noaa.gov/sfa/domes_fish/catchshare/docs/ak_halibut_sablefish.pdf; Catch Share Spotlight: Red king crab fishery (IFQ program resulted in 71% reduction in number of vessels from 2004 to 2008), *available at*
http://www.nmfs.noaa.gov/sfa/domes_fish/catchshare/docs/crabrat_program.pdf ; Catch Share Spotlight: Wreckfish fishery (fleet was reduced from 91to 27 vessels within first two years of IFQ program; by 2009 there were 10 vessel permits and fewer than 5 five active vessels), *available at*
http://www.nmfs.noaa.gov/sfa/domes_fish/catchshare/docs/wreckfish.pdf.

the NEFMC acknowledged as much in a letter presenting arguments that "it does not make sense" for sector allocation "to apply to a system that meets the statutory definition of an [IFQ]" because this "would provide a loophole for evading IFQ referendum requirements merely by naming these organizations 'sectors,' since there isn't any discussion of how sectors differ from other programs subject to a referendum," allowing evasion of the requirement for a future ITQ system "just by defining the program as a 'sector.'"   AR Doc. 103 at 10140 (letter from Pappalardo to Kurkul seeking guidance on whether sectors will be subject to referendum).

The Record demonstrates that Defendants were aware since at least 2007 of the potential complexities of subjecting A16 to a referendum and actively sought to avoid this process.  *See, e.g.*, AR Doc. 158 at 11903 (letter from Northeast Seafood Coalition to NEFMC stating that none of their members would support A16); AR Doc. 55 at 05855 (letter from Pappalardo to Kurkul stating NEFMC's belief that the referendum requirement makes IFQ proposals impractical because of the limited time frame, and that such proposals were rejected "primarily due" to this requirement); AR Doc. 47 at 05287 (letter from Ocean Conservancy to NOAA Chief Regional Council Gene Martin calling it "unfortunate" that Congress included referendum requirement and stating that there was "consternation" over which alternative might meet IFQ definition, because NEFMC will want to anticipate whether it "will be effectively blocked, down the road," by a referendum); EIS at 66 (stating NEFMC's concern that there would not be enough time available to develop a proposal and complete the referendum); AR Doc. 103 at 10134-40 (correspondence between Pappalardo and Kurkul on whether sectors under A16 meet referendum exemption, and posing arguments on both sides).

Since the distribution of the TAC to individual vessels is the functional equivalent of an IFQ, it must be subject to the same requirements.  *See United States v. O'Brien*, 130 S. Ct. 2169,

2181 (2010) (holding that functionally equivalent factors are subject to the same legal standards) (Stevens, J., concurring); *United States v. Lopez*, 380 F.3d 538, 545 (1st Cir. 2004) (holding that functionally equivalent actions triggered same requirements) (citing *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)).   Defendants have impermissibly read into the statute an unrestricted ability to avoid congressional requirements by a linguistic sleight of hand substituting sector allocation for what is in all respects an IFQ.   *See Haw. Longline Ass'n v. NMFS*, 281 F. Supp. 2d 1, 22 (D.D.C. 2003) ("Agencies derive their authority from law and may not exceed its limitations or circumvent its requirements.").   Their interpretation is arbitrary, capricious, and not in accordance with law.   5 U.S.C. § 706(2)(A); *see Arctic Sole Seafoods v. Gutierrez*, 622 F. Supp. 2d 1050, 1061 (W.D. Wash. 2008) (holding NMFS' regulation invalid because it is impermissible in light of the statutory language and purpose and not supported by a rational basis).

### B. Defendants' Failure to Adequately Assess Environmental Impacts and Evaluate All Reasonable Alternatives Violated NEPA.

