UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
)
THE CITY OF NEW BEDFORD, *et al.*,    )
)
      Plaintiffs,       )
)
    v.       )
)
GARY LOCKE, *et al.,*      )
)
      Defendants.      )
_____) CIVIL ACTION NO. 10-10789-RWZ
)
LOVGREN, *et al.,*      ) LEAVE TO FILE EXTENDED BRIEF
      Plaintiffs,       ) GRANTED BY ORDER OF COURT ON
)      DECEMBER 1, 2010
    v.       )
)
GARY LOCKE, *et al.,*      )
)
      Defendants.      )
_____)

**DEFENDANT CONSERVATION LAW FOUNDATION'S MEMORANDUM IN
SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO
PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT**

Peter Shelley          Greg Cunningham
MA BBO # 544334       ME BOB #7718
Conservation Law Foundation     Conservation Law Foundation
62 Summer Street        47 Portland Street
Boston, MA  02110        Portland, ME  04101
Telephone:  (617) 350-0990      Telephone:  (207) 210-6439
pshelley@clf.org         gcunningham @clf.org

Dated: January 28, 2011

# **TABLE OF CONTENTS**

TABLE OF CONTENTS...................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................. ii

I.      Introduction......................................................................................................... 1

II.     Background .......................................................................................................... 2

III.    Argument ............................................................................................................. 5

   A.  Standard of review .............................................................................................. 5

   B.  The agency action is consistent with the Magnuson-Stevens Act, its implementing
       regulations and the agency's guidelines and, therefore, must be affirmed. ........................ 7

       1.  The annual catch limits for stocks in the groundfish fishery were properly set in
           Amendment 16 and meet national standard 1 of the Magnuson-Stevens Act. ............. 7

       2.  The allocations for the pre-existing sectors and the recreational fishery are consistent
           with the Magnuson-Stevens Act. ............................................................. 13

           a.   The recreational allocation.................................................................. 14
           b.   The pre-existing sectors allocation. ....................................................... 17

       3.  Amendment 16 does not violate any of the Magnuson-Stevens Act provisions with
           respect to limited access privilege or IFQ programs. ................................... 18

           a.   Sectors do not meet the definition of a LAPP.................................... 19
           b.   The sector system is not an individual fishing quota system............................... 21

       4.  Amendment 16 complies with the National Environmental Policy Act.................... 25

       5.  NOAA Complied With the Requirements of the Regulatory Flexibility Act............. 29

IV.     Conclusion ........................................................................................................ 30

# TABLE OF AUTHORITIES

## Cases

*Adams v. EPA,*
  38 F.3d 43 (1st Cir. 1994) .................................................................................................. 5

*Allied Local & Regional Mfrs. Caucus v. U. S. E. P. A.*,
  215 F.3d 61 (D.C. Cir. 2000) ............................................................................................ 30

*Associated Fisheries of Maine, Inc. v. Daley*,
  127 F.3d 104 (1st Cir. 1997) ............................................................................................... 5

*Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, Inc.,*
  462 U.S. 87 (1983) ...................................................................................................... 6, 25

*Blue Water Fisherman's Ass'n v. Mineta*,
  122 F.Supp.2d 150 (D.D.C. 2000) .................................................................................... 30

*Camp v. Pitts*,
  411 U.S. 138 (1973) ........................................................................................................... 6

*Chevron U.S.A., Inc.v. Natural Res. Def. Council, Inc.,*
  467 U.S. 837 (1984) ......................................................................................................... 12

*Conservation Law Foundation v. Evans*,
  209 F. Supp. 2d 1 (D.D.C. 2001) ........................................................................................ 2

*Conservation Law Foundation v. Mosbacher*,
  996 F.2d 39 (1st Cir. 1992) ................................................................................................. 8

*Dubois v. U.S. Dept. of Agriculture*,
  102 F.3d 1273, 1286 (1st Cir. 1996) ................................................................................ 28

*Envtl. Def Fund, Inc v. U.S. Army Corps of Eng'rs*,
  492 F.2d 1123 (5th Cir. 1974) .......................................................................................... 25

*Liston v. Unum Corp. Officer Severance Plan*,
  330 F.3d 19 (1st Cir. 2003) ................................................................................................. 6

*M/V Cape Ann v. United States,*
  199 F.3d 61, 63-64 (1st Cir. 1999) ..................................................................................... 6

*Marsh v. Oregon Natural Res. Def. Council,*
  490 U.S. 360 (1989) .................................................................................................... 25, 26

*Massachusetts v. Gutierrez*,

    607 F. Supp. 2d 284 (D. Mass. 2009) .............................................................. 9

*Puerto Rico Sun Oil Co. v. EPA*,

    8 F.3d 73 (1st Cir. 1993) .................................................................................... 5

*Rempfer v. Sharfstein*,

    583 F.3d 860 (D.C. Cir. 2009), *cert. denied*, 130 S. Ct. 1707 (2010) ............... 6

*River Street Donut, LLC v. Napolitano*,

    558 F.3d 111 (1st Cir. 2009) ........................................................................... 17

*Seacoast Anti-Pollution League v. Nuclear Regulatory Comm'n*,

    598 F.2d 1221 (1st Cir. 1979) ......................................................................... 26

*Sierra Club v. Marsh*,

    976 F.2d 763, 767 (1st Cir. 1992) ................................................................... 28

*Town of Winthrop v. F.A.A.*,

    535 F.3d 1 (1st Cir. 2008) ................................................................................. 6

*Western Sea Fishing Company, Inc. v. Locke*,

    722 F. Supp. 126 (D. Mass. 2010) ........................................................ 6, 12, 18

## Statutes

Administrative Procedures Act 5 U.S.C. §§ 706(2)(A)-(D)(1994) ................................ 5

    5 U.S.C. § 706(2)(A) ....................................................................................... 5

    5 U.S.C. § 706(2)(D) ....................................................................................... 6

Magnuson-Stevens Fishery Conservation and Management Act, 16 U.S.C. §§ 1801-84 ............. 1

    16 U.S.C. § 1801(b)(4) .................................................................................. 10

    16 U.S.C. § 1802(13) ..................................................................................... 11

    16 U.S.C. § 1802(23) ..................................................................................... 24

    16 U.S.C. § 1802(26) ..................................................................................... 19

    16 U.S.C. § 1802(33) ..................................................................................... 11

    16 U.S.C. § 1802(33)(B) ................................................................................ 11

    16 U.S.C. § 1802(34) ..................................................................................... 11

    16 U.S.C. § 1802(a)(34) ................................................................................... 3

    16 U.S.C. § 1851(a)(1) ..................................................................................... 7

16 U.S.C. § 1851(a)(4)(B) ............................................................................... 15

16 U.S.C. § 1851(b) ........................................................................................... 8

16 U.S.C. § 1852(g)(1) ..................................................................................... 12

16 U.S.C. § 1852(h) ............................................................................................ 1

16 U.S.C. § 1852(h)(6) ....................................................................................... 3

16 U.S.C. § 1853(a)(1)(A) .................................................................................. 4

16 U.S.C. § 1853(a)(14) .................................................................................... 13

16 U.S.C. § 1853(a)(15) ...................................................................................... 3

16 U.S.C. § 1853a .......................................................................................... 3, 18

16 U.S.C. § 1853a(c)(6)(D) ................................................................................. 3

16 U.S.C. § 1853a(c)(6)(D)(vi) ..................................................................... 3, 22

16 U.S.C. § 1853a(h) ........................................................................................ 21

16 U.S.C. § 1854(a)(3) ..................................................................................... 28

16 U.S.C. § 1854(e)(3) ........................................................................................ 3

16 U.S.C. § 1854(e)(3)(A) ................................................................................ 10

16 U.S.C. § 1854(e)(4) .................................................................................. 3, 13

16 U.S.C. § 1857(1)(A), (B), (G).................................................................... 21

16 U.S.C. § 1858(g) .......................................................................................... 21

16 U.S.C. § 1859(a) .......................................................................................... 21

16 U.S.C. §1853a(b) ......................................................................................... 21

16 U.S.C.§ 1853a(c)(1)(D) ............................................................................... 20

Magnuson-Stevens Fishery Conservation and Management Reauthorization Act, P.L. 109-479.. 2