### 1.   Failure to Adequately Assess A16's Environmental Impacts

To ensure that a federal agency makes "a fully informed and well-considered decision," it must "consider every significant aspect of the environmental impact of a proposed action." *Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council*, 435 U.S. 519, 558 (1978); *Dubois*, 102 F.3d at 1285 (citing *Baltimore Gas*, 462 U.S. at 97).   This includes "direct and indirect effects (secondary impacts) of a proposed project," and "reasonably foreseeable" future impacts.   40 C.F.R. § 1502.16(b); *Dubois*, 102 F.3d at 1285.   The First Circuit has defined a reasonably foreseeable impact as one that is "sufficiently likely to occur that a person of ordinary prudence would take it into account in reaching a decision."   *Dubois*, 102 F.3d at 1286.   Though the most speculative of effects need not always be included in an EIS, "[r]easonable forecasting

... is ... implicit in NEPA, and [courts] must reject any attempt by agencies to shirk their responsibilities under NEPA by labeling any and all discussion of future environmental effects as 'crystal ball inquiry.'"  *Id.*  (quoting *Scientists' Inst. for Pub. Info. v. Atomic Energy Comm'n*, 481 F.2d 1079, 1092 (D.C. Cir. 1973)).  Agencies must also collect all available information on speculative consequences and include it in the EIS; if the cost of obtaining the information is exorbitant, the agency may summarize what information is available, explain its relevance, and attempt to evaluate the limited information based on accepted theoretical approaches or research models. 40 C.F.R. § 1502.22.

Defendants' analysis is inadequate because it fails to assess the environmental impacts of the *distribution* of PSC allocations to vessels employing different gear types.  Although Defendants analyzed the very general environmental impacts of fishery activity by gear type used, *see* EIS at 262-63, they failed to make the connection between PSC distributions and an increase in the use of environmentally damaging fishing gear, despite their own data demonstrating the likelihood of this event, as shown below.

Defendants documented in a subsequent Environmental Assessment ("EA") that bottom trawlers, and specifically Georges Bank ("GB") haddock trawlers, have the highest fishing landings over the years used to determine quota.[20]  Georges Bank Cod Fixed Gear Sector EA, AR Doc. 898 at 52432.  In A16's EIS, Defendants estimate that large boats fishing for GB haddock will receive the greatest initial allocation of quota:  about 66% of A16's initial allocation.  EIS at 638.  Because bottom trawlers account for the vast majority of GB haddock catch, and boats that fish for GB haddock will receive the largest quota, it is reasonable to assume that these trawlers will receive a large amount of quota.  Not only does this allow

---

[20] An Environmental Assessment is a document prepared by federal agencies under NEPA to "provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement."  40 C.F.R. § 1508.9.

fishermen who use bottom trawlers to fish more, but it gives them the buying power to acquire more quota from small fishermen. Thus, as A16's PSC allocation program reaches full effect, the reasonably foreseeable outcome is that boats using bottom trawlers will fish an increasingly larger percentage of the TAC.

As bottom trawlers become more prevalent, groundfish fishing will cause increased environmental impacts. Defendants' own studies show bottom trawls to be the fishing gear associated with the highest level of environmental damage. EIS at 263. Bottom trawling is a non-passive and non-selective fishing method, in which a trawler net actively dredges the ocean floor, catching whatever species may be in their path and large enough to be caught in the net mesh. *Medeiros v. Vincent*, 431 F.3d 25, 30 (1st Cir. 2005). Defendants describe the high level of environmental damage bottom trawling causes in the EIS conducted for Amendment 13, incorporated by reference in the A16 FEIS. AR Doc. 3 at 01310-11 (A13 SEIS); EIS at 262-63. The numerous environmental impacts of bottom trawls Defendants document are both adverse and significant. Bottom trawls can permanently destroy physical features of the marine environment, cause the loss of ecologically important structure-forming organisms and numerous species and stocks dependent on those organisms; degrade habitat, including natural and biogenic features, and reduce ecological diversity in various ways.[21] EIS at 262. Bottom trawls also have the highest rate of bycatch of all gear types, and GB Haddock trawlers have the highest rate of bycatch of all boats, even compared to other large trawlers.[22] *Id*. Thus, bottom trawls result in "very high habitat impacts." *Id*. at 263. In contrast, smaller-scale fishermen often

---

[21] For a full overview of the environmental effects of bottom trawls, see EIS at 262-67.