National Environmental Policy Act 42 U.S.C. § 4321-32........................................ 25

Regulatory Flexibility Act 5 U.S.C. §§ 601-612 (2006)........................................ 29

5 U.S.C. § 603 .................................................................................................. 29

## Rules and Regulations

40 C.F.R. § 1502.14 (2006) ............................................................................. 25

50 C.F.R. § 600.310 ....................................................................................... 9, 10

50 C.F.R. § 600.310(b)(2)(i) ............................................................................ 11

50 C.F.R. § 600.310(b)(2)(ii)........................................................................... 12

50 C.F.R. § 600.310(e)(1)(i) ................................................................................. 11

50 C.F.R. § 600.310(e)(2)(B), (E) ........................................................................... 3

50 C.F.R. § 600.310(j)((3)(i) .................................................................................. 12

Fed. R. Civ. P. 56(c) ................................................................................................ 5

**Federal Register**

63 Fed. Reg. 24229 (May 1, 1998) ........................................................................... 9

75 Fed. Reg. 18113 (April 9, 2010) ......................................................... 19, 22, 23

75 Fed. Reg. 18262 (April 9, 2010) .............................................................. passim

75 Fed. Reg. 5016 (February 1, 2010) ................................................................. 16

**Other Authorities**

Daniel S. Holland & Joshua Wiersma, *Free Form property rights for fisheries: The decentralized design of rights-based management through groundfish "sectors" in New England*, 34 Marine Policy 1076, 1078 (2010) ............................................................. 20

Northeast Multispecies (Groundfish) Fishery Management Plan ......................... passim

I.       **Introduction**

Conservation Law Foundation, Inc. ("CLF") submits this memorandum of points and authorities in support of its motion for summary judgment and in opposition to the motions for summary judgment filed by the Plaintiffs, City of New Bedford *et al*., (Docket Nos. 56 & 57) and James Lovgren *et al.* (Docket Nos. 55-1). CLF also responds here to matters raised in the Memorandum of *Amici* U.S. Representatives Frank and Tierney (Docket No. 62) and in the proffered motion for summary judgment of prospective plaintiff-intervenor, Food & Water Watch, Inc. ("F&WW")(Docket Nos.63 & 64).[1]

Plaintiffs challenge regulations promulgated on April 9, 2010 by the National Marine Fisheries Service ("NMFS") pursuant to the Magnuson-Stevens Fishery Conservation and Management Act, 16 U.S.C. §§ 1801-84 (hereinafter "Magnuson-Stevens Act"), implementing Amendment 16 to the Northeast Multispecies (Groundfish) Fishery Management Plan ("Groundfish FMP").

The substantive and procedural conservation and management elements contained in these rules were developed and approved by the New England Fishery Management Council ("New England Council"), the quasi-governmental planning entity responsible for preparing and submitting fishery management plans to the Secretary of Commerce for fisheries under the Council's jurisdiction. 16 U.S.C. § 1852(h).  The Groundfish FMP regulates the New England

---

[1] CLF requests an opportunity to respond fully to the issues raised by Governor Deval Patrick and Director Paul Diodati in their proffered *amici curiae* memorandum should the Court rule favorably on their motion to participate and the scope of that participation. *See* Intervenor [CLF] Response to Motion of Governor Deval Patrick *et al.* to Participate as *Amici Curiae* (Docket No. 71).

groundfish fishery, which catches a complex of fish species including Atlantic cod, haddock, yellowtail flounder, and others that are primarily found on the bottom of the ocean.[2]

## II.     Background

The first fishery management plan developed by the New England Council managing the groundfish fishery in New England was adopted in 1986, Groundfish FMP at 53, Administrative Record ("AR") at 047,809. That first plan managed three species of fish: cod, haddock and yellowtail flounder. The New England Council began development of Amendment 16 in 2006 directly on the heels of the previous major amendment, Amendment 13, itself the progeny of earlier federal litigation. *Id.* at 54, AR at 047,810.[3]  Amendment 13 specified that the groundfish rebuilding plans and associated annual catch limits for overfished fish stocks would be re-assessed and revised as necessary before the beginning of the May 1, 2009 fishing year. Amendment 16 was the procedural vehicle chosen for accomplishing that objective. Groundfish FMP at 5, AR at 047,761.

That same year, the Magnuson-Stevens Act was reauthorized by Congress. Magnuson-Stevens Fishery Conservation and Management Reauthorization Act, P.L. 109-479, ("MSA Reauthorization"). The MSA Reauthorization added a number of new legal requirements:

---

[2] The regulated groundfish complex is managed as twenty stocks of thirteen species, because of geographical distinctions between the concentrations of fish of some of the species. They are: Georges Bank (GB) cod, Gulf of Maine (GOM) cod, GB haddock, GOM haddock, GB yellowtail flounder, southern New England Yellowtail flounder, Cape Cod yellowtail flounder, American plaice, witch flounder, GB winter flounder, GOM winter flounder, southern New England winter flounder, redfish, white hake, pollock, northern windowpane flounder, southern windowpane flounder, ocean pout, Atlantic halibut, and Atlantic wolffish.
[3] *Conservation Law Foundation v. Evans*, 209 F. Supp. 2d 1 (D.D.C. 2001).

- new provisions regarding mandatory, immediate actions required for any fishery in which "overfishing" is occurring, 16 U.S.C. § 1854(e)(3), or where the fishery is in an "overfished" status, 16 U.S.C. § 1854(e)(4);[4]

- new provisions requiring the setting of annual catch limits that immediately prevent overfishing "including measures to ensure accountability," 16 U.S.C. § 1853(a)(15);

- a new provision that each council's annual catch limits "may not exceed the fishing level recommendations of its scientific and statistical committee or [a] peer review process…," 16 U.S.C. § 1852(h)(6);

- new provisions regarding the establishment of "limited access privilege programs," 16 U.S.C. § 1853a; and

- a new provision specific to New England fisheries that prohibits the establishment of a so-called "individual fishing quota [IFQ] program" in the absence of a referendum approval of two-thirds of eligible voters. 16 U.S.C. § 1853a(c)(6)(D).  "Sector allocations" were explicitly excluded from the referendum requirement. 16 U.S.C. § 1853a(c)(6)(D)(vi).

The new provisions relating to mandatory actions for fish stocks that were "overfished" or subject to "overfishing" were particularly relevant in New England. Of the nineteen[5] stocks of groundfish managed by the New England Council in 2006 when the amendment process started, twelve stocks were determined to be subject to "overfishing" and thirteen were determined to be

---

[4] "Overfishing" and "overfished" are terms of art in fisheries management that refer to a rate of fishing on a population of fish and the biomass of a population of fish respectively. The Magnuson-Stevens Act defines them as follows: "The terms 'overfishing' and 'overfished' mean a rate or level of fishing mortality that jeopardizes the capacity of a fishery to produce the maximum sustainable yield on a continuing basis." 16 U.S.C. § 1802(a)(34) (emphasis added). *See also* National Standard 1 Guidelines at 50 C.F.R. § 600.310(e)(2)(B)(overfishing) & (E)(overfished).
[5] Atlantic wolffish was added to the fishery by Amendment 16 itself, 75 Fed. Reg. 18262, 18309, AR at 056,533, bringing the new total number of stocks managed under the Groundfish FMP to twenty.

"overfished.[6] *E.g.,* Groundfish FMP at 7, Table 1, AR at 047,763. The New England Council and the Secretary of Commerce, acting through NMFS, were required to implement management plans with associated annual catch limits and accountability measures that "prevent overfishing and rebuild the fishery" by specified deadlines by the start of the 2010 fishing year for fisheries that were subject to overfishing and by the start of the 2011 fishing year for all others. 16 U.S.C. § 1853(a)(1)(A), 1853 (note). The start of the 2010 fishing year for groundfish was May 1, 2010. 75 Fed. Reg. 18262.