[22] "Bycatch" is the unintended catch of other marine species in a fishery not sold or kept for personal use. 16 U.S.C. § 1802(2). GB Haddock trawlers have a bycatch rate of 0.70; the next highest bycatch rate is 0.47, and the average for all trawlers is 0.268. EIS at 564.

employ fishing methods such as bottom gillnets, which have "low to medium impacts," and bottom longlines, which have "low impacts."[23]  *Id.*

The EIS includes estimates of allocations of stock by vessel size, but does not take the next step of analyzing the *effects* of those allocations. The EIS explains that:

> It is possible that the Proposed Action may have indirect biological impacts.  For example, if it results in allocating more groundfish to a sector that because of its fishing practices has more interaction with a non-groundfish stock that is overfished, including the use of less selective fishing gear that results in increased bycatch of non-targeted species, that option could increase fishing mortality on that stock and slow rebuilding progress.  These types of indirect impacts are impossible to predict without knowing sector membership and fishing practices. Because the Proposed Action allocates resources based on recent landings history, any indirect impacts will be due primarily to the transfer of ACE between sectors, or other exchanges of fishing privileges.

*Id.* at 502.  Based on the available data, it is reasonable to expect that an increase in the number of large boats that use bottom trawl fishing gear will cause a significant increase in the adverse environmental impacts associated with the fishery.   Hence, the reasonably foreseeable environmental impact of A16's implementation to a person of ordinary prudence is a significant increase in fishing activity that causes adverse environmental impacts.  *See Dubois*, 102 F.3d at 1286.

Defendants do not address this likelihood in the EIS.  To the contrary, they claim throughout the EIS that they cannot adequately predict future consequences of A16 because they do not yet have complete information on sector membership.  Even if Defendants are correct that a lack of complete information prevents them from properly considering possible future impacts of sector make up and potential consolidation, Defendants have still failed to comply with applicable law.  When faced with incomplete yet relevant data, agencies must either spend the

---

[23] *See* AR Doc. 898 at 52432 (showing that Gulf of Maine cod is the only stock fished primarily by small boats, and gillnets account for the highest rate of catch of Gulf of Maine cod.)

time and resources to collect all available information and include it in the EIS, or, if the cost of obtaining the information is exorbitant, summarize what information is available, explain its relevance, and attempt to evaluate the limited information based on accepted theoretical approaches or research models. 40 C.F.R. § 1502.22.  Defendants have done neither one.

Thus, Defendants have failed in their statutory duty to take a "hard look" at the environmental consequences of A16 and failed to consider its reasonably foreseeable future effects.  By not analyzing the environmental impacts that quota allocations will have through increased environmentally damaging fishing methods, Defendants have "entirely failed to consider an important aspect of the problem" at hand.  *Dubois*, 102 F.3d at 1285 (quoting *State Farm*, 463 U.S. at 43).  Defendants' failure to adequately analyze the environmental impacts of A16 is arbitrary, capricious, and not in accordance with law.  5 U.S.C. § 706(2)(A).

### 2. Failure to Evaluate All Reasonable Alternatives

Defendants failed entirely in their duty to study all alternatives to the proposed action that appear "reasonable and appropriate." 42 U.S.C. § 4332(2)(c)(iii); *Dubois*, 102 F.3d at 1286.  The consideration of alternatives is the "heart of the [EIS]."  *Dubois*, 102 F.3d at 1286 (citing 40 C.F.R. § 1502.14); *see also id.* at 1286-87 (requiring that decision maker "be provided with a detailed and careful analysis of the relative environmental merits and demerits of the proposed action and possible alternatives.").  They did not "[r]igorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated."  40 C.F.R. § 1502.14(a).  "The existence of a viable but unexamined alternative renders an [EIS] inadequate." *Id.* at 1287.

Defendants consider five superficially distinct alternatives, representing different ways to allocate initial quota to individual vessels in the newly implemented sectors.  *Id.* at 188-89.

These are nothing more than minor variations on the same substantive plan.  *See Friends of Yosemite Valley v. Kempthorne*, 520 F.3d 1024**,** 1038-39 (9th Cir. 2008); *see also Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations*, 46 Fed. Reg. 18,026, 18,027 (agencies have a duty to consider substantively different alternatives; compliance with NEPA demands that the "full spectrum of alternatives be analyzed and compared in the EIS."); *see also Sierra Club v. Watkins*, 808 F. Supp. 852, 872 (D.D.C. 1991) (holding EIS inadequate because only a small number of similar alternatives with similar environmental impacts were considered, in violation of full spectrum analysis requirement).  No non-sector alternatives are considered.