Thus, Amendment 16 also became the vehicle for NFMS and the New England Council to meet its new statutory mandates. The primary drivers of the Amendment 16 process were setting the necessary catch limit adjustments that the amended Magnuson-Stevens Act required for all twelve of the stocks subject to overfishing and the fourteen overfished groundfish stocks by May 1, 2010. *See, e.g.,* OMB Briefing Document (August 2009) at 1, AR at 045,207. The addition of the sectors system in Amendment 16 was a secondary objective, developed to provide an option to fishermen to allow them to meet the new stricter catch limits at a lower cost and with more flexibility. *E.g.,* Groundfish FMP at 98, AR at 047,854. At the time NMFS approved Amendment 16, it had no firm idea of exactly how many fishermen would ultimately elect to participate in this voluntary option and had to design their social and economic analysis around that uncertainty.[7] *See, e.g.,* Groundfish FMP at 861-62, AR at 048,617-618.

The New England Council was unable to finish the amendment in time for a May 1, 2009 start and rescheduled Amendment 16 implementation for May 1, 2010. After more than three

---

[6] Atlantic wolffish was also determined to be overfished by Amendment 16 itself. *E.g.,* Groundfish FMP at 81-82, AR at 047,837-838

[7] The FMP is dated October 16, 2009. The NMFS approval is dated January 21, 2010. Although fishermen were supposed to declare their intentions for sector participation by September 1, 2009, the enrollment period was reopened and, in any event, enrolled fishermen were free to leave their sectors at any time until the start of the May 1, 2010 fishing season. *See* Kurkul Letter to Permit Holders (12/23/2009), AR at 050,642.

years of work, scores of public meetings up and down the coast, countless motions and

comments, the New England Council voted to approve Amendment 16 in June 2009; the vote

was 14/1/1 in favor. *See, e.g.*, Letter from Dr. Lubchenco to Secretary Locke at 1 (November 6,

2009), AR at 048,851. The plan was partially approved by NMFS on January 2010,[8] and the

implementing regulations were issued on April 9, 2010. AR 056,485; AR 056,715; AR 056,466.

## III.   Argument

### A.  Standard of review

Summary judgment is appropriate when a party demonstrates that there are no material

issues of fact in dispute and that the party is entitled to judgment as a matter of law. Fed. R. Civ.

P. 56(c). When a court reviews an agency decision under the Administrative Procedures Act, the

agency action must be upheld unless the reviewing court finds that it is "arbitrary, capricious, an

abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Under well-

settled precedent in the First Circuit and elsewhere, the agency action has a presumption of

validity and is entitled to great deference, *e.g., Associated Fisheries of Maine, Inc. v. Daley*, 127

F.3d 104, 109 (1st Cir. 1997), particularly where the subject matter of the agency action is

technical or scientific and falls within the agency's core competence. *E.g., Puerto Rico Sun Oil

Co. v. EPA*, 8 F.3d 73, 77 (1st Cir. 1993). Agency decisions will be affirmed as long as they "do

not collide directly with substantive statutory commands and so long as procedural corners are

squarely turned." *Adams v. EPA,* 38 F.3d 43, 49 (1st Cir. 1994). As long as the decision is

"'within the bounds of reasoned decisionmaking,' [the reviewing court] may not set it aside,

regardless of whether [the court] would have reached an opposite decision." *M/V Cape Ann v.*

---

[8] The disapproved part of the plan had to do with an experimental fishery and is not relevant to these proceedings.

*United States,* 199 F.3d 61, 63-64 (1st Cir. 1999)(quoting *Baltimore Gas & Elec. Co. v. Natural*

*Resources Defense Council, Inc.,* 462 U.S. 87, 105-06 (1983) ).

    The reviewing court confines its review to the record before the agency at the time it

made its decision.  5 U.S.C. § 706(2)(D); *e.g., Town of Winthrop v. F.A.A.*, 535 F.3d 1, 14 (1st

Cir. 2008) (explaining that "the focal point for judicial review should be the administrative

record already in existence, not some new record made initially in the reviewing court" (quoting

*Camp v. Pitts*, 411 U.S. 138, 142 (1973)). There is a "strong presumption that the record on

review is limited to the one before the administrator."  *Liston v. Unum Corp. Officer Severance*

*Plan*, 330 F.3d 19, 23 (1st Cir. 2003). Parties attacking an agency decision, therefore, are not

"ordinarily entitled to augment the agency's record with either discovery or testimony presented

in the district court." *Rempfer v. Sharfstein*, 583 F.3d 860, 865 (D.C. Cir. 2009), *cert. denied*,

130 S. Ct. 1707 (2010).   Exceptions to this general rule apply only in limited circumstances.

*Town of Winthrop*, 535 F.3d at 15. As CLF has previously argued, the exceptions do not apply to

this agency action. *See* CLF Memorandum in Opposition to Plaintiffs' Motion for Discovery

(10/27/10)(incorporated here by reference)(Docket No. 46). Plaintiffs have the burden of proof

with respect to demonstrating any claims that a fishery management plan and its implementing

regulations violates the Administrative Procedures Act. *E.g., Western Sea Fishing Company, Inc.*

*v. Locke*, 722 F. Supp. 126, 136 (D. Mass. 2010).

**B. The agency action is consistent with the Magnuson-Stevens Act, its implementing regulations and the agency's guidelines and, therefore, must be affirmed.**

Plaintiffs raise a number of claims with respect to the agency action on Amendment 16.

They fail to meet their burden with respect to any of these claims as a matter of law and fact.

Because of space limits, CLF will respond here to the major issues raised by the Plaintiffs.[9]

**1. The annual catch limits for stocks in the groundfish fishery were properly set in Amendment 16 and meet national standard 1 of the Magnuson-Stevens Act.**

Plaintiffs and others assert that Amendment 16 violates national standard 1[10] of the

Magnuson-Stevens Act by failing to "obtain optimum yield from each fishery." *E.g.*

Memorandum of the Cities of New Bedford and Gloucester and Others in Support of their

Motion for Summary Judgment (11/22/10) (hereinafter "New Bedford Brief") at 9-15 (Docket

No. 57); and Memorandum of *Amici Curiae* Representatives Barney Frank and John Tierney In

Support of the Plaintiffs and Prospective Plaintiff-Intervenor on Cross-Motions for Summary

Judgment (11/22/10) (hereinafter "*Amici* Frank Brief") at 8-12 (Docket No. 62).

Some background may be useful here. The groundfish complex is composed of numerous

stocks of fish and is primarily harvested with large nets called otter trawls, which are relatively

unselective mobile fishing gear.  As a result, many different species, often found swimming

together, are caught in every tow. The biological status of the respective co-mingled species or

stocks, their overfished status or whether overfishing is occurring, is very different from stock to

stock, so fish that are determined to be overfished and fish that are determined to be in healthy

---

[9] There is a laundry list of issues raised by the <u>Lovgren</u> Plaintiffs that variously sound in constitutional law, are highly technical issues, or assert that the process may have disadvantaged the mid-Atlantic states and fishermen . While CLF does not believe any of these ssues have any merit, the federal government is in a better position to respond to them and CLF will not brief them here.

[10] National standard 1 provides: "Conservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry." 16 U.S.C. § 1851(a)(1).

condition are frequently harvested in the same net. Plaintiffs assert that the language of the

Magnuson-Stevens Act *requires* NMFS to ensure that the optimum yield of every individual

stock in the fishery is achieved even if the effect of that is to require or condone continued

overfishing on another stock in the same fishery. New Bedford Brief at 9-15; *Amici* Frank Brief

at 8-12. Their argument is simply wrong.

A good example can be seen by looking at the Georges Bank ("GB") Atlantic cod stock

and the GB haddock stock. These fish are often caught together. Although both stocks were

heavily overfished and depleted in the 1990s, *see Conservation Law Foundation v. Mosbacher,*

996 F.2d 39 (1st Cir. 1992), GB haddock was fortunate to rebound strongly when fishing

pressure was reduced by managers, while GB Atlantic cod's recovery languished. Thus, by the

time Amendment 16 was under development, GB haddock was fully rebuilt for management

purposes but GB Atlantic cod was still significantly overfished and subject to overfishing. *See*

Table 1, Groundfish FMP at 7, AR at 047,763.