Defendants treat implementation of sectors as a predetermined outcome; the only alternatives that Defendants consider in the EIS are the details of that implementation.  *See* AR Doc. 169 at 12270 (detailing that in January 2008 Defendants had already decided that some version of sector management program would be implemented in A16); *see also* AR at 56758 (response of NOAA Administrator Jane Lubchenco ("Lubchenco") to concerns about sector program, stating that sector implementation would move forward because of significant time and resources already invested).  While there would be minor differences in the total pounds of catch allocated to vessels under each alternative, the quota distributions would be largely similar no matter which alternative Defendants chose.  EIS at 637-41; Tables 208-212.  Each plan would result in largely the same amount of fishing by each boat size and gear type and would have substantially the same environmental impacts.  Thus, any discussion of the alternatives' impacts would be insufficient because a discussion based on the EIS' limited alternatives would fail to provide the decision maker enough information to make a reasoned choice.  *Dubois*, 102 F.3d at 1286-87.

Defendants had a duty to consider substantively varied alternatives from the full spectrum of possibilities, thus allowing for a truly reasoned choice.  In *Friends of Yosemite Valley*, the National Park Service ("NPS") attempted to address park capacity management by devising a specific statistical program and analyzed alternatives representing different variations of the specific numbers within that same program.  520 F.3d 1024, 1029.  The Ninth Circuit ruled that these statistical differences did not satisfy NPS's duty under NEPA to consider the full range of alternatives and that NPS was required to consider qualitatively different alternatives as well.  *Id*. at 1038-39.  The same reasoning applies here.  Just as in *Yosemite Valley*, the alternatives discussed in the A16 EIS were all *quantitatively* different variations of the same substantive plan, and there was no consideration of any *qualitatively* different plans.  By considering only one substantive management tool—sectors—Defendants have arbitrarily limited the scope of the considered alternatives, and failed in their obligation to consider the full spectrum of reasonable alternatives.

Defendants also failed in their obligation to consider reasonable alternatives suggested by the public.  *See Dubois*, 102 F.3d at 1286 (holding agency has a duty to study significant alternatives suggested by the public during comment period).  Public comments submitted to Defendants raised serious concerns about the wisdom of the sector program.[24]  Public comments provided Defendants with *several* reasonable alternatives to a sector management approach.[25]

---

[24] *See, e.g.,* Public Comment of Ocean Conservancy, AR Doc. 591 at 32998 (detailing how Draft EIS places blame for past failures to prevent overfishing on faulty science and excessive quotas, not on failure of management controls that sectors are design to address).

[25] *See, e.g.,* Comment of Director of Associated Fisheries of Maine Maggie Raymond to NEFMC, AR Doc. 11 at 4386-90 (providing council with information on successful DAS program); Letter from Congress members Chellie Pingree and Michael Michaud, AR Doc. 591 at 32988 (urging Defendants to adopt Community Fishery Associations); Comment of Tom Osmers, Comment of Stephen Norberg, AR Doc. 591 at 33063 & 33059 (same); Community Fisheries Management Handbook Table 2, AR Doc. 8 at 03230 (providing general overview of "community based" fishery program); Comment of Northeast Seafood Coalition, AR Doc. 71 at 06519-21

Defendants did not explore and evaluate those alternatives, nor did they explain the failure to do so.  *See* EIS at V-24 (declaring suggestions for alternative management systems as outside the scope of issues considered).   Failure to consider the suggested alternatives renders the EIS inadequate.  *Dubois*, 102 F.3d at 1287; *id.* at 1290-91 (holding EIS inadequate in part due to agency's failure to address reasonable alternative submitted via public comment).

Defendants have failed in their duties to consider a reasonable range of alternatives, and in their duty to consider reasonable alternatives suggested by public comment.   These failures were arbitrary, capricious, and not in accordance with law.  5 U.S.C. § 706(2)(A).