The New Bedford Plaintiffs and *amici* Frank and Tierney argue that NMFS was required

to achieve optimum yield by allowing high catches of GB haddock even if the result of that was

continued overfishing on GB Atlantic cod. *See* New Bedford Brief at 13 (citing to a snippet of

legislative history from Representative Young on this point). They argue that the so-called

"mixed stock rule" is mandated by the Magnuson-Stevens Act. *Id.* at 15.[11]

The mixed-stock exception is not found in the Magnuson-Stevens Act. Rather, it is found

in the interpretive guidelines NMFS has published based on the national standards.[12] In 2006

when the Amendment 16 process started and before the MSA Reauthorization occurred, the

national standard 1 guidelines provided as follows:

---

[11] This is more commonly referred to as the mixed-stock exception to the prohibition on overfishing.

[12] "The Secretary shall establish advisory guidelines (which shall not have the force and effect of law), based on the national standards, to assist in the development of fishery management plans." 16 U.S.C. § 1851(b).

> There are certain limited exceptions to the requirement to prevent overfishing. Harvesting one species of a mixed-stock complex at its optimum level may result in the overfishing of another stock component in the complex. A Council *may* decide to permit this … overfishing only if all of the following conditions are satisfied:(i) It is demonstrated by analysis … that such action will result in long-term net benefits to the Nation. (ii) It is demonstrated by analysis that mitigating measures have been considered and that a similar level of long-term net benefits cannot be achieved [in other ways] such that no overfishing would occur. (iii) The resulting rate or level of fishing mortality will not cause any species … to require protection under the ESA [Endangered Species Act].

63 Fed. Reg. 24229 at 24231 (May 1, 1998) (emphasis added) (included as Attachment 1).

The applicability of these provisions to the New England groundfish fishery was legally tested by New Hampshire and Massachusetts. However, even under the old, more discretionary guidelines then in effect, the court held that these provisions were completely discretionary and that "[t]he discretion whether to apply the Mixed-Stock Exception lies entirely within the province of the administrative agency and not with the court." *Massachusetts v. Gutierrez*, 607 F. Supp. 2d 284, 285 (D. Mass. 2009).

The national standard 1 guidelines were significantly revised as a result of the new mandatory overfishing provisions in the MSA Reauthorization. The new national standard 1 guidelines, which Plaintiffs fail to even reference in their brief, provide in pertinent part as follows:

> Exceptions to the requirement to prevent overfishing could apply under certain limited circumstances. Harvesting one stock at its optimum level may result in overfishing of another stock when the two stocks tend to be caught together. Before a Council may decide to allow this type of overfishing, an analysis must be performed and the analysis must contain a justification in terms of overall benefits….*The Council may decide to allow this type of overfishing if the fishery is not overfished* and the analysis demonstrates that all of the following conditions are satisfied….

50 C.F.R. § 600.310 (emphasis added) (new guidelines included as Attachment 2).

In other words, under certain limited circumstances and purely as a matter of council and agency discretion, a fishery management plan could approve a harvest rate on a population of

fish that would otherwise be considered overfishing *but* only "if the fishery is not overfished." *Id.* But the New England groundfish fishery *is* overfished. As noted above, thirteen of the twenty stocks in this groundfish fishery were overfished at the time Amendment 16 was developed and approved. The "mixed-stock exception" is not applicable in the groundfishery and, if applied, would violate the Magnuson-Stevens Act prohibition on ending overfishing immediately. 16 U.S.C. § 1854(e)(3)(A). Since this "exception" is based on an agency interpretation of law in the first instance, the agency's interpretation of its own interpretation is, of course, entitled to particularly great deference.

Plaintiffs and *amici* Frank and Tierney seem to be arguing that the national standard 1 guidelines are in violation of the law. For example, the *amici* argue: "[m]anaging for the weakest stock in a multi-stock fishery effectively cannot be squared with the goal of achieving optimum yield for the fishery as a whole embodied in National Standard No.1." *Amici* Frank Brief at 11. The New Bedford Plaintiffs argue that because Amendment 16 sets different harvest rates for different stocks of fish based on their biological condition, the amendment violates the Magnuson-Stevens Act by not managing the fishery as a unit. New Bedford Brief at 11. Taking these assertions to their logical end, nineteen of the twenty stocks in the groundfish complex could be overfished and the New England Council and NMFS would still be prohibited from adopting measures to prevent overfishing if there was any collateral reduction on the optimum yield of the one healthy stock. These arguments misapply both the statutory language and agency guidelines.

Fishery management plans are meant to " achieve and maintain, on a continuing basis, the optimum yield from each fishery." 16 U.S.C. § 1801(b)(4). So what is "optimum yield of a fishery?"

10

Congress said that the term "optimum," with respect to the yield of a fishery, means the

amount of fish which—(A) will provide the greatest overall benefit to the Nation.

. . ; (B) `is prescribed by such on the basis of the *maximum sustainable yield from*

*the fishery*, as reduced by any relevant economic, social, or ecological factor; and

(C) *in the case of an overfished fishery*, provides for rebuilding to a level

consistent with producing the *maximum sustainable yield in such fishery*.

16 U.S.C. § 1802(33) (emphasis added).

The question thus becomes: what is the "maximum sustainable yield of a fishery?" A

"fishery" is defined to mean ". . . one or more stocks of fish which can be treated as a unit for

purposes of conservation and management . . . ." 16 U.S.C. § 1802(13). "Maximum sustainable

yield" ("MSY") is not defined in the statute but has been defined by the agency to refer to "the

largest long-term average catch or yield that can be taken *from a stock* or stock complex under

prevailing ecological, environmental conditions and fishery technological characteristics (e.g.

gear selectivity), and the distribution of catch among fleets." 50 C.F.R. §

600.310(e)(1)(i)(emphasis added). MSY is the available yield of a stock of fish.

"Optimum yield" in turn, is "*prescribed* on the basis of" MSY. 16 U.S.C. § 1802(33)(B)

(emphasis added). Optimum yield cannot exceed MSY. 50 C.F.R. § 600.310(b)(2)(i). Therefore,

the optimum yield "in a fishery" has to be a function of the MSYs of the stocks in that fishery.

There is no such thing as a multi-species fishery optimum yield or MSY that exists

independently of the scientific analysis of the individual stocks in that fishery.

"Overfishing" in reference to a fishery is also focused on the individual stocks in that

fishery. The statutory definition follows: "The terms 'overfishing' and 'overfished' mean a rate

or level of fishing mortality that jeopardizes the capacity of a fishery to produce the maximum

sustainable yield on a continuing basis." 16 U.S.C. § 1802(34). Since MSY is strictly calculated

on a stock basis, 50 C.F.R. § 600.310(e)(1)(i), "the capacity of a *fishery* to produce maximum

sustainable yield," therefore, is necessarily focused on producing the MSY for *each of the stocks* in the fishery. Thus, when the national guidelines say that "[t]he most important limitation on the specification of optimum yield is that the choice of optimum yield and the conservation and management measures used to achieve it *must prevent overfishing[,]"* 50 C.F.R. § 600.310(b)(2)(ii) (emphasis added), "overfishing" can only be referencing the individual stocks that comprise that fishery.

NMFS has always interpreted "overfishing in a fishery" to reference the individual stocks in that fishery. *E.g.,* 50 C.F.R. § 600.310(j)((3)(i) (actions to be taken with an overfished fishery). The agency's long-term interpretation of a technical term in a statute within the agency's jurisdiction is entitled to great deference. *E.g., Chevron U.S.A., Inc.v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 843-44, n.11 (1984). This has also always been the understanding of courts interpreting the language: "Congress intended optimum yield to be based on the scientific analysis of maintaining a consistent stock 'as modified by relevant economic, social, or ecological factors.' " *Western Sea Fishing,* 722 F. Supp. 2d at 140 (referencing the former statutory definition for optimum yield).

New Bedford Plaintiffs' assertions that the fishery is not being managed "as a whole," *e.g.,* New Bedford Brief at 9 & 11, are also factually flawed. Amendment 16 does not manage each stock individually as Plaintiffs assert; it sets different fishing mortality rates for each stock in the fishery and different annual catch limits for that stock based on the scientific advice as required by law. 16 U.S.C. § 1852(g)(1). Amendment 16 comprehensively implements conservation and management measures in the same way for all the stocks in the groundfish fishery: some of the stock catch rates are being increased (haddock by 202 percent, for example)

and others are being decreased (SNE/MA winter flounder by 100 percent). Detailed explanations

are provided for the various changes. Groundfish FMP at 79-86; AR at 047,835-842.