### C. Defendants' Failure to Adequately Analyze A16's Socioeconomic Impacts Violated the MSA.

The MSA requires that any FMP or amendment thereto contain a fishery impact statement, "which shall assess, specify, and analyze the likely effects, if any, including the cumulative conservation, economic, and social impacts, of the conservation and management measures on, and possible mitigation measures for … participants in the fisheries and fishing communities affected by the plan or amendment."[26]   16 U.S.C. § 1853(a)(9).   Similarly, Defendants' regulations require FMPs to contain, among other things, an analysis of the social and economic importance of the fishery on communities potentially affected by management measures.   50 C.F.R. § 600.345(c)(1).   While recognizing that A16 would harm fishing communities, Defendants failed to evaluate those adverse impacts and identify alternatives that would mitigate them.  Instead, they hide under the cloak of uncertainty to avoid having to assess

---

(suggesting "Points System" approach); Comment of Earthjustice, AR Doc. 85 at 09339-42 (suggesting "Area Management" system).

[26] "Fishing community" means "a community that is substantially dependent on or substantially engaged in the harvest or processing of fishery resources to meet social and economic needs ... A fishing community is a social or economic group whose members reside in a specific location and share a common dependency on commercial, recreational, or subsistence fishing or on directly related fisheries-dependent services and industries."  50 C.F.R. § 600.345(3).

the potential adverse impacts.  Defendants' attempts to rely on the EIS to fulfill these obligations fail.

Defendants' purportedly set out a socioeconomic analysis in the EIS.  *See* EIS at 465-80 (giving overview of fishing communities); 626-746 (describing economic impacts); 746-78 (describing social impacts).  However, the economic analysis section simply provides numerical estimates of the initial allocation of PSCs by vessel size and homeport state.  *See* EIS at 636-54, Tables 207-227.  Raw allocation modeling numbers in a series of tables easily elude analysis.  But even these tables show that large vessels receive over 66% of the total initial allocation of fish stocks, the highest total value of such allocations, as well as the highest average value of allocations per vessel.  EIS at 638.  Defendants then fail to use these projections to analyze the impacts of these allocation numbers—that is, to assess *qualitatively* the actual, real-life socioeconomic effects on smaller-scale fishermen and their communities.  Quantitative projections do not serve as a sufficient proxy for the socioeconomic analysis Congress required under the MSA.  *See* 16 U.S.C. § 1853(a)(9) (fishery impact statements "shall assess, specify, *and analyze* the likely effects" of an FMP) (emphasis added); *N.C. Fisheries Ass'n, Inc. v. Daley*, 27 F. Supp. 2d 650, 664 (E.D. Va. 1998) ("*N.C. Fisheries II*") (finding that mere collection of economic data, without the attendant impacts analysis, did not satisfy Secretary's duty to analyze impacts).  Defendants also fail to adequately address the socioeconomic impacts of removing the cap restricting sectors from controlling over 20% of the yearly TAC.  *See* 75 Fed. Reg. 18,296-97.  Instead, to support their decision to remove the cap, Defendants impermissibly cite several goals that are not consistent with the MSA's National Standards regarding FMPs.[27]

---

[27]  These impermissible or irrelevant goals include "giving industry greater control over their own fate, providing a mechanism for economics to shape the fleet, rather than regulations ...  increasing economic efficiency, and transitioning the fishery from effort controls to quota management."  75 Fed. Reg. 18,296.

A § 1853(a)(9) analysis must additionally include a discussion of several socioeconomic factors regarding current and historical participation in a fishery for any FMP designed to achieve an optimum yield.[28]  16 U.S.C. § 1853(b)(6).  Defendants do not include a sufficient discussion of these or other factors meriting consideration under that section.[29]  Instead, they admit that the socioeconomic analysis is not complete, claiming that because sector participation is voluntary, it is too difficult to know the likely outcomes on fishermen and their communities. EIS at 481-82, 708; 75 Fed. Reg. 18,281.[30]