Amendment 16 does not restrain fishermen from achieving MSY or optimum yield on

haddock by the catch limits it sets on haddock. Under Amendment 16, fishermen can catch as

many of the more abundant haddock as they can so long as they don't catch more than the

prescribed amounts for the other stocks at the same time. It is the lack of selectivity of the gear

some fishermen elect to use that causes the problem with catching the overfished stocks that they

need to avoid. Indeed, Amendment 16's provisions encourage fishermen to develop gear that is

more selective and allows them to access more of the annual catch available for more abundant

species. *See, e.g.,* Groundfish FMP at 131-32, A.R. at 047,887-888 (easing the regulations

governing the introduction and use of more selective gear during the fishing season). The ACL

setting process in Amendment 16 is consistent with the law, supported by a reasoned decision

process, and based on substantial evidence and sound agency discretion.

2. **The allocations for the pre-existing sectors and the recreational fishery are consistent with the Magnuson-Stevens Act.**

There was extensive discussion, debate, and analysis that occurred during the

Amendment 16 process on how the available fish catch should be distributed to the various

elements of the fishery, including arguments over what time periods should be used to establish

someone's fishing "history." Plaintiffs assert that the formula for allocating Georges Bank

("GB") cod to the members of the Cape Cod Commercial Hook Fishermen's Association

("CCCHFA") Hook Sector and the CCCHFA Fixed Gear Sector, and the formula for allocating

Gulf of Maine ("GOM") cod and GOM haddock to the recreational fishing sector violated

national standard 4 as well as sections 303(a)(14) and 304(e)(4)[13] of the Magnuson-Stevens Act. 16 U.S.C. §§ 1853(a)(14), 1854(e)(4). New Bedford Brief at 15-18. Their arguments were fully considered during the Amendment 16 process but not accepted by the New England Council and NMFS.

The distribution of the annual catch limits in the groundfish fishery is always a topic of extensive and heated discussion. Accordingly, the New England Council followed a methodical process for allocation.[14]  First, the fisheries for the various stocks were broken into fishery sub-components: commercial fisheries, recreational fisheries, the herring mid-water trawl fishery, the scallop fishery, and state water fisheries. Groundfish FMP at 90-93, A.R. at 047,846-849. Then the allocation within the commercial fisheries was further divided between the sector and the common pool fisheries. Finally the sector allocation formula was evaluated in terms of two categories of sectors: first, the two pre-existing CCCHFA sectors that were already operating under Amendment 13's allocation formula and, second, the new sectors that were being launched through Amendment 16.

### a.   The recreational allocation.

Turning first to the issue of the recreational allocation, there was no specific allocation of fish to recreational fishermen prior to Amendment 16 because their catch was considered to be relatively minor and was managed through various other controls. The New England Council analyzed and debated various alternatives in Amendment 16 with respect to an allocation to recreational fishermen from no specific allocation to numerical allocations of up to six stocks to

---

[13] Mis-referenced in New Bedford's Brief as 304(a)(4). New Bedford Brief. at 16.

[14] The allocation process is the mechanism by which the total allowable catch of the various stocks in the fishery are distributed among the various elements in the fishing community, typically a recreational fishing component, a commercial fishing component, a bycatch component to account for groundfish that are unintentionally caught in non-groundfish fisheries like the sea scallop fishery, and a state-waters component to account for fish that are caught in state waters by fishermen without a federal license or permit.

the recreational fleet using various qualifying time periods. *E.g.,* Memorandum from Groundfish Plan Development Team to the Groundfish Oversight Committee (12/12/2007), AR at 011,251-264. CLF has identified more than 60 documents in the administrative record that refer to this recreational allocation issue. (partial index included as Attachment 3)

By the time the draft Groundfish FMP was released in April 2009, the New England Council had reduced the alternatives for further analysis to two alternatives and they had made a further determination that only GOM cod and haddock met the 5 percent or greater recreational share of the total catch threshold, previously established as the minimum for a recreational allocation. Draft Groundfish FMP at I--122-124, AR at 030,570-572. Additionally, the New England Council was evaluating two different time periods of recreational landings: 1996-2006 and 2001-2006. *Id.* The stated basis for the recreation allocation was for improved conservation purposes, *id.* at I-463, AR at 030,911, an explicit purpose recognized by national standard 4. 16 U.S.C. § 1851(a)(4)(B). Moreover, the economic impacts associated with the recreational allocation options were fully discussed. *E.g., id.* at I-595, AR at 031,043.

Over the course of the public hearing and public comment period on the draft Groundfish FMP, the New England Council received comments supporting both time periods for establishing history. *Compare, e.g.,* comment at AR 032,978 (promoting 1996-2006) *with* comment at 042,929 (promoting 2001-2006). The Final Groundfish FMP settled on making an allocation of GOM cod and haddock to the recreational fleet using the 2001-2006 time series. Groundfish FMP at 125-25, AR at 047,881-882. The economic effects of that allocation were fully analyzed. *Id.* at 683, AR at 048,439. One of the reasons for picking the 2001-2006 time period was that it better reflected current recreational catches; using the longer period would have produced a net economic decline for recreational fishermen from the status quo. *Id.* The

differential social impacts for the two time periods were also analyzed. *Id.* at 775, AR at 048,531.

The recreational allocation decision was a "hot button" issue, producing a minority report submitted by the one New England Council member who voted against Amendment 16. Letter of dissenting Council member Goethel to Sec. Locke (June 27, 2009), AR at 056,267; NH Congressional Delegation letter to Sec. Locke (Sept. 30, 2009), AR at 047,493; Letter from New England Council Chair to Secretary Locke (Aug. 12, 2009), AR at 045,955 (rationale for time period selected).

After the Amendment 16 documents were transmitted to NMFS for approval, another public comment period was held on the draft NMFS rules implementing Amendment 16 and the recreational allocation issue was explicitly identified in the preface to the rulemaking. Draft Amendment 16 Rule, 75 Fed. Reg. 5016, 5020, AR at 054,862. After the public comment period closed, NMFS Regional Director Patricia Kurkul specifically brought the comments received during that period with respect to the recreational allocation to her superior's attention.  Letter from Patricia A. Kurkul to Dr. James W. Balsinger (Feb. 2, 2010) at 2, AR at 055,273. *See also* Decision Memorandum from NOAA Dr. Lubchenco to Sec. Locke (Nov. 6, 2009) at 2, AR at 048,852(advising Secretary on recreational allocation issue).

When the final rule adopting the proposed recreational allocation of GOM cod and haddock was published, an extensive response was included in the preamble setting forth the agency's reasons for adopting the provision. 75 Fed. Reg. 18262, 18290, AR at 056,514. NMFS found that the allocation was consistent with national standard 4, did not discriminate between states, and was fair and equitable. *Id.* The agency's action was clearly supported by a rational and articulated basis and substantial evidence, even though Plaintiffs may disagree with the

outcome. Accordingly, this Court must affirm it. *E.g.*, *River Street Donut, LLC v. Napolitano*, 558 F.3d 111, 114 (1st Cir. 2009).[15]

### b.   The pre-existing sectors allocation.

With respect to the second allocation issue raised by the New Bedford Plaintiffs—the decision to grandfather Amendment 13's allocation formula for GB Atlantic cod to the pre-existing CCCHFA sectors—there is a similarly long trail of alternatives analysis, debate, evidence and reasoned decisionmaking.

This issue involves how much fish each commercial sector is allocated at the start of the fishing season. As explained in more detail below, *see infra* at pp. 21-22, Amendment 16 created a new management concept as part of the sector system called a permit holder's "potential sector contribution" ("PSC"). This PSC was the amount of fish that a potential member of a sector could bring into the sector when he joined. In the Amendment 16 process a number of formulas for calculating this PSC were considered: some were based purely on various time series of fishing histories associated with a permit, others were based on fishing history and boat size. Draft Groundfish FMP at I-96 to 102, I-540 to 590, AR at 030,544-550 & 988-031.

The New England Council and NMFS also evaluated a fifth option--which is the one the New Bedford Plaintiffs complain about--related to the two Cape Cod sectors that were established by Amendment 13: "[t]his option recognizes that members of the existing sectors made investment decisions based on the qualification criteria adopted by Amendment 13." *Id.* at I-102, AR at 030,550 ("Option 5"). Option 5 proposed to grandfather these sectors into Amendment 16 by using the same Amendment 13 qualifying period that had been used when their sectors were set up: 1996-2001.