Defendants implicitly acknowledge that smaller-scale fishermen may be pushed out when they state that "it is possible to allow for consolidation in the fleet without compromising the diversity of the fleet."  75 Fed. Reg. 18,296.  Defendants even stated that a goal of A16 is to prevent excessive consolidation of the fishery, later refining the goal to maintaining *a diverse fleet*.[31]  *See* 75 Fed. Reg. 18,296; AR Doc. 169 at 12270 (Jan. 24, 2008 press release from NEFMC describing one of the goals of A16 as the prevention of excessive consolidation of fishing business so that a day boat fishery might continue).  While this may be possible—the number of vessels could shrink by similar percentages, leaving a smaller fleet with the same general makeup—Defendants do not explain *why or how* A16 will actually maintain a diverse fleet.  Nor do they analyze the inconvenient result underlying this statement—namely, that A16

---

[28]  "Optimum yield" is "the maximum sustainable yield from the fishery, as reduced by any relevant social, economic, or ecological factor."  16 U.S.C. § 1802 (33).

[29]  Other factors that Defendants must consider are: "(B) historical fishing practices in, and dependence on, the fishery; (C) the economics; (D) the capability of fishing vessels used in the fishery to engage in other fisheries; (E) the cultural and social framework relevant to the fishery and any affected fishing communities; (F) the fair and equitable distribution of access privileges; and (G) any other relevant considerations."  16 U.S.C. § 1853(b)(6).

[30]  "There are a number of sources of uncertainty associated with measures in [A16] that make precise evaluation of impacts difficult."  75 Fed. Reg. 18,281.  The "major cause of uncertainty" is "the uncertainty over the number of vessels that will choose to participate in groundfish sectors" because participation "will not be determined until after [A16] is submitted for review and approval by NMFS."  EIS at 481-82, 708.

[31]  *See* Letter from Northeast Seafood Coalition to NEFMC, AR Doc. 158 at 11902-03 (expressing concern that amendments in allocation effectively invalidated goals, objectives, rationale, and intended results of past-considered management approaches).

will inevitably push some fishermen out.  It is reasonable to assume that fishermen who receive low initial PSC allocations will struggle under the new scheme, while large-scale vessels with more available capital will buy up increasing amounts of quota.[32]  Defendants, however, do not address this likelihood or discuss alternatives to avoid it.  Instead, they defer the requisite analysis by stating that "future Council actions could be directed to explicitly increase, or at least maintain, the existing diversity of the fleet."  75 Fed. Reg. 18,296.

Even if a discussion of the impacts would contain some uncertainty due to the voluntary nature of sectors, reasonable assumptions can be made estimating sector participation rates.[33] Indeed, Defendants even estimate the rate of sector participation, but then fail to apply it.  *See* EIS at 481 (preliminary estimates suggest "nearly two-thirds of the fishery may choose to join sectors.").  Where an examination is warranted, Defendants should not be permitted to throw up their hands and say that not enough information is available. *See N.C. Fisheries II*, 27 F. Supp. 2d at 664 (a court has no authority to waive Secretary's statutory obligation to analyze socioeconomic effects of an FMP).  Moreover, Defendants' regulations specify that, where data are limited, efforts should be directed to identifying and gathering those data.  50 C.F.R. § 600.345(c)(2).  Even assuming the Defendants have insufficient data at present to assess the impacts on communities, they completely failed to provide a description of the data that that they have or would need for this analysis.

In addition, Defendants failed to identify communities dependent on the fishery and discuss the likely effect of prospective management alternatives on those communities' sustained

---

[32]  Defendants acknowledge in their regulations that "management measures allocating fishery resources among competing sectors may benefit some communities at the expense of others."  50 C.F.R. § 600.345(c)(1).

[33] For example, an economic model was employed in the Gulf of Mexico to estimate economic inefficiencies in the fishery and, therefore, which entities would find it more economically efficient to be bought out than to continue fishing.  Quinn Weninger, *Individual Fishing Quotas in the Eastern Gulf of Mexico Grouper Fishery: Fleet Restructuring, Effort Reduction and Cost Savings* (May 2008), *available at* http://www2.econ.iastate.edu/faculty/weninger/documents/GrouperIFQsMay2008.pdf.