---

[15] There is considerably more detail and commentary in the other documents in the record on this topic. We have included just enough to give the Court a sense of the progression of the decision making process.

Space will not allow us to repeat the extensive debate and analysis that followed the PSC formula options in general or the debate over Option 5 in particular as they made their way through the management planning process. (Index to record references included as Attachment 4). Ultimately, a generic PSC formula was selected for new commercial fishermen joining sectors that was based strictly on a permittee's landings history between 1996 and 2006. Option 5 was also adopted, grandfathering the 1996-2001 formula for existing sector members. Groundfish FMP at 104-05, AR at 047,860-861. The alternatives were fully analyzed, *e.g.*, *id.* at 188-190, AR at 047,944-946; and economic and social analyses were conducted, *e.g., id.* at 633-679, AR at 048,389-435.

When the approved plan reached NMFS for review, Option 5 was identified as a key issue, *see, e.g.,* NEFMC Chair Letter to Secretary Locke at 1, AR at 045,955, and fully analyzed by the agency. NMFS's rationale for approving Option 5 is stated in the response to comments contained in the preamble to the final rule implementing Amendment 16. 75 Fed. Reg. 18262, 18294-295, AR at 056,518-519. The agency's finding that the Council's allocation formula was consistent with the national standards and in full compliance with the Magnuson-Stevens Act is a reasonable conclusion based on substantial evidence and alternatives analysis in the record; it must be affirmed. *Western Sea Fishing Co.,* 722 F. Supp. 2d at 135-36.

### 3. <u>Amendment 16 does not violate any of the Magnuson-Stevens Act provisions with respect to limited access privilege or IFQ programs.</u>

Plaintiffs seek to invalidate the entirety of Amendment 16 by arguing that the sectors system constitutes a limited access privilege program (LAPP) as defined by section 303A of the Magnuson-Stevens Act, 16 U.S.C. § 1853a, that fails to comply with the applicable requirements of that section. New Bedford Brief at 20-21, Memorandum In Support of Prospective Intervenor-Plaintiff Food & Water Watch, Inc.'s Proposed Motion for Summary Judgment ("F&WW

Brief") at 9-15. Plaintiffs' assertion is based upon the entirely unsupported premise that "(a)ny allocation of quota is a LAPP, unless excluded" and, consequently, that any allocation of quota to sectors must meet the section 303A requirements. New Bedford Brief at 20-21.  In fact, not all allocations of quota are LAPPs as the Magnuson-Stevens Act's definitions make apparent and, more importantly, sector allocations are among those not covered by the LAPP umbrella.

### a.   Sectors do not meet the definition of a LAPP.

In order to qualify as a limited access privilege, the privilege must be a federal permit that is part of a limited access system (LAS) "to harvest a quantity of fish expressed by a unit or units representing a portion of the total allowable catch of the fishery and be held by a person." 16 U.S.C. § 1802(26). The Amendment 16 sectors system is not a LAPP because sectors hold no permits, sectors are part of a fishery system that is characterized by both open and limited access attributes, and sectors are not a legally recognized entity that is eligible for the limited access privilege program.

Amendment 16 defines sectors as "a group of persons … holding limited access vessel permits who have voluntarily entered into a contract and agree to certain fishing restrictions for a specified period of time." 75 Fed. Reg. 18113, 18114; Groundfish FMP at 98, AR at 047,854. The fishing permits remain with the permittees when they enter a sector. 75 Fed. Reg. 18114, AR at 056,466. Sectors do calculate a sector-specific annual catch entitlement (ACE), based upon an aggregation of the PSCs of their members, but that is for accountability purposes only; sectors do not hold or fish that ACE in any permitting sense.[16] For purposes of increasing their efficiency, sectors can also have internal rules that allow for transfer of an individual permit holder's PSC,

---

[16] Once the sector has established its ACE, based on the overall TAC and the PSCs of its members, it allocates catch to its sector members based upon a private contract among the sector members. *See generally* Daniel S. Holland & Joshua Wiersma, *Free Form property rights for fisheries: The decentralized design of rights-based management through groundfish "sectors" in New England*, 34 Marine Policy 1076, 1078 (2010).

or annual fishing authorization, between members of the sector or between sectors but such internal rules and practices are not specified or prescribed by Amendment 16.

Although the definition of limited access privilege suggests that any "person" (defined broadly to include individuals, corporations, partnerships, associations, other entities, governments or entities of a government) can hold a limited access privilege, section 303A(c)(1)(D) of the Magnuson-Stevens Act further limits eligibility for a limited access privilege to *only* "a United States citizen, a corporation, partnership, or other entity established under the laws of the United States or any state, or a permanent resident alien . . . ." 16 U.S.C.§ 1853a(c)(1)(D). Because sectors are not a legally recognized entity or an individual, as required under section 303A(c)(1)(D), but a function and creation of a private contractual arrangement, they are not eligible for designation as a LAPP.

Even if sectors could theoretically hold permits and were eligible for limited access privileges, it is not clear that the New England groundfish fishery is an eligible "limited access system," as that term is used by section 303A of the Magnuson-Stevens Act. The fishery has both open access and limited access permits as part of its system. *See infra* at fn. 20. Moreover, the limited access permits that exist in this fishery were established in 1996 by Amendment 5 to the Groundfish FMP. *See* Groundfish FMP at I-6, AR at 048,670. It is absurd to suggest that those limited access permits are now illegal because they have not been established in conformance with the new section 303A providsions. The only change Amendment 16 made to the existing limited access permit system was to change the "currency" of the existing permits from days-at-sea to pounds of fish based on a specified fishing history. This is not a change within the scope of section 303A. 16 U.S.C. § 1853a(h).[17]

---

[17]  "[N]othing … shall be construed [in the Reauthorization Act] to require a … reevaluation of . . . other quota programs, including sector allocation in effect before the date of enactment . . . .").

Finally, Plaintiffs' assertion that the language of section 303(A)(b) of the Magnuson-Stevens Act is somehow dispositive of this LAPP question is entirely misplaced.[18] New Bedford Brief at 20. Section 303A(b) simply accounts for the fact that the enforcement provisions of the Magnuson-Stevens Act (Sections 307, 308 and 309) use terminology that assumes that a permit is involved. *See, e.g.,* 16 U.S.C. § 1857(1)(A), (B), (G); 16 U.S.C. § 1858(g); 16 U.S.C. § 1859(a). The only statutory purpose for this provision characterizing a limited access privilege, quota share or other LAPP authorization as "permits" under section 303A(b) is to ensure that a violation of those LAPP fishing authorizations is enforceable under the terms of sections 307, 308 and 309.

### b.   The sector system is not an individual fishing quota system.

Plaintiffs further assert that because Amendment 16 allocates 95 percent of the groundfish "total allowable catch" ("TAC") to sectors, which in turn redistributes that TAC to sector members, sector allocation "unquestionably" amounts to individual fishing quotas (IFQ). New Bedford Brief at 21. Along the same vein, F&WW asserts that "PSCs are the functional equivalent of IFQs and are, therefore, subject to the Magnuson-Stevens Acts' referendum requirements." F&WW Brief at 10. This characterization reflects a fundamental misunderstanding of the sector system and PSC and ignores the plain language of the Magnuson-Stevens Act, which unmistakably excludes groundfish sector allocation in New England from the IFQ referendum requirement. 16 U.S.C. § 1853a(c)(6)(D)(vi) "'individual fishing quota' does not include a sector allocation"[19]

---

[18] Section 303A(6) provides that a limited access privilege, quota share, or other limited access system under the Act "shall be considered a permit for purposes of sections 307, 308 and 309." 16 U.S.C. §1853a(b).

[19] Plaintiffs suggest that this distinguishing language applies only to the two pre-existing CCCHFA sectors. New Bedford Brief at 21. There is no support for this limiting construction.