participation in the fishery.  *See* 50 C.F.R. § 600.345(c)(3).  Defendants declare simply that "successful rebuilding of groundfish stocks should lead to future benefits for fishermen and their communities, but ... it is not clear that current fishery participants will reap those benefits."  EIS at 774.  Defendants further fail to assess the alternative management measures in terms of their likely positive and negative socioeconomic impacts on the communities in both the short and long terms, and identify alternatives that would minimize adverse impacts.  50 C.F.R. § 600.345(c)(4)-(5).  Where two alternatives achieve similar conservation goals, the "preferred alternative" is the alternative that minimizes the adverse economic impacts on and provides the greater potential for sustained participation of such communities.  *Id.* § 600.345(b)(1).  Where the chosen alternative negatively affects the sustained participation of fishing communities, the FMP should discuss the rationale for selecting this alternative over another with lesser socioeconomic impacts.  *Id.*  It fails to do so.[34]

Defendants also failed in their statutory obligation to develop measures to mitigate any potential adverse impacts of A16 on fishermen and fishing communities.  *See* 16 U.S.C. § 1853(a)(9).  The above admissions make clear Defendants' duty to develop mitigation measures, but the EIS contains no mitigation measures to lessen the socioeconomic impacts of the distribution of quota.  A16 leaves smaller-scale fishermen to fend for themselves, no matter how dire the economic consequences of A16 may be for them.

Defendants should not be permitted to claim that further socioeconomic analysis was impractical because prompt implementation was necessary to achieve conservation goals.[35]

---

[34]   Defendants instead defer consideration of alternative measures.  *See* 75 Fed. Reg. 18,281 (Council may reconsider an alternative means of allocation "during development of Amendment 17 or another future action.").

[35]   In a letter to New Bedford Mayor Scott Lang responding to his concern over quota distribution, Lubchenco stated that economic effects of receiving small quotas resulted not from the sector management measures, but from the required ACLs.  AR Doc. 1010 at 56758.

Under MSA National Standard 8, Defendants must consider socioeconomic impacts within the context of their conservation obligations.[36]   16 U.S.C. § 1851(a)(8).   Thus, Defendants have a "statutory obligation to balance their obligation to conserve fishery resources with their responsibility to minimize the adverse impacts on fishing communities." *N.C. Fisheries Ass'n, Inc. v. Daley*, 16 F. Supp. 2d 647, 654 (E.D. Va. 1997) ("*N.C. Fisheries I*").   Thus, the requirement that socioeconomic considerations not compromise conservation goals, *see* 50 C.F.R. § 600.345(b)(1), does not relieve Defendants from their obligation to evaluate the socioeconomic impacts of A16.   "The very reason National Standard 8 was added to the [MSA] was that there was no requirement ... that fishery management councils try to minimize the adverse impacts of fisheries regulations on fishing communities." *N.C. Fisheries I*, 16 F. Supp. 2d at 654 (quoting 142 Cong. Rec. S10794-02, S10825 (statement of Sen. Snowe)).   Moreover, here, the goals of conservation and mitigating adverse impacts need not even be in conflict: Lubchenco acknowledged that ACL requirements could be put in place to address overfishing while the sector program was delayed to study socioeconomic impacts.   AR Doc. 1010 at 56758; *see N.C. Fisheries II*, 27 F. Supp. 2d at 664-65 ("The purposes of National Standard 8 do not concern fishery conservation in isolation.   To the contrary, the express terms of National Standard 8 provide for a balancing of conservation interests against the economic rights of commercial fishermen and fishing communities.").

Neither Defendants' repeated pledge nor attempt to collect information *after* A16's adoption to help assess the actual socioeconomic impacts of sector management on individuals

---

[36]  MSA National Standard 8 provides, "conservation and management measures shall, consistent with conservation requirements of the [MSA] (including the prevention of overfishing and rebuilding of overfished stocks), take into account the importance of fishery resources to fishing communities ...  in order to (A) provide for sustained participation in such communities; and (B) to the extent practicable, minimize adverse economic impacts on such communities."  16 U.S.C. § 1851(a)(8).