Again, to better understand this issue, some background may be useful. One of the most significant challenges of Amendment 16 was to convert the "currency" that fishermen had in their permits under the Amendment 13 system, which was measured in the number of days they were allowed to fish during the season ("days-at-sea" or "DAS"), to the new "currency" of Amendment 16: pounds of fish. The switch was necessary because the New England Council was shifting from an "input control fishery" (where fish mortality is limited indirectly by measures like controlling how many days a fishermen could fish) to an "output control fishery" (where fish mortality is limited directly by the number of pounds of fish a fishermen can catch). This changeover had already been decided by the New England Council in Amendment 13.

Under Amendment 16, each limited access groundfish permit[20] is allocated a PSC, which is a fractional share of one or more fish stocks based on that permit's past fishing history.[21] 75 Fed. Reg. 18262, 18276. When fishermen elect to join a particular sector, they take their permit or permits with the associated PSCs with them into the sector. 75 Fed. Reg. 18113, 18114. The sum total of PSCs in the sector produces that sector's Annual Catch Entitlement ("ACE"), measured in pounds of the various fish stocks. *Id.* When the TAC (also measured by stock in pounds of fish) for the fishery is set by the New England Council and its scientists for each fishing season, the sector multiplies its ACE by the TAC for the various stocks in the fishery, producing the total pounds of that particular stock that the sector is entitled to catch through its membership's efforts during the upcoming fishing year. *Id.* Under Amendment 16, the sector creates its own rules governing how its members will fish for that ACE; they also have the

---

[20] The permitting system for groundfish is fairly complex and not directly relevant here. An identification of the various permits, including a discussion of the distinction between limited access and open access permits can be found at the Groundfish FMP at 312-15. AR at 048,068-071.

[21] Different time periods can produce different fishing histories for a particular fishermen for a variety of reasons: injuries, differences in the accessibility of certain fish, the effects of different regulations, etc.

option to trade or lease all or portions of their ACE to another sector for the fishing season. *Id.*
An IFQ program shares none of these attributes.

Contrary to Plaintiffs' assertion, for which no record cite is provided, Amendment 16
does not allocate *any* quota to sectors at all. Indeed, at the time Amendment 16 was promulgated,
the final sector membership rosters had not even been finalized and fishermen were free to enter
or leave sectors until weeks thereafter. 75 Fed. Reg. 18113, 18114, AR at 056,465-466.[22] Rather
than allocate quota to permits as an IFQ program does, Amendment 16 provides for the
calculation of a PSC for each limited access groundfish permit. 75 Fed. Reg. 18262, 18309.

A PSC has no quota associated with it should the permit holder not choose to join a
sector. Upon joining a sector, however, a permit holder's PSC is then pooled with the other
sector members' PSCs, providing that sector with a specific ACE (again, represented in total
pounds of fish by stock), for which the sector is accountable to NMFS. *Id.* The total catch from
the sector cannot exceed its ACE.  It is between the sector and the member to reach agreement
regarding how much of the ACE that member lands. Some members might land no fish in a
sector (even though they brought PSC into the sector); some members might land all the fish for
a sector (even though they only brought a fraction of the PSCs into the sector). *Id.*

Sector ACE and PSCs do not fall within the definition of an IFQ because, unlike an IFQ
system where quota is directly allocated to permits, the Amendment 16 quota allocation process
and the permit are separated and not individualized. Sectors only trade in PSCs and PSCs are
only valuable to fishermen as potential pounds of fish once they join a sector. An IFQ requires
the permit holder to possess a permit that denotes "a quantity of fish, expressed by a unit or units
representing a percentage of the total allowable catch of a fishery that may be received or held

---

[22] At the time the final rules were published on April 9, 2010, 812 boats out of the 1,477 eligible boats had joined
sectors, representing a cumulative PSC of 98% of the cumulative landings during the qualifying period. 75 Fed. Reg.
at 18114, AR at 056,466.

for exclusive use by a person." 16 U.S.C. § 1802(23). Contrary to F&WW's unsupported assertion, F&WW Brief at 10, PSCs, unlike IFQs, are not for the exclusive use of a permit holder, but are only aggregated at the sector level and come to define a sector's ACE – any portion of which can be annually transferred to another sector. 75 Fed. Reg. 18276-18277. Under the Amendment 16 sector system, there is no individual quota allocation made by NMFS, nor is there a permanent allocation that could be fished or transferred. In short, unlike an IFQ, a holder of PSC is not entitled to any share of the TAC simply by possessing a permit.

The distinctions between sectors and IFQs do not end there.  Unlike IFQs, "sector allocations are temporary, changeable, and do not constitute a property right in the most common use of the term, or even an allocation of fishing privileges, as such terms are used in the Magnuson-Stevens Act." 75 Fed. Reg. 18262, 18290-91, AR at 056,514-515. Moreover, under an IFQ program, a permit holder has no choice as to what management regime to fish under, whereas under Amendment 16, the permit holder may choose to fish in a sector (thus receiving a share of that sector's ACE subject to the terms of their contract with the sector) or in the common pool (thus fishing under a DAS limit). *Id.*  Legal liability is also addressed differently, with IFQ permit holders held individually responsible while sector members have joint and several liability for another member's infraction. *Id.* at 18341. Groundfish FMP at 107, AR at 047,863. The Amendment 16 sectors system is not and does not operate like an IFQ program. Accordingly, Amendment 16 is not subject to any of the important measures that do apply to those programs, including a referendum vote. For these reasons, the agency's conclusion that Amendment 16 does not trigger any of the requirements of Section 303A of the Magnuson-Stevens Act is legally sound, based on substantial evidence, and is explained in detail in the

preamble to the final rule as well as in other parts of the administrative record. It is entitled to great deference and must be affirmed.

### 4.  <u>Amendment 16 complies with the National Environmental Policy Act</u>.

Plaintiffs' claims that Defendants violated the requirements of the National Environmental Policy Act, 42 U.S.C. § 4321-32 ("NEPA"), are primarily premised on two alleged failures: the failure to take into account the economic and social impacts of Amendment 16 and the failure to consider the so-called "points system" alternative.  However, the cases and the record citations Plaintiffs themselves provide establish that the agency fully and faithfully complied with its obligations under NEPA.

NEPA requires an agency contemplating a major federal action to take a "hard look" at alternatives and environmental consequences before undertaking the action. *E.g.*, *Baltimore Gas,* 462 U.S. at 97. NEPA is a procedural statute and does not mandate a substantive outcome – opposition to the ultimate action taken by an agency is not grounds for a NEPA claim. *Marsh v. Oregon Natural Res. Def. Council,* 490 U.S. 360, 391 (1989). To this end, the agency ordinarily must prepare an Environmental Impact Statement ("EIS") that includes, among other things, a rigorous, objective evaluation of all reasonable alternatives to the proposed action – including the alternative of no action – and, for alternatives which were eliminated from detailed study, a brief discussion of why they were eliminated.  40 C.F.R. § 1502.14 (2006).

Courts have long recognized that evidence that an agency preferred a particular alternative from the outset of the NEPA process does not, by itself, violate NEPA.  *See, e.g.*, *Envtl. Def Fund, Inc v. U.S. Army Corps of Eng'rs*, 492 F.2d 1123, 1129 (5th Cir. 1974). Moreover, courts have also recognized that in considering alternatives to a proposed action, "alternatives cannot be studied *ad infinitum* . . . ." *Seacoast Anti-Pollution League v. Nuclear*

*Regulatory Comm'n*, 598 F.2d 1221, 1232-33 (1st Cir. 1979).  Applying these statutory and regulatory standards and judicial precedent to the exhaustive and transparent process that the New England Council and NMFS followed in evaluating the alternatives and impacts associated with Amendment 16, this Court must conclude that Plaintiffs' NEPA claims are without merit.

Specifically, the claim that NMFS failed to assess the economic and social implications of Amendment 16 on the fishing industry and fishing communities is belied by the Plaintiffs' own citations to the administrative record, which make clear that the costs and economic impacts were exhaustively analyzed and debated by the New England Council and the agency. *See* New Bedford Brief at 22 (the EIS "details significant economic losses and concludes that '[t]he economic impacts of this action [on] communities are expected to be severe and in some cases may threaten the existence of fishing businesses in some communities.""). Indeed, the portion of the New Bedford Brief relevant to this claim concludes that the "concern of the smaller ports, as evidenced in the EIS[,] are well substantiated." *Id* at 25. That is exactly what NEPA requires– that impacts be considered.  That the consideration of those impacts did not result in the outcome Plaintiffs now seek is not grounds for a NEPA claim. *Marsh,* 490 U.S. at 391.