and fishing communities, *see* 75 Fed. Reg. 55,305, AR Doc. 1010 at 56758-59; AR Doc. 891 at 52242; 75 Fed. Reg. 18,281, 18,296, does not meet MSA's requirement that this be done *before* fishery management measures are implemented.  Defendants were well aware of A16's potential socioeconomic consequences prior to its adoption, as opponents of the sector management program submitted letters to this effect and voiced their concerns at Council meetings.[37]  *See* 75 Fed. Reg. 18,295 (responding to public comments voicing concerns regarding consolidation).  At least one letter urged Defendants to delay implementing A16's sector program temporarily until they had a clear understanding of its effects on fishermen and their communities.  *See* AR Doc. 1010 at 56764 (Letter from New Bedford Mayor Scott Lang to Lubchenco).  Defendant Lubchenco responded that the program would move forward, citing considerations that have no bearing on the statutory mandate to assess the socioeconomic impacts of an FMP, such as the amount of time the NEFMC has worked on the plan and the investments in infrastructure already made by sector proponents.  *Id.* at 56758; *see also* 75 Fed. Reg. 55,305 ("The rapid implementation of [A16] made capturing a full-implementation baseline virtually impossible.").

An agency's substantial discretion in determining how it will follow congressional mandates "does not include rewriting or ignoring statutes."  *N.C. Fisheries I*, 16 F. Supp. 2d at 654.  Thus, although a court should defer to an agency "in making policy judgments and choosing appropriate management and conservation measures based on [its] evaluation of the relevant quantitative and qualitative factors," *Nat'l Fisheries Inst., Inc. v. Mosbacher*, 732 F. Supp. 210, 223 (D.D.C. 1990), here, where Defendants failed to even consider the relevant socioeconomic factors, no such deference is warranted.  *See N.C. Fisheries II*, 27 F. Supp. 2d at

---

[37] *See, e.g.,* Letter from New Bedford Mayor Scott Lang to Lubchenco, AR Doc. 1010 at 56763-66; Letter from several New Bedford fishery support industry companies to Lubchenco, AR Doc. 964 at 56198 ("Now because of [sectors] … 50% or more of the small boat fleet [comprising our customer base] will be out of business by years [sic] end."); Letter from Northeast Seafood Coalition to NEFMC, AR Doc. 158 at 11902-04.

664-65 (holding Secretary acted arbitrarily and capriciously in entirely failing to consider potential economic effect of fishery plan amendment on fishing communities).  Defendants' lack of perfect knowledge or expressed intent to conduct analysis in the future does not justify an inadequate analysis now.  Defendants' action in refusing to consider, let alone conduct, any analysis of the adverse socioeconomic impacts of the sector program on smaller-scale fishermen and dependent communities was arbitrary, capricious, and not in accordance with law.  5 U.S.C. § 706(2)(A).

## V. CONCLUSION

The regulatory scheme established under A16 has the practical effect of transferring the ability to fish to large, industrial-scale fishing vessels while pushing out smaller-scale fishermen. This will lead to significant adverse environmental and socioeconomic consequences that went unconsidered in the adoption of A16.  Defendants also adopted A16 without the required community input in the form of a referendum.  Because A16 was not based upon informed and reasoned decision-making, this Court should vacate A16 and enjoin its implementation until Defendants fully comply with the requirements set forth in the MSA and NEPA.


Dated: December 1, 2010.

                              Respectfully Submitted,


                               /s/ Arthur P. Kreiger_____
                              Arthur P. Kreiger (BBO No. 279870)
                              ANDERSON & KREIGER LLP
                              One Canal Park, Suite 200
                              Cambridge, MA 02141
                              Tel: 617-621-6540
                              akreiger@andersonkreiger.com

__/s/ Hope M. Babcock_____
Hope M. Babcock
Fed/D.C. Bar No. 14639
Institute for Public Representation
Georgetown University Law Center
600 New Jersey Ave. NW, Suite 312
Washington, D.C. 20001-2075
Tel: 202-662-9481
babcock@law.georgetown.edu

ADMITTED PRO HAC VICE

__/s/ Kelly D. Davis_____
Kelly D. Davis
Texas Bar No. 24069578
Institute for Public Representation
Georgetown University Law Center
600 New Jersey Ave., NW, Ste. 312
Washington, DC 20001
Tel: 202-662-9481
kdd33@law.georgetown.edu

ADMITTED PRO HAC VICE

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document was served today, December 1, 2010, via the Court's CM/ECF system on all Counsel of Record.

___/s/  Kelly D. Davis_____

Kelly D. Davis, Esq.