The claim that the agency failed to consider all reasonable alternatives is similarly put to rest by Plaintiffs' own argument. Plaintiffs allege that the so-called "point system" alternative was not adequately considered. This was an alternative approach favored by some for allocating fishing privileges to the commercial fleet.  Again, however, Plaintiffs acknowledge in their brief that there were "[n]umerous comments and petitions from many different stakeholders throughout the decision making process [that] supported this alternative" and cite some, but not all of those comments and petitions in the administrative record. *See* New Bedford Brief at 25. In

fact, CLF has indexed some seventy documents in the administrative record that reference the discussion around the point system. (Index attached as Attachment 5).

Plaintiffs refer to the analysis by a NMFS attorney in which the attorney concluded that the point system alternative was likely to constitute an IFQ and therefore require a referendum pursuant to the Magnuson-Stevens Act, thereby eliminating it as a viable or reasonable alternative for a management plan that was facing a May 1, 2010 statutory deadline for ending all overfishing. Plaintiffs charge that analysis of the point system was "obstructed" by the agency and that the "point system" totally disappeared from the Amendment 16 process. Both characterizations are wrong. First, the record shows that further agency action on the points system became moot after the New England Council voted to table the point system until the next amendment. Motions from New England Council (June 19, 2007), AR at 07,568-569 (motion to defer points system development carried 13/4/0). Second, the point system alternative did not disappear from the process and was mentioned multiple times after the vote to table it went forward. *See* entries in Attachment 5 Index after 6/19/2007. Moreover, the final EIS discussed the point system and explained the action that was being taken with respect to the point system. Groundfish FMP at 64-54, AR at 047,820-821.

F&WW makes a similar claim concerning the failure to analyze all reasonable alternatives and also alleges defendants violated NEPA by failing to assess the environmental impacts of a projected change in prevalence of one type of fishing gear over another due to the distribution of PSC allocations in the sectors.  More specifically, F&WW argues that because large boats that use bottom trawl gear, and specifically the GB haddock trawlers, accounted for the most landings of groundfish over the years and would therefore get the largest allocation of groundfish under the new system, these vessels would fish more and would have buying power

to acquire even more fish. F&WW Brief at 16-17.  However, these "impacts" are really nothing more than speculation because, as noted earlier, the agency had no way of determining with any sense of reliability how the groundfish fleet would respond to the change from the DAS system to the sector system.  It is also highly speculative in that it assumes that the new system would result in there being more fishing trips under the sector system, when in fact one of the reasons cited to support sectors was the increased flexibility it gave fishermen to control when they fish, who in the sector would fish, how they would fish and how often they would fish, thereby reducing trips. Gear impacts in the existing fishery were extensively analyzed in the EIS and, since they reflect the existing patterns of trawl behavior, the presumption that they represent a worst case is reasonable. For this Court's purposes, it is enough to note, as F&WW does, that speculative effects need not be included in an EIS. "An environmental effect would be considered 'too speculative' for inclusion in the EIS if it cannot be described at the time the EIS is drafted with sufficient specificity to make its consideration useful to a reasonable decisionmaker." *Dubois v. U.S. Dept. of Agriculture*, 102 F.3d 1273, 1286 (1st Cir. 1996) (citing *Sierra Club v. Marsh*, 976 F.2d 763, 767 (1st Cir. 1992)).

It is important to note that the actions that NMFS can take under the Magnuson-Stevens Act are severely constrained: the agency can only approve, partially approve, or disapprove the management plan tendered by a fishery management council. 16 U.S.C. § 1854(a)(3). Here, where there was extreme time sensitivity to meet the May 1, 2010 statutory deadline, where the alternative Plaintiffs identify was discussed and analyzed, where the New England Council was simply deferring consideration of the point system approach until a subsequent amendment, and where there is not an irreversible commitment regarding the allocation system set up by Amendment 16, it would be absurd to require the agency to any extended analysis of an

alternative that was determined not to be viable in the context of Amendment 16. The agency

properly determined that it was not necessary or productive to include it within the alternatives to

evaluate in greater detail in the EIS. Plaintiffs' NEPA claims are without basis in fact or in law

and should be dismissed in their entirety.

### 5.   NOAA Complied With the Requirements of the Regulatory Flexibility Act.

Plaintiffs assert that the process by which Amendment 16 was promulgated violates the

Regulatory Flexibility Act's (RFA) requirement that the agency complete a satisfactory Initial

Regulatory Flexibility Analysis (IRFA)[23]. New Bedford Brief at 28-29. In that analysis, Plaintiffs

fail to identify any specific inadequacies associated with the IRFA. Furthermore, Plaintiffs

Motion makes no allegation as to any other provision of the RFA, and states only that the costs

associated with Amendment 16 are "excessive and not justifiable[24]." New Bedford Brief at 29.

Because the RFA provides no cause of action for a noncompliant IRFA and the administrative

record reflects a thorough and compliant FRFA, the RFA claim should be dismissed.

The RFA generally requires that federal agencies consider the impact of agency rule

changes on small businesses. 5 U.S.C. §§ 601-612 (2006). The IRFA component of the RFA

process, which is the sole focus of Plaintiffs' Motion for Summary Judgment, is intended to

describe the purpose, objective, legal basis, and potential impact and effect of such amendments.

---

[23] Plaintiffs' Motion for Summary Judgment also refers to the Paperwork Reduction Act (PRA), 44 U.S.C. §3506b), and implies that it has bearing on this appeal. Because there is no private cause of action under the PRA and because Plaintiffs have failed to assert any claim or allegation under the PRA in their First Amended Complaint, CLF will not address the implications of the PRA in this memorandum.

[24] Plaintiffs' Amended Complaint appears to assert a claim, based upon Section 604(a)(5) of the RFA, alleging that the final regulatory flexibility analysis (FRFA) improperly failed to include a description of alternatives that might lessen the financial impact of the regulation on small businesses, as required by the Regulatory Flexibility Act (RFA). Am Compl. ¶ 68 [13]. This claim is not supported in the administrative record as Amendment 16 addresses both the means by which it decreases costs for small entities and the financial implications of alternatives to Amendment 16. *See, e.g.,* 75 Fed. Reg. §18262, 18306-18308, AR 056,530-532. Moreover, by failing to assert this claim in the Motion for Summary Judgment, Plaintiffs have waived any claim as to compliance with Section 604 of the RFA.

5 U.S.C. § 603.  Plaintiffs' singular emphasis on the alleged failings of IRFA appears to ignore

the fact that the RFA does not provide for judicial review of a federal agency's compliance with

the provisions of section 603. *Allied Local & Regional Mfrs. Caucus v. U. S. E. P. A.*, 215 F.3d

61, 79 (D.C. Cir. 2000) (observing that section 603 is not listed among the provisions for which

5 U. S. C. § 611 allows judicial review); *Blue Water Fisherman's Ass'n v. Mineta*, 122

F.Supp.2d 150, 175 (D.D.C. 2000). Consequently, to the extent that Plaintiffs' claim alleges

noncompliance with Section 603, it is invalid and must be dismissed.

## IV.      Conclusion

For the foregoing reasons, CLF's motion for summary judgment as to the issues raised by

Plaintiffs should be granted, the agency action approving Amendment 16 should be affirmed,

and Plaintiff's complaints should be dismissed.


Respectfully Submitted,
Conservation Law Foundation, Inc.
By its attorneys:


_____/s/ Peter Shelley_____          Greg Cunningham
Peter Shelley                                  ME BOB #7718
MA BBO # 544334                                Conservation Law Foundation
Conservation Law Foundation                    47 Portland Street
62 Summer Street                               Portland, ME  04101
Boston, MA  02110                              Telephone:   (207) 210-6439
Telephone:   (617) 350-0990                    gcunningham @clf.org
pshelley@clf.org




Dated: January 28, 201


30

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing was served January 28, 2011 via the Court's

CM/ECF system on all counsel of record.

            <u>  /s/ Peter Shelley     </u>
              PETER SHELLEY