# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| THE CITY OF NEW BEDFORD, et al., )<br><br>Plaintiffs, )<br><br>v. )<br><br>GARY LOCKE, et al., )<br><br>Defendants. ) | 1:10-cv-10789-RWZ<br><br>**Federal Defendants' Consolidated Memorandum in Support of Cross-Motion for Summary Judgment and in Opposition to Motions for Summary Judgment, Docket Nos. 56, 61, and 63.** |
| LOVGREN, et al., )<br><br>Plaintiffs, )<br><br>v. )<br><br>GARY LOCKE, et al., )<br><br>Defendants. ) | |

## Table of Contents

I. **Introduction**................................................................................................................ 1

II. **Background** ............................................................................................................... 2

  A.  Statutory Background ................................................................................................ 2

     1.  The Magnuson-Stevens Fishery Conservation and Management Act ........................ 2

     2.  The National Environmental Policy Act .......................................................... 3

  B.  Factual Background ................................................................................................ 4

III. **Standard of Review** .................................................................................................. 10

  A.  The Magnuson-Stevens Act .................................................................................... 10

  B.  NEPA ................................................................................................................. 10

IV. **Argument** ................................................................................................................. 12

  A.  NMFS's approval of Amendment 16 complies with the Magnuson-Stevens Act. ........... 12

     1.  The agency reasonably concluded that the referendum requirement and the LAPP
provisions do not apply to Amendment 16's sectors. .......................................... 12

        a.  Sectors are contractual organizations that fish as a unit and restrict their members'
abilities to fish for the benefit of the sector. ................................................ 12

        b.  The agency's interpretation of the statute merits deference. ........................... 15

        c.  The sector allocation is not a limited access privilege program. ...................... 17

        d.  The agency did not need to conduct a referendum. ........................................ 18

           i.  The sectors at issue here do not constitute an IFQ ...................................... 18

           ii.  The method used to assign catch to sectors, "potential sector contribution," is not
an IFQ program. .................................................................................... 19

           iii.  Additionally, the Magnuson-Stevens Act exempts sectors from the referendum
requirement. ......................................................................................... 20

     2.  National Standard 1 does not allow NMFS to ignore its obligation to rebuild the
remaining overfished stocks in this fishery. .................................................... 22

3.   NMFS thoroughly analyzed the economic effects of Amendment 16.......................... 28

   a.   NMFS analyzed the economic effects of the catch reductions needed to rebuild this fishery. ........................................................................................................................ 29

   b.   NMFS analyzed the economic effects of the expanded sector program.................. 30

   c.   NMFS concluded that the economic effects of Amendment 16 are "severe" but "unavoidable." ................................................................................................................ 33

   d.   NMFS took steps to minimize the short-term negative economic effects of Amendment 16.............................................................................................................. 36

   e.   The Plaintiffs and amici have ignored NMFS's economic analysis and misstated the requirements of the Magnuson-Stevens Act. ................................................................ 37

      i.   NMFS did not ignore the economic effects of the expanded sector program. ..... 38

      ii.   NMFS did not ignore the effects of Amendment 16 on vessels in the common pool. .......................................................................................................................... 40

      iii.   NMFS considered whether the sector program would drive further consolidation.. .................................................................................................................................. 42

      iv.   NMFS evaluated the effects of lifting the 20% allocation cap. ........................... 43

      v.   Amendment 16 does not violate National Standard 8, despite its costs, because it is needed to rebuild this fishery. ................................................................................ 44

      vi.   The Plaintiffs' challenges are not supported by caselaw. .................................... 46

   4.   The allocations that NMFS approved in Amendment 16 are rational and comply with the law................................................................................................................................ 48

   5.   NMFS used the best data available and is committed to correcting any errors in that data...................................................................................................................................... 51

   6.   Mid-Atlantic fishers were not excluded from the scoping and decision-making process for Amendment 16. ............................................................................................................ 56

B.   NMFS fully complied with NEPA................................................................................. 60

   1.   Amendment 16 underwent an extensive public NEPA process.................................... 60

   2.   The FEIS evaluated an adequate range of reasonable alternatives. .............................. 61

3.    The EIS evaluated potential social and economic impacts in compliance with NEPA. 69

4.    The FEIS sufficiently evaluated impacts to the mid-Atlantic region. ......................... 71

5.    The FEIS sufficiently discusses the potential impacts related to distribution of potential sector contributions. ........................................................................................................ 73

6.    NEPA does not require an FEIS to evaluate speculative and causally remote impacts. .. ............................................................................................................................... 77

C.    Mr. Lovgren's Fifth Amendment claim must fail. ............................................................ 79

1.    Mr. Lovgren's Fifth Amendment claim should be dismissed because an adequate statutory remedy exists. .................................................................................................... 79

2.    Mr. Lovgren may not amend his Complaint through briefing to allege a takings claim. . ............................................................................................................................... 80

3.    Mr. Lovgren does not allege a Fifth Amendment claim. .............................................. 80

D.    NMFS complied with the Regulatory Flexibility Act. ..................................................... 82

V.   Conclusion ................................................................................................................. 84

## I.     INTRODUCTION

Despite years of careful management and ever-tightening restrictions on fishing, many of the stocks that make up the Northeast multispecies fishery are still overfished.  As a result, this fishery—whose abundant groundfish have been important to the people of New England and the United States for hundreds of years—now produces less than one-tenth the amount of fish that it did as recently as the 1960s.  Through the Magnuson-Stevens Act, Congress directed the New England Fishery Management Council ("NEFMC" or "the Council") and the National Marine Fisheries Service ("NMFS") to develop a plan that would put an end to unsustainable overfishing and rebuild this fishery's overfished stocks.  In response, the Council and NMFS developed Amendment 16, which will ensure that this fishery reaches those goals under the strict deadlines set by Congress.

The Plaintiffs and *amici* now challenge NMFS's partial approval of Amendment 16, arguing that the costs of the plan are simply too great.[1]  The Council and NMFS both recognized that the economic effects of Amendment 16 on fishers and fishing communities are likely to be severe in the short term.  But they also recognized that, in the long term, the economic health of these fishing communities is inextricably linked to the health of this fishery, and the only way to protect these communities is to end the unsustainable overfishing that has brought us to this point and to rebuild these stocks so that they will once again produce their "maximum sustainable

---

[1] This brief responds to the arguments made by the Plaintiffs (New Bedford et al. and Mr. Lovgren), proposed Plaintiff-Intervenor Food and Water Watch, Inc., and *amici* Representatives Frank and Tierney.  Memorandum of the Cities of New Bedford and Gloucester and Others in Support of Their Motion for Summary Judgment, Docket No. 57 (Nov. 22, 2010) ("NB Mem."); Memorandum of Law in Support of Plaintiff Lovgren's Motion for Summary Judgment, Docket No. 65 (Nov. 23, 2010) ("Lov. Mem."); Memorandum in Support of Prospective Intervenor-Plaintiff Food & Water Watch, Inc.'s Proposed Motion for Summary Judgment, Docket No. 67 (Dec. 1, 2010) ("FWW Mem."); Memorandum of Amici Curiae Representatives Barney Frank and John Tierney in Support of the Plaintiffs and Prospective Plaintiff-Intervenor on Cross-Motions for Summary Judgment, Docket No. 62 (Nov. 22, 2010) ("Am. Mem.").  It does not attempt to respond to the arguments presented in the *amicus* brief recently filed by the Commonwealth of Massachusetts, for the reasons described in our response to the Commonwealth's motion for leave to file that brief.  Docket No. 72.

yield."  Because NMFS rationally concluded that Amendment 16 would meet the goals set by Congress, and because that conclusion is fully supported by the administrative record, the Plaintiffs' claims under the Magnuson-Stevens Act fail.

The Plaintiffs' National Environmental Policy Act ("NEPA") claims should be rejected as well because the Plaintiffs fail to establish that NMFS violated the statute in approving Amendment 16.  They contend that NMFS violated NEPA by failing to evaluate sufficient alternatives in the Amendment 16 environmental impact statement ("EIS") and by failing to discuss adequately the impacts of the proposed action.  But those claims are belied by the final EIS ("FEIS") (and other record documents) which evaluated a complex suite of alternatives to the proposed action and provided a reasoned basis explaining why certain other proposals were not considered in greater detail.  In addition, the FEIS contains an extensive review of potential environmental and socio-economic impacts and identifies and discusses uncertainties in projecting those impacts.  For these reasons, the Plaintiffs' NEPA claims should also be rejected, and summary judgment on all counts should be entered on behalf of the Federal Defendants.

## II.     BACKGROUND

### A.     Statutory Background

#### 1.     The Magnuson-Stevens Fishery Conservation and Management Act (the "Magnuson-Stevens Act")

The Magnuson-Stevens Act creates eight regional fishery management councils, 16 U.S.C. § 1852(a), which develop fishery management plans ("FMPs") to conserve and manage the nation's fisheries, *id.* § 1852(h)(1).  The Councils are made up of state and federal fishery management officials, commercial and recreational fishers, and others with relevant scientific experience and training.  16 U.S.C. § 1852(b).  The relevant Council here is the New England Fishery Management Council ("NEFMC" or the "Council").  16 U.S.C. § 1852(a)(1)(A).  Once

stocks within a fishery are identified as overfished, the Act requires the Council to develop a fishery management plan (or an amendment to an existing plan) within two years that will "end overfishing immediately" and rebuild overfished stocks in a time period "as short as possible" but, in any event, no longer than ten years.  16 U.S.C. §§ 1854(e)(3), (4).

NMFS reviews the plan or amendment developed by the Council, and then approves, partially approves, or disapproves it.  16 U.S.C. §§ 1854(a).  NMFS may disapprove a plan or amendment, in whole or in part, only to the extent that it is inconsistent with applicable law, and NMFS may not substantively modify the plans and amendments submitted by the Council.  16 U.S.C. § 1854(a)(3).  Once approved, NMFS then implements the plan through regulations and enforces it.  16 U.S.C. § 1854(b).

These plans, amendments, and framework adjustments must be consistent with ten National Standards set out in the Act (as well as the other requirements of the Act).  16 U.S.C. §§ 1851(a)(1)-(10); *see also id.* §§ 1853(a), 1854(e).  The National Standards require the Council and NMFS to balance many competing interests in managing fisheries.  *See, e.g., Conservation Law Found. v. Mineta*, 131 F. Supp. 2d 19, 27 (D.D.C. 2001); *American Oceans Campaign v. Daley*, 183 F. Supp. 2d 1, 12 (D.D.C. 2000).  NMFS has published guidelines that describe the agency's interpretation of the National Standards.  50 C.F.R. § 600.305-600.355.

## 2.      The National Environmental Policy Act

The National Environmental Policy Act of 1969, 42 U.S.C. §§ 4321-4370f, requires federal agencies to examine the environmental effects of proposed federal actions and to inform the public about those effects.  42 U.S.C. § 4332(C).  NEPA does not mandate particular substantive results, but instead prescribes a process to ensure that agencies are fully informed of the environmental consequences of their projects.  *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350-51 (1989).  Under NEPA, whenever an agency proposes a "major

Federal action[] significantly affecting the quality of the human environment," it must prepare an environmental impact statement.  42 U.S.C. § 4332(2)(C).  An EIS must "provide [a] full and fair discussion of significant environmental impacts" so as to "inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment."  40 C.F.R. § 1502.1.

### B.    Factual Background

The Northeast multispecies fishery (also known as the "groundfish fishery") is a "mixed stock" fishery: it is not made up of a single species or stock, but instead includes 12 species of groundfish, divided into 20 stocks, that live in the waters off of New England and the mid-Atlantic states.[2]  AR 773 at 47761-63.  These abundant groundfish stocks have been important to the people of New England (and the United States) for hundreds of years.  AR 898 at 52446; AR 619 at 44612.  But in the last century, the fishery has faced new challenges as technology has transformed the fishing industry.  Where fishers once had only sails and simple hook-and-line gear, they now have diesel engines, trawl nets, and GPS, and they are able to catch fish with greater efficiency than ever before.  AR 898 at 52446.

The result has been a series of "boom-and-bust" cycles for this fishery.  AR 619 at 44612; AR 898 at 52446.  As "many of the most productive stocks have collapsed in the wake of ever-advancing harvesting technology," fishers have moved on to target new stocks, over-exploited them, and then moved on again.  AR 898 at 52446.  But that strategy could not be sustained, and the fishery has been declining since it reached its peak in the 1960s, when about 650,000 tons of the principal groundfish stocks were landed.  AR 898 at 52446.  By the 1970s, landings had already dropped sharply to between 200,000 and 300,000 tons.  *Id.*  They fell to

---

[2] The Magnuson-Stevens Act defines a "stock of fish" to mean "a species, subspecies, geographical grouping, or other category of fish capable of management as a unit."  16 U.S.C. § 1802(42).

about 100,000 tons in the mid-1980s and finally leveled off at a roughly-stable 40,000 tons in the

mid-1990s.  *Id.*; *see also, e.g.,* AR 40 at 5091; *Conservation Law Foundation v. Mineta*, 131 F.

Supp. 2d 19, 22 (D.D.C. 2001).

It does not have to be this way.  Fish are a renewable resource that "replenish themselves

naturally and can be harvested, within limits, on a continuing basis without being eliminated."

Understanding Fisheries Management: A Manual for Understanding the Federal Fisheries

Management Process (2d Ed. 2000) (attached hereto as Exhibit 1)[3], at 2; *see also* 16 U.S.C. §

1801(a)(5) ("Fishery resources are finite but renewable.").  In fact, a fishery will generally be

more productive and produce a greater yield if some fishing is allowed (because fishing thins out

the population of slow-growing "older, larger fish" that would otherwise prevent "all but a small

percentage of the [fast-growing] young fish produced each year from surviving . . . .").  *Id.* at 2.

Of course, some fish, especially the smaller, immature fish, must be allowed to survive and

reproduce to maintain the population.  *Id.*; *see also* AR 40 at 5091.

Together, these principles mean that there is a level of fishing that will produce the

largest possible yield that can be sustained in the long run from all of the stocks that collectively

make up this fishery: the "maximum sustainable yield" ("MSY").  This "maximum sustainable

yield" is the basis for fisheries management under the Magnuson-Stevens Act.  50 C.F.R. §

600.310(b)(2)(i); 50 C.F.R. § 600.310(e)(1)(i) (defining MSY).  The Act requires the stocks that

make up a fishery to be managed to "prevent overfishing while achieving, on a continuing basis,

the optimum yield," where the "optimum yield" is based on the maximum sustainable yield "as

reduced by any relevant economic, social or ecological factor . . . ."  16 U.S.C. § 1851(a)(1); *id.*

---

[3] This document was not included in the administrative record because it is not specific to this fishery or
Amendment 16.  The Court may properly consider it here, even though it is not in the record, because it is a general
reference work that explains basic fisheries management principles.  It was produced by Auburn University and the
University of Mississippi under a grant from NOAA and is also available at
http://nsgl.gso.uri.edu/masgc/masgch00001.pdf.

§ 1802(33)(B).  The Act's regulations also define the important terms "overfishing" and "overfished" in relation to the maximum sustainable yield: overfishing occurs whenever a stock is subject to fishing mortality so great that it "jeopardizes" its capacity to "produce [maximum sustainable yield] on a continuing basis."  50 C.F.R. § 600.310(e)(2)(i)(B).  Similarly, a stock is "overfished" when its biomass has fallen "below a level that jeopardizes the capacity of the stock . . . to produce [maximum sustainable yield] on a continuing basis."  50 C.F.R. § 600.310(e)(2)(i)(E).

After decades of unsustainable overfishing and dwindling landings, the Council and NMFS began to manage this fishery in 1986 to try to return these stocks to their maximum sustainable yield.  *See, generally*, AR 773 at 47809-812.  The Council adopted Amendment 5 to its fishery management plan in 1994, which required fishers to have permits and created the "days-at-sea" ("DAS") effort control program.  AR 773 at 47809.  The effort control program is an attempt to reduce fishing mortality so that these stocks can replenish themselves.  It does not directly limit the amount of fish that each fisher may catch (that is, it does not directly control the "output" of the fishery).  Instead, it tries to reduce fishing mortality by restricting the total number of days that each fisher may fish ("days-at-sea") and by imposing a series of other restrictions so that these days-at-sea become an effective proxy for the amount of fish caught.  The other restrictions include limits on the total amount of fish that may be caught on each trip (trip limits), area closures, and gear restrictions.  AR 889 at 52110.  Thus, the effort control program limits the amount of fishing effort that may be "input" into the fishery, instead of directly limiting the fishery's "output".  This fishery is the only fishery in the United States that is managed using these kind of "input" or "effort" controls.  AR 619 at 44617.

Since 1996, the total number of days-at-sea allocated to fishers has been "continuously decreased" in an effort to eliminate overfishing and rebuild overfished stocks. AR 889 at 52095; AR 773 at 47809. In particular, Amendment 13, which the Council adopted in 2004, "greatly reduced fishing effort" in this fishery. AR 773 at 47810. These ever-tightening restrictions have been successful in reducing the fishing mortality for many stocks. AR 889 at 52095; AR 550 at 31535-36 (identifying trends in stock mortality and biomass from 1977-2007). And the total biomass of the fishery has been improving. AR 320 at 19879 (Figure 7).

But while some stocks have improved under these efforts controls, others have not, and some have even deteriorated. AR 550 at 31537; AR 357 at 22791-92. In 2008, when the latest assessment was completed, eleven of the stocks in this fishery were still overfished: their populations were at less than half of the biomass necessary to support the maximum sustainable yield. AR 997 at 56486. And eleven of these stocks were still subject to overfishing: they were being caught at a rate greater than the rate that would produce the maximum sustainable yield. AR 997 at 56489 (Table 3).

The Council adopted Amendment 16 in 2009 to end this overfishing and rebuild the remaining overfished stocks, as the Magnuson-Stevens Act requires. AR 773. NMFS then partially approved Amendment 16 and issued three related sets of regulations to implement it. AR 996, 997, and 1001. The first set of regulations is Amendment 16 itself, which details rebuilding programs for overfished stocks and revises existing management measures. AR 997. The second set is the "sector" operations rule, which, as discussed below, approves 17 sector operations plans for FY 2010. AR 996. The third set is Framework Adjustment 44 ("Framework 44"), which sets the specific catch limits for FY 2010 to FY 2012 using the process defined by Amendment 16. AR 1001. These regulations became effective on May 1, 2010, and they are the

actions that the Plaintiffs and *amici* have challenged here.  For ease of reference, we refer to them collectively throughout this brief as "Amendment 16."

Amendment 16 makes three important changes in the management of this fishery.  First, it sets "annual catch limits" ("ACLs").  Congress amended the Magnuson-Stevens Act in 2007 to require all fishery management plans to "establish a mechanism for specifying annual catch limits . . . , including measures to ensure accountability."  16 U.S.C. § 1853(a)(15); Pub. L. 109-479, § 104(b) (Jan. 12, 2007).  Congress also required that this fishery have these annual catch limits and "accountability measures" ("AMs") in place for overfished stocks by 2010.  Pub. L. 109-479, § 104(b) (Jan. 12, 2007).  Amendment 16 satisfies these requirements—it establishes accountability measures and defines the process to set annual catch limits.  AR 997 at 56490-495.  Framework 44 then uses that process to set the specific annual catch limits for FY 2010 to FY 2012.  AR 1001 at 56718-721.

Second, Amendment 16 imposes further catch reductions to end overfishing and rebuild the remaining overfished stocks in this fishery.  NMFS found that it would require reductions in fishing mortality of between 16% and 100% (depending on the stock) to achieve those goals here.  AR 997 at 56489.  As a result, Amendment 16 again sharply reduces the total number of days-at-sea allocated to fishers (by 50% from their 2006 allocation), AR 961 at 56142, and also sets strict limits on the total amount of fish that may be caught by sectors, as discussed below.

Third, Amendment 16 expands the "sector" program first created by Amendment 13.  As discussed above, this fishery has been managed since 1994 using the days-at-sea effort control program.  But effort controls are "blunt tools," AR 773 at 48464, that are sometimes unable to prevent overfishing.  AR 773 at 48624.  The sector program takes a different approach to managing the fishery.  It allows fishers to join "sectors," which are "temporary, voluntary, fluid

associations of vessels . . . ."  AR 997 at 56499.  Fishers that join a sector are exempt from many

of the complex restrictions of the effort control program.  AR 773 at 48526; AR 997 at 56500.

Most importantly, they are not subject to days-at-sea limits, trip limits, or seasonal closures.  *Id.*;

AR 997 at 56497.

In exchange for being exempt from these complex "input" controls, sectors are subject to

the "output" control of a hard limit on the total amount of each stock of fish that they may catch.

AR 997 at 56497.  Specifically, each sector is assigned an "annual catch entitlement" ("ACE")

for the stocks that they are allowed to catch.  AR 997 at 56500.  The amount of that entitlement

is proportional to the "potential sector contributions" ("PSCs") of the vessels participating in the

sector, which in turn are based on the landings histories of those vessels.  *Id.*  So the more fish

that the vessels in the sector have caught in the past, the greater the sector's share of those stocks

will be.  Once a sector catches its total annual catch entitlement for a stock, it must stop fishing

in that stock area for the rest of the fishing year (unless it acquires additional ACE through

transfers between sectors).  *Id.*  And in order to ensure that the sectors comply with these limits,

the regulations require them to contract with an independent third-party to conduct both dockside

and at-sea monitoring of their catch.  AR 997 at 56515.

The sector program was introduced into this fishery to help mitigate the severe impacts of

ever-tightening effort controls.  Because vessels in sectors are exempt from days-at-sea and

many other restrictions, they have much greater flexibility in how, when, and where they fish.

AR 996 at 56482.  The Council and NMFS both concluded that this flexibility would increase

the efficiency of these vessels, reduce discards, and promote selective fishing practices.  AR 889

at 52107; AR 773 at 48527.  The sector program is voluntary, however, and vessel owners that

chose not to join a sector may still fish as part of the "common pool" under the days-at-sea effort control program.  AR 997 at 56508.

## III.  STANDARD OF REVIEW

### A.  The Magnuson-Stevens Act

The Magnuson-Stevens Act incorporates the familiar "arbitrary and capricious" standard of review defined by the Administrative Procedure Act ("APA").  16 U.S.C. § 1855(f)(1).  As the First Circuit has explained, the only question for the Court under the Magnuson-Stevens Act is whether NMFS has exercised its discretion in "an irrational, mindless, or whimsical manner." *Associated Fisheries of Maine v. Daley*, 127 F.3d 104, 110 (1st Cir. 1997); *see also Conservation Law Found. v. Evans*, 360 F.3d 21, 27 (1st Cir. 2004).  Thus, when the Court reviews the claims that Amendment 16 is not consistent with the Act's National Standards, the Court's task is not to review "*de novo* whether the amendment complies with these standards," but only to "determine whether [NMFS's] conclusion that the standards have been satisfied is rational . . . ." *North Carolina Fisheries Ass'n v. Gutierrez*, 518 F. Supp. 2d 62, 79 (D.D.C. 2007) (citations omitted); *see also Oregon Trollers Ass'n v. Gutierrez*, 452 F.3d 1104, 1119 (9th Cir. 2006) (same).  Judicial review under the Magnuson-Stevens Act is "especially deferential" because "there is still much that is unknown about fisheries management" and the agency is "'making predictions, within its area of special expertise, at the frontiers of science.'" *Oceana, Inc. v. Evans*, No. 04-811, 2005 WL 555416, at *19 (D.D.C. Mar. 9, 2005) (citing *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council*, 462 U.S. 87, 103 (1983)).

### B.  NEPA

Section 706 of the Administrative Procedure Act governs judicial review of agency actions challenged under NEPA.  5 U.S.C. § 706; *see Dubois v. U.S. Dep't of Agric.,* 102 F.3d 1273, 1284 (1st Cir. 1996).  The scope of review under section 706 is narrow, and a court must

uphold an agency's action unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "An agency's decision is not arbitrary and capricious if that decision was based on consideration of the relevant factors and if it did not commit a clear error of judgment." *Town of Winthrop v. F.A.A.,* 535 F.3d 1, 8 (1st Cir. 2008) (citations omitted); *see Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402, 416 (1971). Judicial review is based on the administrative record before the agency at the time of the challenged action. 5 U.S.C. § 706; *Camp v. Pitts,* 411 U.S. 138, 142 (1973); *Town of Winthrop,* 535 F.3d. at 14.

When the administrative record evidences an agency "considered the relevant factors and articulated a rational connection between the facts found and the choice made," the court must uphold the agency's action. *Baltimore Gas*, 462 U.S. at 105. Moreover, the court generally must be "at its most deferential" when reviewing scientific judgments and technical analyses within the agency's expertise. *Id.* at 103. The court also should conduct a "particularly deferential review" of an "agency's predictive judgments about areas that are within the agency's field of discretion and expertise . . . as long as they are reasonable." *Earthlink, Inc. v. FCC*, 462 F.3d 1, 12 (D.C. Cir. 2006) (citations omitted). And "[w]hen specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 378 (1989). Consistent with this deferential standard of review, the Supreme Court recently reiterated that courts should "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *National Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 658 (2007) (citation omitted). Moreover, an agency is entitled to the presumption that it has acted in accordance with the law. *Overton Park*,

401 U.S. at 415; *Wash. Crab Producers v. Mosbacher*, 924 F.2d 1438, 1441 (9th Cir. 1990)

(agency action presumed to be valid).

IV.     **ARGUMENT**

    A.     **NMFS's approval of Amendment 16 complies with the Magnuson-Stevens Act.**

        1.     **The agency reasonably concluded that the referendum requirement and the LAPP provisions do not apply to Amendment 16's sectors.**

Plaintiffs, *amici*, and proposed Plaintiff-Intervenor Food & Water Watch ("FWW") argue

that sectors, as defined by Amendment 16, constitute limited access program permits ("LAPPs")

and individual fishing quotas ("IFQs"). They contend that, because sectors are LAPPs and IFQs,

Amendment 16 must satisfy two statutory requirements. First, before submitting an amendment

with an IFQ program, the NEFMC must submit the program to a referendum. 16 U.S.C. §

1853a(c)(6)(D)(i),(v) (2007). Second, any LAPP must meet several procedural and substantive

requirements.  *See* 16 U.S.C. § 1853a (2007).  But, as the agency reasonably concluded, sectors

do not constitute IFQs and LAPPs under the statute. Defendants respectfully urge the Court to

defer to those interpretations and grant their Cross-Motion. To demonstrate why NMFS's

definition is reasonable, this section first describes sectors and then explains why the agency

reasonably construed the statutory provisions.

        a.     **Sectors are contractual organizations that fish as a unit and restrict their members' abilities to fish for the benefit of the sector.**

Sectors are established by contracts that operate like mini-FMPs, determined by the

interests of their members. *See* 50 C.F.R. § 648.2 (defining a sector).  They have managers who

bear responsibility for monitoring the catch of their members, for determining who catches fish

and when, and for imposing appropriate sanctions to prevent the sectors' fishers from catching

more than the annual catch entitlement for the sector for that fishing year. *See* AR 1057-72

(sector management plans approved in conjunction with Amendment 16); 75 Fed. Reg. 18,113, 18,114 (Apr. 9, 2010) (explaining the components of sector management plans). Sectors are assigned portions of the total allowable catch of a fishery based on the fishing history of their members, and the individual members do not have an exclusive right to fish based on that history. *See, e.g.*, AR 283 at 18395.

FWW and Plaintiffs mischaracterize how sectors operate and how they are assigned their annual catch entitlement, which leads them to mistaken conclusions about the applicable provisions of the Magnuson-Stevens Act. For example, FWW argues that the potential sector contribution ("PSC"), or the amount of fishing history that a member of a sector brings to the sector's annual catch entitlement, is the functional equivalent of an IFQ in part because the potential sector contribution "is completely within the control of the permit holder, who can choose when, how, and if he will access his quota." *See* FWW Mem. at 11, 14. As these characterizations of the potential sector contribution overstate its function, it is unsurprising that FWW and Plaintiffs read the applicable statutory provisions incorrectly.

For purposes of Amendment 16, potential sector contribution is the term used to describe a vessel's landings history from fishing years 1996-2006,[4] and, once a vessel joins a sector, its potential sector contribution is used to calculate how much of the fishery's annual catch limit the sector may fish. *See* 75 Fed. Reg. at 18,276. This fishing history, or potential sector contribution, has no independent value outside a sector. Potential sector contribution "remain[s] with the limited access permit indefinitely," *see* 75 Fed. Reg. at 18,276, in that this value is linked to the multispecies permit of each fisher in the fishery (common pool fishers also have permits with a potential sector contribution value), but it gains relevance only once a vessel joins a sector. A

---

[4] Except, as discussed below, for the allocation of Georges Bank cod to sectors created under Amendment 13.

sector is assigned an annual catch entitlement equal to the sum of the potential sector contributions of a sector's vessels. *See* 75 Fed. Reg. at 18,276 (explaining the assignment of catch entitlement to sectors).

Nothing in Amendment 16 requires that a vessel's owner have the right to fish an amount equivalent to the vessel's potential sector contribution and, in fact, the sector plans submitted do not initially allow fishers to catch this entire amount. *See, e.g.*, AR 1057 at 57847-48 (allowing sector members to fish only 90 % of their potential sector contribution by establishing a reserve of the sector's allowable catch entitlement); AR 1058 at 58046 (establishing a reserve of ten percent); AR 1070 at 61999 (authorizing a research reserve, presumably for scientific research, to be deducted from the annual catch entitlement); AR 1071 at 62096 (five percent reserve); 75 Fed. Reg. at 18,114. Also, nothing in Amendment 16 prevents a sector from having one vessel fish the sector's entire annual entitlement. *See, e.g.*, 75 Fed. Reg. at 18,276-77. For example, Northeast Fishery Sector II's Environmental Assessment notes that the sector model allows it to coordinate fishing effort so that fishers do not reach the annual catch entitlement for one stock well before they reach that level for other stocks. AR 901 at 52788. This flexibility allows sector members to catch more than they could acting individually.[5] *See id.* And, lastly, Amendment 16 and sector operations plans also restrict transfers of landings history. To sell part of a sector's annual catch entitlement to another sector, the sector must request permission to perform the trade, lay out the specifics, and deduct annual catch entitlement from the sector's total. 75 Fed. Reg. at 18,277. In sum, annual catch entitlement is assigned to sectors, not to particular fishers, and sectors manage this entitlement to fish by coordinating the effort of the sectors' vessels.

---

[5] Once a sector's annual catch entitlement for a particular stock is caught, the sector must cease operations in that stock area (for all stocks), until it acquires additional annual catch entitlement. *See* 75 Fed. Reg. at 18,277.

**b.      The agency's interpretation of the statute merits deference.**

A court applies a deferential standard of review when it evaluates an agency's interpretation of the statute the agency implements. NMFS's interpretation here is entitled to deference under both the *Chevron* and *Skidmore* frameworks. Under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), NMFS's determination is entitled to "respect" because it is part of "a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Northwest Ecosystem Alliance v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1141 (9th Cir. 2007) (citation omitted).  This respect is enough to resolve the issue because of NMFS's careful consideration of the issue and the expertise it brought to bear. Thus the Court can and should defer to NMFS without deciding necessarily whether or not *Chevron* applies.

*Chevron* deference to NMFS is warranted nonetheless. *See also* FWW Mem. at 9 (discussing *Chevron* deference). Under *Chevron*, an agency's interpretation of an ambiguous statutory term is entitled to deference—"controlling weight"— so long as the interpretation is not "arbitrary, capricious, or manifestly contrary to the statute."  *Northwest Ecosystem*, 475 F.3d at 1141 (quoting *Chevron U.S.A., Inc. v. Natural Res. Def. Council*, 467 U.S. 837, 844 (1984)). Assuming that the terms "IFQ," and "LAPP," and the referendum requirement are ambiguous to the extent they apply to sectors, NMFS's interpretation is reasonable. Thus the only question is whether *Chevron* applies to the interpretation, a question to which the answer is "yes." If Congress's intent is not clear, and if "Congress delegated authority to the agency generally to make rules carrying the force of law, and [ ] the agency interpretation claiming deference was promulgated in the exercise of that authority," *United States v. Mead Corp.*, 533 U.S. 218, 226-

27 (2001), then a court must defer to the agency's construction of the statute so long as "the

agency's answer is based on a permissible construction … ." *Chevron,* 467 U.S. at 843.[6]

    In this case, NMFS construed the Act in response to the Council's questions during the

development of Amendment 16, and it spent time considering its interpretation before

determining that sectors in the groundfish fishery were not LAPPs or IFQs, *see* AR 103

(weighing a variety of interpretations), a position it provided in Federal Register notices. *See,*

*e.g.*, 75 Fed. Reg. at 18,292. Several parties, including FWW, proffered interpretations that

NMFS considered before publishing its final interpretation. AR 864 at 50496-98; *see Doe v.*

*Leavitt*, 552 F.3d 75, 79-80 (1st Cir. 2009) (explaining the importance of notice-and-comment

and publication in the Federal Register in determining deference); *Natural Res. Def. Council v.*

*Daley*, 209 F.3d 747, 753 (D.C. Cir. 2000) (applying *Chevron* but declining to defer to the

agency because the fishing quota did not meet the conservation goals of the Magnuson-Stevens

Act); *Oceana, Inc. v. Evans*, No. 04-0811, 2005 WL 555416, at *13 (D.D.C. Mar. 9, 2005)

(applying *Chevron* deference to an interpretation in an FMP amendment). The Supreme Court

has deferred to agency determinations developed less formally than was Amendment 16. *See*

*NationsBank of N.C., N.A. v. Variable Annuity Life Ins. Co.*, 513 U.S. 251, 257 (1995) (applying

*Chevron* deference to a letter determination issued by the comptroller of the currency); *cf.*

*Christensen v. Harris County*, 529 U.S. 576, 587 (2000) (statements expressed only in opinion

letters do not warrant *Chevron* deference). In short, the Court may apply *Chevron* deference to

NMFS's interpretation but, even if it does not, the respect an agency's interpretation receives

under *Skidmore* is enough for the Court to conclude that NMFS permissibly construed the Act.

---

[6] NMFS is the agency with delegated authority to ensure that FMPs are consistent with the Magnuson-Stevens Act. *See* 16 U.S.C. 1854(a), (b)(1)-(3); *see also Massachusetts v. Sebelius*, 677 F. Supp. 2d 397, 404 n.3 (D. Mass. 2009) (noting that even if Congress did not expressly delegate the authority to decide the precise question at issue it may have implicitly granted the authority by delegating the agency general rule-making authority).

**c.      The sector allocation is not a limited access privilege program.**

The New Bedford Plaintiffs, Mr. Lovgren, and *amici* Frank and Tierney argue that the sector allocation in the groundfish fishery is a LAPP. A limited access privilege is defined as "a Federal permit, issued as part of a limited access system under section 303A [16 U.S.C. § 1853a] to harvest a quantity of fish expressed by a unit or units representing a portion of the total allowable catch of the fishery that may be received or held for exclusive use by a person." 16 U.S.C. § 1802(26).

Sectors do not meet this definition. NMFS concluded that, because sectors are temporary, voluntary, and established by contract, they are not LAPPs, which require a "permit" issued for a quantity of fish that may be used exclusively by a "person." 16 U.S.C. § 1853a(c)(1)(D); *see e.g.*, AR 103; AR 283 at 18395, 474 at 25114 (explaining that Amendment 13 sectors are not IFQ systems); 643 at 45201; 962 at 56196; 971 at 56295; 1040 at 56906; 75 Fed. Reg. at 18,292 (final rule). No party contends that a sector receives a physical (or electronic) federal permit. Consequently, sectors do not receive "permit[s]" held for the "exclusive use of a person." Instead, sectors are assigned an annual catch entitlement that its members, together, may fish. Consequently, because a sector is not issued a permit, it is not a LAPP.

The New Bedford Plaintiffs attempt to complicate matters by citing section 1853a(b) to argue that sector allocations are a "permit." NB Mem. at 20-21. That section defines "permit" only for enforcement purposes. That is, section 1853a defines "permit," for purposes of civil and criminal penalties, to include the categories "limited access privilege, quota share, or other limited access system." The problem with these arguments is that Congress explicitly confined its equation of these categories as "permits" to enforcement sections of the Act. *See* 16 U.S.C. §§ 1857 (defining prohibited acts); 1858 (civil penalties and sanctions); 1859 (criminal violations).

It would strain the statutory language to conclude that, while Congress explicitly restricted its definition of "permit" to the enforcement sections of the Act, it actually intended to define the word "permit" for other sections of the Act it did not list and to suggest, through an expansive, open-ended definition, that all limited access systems and quota shares (an undefined term) are LAPPs.[7] In short, because NMFS reasonably construed the statute to conclude that a sector is not a "person" and it is not issued a "permit," Defendants respectfully urge deference to NMFS's conclusion that a sector is not a LAPP so that the LAPP requirements do not apply.

### d.      The agency did not need to conduct a referendum.

#### i.      The sectors at issue here do not constitute an IFQ.

Plaintiffs and FWW argue that there should have been a referendum on Amendment 16's sectors before Amendment 16 was implemented.[8] They note that all new IFQ programs in fisheries managed by the NEFMC must be approved by a referendum. *See* 16 U.S.C. § 1853a(c)(6)(D)(i) (describing the referendum requirement). An IFQ is a kind of LAPP and is defined in essentially the same way.  *See* 16 U.S.C. § 1802(23) & (26). For the reasons discussed above, sectors are not LAPPs, nor are they IFQs. To recap, a sector is a short-term, contractual arrangement that governs how and when fishers catch fish. It is not a percentage or portion of the total allowable catch assigned to any *individual*. *See* 74 Fed. Reg. 69,382, 69,399-400 (Dec. 31, 2009) (Draft Amendment 16); 75 Fed. Reg. at 18,275 (final rule), 18,302 (noting that the

---

[7] In addition, while NMFS's interpretation is reasonable in light of the "permit" requirement alone, sectors are also not a "person" for purposes of a LAPP. While the general definition of "person" in the Act is broad, 16 U.S.C. § 1802(36), the definition for purposes of a LAPP is much narrower. 16 U.S.C. § 1853a(c)(1)(D); *see* AR 103; 75 Fed. Reg. at 18,292 (final rule). The LAPP provision prohibits "any person other than a United States citizen, a corporation, partnership, or other entity established under the laws of the United States or any State, or a permanent resident alien, that meets the eligibility and participation requirements established in the program from acquiring a privilege to harvest fish…" *Id.* In contrast, a sector is a voluntary, short-term, arrangement established by contract that, in the very narrow context of LAPPs, is not a "person." *See id.* Consequently, because a sector is not a section 1853a "person," it does not constitute a LAPP.

[8] The referendum requirement is not one of the ten National Standards, *see* 16 U.S.C. § 1851, but, rather, a separate requirement contained within the section addressing LAPPs. *See* 16 U.S.C. § 1853a(c)(6)(D).

requirement that sectors include at least three unrelated individuals addresses concerns that Amendment 16 was a means to circumvent the referendum requirement). The Court need go no further before holding that NMFS permissibly determined that a referendum is not required.

### ii. The method used to assign catch to sectors, "potential sector contribution," is not an IFQ program.

FWW argues that, while sectors may not be IFQs (or LAPPs, *see* FWW's comments on Amendment 16, AR 864 at 50496), the potential sector contribution ("PSC") of each vessel, used to calculate the sector's assignment of the fishery's annual catch limit, is an IFQ by another name. Therefore, FWW argues, the referendum requirement applies. An IFQ is "a Federal permit under a limited access system to harvest a quantity of fish, expressed by a unit or units representing a percentage of the total allowable catch of a fishery that may be received or held for exclusive use by a person…." 16 U.S.C. § 1802(23). As discussed above, it is incorrect to argue that the fishing history that each sector vessel brings to a sector's annual catch entitlement is used "exclusively" by a "person." Instead, potential sector contribution is merely an attribute of the multispecies permit (issued to all members of the fishery) that describes the landings of those vessels for fishing years 1996-2006 (i.e., potential sector contribution is also an attribute of the permits of those fishers who fish the common pool under the days-at-sea ("DAS") system, and is used to determine the fish available to the common pool). *See* 75 Fed. Reg. at 18,276. This "potential sector contribution," or fishing history, has meaning only once a vessel joins a sector. At that point, NMFS uses the permit's fishing history to calculate how many fish may be caught by the sector. *See id*. Therefore, this potential sector contribution is not exclusively used by a person. Because the "potential sector contribution" is not an IFQ, it does not trigger the referendum requirement.

iii.     **Additionally, the Magnuson-Stevens Act exempts sectors from the referendum requirement.**

The first sector in the groundfish fishery was implemented in Amendment 13, effective in 2004. Between the implementation dates of Amendment 13 and Amendment 16, Congress, to resolve any confusion, explicitly exempted sector allocations from the referendum requirement it established for any new IFQ programs in the fisheries managed by the NEFMC. *See* 16 U.S.C. § 1853a(c)(6)(D)(vi). It also exempted any program approved before the effective date of the reauthorization of the Magnuson-Stevens Act in 2006. *See* 16 U.S.C. § 1853a(i). The sectors in Amendment 16 are covered by both exemptions to the referendum requirement.

A comparison of Amendment 13 with Amendment 16 demonstrates why the sectors in Amendment 16 are extensions of those approved in Amendment 13, such that the referendum requirement does not apply because the sector program in the groundfish fishery was already in effect when the referendum requirement was imposed. *See* 16 U.S.C. § 1853a(i). Amendment 13 implemented the Georges Bank Cod Hook Sector Gear, *see* 69 Fed. Reg. 22,906, 22,914 (April 27, 2004), which received part of the total allowable catch of Georges Bank cod based on members' fishing history from 1996-2001. The term "potential sector contribution" describes in Amendment 16 what Amendment 13 called "documented accumulated landings." Like for the Amendment 16 sectors, Amendment 13 allowed sectors to fish up to a total catch entitlement based on the fishing history of the sector's vessels (with a different timeframe). The "shares" that each vessel brought to a sector in Amendment 13 were tantamount to what is now called "potential sector contribution." Amendment 13 provided:

> Allocation of fishery resources to a sector is based on documented accumulated landings for the 5-year period prior to submission of a sector allocation proposal to the Council, **of each participant in the sector**. Any allocations of GB cod for fishing years 2004 through 2007 must be based upon a proposed sector's documented accumulated landings during the 1996 through 2001 fishing years, but no sector may be allocated more than 20 percent of a stock's [total allowable

20

> catch or] TAC. Once an allocated TAC is projected to be attained, sector operations will be terminated for the remainder of the fishing year. If, in a particular fishing year the sector exceeds its TAC, the sector's allocation will be reduced by the amount of the overage in the following fishing year. If the sector does not exceed its TAC, but other vessels in the general pool do, the sector's quota in the following year will not be reduced as a result of such overages.

69 Fed. Reg. at 22,914 (emphasis added).

FWW suggests that, unlike in Amendment 16, the sector allocation in Amendment 13 was done "as a unit." FWW Mem. at 12 n.15. It is unclear exactly what FWW means by this. *Cf.* 69 Fed. Reg. at 22,914. Amendment 16 merely used the term "potential sector contribution" to name the "allocation of fishing resources to a sector … based on documented accumulated landings … of each participant in the sector." *Compare* 75 Fed. Reg. at 18,276 (explaining that potential sector contribution is "calculated by summing the dealer landings for each permit during [fishing years] 1996 through 2006") *with* 69 Fed. Reg. at 22,914.  Likewise, the current definition of a sector, *see* 50 C.F.R. § 648.2, is only a slight modification of Amendment 13's definition of a sector as "a group of vessels that have voluntarily signed a contract and agree to certain fishing restrictions, and that have been allocated a portion of the [total allowable catch] of a species, or an allocation of [days-at-sea]." 50 C.F.R. 648.2 (2004). Because the sector allocation that eventually grew into Amendment 16 was approved before the 2006 Magnuson-Stevens Act reauthorization, all the requirements of section 1853a do not apply, and no referendum is needed. *See* 16 U.S.C. § 1853a(i); *see* 50 C.F.R. § 648.87 (regulation about sectors in the groundfish fishery, which was, and is, entitled "sector allocation").

And, Congress provided yet another clear indication that the referendum requirement is inapplicable to Amendment 16. The plain language of 1853a(c)(6)(D)(vi), exempting a sector allocation from the referendum requirement, suggests that Amendment 16 need not be submitted to a referendum, even if the Court construes Amendment 16's sectors as a new sector allocation,

21

rather than as a continuation of those approved in Amendment 13. In addition to the statute's plain language, the timing of the statutory re-authorization suggests that Congress intended, in case there was any possible confusion between a "sector allocation" and a LAPP, to unambiguously exempt from the section 1853a requirements new sector allocations in the groundfish fishery. Sectors had become a part of the groundfish fishery when Congress exempted "sector allocation[s]" from the referendum requirement for NEFMC's fisheries, 16 U.S.C. § 1853a(c)(6)(D)(vi), and the NEFMC managed no other sectors. It is, therefore, reasonable to conclude that Congress was aware of the groundfish fishery's sector allocation when it drafted the exemption and intended it to apply to its sector allocation. *See, e.g.*, *Barnhart v. Walton*, 535 U.S. 212, 220 (2002); *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 845-46 (1986) (court may assume that Congress was aware of the agency interpretation). Consequently, section 1853(c)(6)(D)(vi) applied to unambiguously exempt from the referendum requirement new sector allocations like those in the groundfish fishery.

Accordingly, Plaintiffs are not entitled to summary judgment regarding the statutory interpretation of the Magnuson-Stevens Act as it applies to Amendment 16's sectors. As reasonably explained by NMFS, sectors are not LAPPs or IFQs so the LAPP provisions and the referendum requirement are inapplicable. For all the foregoing reasons, Defendants' Cross-Motion should be granted.

### 2.    National Standard 1 does not allow NMFS to ignore its obligation to rebuild the remaining overfished stocks in this fishery.

The Northeast multispecies fishery is a "mixed stock" fishery.  As discussed above, while some stocks in this fishery have been rebuilt to healthy levels, others have not.  Before Amendment 16 was promulgated, eleven stocks were still overfished and eleven were still subject to overfishing.  AR 997 at 56489 (Table 3).  The Magnuson-Stevens Act did not allow

this to continue.  It required the Council to develop a plan that would "end overfishing

immediately" and "rebuild [the] affected stocks of fish."  16 U.S.C. § 1854(e)(3)(A).  And it not

only required the plan to rebuild these stocks, it required the plan to rebuild them in a time period

that is "as short as possible" and "not [to] exceed 10 years" (except where "the biology of the

stock of fish . . . dictate[s] otherwise" or for certain other limited reasons).  16 U.S.C. §

1854(e)(4)(A).

     Amendment 16 satisfies those requirements, ending overfishing and rebuilding most of

these stocks within the next six years.  To accomplish that, it reduces catch significantly to

protect and rebuild these overfished stocks so that they will again be able to produce their

maximum sustainable yield.  AR 773 at 47768 (Table 3) (identifying expected rebuilding dates

for each stock).  This is a mixed stock fishery, however, and the gear that most fishers use limits

their ability to target specific stocks selectively.  AR 773 at 47761, 48591.  That means that

"most fishing trips in this fishery catch a wide range of species," AR 773 at 47761, including fish

from both healthy and overfished stocks.  As a result, "the measures necessary to rebuild

overfished stocks also reduce fishing mortality on healthy stocks."  AR 773 at 48591; AR 1001

at 56725.  Fishers have not been able to fully harvest healthy stocks in recent years because, in

doing so, they would catch too many fish from the weaker stocks.  AR 255 at 17435.  NMFS

concluded that these "kinds of constraints in harvesting one stock because of more restrictive

measures on other stocks in a mixed-stock fishery are inevitable and unavoidable due to

Magnuson-Stevens Act mandates and national standards."  AR 1001 at 56725.

     But while these are the "inevitable and unavoidable" consequences of the law, the

Council and NMFS have also taken steps to help fishers harvest more of the healthy stocks.  AR

255 at 17435.  For example, Amendment 16 reduces the minimum fish size for haddock from 19

inches to 18 inches to "increase landings of this healthy species . . . ."  AR 997 at 56498.  The

Council and NMFS have also created several programs to encourage fishing that targets healthy

stocks selectively.  These programs include "special access programs" ("SAPs") that make it

easier for fishers to "harvest more of the abundant stocks of haddock, particularly on [Georges

Bank]," AR 997 at 56531, and which rely on gear, area, and seasonal restrictions to improve

selectivity and protect weaker stocks.  They also include "Category B days-at-sea," which are

allocated to vessels fishing in the common pool in addition to their regular "Category A days-at-

sea," and which allow additional fishing when certain selective fishing practices are used.  AR

997 at 56531.  And they include the sector program itself, which gives fishers the flexibility to

fish more selectively (and catch more of the healthy stocks) by removing trips limits and some of

the other restrictions imposed under effort controls.  AR 1001 at 56725.

But even with these programs, the catch limits necessary to protect and rebuild overfished

stocks are still likely to prevent fishers from fully harvesting the healthy stocks.  NMFS

concluded that this is an "inevitable and unavoidable" consequences of the law.  New Bedford

and the *amici* disagree.  They argue that NMFS has "misconstrue[d] the Act and ignore[d]

Congressional intent by prioritizing the rebuilding of individual stocks in the Multispecies

complex over achieving [maximum sustainable yield] or [optimum yield] from the entire

complex on a continuing basis."  NB Mem. at 4; Am. Mem. at 8-12.

Their argument goes like this: in National Standard 1, the Magnuson-Stevens Act

expressly states that "[c]onservation and management measures shall prevent overfishing while

achieving, on a continuing basis, **the optimum yield from each fishery** . . . ."  16 U.S.C. §

1851(a)(1) (emphasis added).  From this, they reason that the "focus" of the Act is "on a fishery

as a whole," NB Mem. at 10-11, and that the "goal of the Act is to obtain Optimum Yield from

24

each fishery" as a whole, not from each individual stock, NB Mem. at 9, Am. Mem. at 11.  They

conclude that "[m]anaging for the weakest stock in a multi-stock fishery" cannot "be squared

with the goal of achieving [optimum yield] for the fishery as a whole" and thus is precluded by

National Standard 1.  Am. Mem. at 11; NB Mem. at 10-11.

New Bedford and the *amici* have only been able to reach that conclusion, however, by

ignoring the rest of the Act, which not only directs the Council and NMFS to protect fisheries as

a whole, but also repeatedly commands them to "rebuild affected stocks of fish."  For example,

the Act expressly requires every fishery management plan for every fishery to include the

conservation and management measures "necessary and appropriate" to "rebuild overfished

stocks . . . ."  16 U.S.C. § 1853(a)(1)(A).  Once a fish stock is classified as overfished (as several

stocks in this fishery are), the requirements become even more strict.  The Act then requires that

"action be taken . . . to rebuild affected stocks of fish."  16 U.S.C. § 1854(e)(2).  It requires the

Council and NMFS to "prepare and implement" a fishery management plan (or amendment)

within two years that will "end overfishing immediately" and "rebuild affected stocks of fish."

16 U.S.C. § 1854(e)(3)(A).  And it requires that plan (or amendment) to "specify a time period

for rebuilding the fishery" that is "as short as possible, taking into account the status and biology

of **any overfished stocks** of fish," but not to exceed ten years, "except in cases where **the

biology of the stock** of fish . . . dictate[s] otherwise."  16 U.S.C. § 1854(e)(4)(A) (emphasis

added).

In light of these express requirements, the claim that NMFS has "misconstrue[d] the Act

and ignore[d] Congressional intent" by attempting to rebuild overfished stocks is absurd.  New

Bedford and the *amici* argue that Congress only meant "to rebuild and manage **fisheries**," not to

rebuild individual stocks.  NB Mem. at 15 (emphasis in original).  But that argument cannot be

reconciled with Congress's direct command, stated repeatedly in the Act, to "rebuild affected **stocks** of fish." *See, e.g.,* 16 U.S.C. §§ 1854(e)(3), (4) (emphasis added). Their argument is also not consistent with National Standard 8, which expressly lists the "rebuilding of overfished stocks" as one of "the conservation requirements of this [Act] . . . ." 16 U.S.C. § 1851(a)(8).

As New Bedford and the *amici* point out, National Standard 1 does require NMFS to "achiev[e], on a continuing basis, the optimum yield from each fishery . . . ." 16 U.S.C. § 1851(a)(1). The optimum yield, however, is not a level of fishing that would prevent the rebuilding of overfished stocks. To the contrary, the Act itself defines the "optimum" yield as "the amount of fish" that "provides for rebuilding to a level consistent with producing the maximum sustainable yield in such fishery." 16 U.S.C. § 1802(33)(C). And NMFS has clarified in its guidelines for National Standard 1 that optimum yield "must take into account the need to . . . rebuild overfished stocks" and that the "measures chosen to achieve the [optimum yield] must **principally** be designed to prevent overfishing and **rebuild overfished stocks**." 50 C.F.R. §§ 600.310(e)(3)(iv), (l)(4) (emphasis added). Thus, achieving the optimum yield does not just mean producing "a long-term series of catches such that average catch is equal to the [optimum yield]," but also producing catches such that "overfishing is prevented, the long term average biomass is near or above $B_{msy}$, **and overfished stocks** . . . **are rebuilt** . . . ." 50 C.F.R. § 600.310(e)(3)(i)(B) (emphasis added).

The Act also does not require NMFS to ignore individual stocks and "focus" on the "fishery as a whole." It is true that many of the provisions of the Act use the term "fisheries," including the requirement to achieve "the optimum yield from each fishery." 16 U.S.C. § 1851(a)(1). But the Act's definition of the term "fishery" is broad and includes not just the entire multi-species fishery, but also individual stocks: "[t]he term fishery means . . . one or more

stocks of fish which can be treated as a unit for purposes of conservation and management . . . ."
16 U.S.C. § 1802(13)(A).  Similarly, NMFS has clarified that optimum yield does not have to be
set at the fishery level, but may also be "established at the stock or stock complex level," 50
C.F.R. § 600.310(e)(3)(i)(A), and, in fact, that has been the long-standing practice of the Council
and NMFS in this fishery.  AR 773 at 47825 (noting that optimum yield is defined for each stock
in this fishery).  Moreover, NMFS has already considered the interpretation of the Act advanced
by New Bedford and the *amici*, in the context of this fishery, and rejected it.  AR 506 at 27296-
99.  The agency's long-standing interpretation of the law—as reflected in the National Standard
1 guidelines, Amendment 13, and Amendment 16, and left undisturbed by Congress when it
amended the Act in 2006—is entitled to deference.  *See, e.g., Oregon Trollers Ass'n v. Gutierrez*,
452 F.3d 1104, 1119 (9th Cir. 2006).

Both New Bedford and the *amici* also cite a statement from the legislative history by
Representative Young, expressing his concern that "the provision requiring that harvest levels be
set to prevent overfishing not be interpreted to shut down entire fisheries if one stock of a multi-
species complex is experiencing overfishing."  NB Mem. at 13; Am. Mem. at 11 n.6.  Even on its
face, that statement does not support their interpretation of the Act because it refers only to
"overfishing," not to the rebuilding of "overfished" stocks.  While Representative Young may
have believed that some overfishing should be allowed in mixed-stock fisheries, he did not
suggest that prolonged overfishing should be allowed to prevent the rebuilding of overfished
stocks in direct violation of the plain language of the Act.  And even if his statement somehow
suggested such an interpretation, the "most authoritative legislative history" of these
amendments demonstrates that Congress intended to rebuild overfished stocks in all fisheries,
including mixed-stock fisheries like this one.  AR 506 at 27298; *see, generally*, AR 506 at

27296-99 (NMFS's analysis of legislative history on this issue).  In any event, there is no need to

resort to the legislative history here because the Act is unambiguous: as discussed above, it

repeatedly directs NMFS to "rebuild overfished stocks."  New Bedford and the *amici* cannot use

a single statement by a single Congressman to rewrite the plain language of the Act.

The interpretation of the Act advanced by New Bedford and the *amici* is wrong.  Under

that interpretation, these overfished stocks would be subjected to prolonged overfishing.  They

would not be rebuilt "within ten years" or in a time period "as short as possible"—to the

contrary, they would probably never be rebuilt at all.  And New Bedford and the *amici* are not

just arguing that the Act permits prolonged overfishing to prevent the rebuilding of these

stocks—they are arguing that it absolutely requires it (through National Standard 1).  That

interpretation simply cannot be reconciled with the Act's express and repeated commands to

"prevent overfishing" and "rebuild overfished stocks."  16 U.S.C. §§ 1853(a)(1)(A), 1854(e)(3),

(4).  In short, the fact that a few of these stocks have been successfully rebuilt does not mean that

NMFS can ignore its obligation to rebuild the remaining stocks.[9]

### 3. NMFS thoroughly analyzed the economic effects of Amendment 16.

Amendment 16 is meant to end overfishing in the Northeast multi-species fishery and to

rebuild overfished stocks under the strict deadlines set by Congress.  AR 773 at 47816-18

(defining the needs and purposes of Amendment 16).  To accomplish those goals, it must reduce

fishing mortality for each of the overfished stocks in this fishery by between 15% and 100%.

---

[9] The National Standard guidelines also create a "mixed-stock exception."  50 C.F.R. § 600.310(m).  That exception gives the Council the flexibility to allow some overfishing on a short-term basis, *id.*, but it does not allow the Council to delay the rebuilding of overfished stocks.  AR 506 at 27260.  New Bedford and the *amici* do not argue that the exception applies here, and it does not.  NMFS reviewed this issue in 2009 and concluded that the mixed-stock exception cannot be applied to this fishery because it would delay the rebuilding of overfished stocks and because "prolonged overfishing of any stock" is not consistent with the Magnuson-Stevens Act.  AR 506 at 27261; AR 483 at 25511.  The Council also considered the exception during its development of Amendment 16 and rejected its application.  AR 773 at 47838; *but see* AR 773 at 47905-6 (allowing that exception may apply under limited and narrow circumstances that are not relevant to this discussion).

AR 773 at 47775; AR 997 at 56489.  Amendment 16 uses a combination of fishery management tools to reach those targets: it subjects vessels fishing in sectors to strict, reduced catch limits, and it reduces the allocation of "days-at-sea" for vessels fishing in the common pool by 50% (compared to their 2006 allocation).  AR 773 at 48457; AR 961 at 56142.

These efforts to reduce fishing mortality mean that fishers are likely to catch less fish under Amendment 16 than they have caught in the past.  The Council and NMFS both recognized that, by reducing catch, Amendment 16 would have negative economic effects on fishers and fishing communities in the short-term while the fishery is being rebuilt.  *See, e.g.,* AR 773 at 47770; AR 1001 at 56725.  They undertook an extensive analysis of those economic effects that is set out in the Council's environmental impact statement for Amendment 16, AR 773 at 48382-534, in its environmental assessment for Framework 44, AR 882 at 51221-264, and in the environmental assessments for each of the individual sectors approved under Amendment 16, *see, e.g.,* AR 898 at 52445-521.  *See also* AR 1001 at 56728-29.  Contrary to the allegations of the Plaintiffs and *amici*, that analysis is thorough and consistent with the requirements of the Magnuson-Stevens Act.

> **a.  NMFS analyzed the economic effects of the catch reductions needed to rebuild this fishery.**

In their analysis, the Council and NMFS considered an array of economic effects.  They broke those economic effects down by vessel size, AR 773 at 48449, gear type, *id.* at 48449, home state, *id.* at 48450, and home port, *id.* at 48452.  They considered the economic effects of the methods they used to allocate the total catch between different sectors and the common pool.  AR 773 at 48387-435.  They evaluated the potential costs of forming and operating sectors.  AR 773 at 48435-37.  And they weighed whether vessels would still be able to "break even" under

these new restrictions—that is, whether they would still be able to produce enough revenue to cover their operating expenses.  AR 773 at 48452-57.

Overall, the Council concluded that the economic effects of Amendment 16 "are expected to be severe and in some cases may threaten the existence of fishing businesses in some communities."  AR 773 at 47771; AR 882 at 51267.  Those effects "will fall most heavily on vessels and communities that are most dependent on groundfish," which tend to be "Maine, New Hampshire, and Massachusetts ports adjacent to the Gulf of Maine, though New Bedford is also a port that will be adversely affected." *Id.*  Some vessels may not be able to break even this fishing year.  AR 773 at 48457-58.

More specifically, the Council found that the catch limits set by Amendment 16 could reduce groundfish revenues by about 25%, from an average of $85 million in FY 2007 and FY 2008 to an estimated $63 million in 2010 (increasing to an estimated $70 million in FY 2011 and FY 2012).  AR 882 at 51223.  That may overestimate the actual effects of Amendment 16 because fishers have been able to surpass predicted revenues in the past by adopting new fishing strategies.  AR 773 at 48447.  If fishers are able to use new strategies under Amendment 16 to fish more selectively and target healthy stocks (as a result of the increased flexibility offered by sectors), NMFS found that the total reduction in revenues could be as little as $3 million or about 4%.  AR 961 at 56190.

### b.    NMFS analyzed the economic effects of the expanded sector program.

The Council and NMFS also evaluated the economic effects of Amendment 16's expansion of the sector program and concluded that it would have positive economic effects by

increasing revenues and profitability for participating vessels.  AR 997 at 56531.[10]  The complex

restrictions of the effort control program create "inefficiencies" that "restrain the profitability of

the fishery."  AR 773 at 48498.  Sectors free fishers from many of those restrictions (including

limitations on days-at-sea, trip limits, area closures, and many gear restrictions) and simply limit

the total amount of each of these stocks that fishers may catch.  AR 889 at 52110.  That allows

fishers to decide where, when, and how they will fish, giving them much greater flexibility.  AR

773 at 47770.

    The Council and NMFS concluded that this flexibility should "increase the economic

efficiency of" vessels participating in sectors "by reducing operational costs and increasing catch

per unit effort . . . ."  AR 889 at 52110; AR 773 at 48464.  For example, freed from trip limits,

trawl vessels that join sectors "are likely to increase catch rates and fish fewer days, reducing trip

costs and increasing profitability."  AR 773 at 48465.  Vessels in sectors will also have strong

economic incentives to fish selectively for healthy stocks with higher catch limits, AR 997 at

56531, and, if they can devise strategies to do so, they may be able to "achieve and even surpass

recent levels of groundfish revenues."  AR 882 at 51223; AR 773 at 48465.

    The available evidence supports the Council's and the agency's conclusions.  As

discussed above, two sectors were operating in this fishery before Amendment 16 was adopted.

Those sectors have been able to increase the efficiency of their operations and "realize higher

vessel revenue streams."  AR 997 at 56516.  "[F]reed from trip limit and gill net restrictions," the

---

[10] The ability of the Council and the agency to quantify the economic effects of the sector program was limited
somewhat by the fact that sectors are voluntary and it was unknown at the time how many permit holders would
choose to join sectors (and how many would choose to remain in the common pool).  AR 754 at 47513; AR 773 at
48464 (explaining that "[d]etermining the economic impacts of these changes is difficult."); AR 874 at 50687; AR
996 at 56482-83; AR 997 at 56512 (noting the "uncertainty in the degree and scope of participation in sectors.").
That said, the Council and NMFS did not give up on their economic analysis of sectors in the face of these
unknowns, as Food and Water Watch repeatedly suggests.  *See, e.g.,* FWW Mem. at 24-25 (falsely claiming that
NMFS "admit[ted] that the socioeconomic analysis is not complete" because the sector participation rate was
unknown).  To the contrary, they analyzed these effects as thoroughly as possible using the best information
available.  AR 773 at 48387-88.

Fixed Gear Sector "harvested more cod in FY 2007 than in the previous year."  AR 773 at 48464-65.  And the Georges Bank Cod Hook Sector, which has been operating since 2004, nearly doubled the revenues of its members.  AR 996 at 56483.  Based on this evidence, NMFS concluded that sectors help to improve "economic performance" and may even "enable more vessels to remain economically viable" in the face of the significant catch reductions necessary to rebuild this fishery.  AR 996 at 56483; AR 997 at 56516, 56531.

The Council and NMFS also considered other economic effects of Amendment 16's expanded sector program.  For example, the Council evaluated the economic effects of several different ways of dividing the total allowable catch between sectors (and thus between sectors and the common pool).  AR 889 at 52083-84.  Ultimately, it decided to allocate catch to each sector in proportion to the total "landings history" of the vessels participating in that sector—that is, the more fish caught by the vessels in the sector in the past, the larger the portion of the total catch allocated to that sector.  But before it reached that decision, the Council considered other ways of allocating the catch, including several alternatives that would have used a mix of landings history, vessel capacity, and allocated days-at-sea.  AR 773 at 48388.

The Council conducted a detailed analysis of the economic effects of each of those different allocation methods.  AR 773 at 48387-435.  It looked at how different allocations would affect different States and vessels of different sizes.  AR 773 at 48389-90, 48392-48410.  It found that small vessels might have benefitted from an allocation that used both landings history and days-at-sea (but only if they were able to harvest the healthy Georges Bank stocks or lease their allocations of those stocks).  AR 773 at 48389.  But in the end, the Council chose to allocate catch to sectors based solely on landings history because that allocation will produce the greatest total revenues from the fishery.  AR 773 at 48394.

The Council and NMFS also considered the costs of forming and operating sectors.  As discussed above, vessels that join sectors are given greater flexibility, but in exchange for that flexibility, they are responsible for their own dockside and at-sea monitoring to ensure that their discards and landings are accurately reported.  AR 773 at 48465; AR 997 at 56501; AR 996 at 56482.  They also bear the cost of preparing an environmental assessment for their sector under NEPA, as well as the costs of sector management.  AR 996 at 56482.

The Council and NMFS reviewed the available information and, based on the experiences of the two existing sectors, found that the cost of forming and operating a sector would range from $60,000 to $150,000.  AR 773 at 48435-37, 48385-86; AR 996 at 56482.  NMFS estimated that the costs of dockside and at-sea monitoring would range from $13,500 to $17,800 for each vessel per year.  AR 996 at 56482.  Many of these costs were paid by NMFS in FY 2010, but Congress may or may not continue to authorize those subsidies.  AR 773 at 48465; AR 996 at 56482.  Even if sectors are required to pay these costs in the future, however, the Council and NMFS concluded that the economic benefits of sectors are still likely to outweigh their costs.  AR 997 at 56515.

### c.    NMFS concluded that the economic effects of Amendment 16 are "severe" but "unavoidable."

Based on this analysis, the Council and NMFS acknowledged that the reductions in catch needed to rebuild this fishery are likely to have severe economic effects on fishers and fishing communities in the short-term.[11]  AR 773 at 47771; AR 882 at 51267.  They also found that

---

[11] As required by the Act, the Council and NMFS also considered the effects of Amendment 16 on "social" factors, including "disruptions in daily living" and "changes in occupational opportunities and community infrastructure." AR 773 at 48502-34; AR 882 at 51243-50.  They identified specific communities of interest, including the cities of Gloucester and New Bedford.  AR 773 at 48505.  And they concluded that, for many of the same reasons addressed in their economic analysis, Amendment 16 "is likely to have a negative effect on [] important social factors."  AR 773 at 47771.  In particular, they found that elements of Amendment 16 such as "further reductions in [days-at-sea], 24-hour clock, additional trip limits, and restricted gear areas will make it more difficult for fishermen to maintain

Amendment 16's expansion of the sector program would have positive economic effects by giving fishers the flexibility they need to increase their revenues and profits.  AR 773 at 48464-65.  But in the end, the Council and NMFS concluded that the increased revenues and profits created by sectors are likely to be overwhelmed by the effects of the new catch limits, and that Amendment 16 is likely to "result in reduced overall revenue."  AR 882 at 51230.

That said, while these economic effects may be severe, they are also "unavoidable."  AR 773 at 48595; AR 882 at 51267; AR 997 at 56511-12.  The Magnuson-Stevens Act expressly requires NMFS and the Council to rebuild the overfished stocks in this fishery within ten years (in most cases).  16 U.S.C. § 1854(e)(4)(A)(ii).  And the only way to rebuild those stocks is to reduce the amount of fish caught by fishers.  AR 882 at 51267.  The Act does not exempt a fishery from these rebuilding requirements simply because the short-term economic effects will be severe.  To the contrary, while the Act requires the Council and NMFS to take such economic effects into account, it also expressly states that they may do so only to the extent "consistent with the conservation requirements of this [Act]" including "the prevention of overfishing and rebuilding of overfished stocks . . . ."  16 U.S.C. § 1851(a)(8).  For that reason, the courts have repeatedly held that negative economic effects do not provide a basis to override the requirements of the Act to end overfishing and rebuild overfished stocks.  *See, e.g., National Coal. for Marine Conservation v. Evans*, 231 F. Supp. 2d at 143 ("Conservation objectives have priority over other Magnuson-Stevens Act objectives, such as minimizing adverse economic impacts."); *Natural Res. Def. Council v. Daley*, 209 F.3d 747, 753 (D.C. Cir. 2000) (same).

Moreover, in the long run, the economic health of these fishing communities is inextricably linked with the health of this fishery.  Fishers will be able to catch significantly

---

daily routines, operate in a safe manner, and maintain a positive attitude towards the management program."  AR 773 at 47771.

more fish once all of these stocks are rebuilt.  AR 773 at 48383; AR 773 at 48245-28252

(projecting increases in biomass for all stocks, except haddock, which is already rebuilt); AR 882

at 50792-812 (showing that catch limits increase from FY 2010 to FY 2012); AR 882 at 50813-

990 (projecting increases in landings for all stocks through 2057).  Rebuilding this fishery will

ultimately result in "[g]reater total revenue due to larger yields from rebuilt stocks," a "[m]ore

profitable fishery and improved income for vessel owners and crew," and a "[m]ore robust

shore-side fishing community economy."[12]  AR 961 at 56192; AR 1001 at 56730.  And

importantly, these increased revenues will be sustainable—they will be based on the yield that

this fishery can naturally replenish and not on the unsustainable overfishing that drove revenues

in the past.  *See* AR 1001 at 56730.

 For these reasons, NMFS and the Council concluded that fishers and fishing communities

will be better off in the long run under Amendment 16 than they would be if we failed to rebuild

this fishery.  AR 997 at 56532.  As the courts have recognized, "the longer-term economic

interests of fishing communities are aligned with the conservation goals set forth in the Act" and,

"[w]ithout immediate efforts at rebuilding depleted fisheries, the very long-term survival of those

fishing communities is in doubt."  *Nat. Res. Def. Council v. NMFS*, 421 F.3d 872, 879 (9th Cir.

2005).  That said, NMFS and the Council also acknowledged that, while "[s]uccessful rebuilding

of groundfish stocks should lead to future benefits for fishermen and their communities," it is

"not clear that current fishery participants will reap those benefits."  AR 773 at 47772.

---

[12] The reverse is also true: delaying rebuilding would harm the economic health of these fishing communities in the long run.  AR 882 at 51249.  The "overall economic impact" of "a long continued decline and delay in rebuilding" is "likely much greater" than "from a short-term reduction in catch in order to rebuild populations quickly."  AR 619 at 44607.

### d.    NMFS took steps to minimize the short-term negative economic effects of Amendment 16.

The Council and NMFS took steps to minimize the short-term economic effects of Amendment 16 and "foster continued participation" in this fishery.  AR 773 at 48595; AR 997 at 56530-31.  During the development of Amendment 16, the Council analyzed several different options to reduce fishing mortality using effort controls and chose the option that had the "least impact" on groundfish revenues.  AR 773 at 48458-60.  Similarly, the Council weighed several different methods of allocating catch to sectors and chose the alternative that produced the greatest total revenues.  AR 773 at 48394.  And the Council rejected some proposed measures because they would have been too expensive (such as a proposal to require 100% at-sea and dockside monitoring coverage).  AR 997 at 56515.  Based on these efforts, NMFS concluded that Amendment 16 "minimized costs to the extent practicable" and consistent with the Act's conservation goals.  AR 997 at 56515.

The Council and NMFS also took steps to try to offset the economic effects of Amendment 16.  AR 889 at 52095; AR 997 at 56531.  For example, Amendment 16 reduced the minimum fish size for haddock from 19 inches to 18 inches to "increase landings of this healthy species . . . ."  AR 997 at 56498.  The Council and NMFS also revised existing "special access programs" to make it easier for fishers to target the abundant stocks of haddock.  AR 773 at 48440-42; AR 997 at 56531.  Amendment 16 continues to allocate "Category B" days-at-sea to vessels fishing in the common pool, which allow additional fishing when certain selective fishing practices are used.  AR 997 at 56531.  The expansion of the sector program, for the reasons already discussed above, will also "help to mitigate the economic impacts" of Amendment 16.  AR 997 at 56531; AR 1001 at 56730.  And the Council and NMFS removed obstacles that had prevented some fishers from participating in the days-at-sea leasing and transfer programs so that

36

fishers would be better able to "acquire sufficient [days-at-sea] to meet [their] annual operating expenses and remain economically viable, despite additional effort controls . . . ."  AR 997 at 56531.

> **e.     The Plaintiffs and *amici* have ignored NMFS's economic analysis and misstated the requirements of the Magnuson-Stevens Act.**

The Plaintiffs and *amici* all object to Amendment 16 because of its short-term economic costs.  But they have largely ignored the hundreds of pages of economic analysis that the Council and NMFS undertook, and they have badly misstated the requirements of the Magnuson-Stevens Act.[13]  Before we explain why their arguments are wrong, the Court should take note of what the Plaintiffs and *amici* do not dispute here: they do not dispute any of the science that the agency relied on when it approved Amendment 16.[14]  They do not dispute that many of these stocks were overfished and still subject to overfishing until Amendment 16 was put into place.  They do not dispute that reductions in fishing mortality are necessary to rebuild these stocks and that Amendment 16 makes the reductions necessary to rebuild these overfished stocks in the time period set by Congress in the Act.  And they do not dispute that, once these stocks are rebuilt, yields and revenues from this fishery will be much higher than they have been recently.

---

[13] For its part, Food and Water Watch has also cobbled together a long list of "requirements" that the Magnuson-Stevens Act allegedly imposes on NMFS's economic analysis.  FWW Mem. at 22-29.  Many of these find no support in the Act at all.  For example, nothing in the Act required NMFS to prepare a "qualitative" economic analysis instead of a "quantitative" one, FWW Mem. at 23, although the agency did both (by looking at the effects of Amendment 16 not only on revenues but also on social factors).  AR 773 at 48502-34.  To the contrary, the Act uses only the broadest language to describe this economic analysis, requiring NMFS to "assess, specify, and analyze" the "economic . . . impacts" of "conservation and management measures" on "fisheries and fishing communities," and never mentions whether that analysis should be qualitative or quantitative.  16 U.S.C. § 1853(a)(9).  Similarly, other arguments presented by Food and Water Watch are based on a misreading of the Act: for example, NMFS is only required to discuss "current and historical participation" in the fishery, FWW Mem. at 24, when a fishery management plan "establish[es] a limited access system," 16 U.S.C. § 1853(b)(6), which happened here in 1994 when Amendment 5 closed the fishery to fishers without permits, not in Amendment 16.  *See* AR 773 at 47809.  We address Food and Water Watch's other economic arguments below.

[14] The only exception, not relevant here, is that Mr. Lovgren argues that NMFS unlawfully relied on a landings history database that contains errors.  We respond to that claim below.

Instead, the Plaintiffs and *amici* object to Amendment 16 because, as NMFS and the Council acknowledged, it is likely to have "severe" economic effects in the short-term while we rebuild this fishery.  AR 773 at 47771.  In particular, the Plaintiffs and *amici* object to Amendment 16's expansion of the sector program.  They claim that the expanded sector program will have "devastating" economic effects, that it will force "consolidation" in the fishing industry, that it means that vessels left fishing in the common pool are no longer "economically viable," and that it will allow sectors to accumulate excessive shares of the fishery.  They argue that NMFS ignored all of these issues and thus failed to fully analyze the economic effects of Amendment 16.  Finally, they claim that the costs of Amendment 16 and the expanded sector program are so great that the amendment violates National Standard 8 of the Magnuson-Stevens Act.  Am. Mem. at 12-13; FWW Mem. at 26-27; *see also* NB Mem. at 22-24.  Their arguments are wrong for five reasons.[15]

> **i.      NMFS did not ignore the economic effects of the expanded sector program.**

First, NMFS did not ignore the allegedly "devastating" effects of the expanded sector program.  *See, e.g.,* NB Mem. at 29; FWW Mem. at 27.  To the contrary, NMFS and the Council carefully analyzed Amendment 16's expanded sector program and concluded that it would ultimately have **positive** economic effects.  AR 773 at 47773.  The flaw in the Plaintiffs' and *amici's* argument is that they have conflated the economic effects of the sector program with the effects of the catch reductions needed to rebuild this fishery.  As discussed at length above,

---

[15] The Plaintiffs and *amici* make a variety of claims about the economic effects of Amendment 16, but do not actually cite any evidence to support many of those claims.  *See, e.g.,* NB Mem. at 8 (claiming, without citing any evidence, that "[b]usinesses are being lost, jobs eliminated, fishing infrastructure lost, . . . consumers are being forced to substitute less healthy foods . . . .").  Where they do cite evidence, they often rely on undocumented hearsay.  *See, e.g.,* NB Mem. at 8 (relying on hearsay from unidentified "news reports"); Am. Mem. at 3 (relying on hearsay from the Mayor of New Bedford).  Or they rely on documents that are not part of the administrative record. *See, e.g.,* FWW Mem. at 25 n.33 (citing an extra-record "economic model"); Am. Mem. at 10 (citing an extra-record, post-decisional newspaper article).  The Federal Defendants hereby move to strike all of this hearsay and extra-record evidence and the portions of the Plaintiffs' and *amici's* briefs that rely on them.

NMFS and the Council fully acknowledged that the catch reductions included in Amendment 16 would have "severe" economic effects in the short-term and that, "in some cases," they may even "threaten the existence of fishing businesses in some communities."  AR 773 at 47771; AR 882 at 51267.  Far from ignoring those negative effects, NMFS and the Council analyzed them in detail.  But NMFS and the Council also rationally concluded that the expanded sector program itself would have positive economic effects.  AR 773 at 47773.

In fact, NMFS expressly considered and rejected the Plaintiffs' and *amici's* claim that the expanded sector program would have negative economic effects.  Responding to a letter from the Mayor of New Bedford, NMFS reminded the Mayor that Amendment 16 not only expanded the sector program, but also implemented catch reductions.  AR 1001 at 56758.  NMFS explained that the "small quotas for some stocks in this multi-species fishery result from the required [annual catch limits], **not the sector management measures**."  *Id.* (emphasis added).  Without sectors, NMFS cautioned, "the same low quotas for some stocks" would "still be in place," but everyone would be forced to fish as part of the common pool, which would "likely result in a derby fishery . . . ."  *Id.*  Far from having negative effects, NMFS concluded that the "expanded sector [] program should actually alleviate some of the negative impacts from low quotas by providing the industry with increased flexibility and efficiency . . . ."  *Id.*; *see also* AR 773 at 47773.  So when the Plaintiffs and *amici* argue that NMFS ignored the "devastating" economic effects of the sector program, their arguments are wrong and misleading both because NMFS did consider the effects of the sector program, and because they have confused the effects of the sector program with the effects of the catch reductions needed to rebuild this fishery.

  ii.  **NMFS did not ignore the effects of Amendment 16 on vessels in the common pool.**

 Second, NMFS did not ignore the effect that the allocation of catch to sectors would have on vessels still fishing in the common pool.  The Plaintiffs and *amici* claim that so much catch is allocated to sectors under Amendment 16's expanded sector program that it is no longer economically viable to fish in the common pool.  *See, e.g.,* NB Mem. at 7, 7 n.10; FWW Mem. at 5-6; Am. Mem. at 5.  Of course, Amendment 16 reduces the total amount of fish that can be caught during the next few years—either by vessels in sectors or in the common pool—as part of the catch reductions needed to rebuild this fishery.  AR 882 at 55787.  But it is also true that, because most vessels joined sectors for FY 2010, the common pool has access to "less than 2 percent of the combined total of the NE multispecies [annual catch limits]."  AR 996 at 56466; AR 961 at 56170; AR 967 at 56258.

 That is the result of the method that the Council used to allocate catch to sectors.  The Council decided that catch should be allocated to each sector in proportion to the total "landings history" of the vessels participating in that sector—that is, the more fish caught by the vessels in the sector in the past, the larger the portion of the total catch allocated to the sector.  AR 773 at 47860.  Since most vessels joined sectors in FY 2010, and since the vessels that joined sectors account for 98% of the landings history, there was relatively little catch left to be allocated to the common pool.  AR 996 at 56466.

 Thus, the limited catch left available to the common pool is not the result of some arbitrary reduction, but rather reflects the landings histories of the vessels in the common pool.  The Council and NMFS understood that, as vessels moved into sectors, much less catch would be left for the common pool.  AR 773 at 48434.  NMFS carefully analyzed the economic effects that this allocation would have on the vessels still fishing in the common pool.  AR 1001 at

56728; AR 961 at 56191.  It determined that their revenues would decline by about 20% (from $24.8 million to $19.7 million).  *Id.*  But in conducting that analysis, NMFS also found that most of the vessels left in the common pool have not been active in this fishery, have very little landings history, and are "primarily engaged in fisheries other than groundfish."  *Id.*; AR 967 at 56258; AR 882 at 51233.  For example, of the 665 permits left in the common pool, only 113 have actually fished in this fishery and, of those 113, only about 30% of their revenues came from trips where groundfish were landed.  AR 996 at 56467; AR 1001 at 56728.

The Council did consider other methods of allocation that would have given more catch to vessels, like those in the common pool, that have little landings history.  AR 773 at 48387-88. In the end, however, it decided to use an allocation based solely on landings history because it found that such an allocation will produce the greatest total revenues from the fishery, AR 773 at 48394, and will "result in substantially fewer adverse economic impacts . . . than the other options considered."  AR 997 at 56531.

So NMFS and the Council did not ignore the effect that the allocation of catch to sectors would have on vessels fishing in the common pool.  They recognized that some permit holders had "invested heavily in permits with allocated [days-at-sea] but little or no landings history . . . ."  AR 773 at 48434; AR 997 at 56519.  And they understood that the method of allocation adopted by Amendment 16 "may devalue [those] investments . . . ."  AR 773 at 48434.  But in the end, they rationally chose an allocation that would produce the greatest benefits to the fishery as a whole, instead of sacrificing overall revenues to protect investments in permits with little landings history.

### iii.    NMFS considered whether the sector program would drive further consolidation.

Third, contrary to the claims made by the Plaintiffs and *amici*, Amendment 16's expansion of the sector program is not likely to drive further consolidation of the fishing industry, and NMFS did not ignore that issue. *See, e.g.,* NB Mem. at 24; FWW Mem. at 6-7. It is true that consolidation has been going on for many years in this fishery. AR 962 at 56196. Between 2001 and 2007, for example, the number of vessels that "actively participated in the groundfish fishery . . . declined each year . . . across all vessel size classes." AR 40 at 5088.

But as NMFS explained, that consolidation occurred under "days-at-sea" effort control program, long before Amendment 16 expanded the sector program. AR 997 at 56520; AR 889 at 52123, 52499. It was largely the result of the continuing reductions in catch needed to protect and rebuild this fishery. *See* AR 773 at 48514 (finding that the "significant downsizing" of the commercial fleet was caused by "[i]ncreasing restrictions in groundfish . . . ."); AR 997 at 56520 (noting that "[c]onsolidation in the fleet has already occurred under the DAS management regime due to continued effort controls . . . ."); AR 889 at 52123 (same). It was also the result of a program that allows permit holders to lease or transfer their allocations of "days-at-sea," which created a mechanism for market forces to encourage consolidation. AR 997 at 56520; AR 889 at 52123.

In contrast, the Council and NMFS reviewed the available evidence and were not convinced that expanding the sector program would drive further consolidation. AR 773 at 48595 (concluding that it was unclear if sectors "will lead to fewer fishing vessels . . . ."). One of the Council's stated goals in designing the sector program was to "[p]revent excessive consolidation that would eliminate the day boat fishery." AR 773 at 47854. And the Council and NMFS found that sectors may actually allow more vessels to remain economically viable,

42

and thus resist consolidation.  *See* AR 773 at 48619; AR 997 at 56515.  For these reasons, NMFS

rationally concluded that, if Amendment 16 does cause "further consolidation," it will be due to

the "further reductions in fishing mortality" required to rebuild this fishery "rather than sectors."

AR 962 at 56196.

**iv.      NMFS evaluated the effects of lifting the 20% allocation cap.**

Fourth, NMFS did not ignore concerns that Amendment 16 would allow sectors to

accumulate excessive shares of this fishery.  It is true that some sectors have been allocated large

shares of some stocks in FY 2010.  AR 886 at 51522.  That was only possible because

Amendment 16, in expanding the sector program, also lifted a cap that prevented any sector from

being allocated more than 20% of the total allowable catch for a stock.  AR 889 at 52109.

NMFS did not ignore the potential "socioeconomic impacts" of lifting that 20% cap, however,

but rather carefully considered whether doing so would allow sectors to accumulate excessive

shares of the fishery.  *See* FWW Mem. at 23.

NMFS explained that, in this context, "excessive" does not simply mean a large share; it

means a share that will "result in inordinate control on buyers or sellers in the market . . . ."  AR

997 at 56519-20 (drawing on 50 C.F.R. § 600.325(c)(3)(iii)); AR 889 at 52109.  NMFS

acknowledged that "the fact that one sector may have a significant cumulative total of [annual

catch entitlement] . . . may raise potential concerns for . . . market effects."  AR 997 at 56519.

But it concluded that there was no evidence that an allocation exceeding 20% would "result in

inordinate control on buyers or sellers in the market . . . ."  AR 997 at 56520.

That is because, as the Council's Plan Development Team concluded, it is "unlikely that

any one sector could accumulate a significant share of a stock to exercise market power over the

rest of the fishery."  AR 997 at 56520; AR 138 at 11253-54.  That kind of market power is

43

improbable here because "there are often many market substitutes and demand for groundfish is elastic . . . ." AR 138 at 11253.  NMFS also noted that a sector's allocation is "temporary in nature"—it lasts for only one fishing season and changes as vessels join and leave the sector— which "limits the ability of a sector to influence market conditions . . . ." AR 997 at 56519-20; AR 967 at 56258.  For those reasons, the Council and NMFS concluded that sectors would not be able to "influence market prices" even if the 20% cap was lifted.[16]  AR 883 at 51321; AR 886 at 51521; AR 997 at 56519-20.  Thus, NMFS did not ignore this issue, but rationally concluded that lifting the 20% cap would "increase the flexibility and efficiency of sector operations, without allowing one entity to acquire an excessive share of a fishing resource . . . ." AR 889 at 52109.

> **v.      Amendment 16 does not violate National Standard 8, despite its costs, because it is needed to rebuild this fishery.**

Fifth, the Plaintiffs and *amici* argue that costs of Amendment 16, especially its expanded sector program, are so great that it violates National Standard 8 of the Magnuson-Stevens Act. Am. Mem. at 12-13; FWW Mem. at 26-27; *see also* NB Mem. at 22-24.  National Standard 8 requires NMFS to "take into account the importance of fishery resources to fishing communities" by using "economic and social data" to "provide for the sustained participation of such communities" and also, "to the extent practicable, [to] minimize adverse economic impacts on such communities."  16 U.S.C. § 1851(a)(8).

---

[16] The 20% cap also created its own economic problems.  If the cap had still been in place this year, for example, NMFS would have been forced to disapprove five of the new sectors formed under Amendment 16.  AR 997 at 56520.  That, in turn, "would have resulted in tremendous disruption and economic impacts . . . ." AR 997 at 56520. And the cap would not necessarily have been effective at preventing sectors from accumulating large shares because it only restricted the initial allocation made to a sector—even with the cap in place, a sector could still acquire a share greater than 20% by trading for more catch.  AR 891 at 52242; AR 886 at 51522.

By its own terms, National Standard 8 only requires the Council to "take into account" these economic effects and minimize them "to the extent practicable." *Id.* As discussed above, Amendment 16 does that. But National Standard 8 also explicitly states that NMFS is only required to "minimize adverse economic impacts" to the extent that doing so is "consistent with the conservation requirements of this Act"—including "the prevention of overfishing" and the "rebuilding of overfished stocks." *Id.* As the regulations plainly state, and the courts have repeatedly held, it does not provide any basis for "continuing overfishing or failing to rebuild stocks." 74 Fed. Reg. 3,178, 3,201 (Jan. 16, 2009); 50 C.F.R. § 600.310(l) (same); 50 C.F.R. § 600.345(b)(1) (noting that the requirements of National Standard 8 "must not compromise the achievement of conservation requirements and goals of the [fishery management plan]."); *see also, e.g., Natural Res. Def. Council v. NMFS*, 421 F.3d 872, 879 (9th Cir. 2005) ("The purpose of the Act is clearly to give conservation of fisheries priority over short-term economic interests."); *North Carolina Fisheries Ass'n v. Gutierrez*, 518 F. Supp. 2d 62, 91-92 (D.D.C. 2007); *National Coal. for Marine Conservation v. Evans*, 231 F. Supp. 2d 119, 133 (D.D.C. 2002).

For these reasons, the courts have "consistently rejected" challenges brought under National Standard 8 even where the challenged fishery management plans or amendments had "potentially devastating economic consequences." *North Carolina Fisheries Ass'n*, 518 F. Supp. 2d at 92. This Court itself upheld a plan to shut down a fishery "for at least . . . five years" even though it could "cause the collapse of the . . . fishing and processing industry" because that plan was needed to protect and rebuild the fishery. *A.M.L. Int'l v. Daley*, 107 F. Supp. 2d 90, 93, 102-3 (D. Mass. 2000). The Court found that such "terrible and unfortunate consequence[s] . . . [were] readily anticipated by Congress when it amended the Magnuson-Stevens Act in 1996."

45

*Id.* at 107-8.  And as this Court observed, while the short-term costs of rebuilding a fishery may be high, the costs of failing to rebuild the fishery are even greater: "[a] collapsed fishery will not be economically viable for decades, creating dramatically worse economic consequences . . . ." *Id.* at 103 (emphasis omitted).  *See also Associated Fisheries of Maine v. Daley*, 127 F.3d 104, 118 (1st Cir. 1997).

Here, Amendment 16 does not violate National Standard 8, despite its "severe" costs, because it is necessary to end overfishing and rebuild overfished stocks in this fishery.  AR 997 at 56510; AR 773 at 48596.  The Plaintiffs and *amici* do not deny that these catch reductions are needed to rebuild the overfished stocks in this fishery.  And they do not explain how NMFS could have avoided these "severe" economic effects without ignoring the conservation requirements of the Act.[17]  In light of the undisputed fact that Amendment 16 is needed to end overfishing and rebuild overfished stocks, as required by the Act, the challenges brought by the Plaintiffs and *amici* under National Standard 8 cannot succeed.

### vi.       The Plaintiffs' challenges are not supported by caselaw.

Finally, the Plaintiffs and *amici* have not cited any caselaw to support their claims that NMFS's economic analysis was inadequate.  The only cases that they cite are *North Carolina Fisheries Ass'n v. Daley*, 16 F. Supp. 2d 647 (E.D. Va. 1997), and a subsequent decision in that matter, 27 F. Supp. 2d 650 (E.D. Va. 1998).  But those were extreme cases where the Secretary at first refused to analyze the economic effects of the fishing quotas and then, even after remand,

---

[17] The *amici* suggest that Amendment 16 "begs the question whether less draconian measures were available to the agency to achieve the same or equivalent conservation benefits," Am. Mem. at 13, but they do not identify any such measures (or even claim that such measures exist).  This kind of vague speculation is not enough at summary judgment: the *amici* were required to present evidence to support their suggestion that "less draconian measures" exist.  *See City of Gloucester v. Mineta*, No. 00-cv-11019, 2000 U.S. Dist. LEXIS 22080 (D. Mass. Nov. 15, 2000), at *18 (rejecting plaintiff's claim that the Council was "obligated to develop yet another option" where the plaintiff did not "proffer any showing that such an additional option existed in fact.").

continued to insist that there would be no significant economic effects because he had

"consciously ignored the Fisheries Service's own data . . . ."  *North Carolina Fisheries Ass'n*, 16

F. Supp. 2d at 651-52; *North Carolina Fisheries Ass'n v. Daley,* 27 F. Supp. 2d 658, 660.

Here, in contrast, NMFS has prepared an extensive economic analysis and has openly

acknowledged that Amendment 16 is likely to have "severe" economic effects in the short term.

Those facts are more than sufficient to distinguish this case from the only decisions cited by the

Plaintiffs and *amici*.  *See North Carolina Fisheries Ass'n*, 518 F. Supp. 2d at 94 (holding that

"[t]his open acknowledgement of Amendment 13C's adverse and uneven economic effects

suffices to distinguish this suit from" the cases discussed above).

In the end, the economic challenges that the Plaintiffs and *amici* have brought all fail

because NMFS thoroughly analyzed the economic effects of Amendment 16, including its

expanded sector program, and because it is undisputed that these measures, whatever their costs,

are needed to stop overfishing and rebuild overfished stocks.  *See North Carolina Fisheries

Ass'n v. Gutierrez*, 518 F. Supp. 2d at 92 (applying a "rule of reason" to these challenges and

holding that the court "will not invalidate a . . . plan amendment simply because . . . the

Secretary could have, but did not, conduct a more thorough analysis.").  Moreover, Congress and

the courts have both recognized that the only way to protect the economic health of these fishing

communities in the long run is to rebuild this fishery, not to allow unsustainable fishing to

continue to deplete it.  *See, e.g.,* 40 Cong. Rec. E 964 (May 18, 1994) (remarks by Rep.

Hamilton) (recognizing that "[r]ebuilt stocks in New England and elsewhere will eventually

provide benefits to producers and consumers, but, at the present, efforts to halt overfishing,

restore the depleted resource, and conserve habitats will decrease revenues to fishermen and

drive some out of business.  The industry will have to sustain some losses in the short term if it is

to remain viable in the long term."); *Natural Res. Def. Council v. NMFS*, 421 F.3d at 879

("Without immediate efforts at rebuilding depleted fisheries, the very long-term survival of those

fishing communities is in doubt.").  For these reasons, and all the reasons set out above,

summary judgment on the Plaintiffs' economic challenges should be entered on behalf of the

Federal Defendants.

> **4.      The allocations that NMFS approved in Amendment 16 are
> rational and comply with the law.**

Under Amendment 16, catch is allocated to each sector in proportion to the total

"landings history" of the vessels participating in that sector.  AR 773 at 48388.  For the new

sectors created by Amendment 16, the Council used landings history from 1996 to 2006 to define

the "baseline" used to make these allocations.  AR 658 at 45955.  For the existing sectors created

under Amendment 13, however, the Council used landings history from 1996 to 2001 to define

their baseline for Georges Bank cod, and it decided not to change that baseline when it adopted

Amendment 16 in the interest of "promoting stability in the fishery . . . ."  AR 658 at 45955.

New Bedford objects to the Council's decision to use different baselines for the new and

existing sectors, arguing that it is not "fair and equitable."  NB Mem. at 15-16.  New Bedford

also objects to Council's decision to use the landings history from a different time period (from

2001 to 2006) to allocate catch between the recreational and commercial components of the

fishery.  *Id.*

New Bedford's challenges to these allocations fail.  The Council did use different

baselines for each of these allocations, but it did not make that decision arbitrarily—to the

contrary, it carefully chose each of these baselines to promote an important objective.  *See*

*discussion at* AR 773 at 48433; AR 658 at 45955; AR 997 at 56518.  The Council used the

period from 1996 to 2006 for new sectors because it wanted to use "as much sound data as

possible," AR 658 at 45955, and because using a longer period would "minimize the impact on catch history that results from changes to groundfish regulations," AR 997 at 56518.

But the Council allowed the existing sectors to keep their original baseline (from 1996 to 2001) for one stock, Georges Bank cod, to "provide stability and the sustained participation of the vessels and fishing communities in the . . . fishery . . . ." AR 997 at 56518. The Council was concerned that, "[i]f sectors are to operate successfully, they need some certainty that their allocation is not likely to change based on future decisions to form sectors by other fishermen." AR 773 at 48593. They "should not be forced to revisit their business plans as a result of other fishermen deciding to form sectors several years later . . . ." *Id.* Amendment 13, the Council noted, "contemplated freezing baselines once an allocation was created." AR 658 at 45955. Thus, the Council found that allowing the existing sectors to continue to use their original baseline for Georges Bank cod would further the "important Council objective" of "promoting stability in the fishery and fostering an environment where sectors can create efficient and effective business plans." *Id.*; *see also* AR 997 at 56532. That decision applies only to the two existing sectors and a single stock, and it made only a small difference in the amount of catch allocated to other sectors this year (a reduction of about two percent for Georges Bank cod). AR 773 at 48433; AR 997 at 56518; AR 658 at 45955.

New Bedford also objects to the Council's use of a different period (from 2001 to 2006) to divide catch of the Gulf of Maine cod and Gulf of Maine haddock stocks between the recreational and commercial components of this fishery (by allocating catch to each component in proportion to its share of the total landings history over that period). NB Mem. at 15-16. To be clear, this allocation divides catch of these two stocks between recreational and commercial

fishers; it has nothing to do with how that allocation is then divided among commercial fisheries (which, as discussed above, is based on their landings history from 1996 to 2006).

As the Council explained, it chose this time period for two reasons. First, the Council used a more recent time period because it had concerns with the reliability of the data on recreational fishing for these two stocks before 2001. AR 970 at 56265; AR 658 at 45956; AR 997 at 56514. By using more recent data, the Council was able to "ensure consistency with National Standard 2, which requires that the best available data be used in establishing the baseline." AR 970 at 56265; *see* 16 U.S.C. § 1851(a)(2). Second, the Council found that these recent data were "the most reliable indicator of future fishing practices" because the recreational and commercial fisheries were managed differently in earlier years (making it "difficult to compare . . . components of the fishery"). AR 658 at 45956.

That allocation is not unfair or inequitable. Both the recreational and commercial components were evaluated using the same time period, so "one group is not advantaged over the other . . . ." AR 970 at 56265-66; AR 997 at 56518; AR 773 at 48593. Moreover, there is no reason why the baseline used to divide the share **between** the components of the fishery needs to be the same as the baseline used to divide catch **within** one of the components: it is "a separate decision that need not use the same period or method." AR 773 at 48593; AR 658 at 45956; AR 997 at 56514.

NMFS reviewed all of these allocations and approved them, concluding that they are consistent with the Magnuson-Stevens Act, including National Standard 4, which requires that any allocation of "fishing privileges" must be "fair and equitable." AR 889 at 52108; AR 997 at 56518-19; *see also* 16 U.S.C. § 1851(a)(4). NMFS responded repeatedly to concerns, like New Bedford's, that the allocations were not fair or equitable, not only in its "record of decision," AR

50

889 at 52108, but also in the Federal Register, AR 997 at 56518-19, and in a fact sheet published
in "Commercial Fisheries News," AR 962 at 56195-96.  As NMFS explained, the requirement
that an allocation must be "fair and equitable" does not mean that it must allocate catch equally
to everyone.  To the contrary, the fact that some may receive more or less catch than others is
"inherent" in any allocation, and the guidelines for National Standard 4 "recognize that . . . there
is the possibility that one group will be advantaged to the detriment of another . . . ."  AR 970 at
56265.

Instead, National Standard 4 simply requires that an allocation "be justified in terms of
the objectives of the [fishery management plan] in order to ensure that 'the disadvantaged user
groups or individuals [do not] suffer without cause.'"  AR 970 at 56265.  NMFS found that the
Council had justified the use of these different time periods for the reasons discussed above and,
on that basis, concluded that "there is sufficient evidence in the administrative record to indicate
that Amendment 16 complies with the Magnuson-Stevens Act, including National Standard 4."
AR 970 at 56265.  Because these allocations are rational and consistent with the Magnuson-
Stevens Act, the Court should reject these challenges and uphold them.[18]

### 5.      NMFS used the best data available and is committed to correcting any errors in that data.

As we have already discussed, catch is allocated to sectors under Amendment 16 in
proportion to the total "landings history" of the vessels participating in those sectors.  AR 773 at

---

[18] These allocations do not violate the Council's "sector policy."  *See* NB Mem. at 18.  While that policy states, in part, that "[e]ach [fishery management plan] must identify a single, fixed and permanent baseline for the purpose of sector allocation," the Council also recognized that "there may be reasons for exceptions."  AR 99 at 9802.  "In such a situation," the Council explained, "the respective species committee should provide the Council with the rationale for adopting multiple, movable or temporary baselines."  AR 99 at 9802.  Here, the Council provided a rationale for each of these different baseline periods, in compliance with the policy.

48388.  Mr. Lovgren complains that these landings history data "contain[] errors."[19]  Lov. Mem.

at 6-7.  He contends that, because of those errors, the allocations violate National Standard 2 of

the Magnuson-Stevens Act, which requires conservation and management measures to be based

"upon the best scientific information available."  Lov. Mem. at 10-11 (citing 16 U.S.C. §

1851(a)(2)).  To be clear, Mr. Lovgren is not challenging the data that the Council and NMFS

used to assess the status of these stocks or to develop their rebuilding plans—he is only

challenging the landings history data used to allocate the available catch.[20]

NMFS has repeatedly acknowledged that the landings history data are not perfect and

that they contains some errors.  The agency acknowledged those errors in its Federal Register

notices, plainly stating that "some of the landings data . . . are incorrect," AR 997 at 56516, and

that "the landings data . . . contains some errors," AR 1001 at 56725.  It responded directly to

public comments about these errors.  AR 997 at 56515-16.  And it described the nature of those

errors to the Council in a presentation dedicated to this issue.  AR 238 at 14455-58.

But there is simply no way to get perfect landings history data.  The regulations require

NMFS to use dealer reports to determine a vessel's landings history (in order to minimize the

potential bias that would occur if NMFS relied on reports submitted by the fishers themselves).

50 C.F.R. § 648.87(b)(1)(i)(E)(2).  Like anyone, dealers sometimes make mistakes: they may fail

---

[19] Mr. Lovgren alleges that he has filed his complaint on behalf of himself and "all other similarly situated individuals," Lov. Compl. at 1, and he has included class action allegations in his complaint, Lov. Compl. ¶ 36 (mistakenly referring to Amendment 11 and "general category scallop permit holders.").  Mr. Lovgren, however, has not filed a motion to certify a class in this action.  Unless and until such a class is certified, Mr. Lovgren represents only himself.

[20] In a somewhat related issue, New Bedford also briefly argues that Amendment 16 is arbitrary and capricious because it applies an assumed rate of bycatch to vessels fishing in sectors.  NB Mem. at 19; see AR 932 at 55531-48 (listing assumed bycatch rates by sector).  This argument is meritless.  NMFS and the Council carefully explained that this assumed rate of bycatch was a necessary first step "because there is only limited experience with what discard rates will be for vessels operating in sectors."  AR 773 at 47866; AR 996 at 56473; AR 997 at 56502.  But as sectors develop their at-sea monitoring programs, as required by Amendment 16, NMFS will apply "sector-specific, gear-specific discard rates that will provide more accuracy" than these assumed rates.  AR 996 at 56474; AR 997 at 56502.  Thus, NMFS did not ignore this issue, but instead reached a rational conclusion based on the available data.

to submit a report entirely, or they may submit a report but enter the wrong vessel permit number, or they may mistakenly enter the wrong species or poundage.  AR 283 at 18390.

That said, NMFS has consistently and diligently tried to correct these errors.  AR 997 at 56500, 56516.  The agency decided early in the development of Amendment 16 that it would allow permit holders to "ground truth" their own data.  AR 477 at 25280.  To accomplish that, NMFS sent a series of letters to permit holders that included their own landings history data and advised them to "compare the report against your own records."[21]  AR 283; AR 555 at 31695; *see also* AR 558.  The agency then set up a detailed data correction process so that permit holders could submit "copies of [vessel trip reports]," "dealer weighout slips," or other documents that would support requests for corrections.  AR 283 at 18390; AR 555 at 31699-701; *see also* AR 648 at 45191; AR 759 at 47541; AR 798; AR 808.  That process allowed NMFS to correct errors in the landings history data, adjust allocations to sectors, and even increase the catch limit for one stock (the Gulf of Maine winter flounder).  AR 1001 at 56725.  Despite his complaints here, it does not appear that Mr. Lovgren ever submitted a request to NMFS to correct his own landings history data.[22]

Contrary to Mr. Lovgren's claims, National Standard 2 of the Magnuson-Stevens Act does not require NMFS to use perfect data—it requires the agency to use the "best scientific information" that is "available."  16 U.S.C. § 1851(a)(2); *see also* 50 C.F.R. § 600.315(b) ("The fact that scientific information concerning a fishery is incomplete does not prevent the

---

[21] The record includes samples of these letters (and not the letters themselves) because hundreds of identical letters were sent out, and because the landings data contained in those letters is confidential and protected from disclosure by the Magnuson-Stevens Act.  16 U.S.C. § 1881a(b).

[22] Oddly, Mr. Lovgren also claims that NMFS refuses to correct errors in the landings history.  Lov. Mem. at 8.  The only evidence that he cites, however, are extra-record documents that address a different fishery.  Lov. Mem. at 7.  In any event, his claim is patently false: as discussed above, NMFS has undertaken an extensive process to correct errors in this data.

preparation and implementation of an FMP.").  As the courts have confirmed time and time

again, that provision of the Act allows NMFS to use the available data even when those data are

incomplete, imperfect, inconsistent, or inexact.  *See, e.g., Midwater Trawlers Coop. v.

Department of Commerce*, 393 F.3d 994, 1003 (9th Cir. 2004) (holding that, "by specifying that

decisions be based on the best scientific information **available**, the Magnuson-Stevens Act

recognizes that such information may not be exact or totally complete."); *Natural Resources

Defense Council v. Locke*, No. 01-cv-421 (N.D. Cal. Apr. 23, 2010), at 10 (holding that the

Magnuson-Stevens Act "requires the best scientific available," not "the best scientific data

possible."); *North Carolina Fisheries Ass'n v. Gutierrez*, 518 F. Supp. 2d 62, 85 (D.D.C. 2007)

(holding that the Secretary may act even when the available science is "incomplete or

imperfect."); *Ocean Conservancy v. Gutierrez*, 394 F. Supp. 2d 147, 157 (D.D.C. 2005), *aff'd*,

488 F.3d 1020 (D.C. Cir. 2007) (holding that National Standard 2 "does not require the NMFS to

rely upon perfect or entirely consistent data.") (citations omitted); *Oceana, Inc. v. Evans*, 384 F.

Supp. 2d 203, 219 (D.D.C. 2005) ("Time and again courts have upheld agency action based on

the 'best **available**' science, recognizing that some degree of speculation and uncertainty is

inherent in agency decisionmaking . . . ."); *A.M.L. Int'l v. Daley*, 107 F. Supp. 2d 90, 101 (D.

Mass. 2000) ("The fact that scientific information is incomplete, however, does not prevent the

implementation of a fishery management plan."); *Massachusetts v. Daley*, 10 F. Supp. 2d 74, 77

(D. Mass. 1998) (holding that the Secretary is "free to act before the information on which he

intends to rely is even complete."), *aff'd*, 170 F.3d 23 (1st Cir. 1999).

Here, NMFS concluded that these landings history data, while not perfect, are the best

data that are available.  AR 997 at 56516 (stating that "these data represent the best data

available to NMFS."); *see also* AR 231 at 14184 (statement by a member of the Council

recognizing that, "[w]hile the data is not perfect, it is what we have . . . ."). As such, their use is consistent with the Magnuson-Stevens Act even though they may contain some errors. In addition, NMFS's determination that these are the "best data available" is entitled to deference from this Court because it is a scientific determination within the agency's expertise. *Ocean Conservancy*, 394 F. Supp. 2d at 157.

To prevail on his claim, it is not enough for Mr. Lovgren to simply point out that the landings history data are not perfect. As the courts have repeatedly held, he is required to show that better data were available and that the agency ignored them. *Massachusetts v. Daley*, 170 F.3d 23, 30 (1st Cir. 1999) ("If no one proposed anything better, then what is available is the best."); *see also, e.g., Oregon Trollers Ass'n v. Gutierrez*, 452 F.3d 1104, 1120 (9th Cir. 2006) ("Bereft of any contrary science, plaintiffs' bare allegation that the agency's distinction conflicts with the 'best scientific evidence available' fails."); *Natural Resources Defense Council v. Locke*, No. 01-cv-421 (N.D. Cal. Apr. 23, 2010), at 23 (same); *North Carolina Fisheries Ass'n v. Gutierrez*, 518 F. Supp. 2d at 85 ("Absent some indication that superior or contrary data was available and that the agency ignored such information, a challenge to the agency's collection of and reliance on scientific information will fail."); *National Coal. for Marine Conservation v. Evans*, 231 F. Supp. 2d 119, 130 (D.D.C. 2002).

Mr. Lovgren has not made that showing. He vaguely suggests that the "superior data is the paper [dealer] reports" that were used to create the landings history database in the first place (or he may mean paper vessel logbooks). Lov. Mem. at 11. But, of course, the dealer reports are themselves the source of many of the errors that are now in the landings history data (or, if he means paper vessel logbooks, those will simply include different errors and may also be biased). Moreover, the process of recompiling paper reports into a new database (so that they could be

used to make allocations) would itself introduce new errors, and there is no reason to believe that it would result in more accurate landings history data.  Having failed to identify better scientific data, Mr. Lovgren "has forfeited any claim that [NMFS] failed to use the best scientific information available."  *Massachusetts v. Daley*, 170 F.3d at 30.

NMFS was "not obliged to 'sit idly by' when faced with overfishing and overfished stocks simply because the data available . . . may have been less than perfect."  *North Carolina Fisheries Ass'n*, 518 F. Supp. 2d at 86 (citation omitted).  To the contrary, the Magnuson-Stevens Act directed NMFS to move ahead with the best scientific information "available."  NMFS did that here and also committed itself to correcting the errors in these data.  For these reasons, and because Mr. Lovgren failed to identify any better data, the Court should reject his challenges to the landings history data.

### 6.    Mid-Atlantic fishers were not excluded from the scoping and decision-making process for Amendment 16.

Mr. Lovgren argues that mid-Atlantic fishers were not allowed to provide their input in Amendment 16's development. Lov. Mem. at 11-15 (Counts III-V, VII-VIII). His claims are belied by the record, which he fails to cite. *Cf.* Fed. R. Civ. P. 56(c)(1)(A); 56(e)(2) (court may consider undisputed facts the opposing party fails to address). In fact, the New England Fishery Management Council and committees and panels involved in developing Amendment 16 conducted meetings in the mid-Atlantic, received input and comments from mid-Atlantic fishers, and explicitly considered the effect of Amendment 16 on mid-Atlantic communities.

First, Mr. Lovgren was a member of the Groundfish Advisory Panel from 2004 through 2007, *see, e.g.*, AR 65 at 6207, AR 74 at 6602, 6608, and participated in early Amendment 16 meetings. Second, the NEFMC held public meetings in New York.  AR 773 at 48609; *see also*

AR 1049 (agency outreach in New York and New Jersey).[23] Third, mid-Atlantic commercial fishers provided their input on the development of Amendment 16.[24] Fourth, the NEFMC consulted with the Mid-Atlantic Fishery Management Council ("Mid-Atlantic Council") in developing Amendment 16. *See* AR 773 at 48608; *see also* AR 814 at 49185; 882 at 51015. Fifth, liaisons from the Mid-Atlantic Council participated in Amendment 16 hearings. *See, e.g.*, AR 45 at 5270; AR 272 at 17756; AR 498 at 25575; AR 611 at 43335; AR 731 at 47185; AR 833 at 50164.[25]

Amendment 16 and its EIS include discussions of effects on communities in the mid-Atlantic and evaluate the projected changes in revenues by state, *see* AR 773 at 47771, landings, *id.* at 48093-94, and dependence on groundfish by state. *Id.* at 48090; *see also* AR 531 (Draft EIS) at 30714, 30719-20; 30731-39; 30740-42; 30826-31; 30871-72, 30876, 31102; 30994, 31088. In Amendment 16's Final EIS, economic and social consequences were evaluated by state, and it was determined that the biggest impact would be on communities in Maine, New Hampshire, and Massachusetts. AR 773 at 48530. The EIS considered the effects of Amendment 16 on fisheries solely managed by the Mid-Atlantic Council. *Id.* at 04279. Additionally, Amendment 16 provides that each sector must report annually its "biological, economic, and

---

[23] In response to a comment about holding more public hearings in New York or New Jersey, the Council noted low attendance at public meetings and its efforts to maximize accessibility and attendance. AR 773 at 48798.

[24] For example, Bonnie Brady, Executive Director of the Long Island Commercial Fishermen's Association, participated in meetings on Amendment 16 and submitted comments on the draft EIS. *See, e.g.*, AR 587 at 32048-49; AR 617 at 44003; *see also* AR 37 at 5066-67 (Greg DiDiminico of the Garden States Seafood Association); AR 45 at 5270 (Jim Ruhle, a commercial fisher, and a member of the Mid-Atlantic Council, participating in an NEFMC meeting held in New York), 5274 (Jim Ruhle was a member of the Multispecies Oversight Committee); AR 77 at 6855 (same); AR 92 at 9602 (same); AR 183 at 12438 (same); AR 591 at 33055 (another fisher from Montauk, NY, commenting on the draft EIS); AR 607(notifying Mr. Lovgren of a meeting).

[25] As an indication of long-standing interest in the mid-Atlantic impact of management of the groundfish fishery, NMFS's Patricia Kurkul participated in the development of a 2005 "visioning" report on the fishery that included interviews of mid-Atlantic fishers. *See* AR 19 at 4561-62 (communities studied included Riverhead, NY), 4550 (the steering committee included mid-Atlantic fishers), 4564 (Administrator Patricia Kurkul's comments).

social impacts." *See* 75 Fed. Reg. 18,262, 18,278 (Apr. 9, 2010). Consequently, in addition to the pre-implementation analysis, Amendment 16 provides for future study of the region.

Mr. Lovgren contends that Amendment 16 violated National Standards 2 (Counts II, V); 4 (III), 6 (IV)[26], and 8 (V). The basis for these alleged violations is that NMFS, the Council, and advisory groups failed to consider the effects of Amendment 16 on mid-Atlantic communities and fishers, *see* Lov. Mem. at 11-15, which is incorrect as just discussed. To bolster arguments for which he can find no record support, Mr. Lovgren cites a September 2010 Federal Register notice, which is post-decisional and therefore properly not considered.[27] *See, e.g.*, *Little Bay Lobster Co. v. Evans*, 352 F.3d 462, 469 (1st Cir. 2003) (declining to consider arguments based on later developments, in a rule challenge). In addition, the notice outlines data collection about the effects of catch shares on mid-Atlantic fishers, further evidence of NMFS's interest in the region. *See* 75 Fed. Reg. 55,305 (Sept. 10, 2010). Consequently, because the NEFMC and NMFS sought the views of the mid-Atlantic communities in developing Amendment 16, the Defendants' Cross-Motion should be granted as to these counts.

Finally, Mr. Lovgren challenges the composition of the NEFMC as unrepresentative of New Jersey and New York. *See* Lov. Mem. at 13-14 (Counts VII-VIII). These claims must be dismissed. None of the Magnuson-Stevens Act's judicial review provisions allow claims about the composition of Councils, which are therefore barred by sovereign immunity. *See Delta Commercial Fisheries Ass'n. v. Gulf of Mex. Fishery Mgmt. Council*, 364 F.3d 269, 273 (5th Cir. 2004) (suit challenging composition of Council barred by sovereign immunity because waiver is

---

[26] Mr. Lovgren misinterprets National Standard 6, which is not focused on the representation of various segments of the fishery but on the need for flexibility in FMPs to allow for uncertainty. *Compare* Lov. Mem. at 11-12 *with* 16 U.S.C. § 1861(a)(6); 50 C.F.R. § 600.335; *see also* 75 Fed. Reg. at 18,280 (discussing compliance with National Standard 6). He does not provide any argument or evidence that Federal Defendants violated National Standard 6.

[27] FWW also cites this post-decision document. *See* FWW Mem. at 28.

for challenge to regulations, not to the Council's composition); *Organized Fishermen of Florida v. Franklin*, 846 F. Supp. 1569, 1578 (S.D. Fla. 1994) ("no private right of action … to challenge the Council's composition"). In addition, the Councils were acting according to statute. The Magnuson-Stevens Act allows for an FMP to bridge the area of two Councils, with one Council managing the FMP in consultation with the other. Lov. Mem. at 3; *see* 16 U.S.C. § 1854(f); 50 C.F.R. § 600.110. The NEFMC manages the groundfish fishery and developed Amendment 16 in consultation with the Mid-Atlantic Council. For both reasons, Defendants' Cross-Motion as to these claims may be granted.

Although Mr. Lovgren's arguments are based on concerns with the process used to solicit the views of mid-Atlantic fishers, even if Amendment 16 does have substantive, disparate impacts on various fishers and states, it does not violate the Magnuson-Stevens Act or its implementing regulations. For example, National Standard 4 requires that any conservation and management measures that assign fishing privileges "shall not discriminate between residents of different States." 16 U.S.C. § 1851(a)(4). Its implementing regulations, however, allow "[c]onservation and management measures that have different effects on persons in various geographic locations … ." 50 C.F.R. § 600.325(b). That is, the Council and NMFS may implement facially neutral measures that adversely affect the interests of some fishers for the benefit of the whole fishery, as long as their decision to do so is rational. *See, e.g.*, *Yakutat, Inc. v. Gutierrez*, 407 F.3d 1054, 1070-73 (9th Cir. 2005); *Ace Lobster Co. v. Evans*, 165 F. Supp. 2d 148, 178-81 (D.R.I. 2001) (upholding uniform trap cap that balanced the need for equitable allocation with other goals of the Act), *rev'd on other grounds by Campanale & Sons, Inc. v. Evans*, 311 F.3d 109 (3d Cir. 2002).[28]

---

[28] Mr. Lovgren, citing only to the general statutory command that industry advisory committees and panels should provide fair representation of commercial fishing interests in the area of authority of the Council, *see* Lov. Mem. at

**B.      NMFS fully complied with NEPA.**

Plaintiffs contend that NMFS violated NEPA in approving Amendment 16. As explained below, Plaintiffs' NEPA claims are defective under the APA's deferential standard of review.

### 1.      Amendment 16 underwent an extensive public NEPA process.

The New England Fishery Management Council announced its intent to prepare Amendment 16 in the Federal Register on November 6, 2006. AR 773 at 47818. The scoping period extended from that date through December 29, 2006. *Id.* at 48605. In addition to accepting written comments via mail, facsimile and electronic mail, the Council conducted eight public hearings during the scoping period to receive public input. *Id.* at 047819.

Based on public scoping comments, the Council began to develop Amendment 16 for implementation in fishing year 2009. AR 889 at 52080. However, in 2008 and early 2009, new stock assessments indicated certain stocks were overfished and/or subject to overfishing, and that draft effort control measures under development for Amendment 16 were not targeting the correct stocks. The Council accordingly requested NMFS to implement an interim action for fishing year 2009 to provide it sufficient time to revise draft management measures in Amendment 16 to meet the updated biological objectives. *Id.* at 52081.

After numerous public meetings,[29] in early 2009 the Council finished developing draft management measures for Amendment 16 and accordingly prepared a draft EIS ("DEIS") which analyzed the impacts of all proposed measures and alternatives. *Id.* A notice of availability for

---

14, argues that it was impermissible for Patricia Kurkul to serve on both the NEFMC and the Groundfish Oversight Committee. Defendants have identified no statutory or regulatory command suggesting that this is improper, *cf.* 16 U.S.C. § 1852(g)(3)(A)-(B); 50 C.F.R. § 600.10 (defining "advisory group" to include a fishing industry advisory committee); 50 C.F.R. § 600.225 (defining rules of conduct for advisory groups), nor has Mr. Lovgren, and Defendants therefore respectfully argue that this line of argument should be rejected. Additionally, for the same reason there is no statutory authority allowing a challenge to the composition of a Council, as discussed, the government has not waived its sovereign immunity for challenges to the Committee.

[29] The public had opportunities to comment at Advisory Panel, Committee and Council meetings, and additional limited opportunities at Plan Development Team meetings and conference calls. AR 773 at 48608. The FEIS lists 70 public meetings and conference calls during the Amendment 16 development process. *Id.* at 48609-11.

the DEIS was published on April 24, 2009, with public comments accepted through June 8, 2009. *Id.*

The Council adopted final measures for Amendment 16 at its June 2009 public meeting. *Id.* Amendment 16 was submitted by the Council to the Secretary of Commerce for review (as required under the Magnuson-Stevens Act), and a notice of its availability was published on October 23, 2009. *Id.* A notice of availability for the FEIS was published on October 30, 2009. *Id.* The public comment period on Amendment 16 extended to December 22, 2009. *Id.* NMFS finalized its record of decision ("ROD") for Amendment 16 and the FEIS (which included responses to comments) on January 21, 2010. AR 889 at 52128. The Service published a proposed rule to implement the measures adopted in Amendment 16 on December 31, 2009, with public comments on the proposed rule accepted through January 20, 2010. *Id.* at 52045. The final rule implementing Amendment 16 was adopted on April 9, 2010. AR 997 at 56485-577.

> **2.      The FEIS evaluated an adequate range of reasonable alternatives.**

Plaintiffs allege NMFS violated NEPA by failing to consider reasonable alternatives to the proposed action in the Amendment 16 FEIS. *See* NB Mem. at 25; FWW Mem. at 21. NEPA regulations provide that an EIS shall "[r]igorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated." 40 C.F.R. § 1502.14(a).   The range of alternatives that needs to be considered, however, is "bounded by some notion of feasibility," and the decisionmaker need not evaluate all conceivable options. *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 551 (1978); *Westland Water Dist. v. U.S. Dep't of the Interior,* 376 F.3d 853, 868 (9th Cir. 2004).   Rather, the adequacy of an EIS's discussion of alternatives is evaluated according to a "rule of reason," given the scope and purpose of the

proposed action. *Tongass Conservation Soc'y. v. Cheney*, 924 F.2d 1137, 1140 (D.C. Cir. 1991); *see U.S. Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 767-68 (2004).

Applying this rule of reason, the First Circuit has explained that "NEPA does not require discussion of environmental effects of alternatives when those effects cannot be ascertained readily, and when the alternatives are only remote and speculative possibilities that *cannot be meaningfully explored within the time-frame of the needs to which the underlying proposal is addressed*." *Seacoast Anti-Pollution League v. Nuclear Regulatory Comm.*, 598 F.2d 1221, 1229 (1st Cir. 1979) (emphasis added).[30]  In determining whether an EIS adequately has considered alternatives, the "touchstone" is whether the EIS's "selection and discussion of alternatives fosters informed decision-making and informed public participation." *Headwaters, Inc.*, 914 F.2d at 1180.

Here, the Amendment 16 FEIS evaluated a broad suite of proposed measures "designed to achieve [fishery] mortality targets, provide opportunities to target healthy stocks, mitigate (to the extent possible) the economic impacts of the measures, and improve the administration of the fishery." AR 773 at 47762; *see id.* at 47762-67 (summary of proposed measures).  In addition, the FEIS also evaluated in detail a wide range of alternatives to the proposed measures, including the no-action alternative for each measure proposed. *See id.* at 47773-76 (summarizing alternative measures evaluated in detail in the FEIS).[31]

---

[30] *See also Headwaters, Inc. v. Bureau of Land Mgmt.*, 914 F.2d 1174, 1180-81 (9th Cir.1990) (NEPA does not require the consideration of alternatives whose effect cannot be reasonably ascertained; whose implementation is remote or speculative; which are infeasible, ineffective, or inconsistent with basic policy objectives; or which are not significantly distinguishable from alternatives actually considered, or which have substantially similar consequences).

[31] For example, the FEIS evaluated: (1) alternatives which would not implement revised species status determinations, allowable biological catch control rules, and annual catch limits, even though these alternatives would not comply with Magnuson-Stevens Act requirements; (2) a number of alternatives regarding sector management measures, including not revising sector policies, not allowing confirmation of permit history category ("CPH") permits to joint sectors, not allowing annual catch entitlement transfers, different options for enforcement and management, and five alternatives for calculating potential sector contributions; (3) alternatives concerning

Despite the broad range of alternatives evaluated, Plaintiffs contend the FEIS violated NEPA because it did not evaluate in detail all alternate management measures proposed by the public.  In particular, the New Bedford Plaintiffs fault the EIS for not evaluating the "point system" proposal in detail, NB Mem. at 25, and the Food & Water Watch Plaintiff-Applicants contend the FEIS violated NEPA by focusing only on "minor variations" of the same plan and by failing to evaluate non-sector management alternatives, FWW Mem. at 20-21.

The FEIS directly addressed these concerns and provided a reasoned explanation detailing why these alternate proposals were not evaluated in further detail.  The FEIS noted that during the scoping process, a number of ideas were suggested (including the point system, an area management system, and an individual fishing quota system); however, after consideration the Council "decided not to pursue these alternatives . . . because of concerns *the design of the measures could not be completed in time*."  AR 773 at 47977 (emphasis added).[32]  The Council further indicated that "it intends to revisit these suggestions after submitting this amendment and may decide to pursue them in a future action."  *Id.*

The FEIS thus satisfies NEPA's requirement that, "for alternatives which were eliminated from detailed study, [it] briefly discuss the reasons for their having been eliminated."  40 C.F.R. § 1502.14(a).  Moreover, the decision to eliminate these alternatives from detailed study in the

reporting requirements and commercial and recreational component allocations; (4) alternatives related to days- at-sea ("DAS") management measures, including the DAS transfer and leasing program and special management program; (5) alternative measures to control fishing mortality for vessels that did not join sectors; (6) alternatives related to recreational fishing; and (7) accountability measure alternatives.  *See* AR 773 at 47773-75); *id.* at AR 47927-75.

[32] *See also* AR 773 at 47821-22) ("*Due to limited time and resources*, the Council designated Amendment 17 as the mechanism to further develop all management options including but not limited to area management, DAS performance plan, point system, ITQ management, party/charter limited entry, and approval of any new sector proposals or adjustments or modifications to existing sectors.  Amendment 17 should also develop and establish a complete allocation system for the groundfish fishery. That Amendment will be developed following the completion of work on Amendment 16.") (emphasis added); *id.* at 47817-22 ("The Council decided not to pursue an ITQ proposal because recent changes to the M-S Act impose a requirement for an industry referendum before an ITQ can be implemented. The Council does not believe there is enough time available to develop a proposal and complete the referendum in time for a May 1, 2009 implementation date.").

FEIS comports with the First Circuit's decision in *Seacoast Anti-Pollution League,* which explained that "NEPA does not require discussion of environmental effects of alternatives when . . . the alternatives are only remote and speculative possibilities that *cannot be meaningfully explored within the time-frame of the needs to which the underlying proposal is addressed.*"  598 F.2d at 1229 (emphasis added).[33]

As detailed in the FEIS, one of the primary purposes of Amendment 16 was to amend the groundfish multi-species FMP in time for the 2010 fishing year in order to, *inter alia,* comply with the Magnuson-Stevens Act.[34]  AR 773 at 47816 ("[s]everal groundfish stocks are either overfished, have been declared overfished in the past, or are experiencing overfishing and are currently rebuilding under programs *that do not meet the requirement of the M-S Act.*" (emphasis added)); *id.* at 47818 (Amendment 16 needed to "[e]nd overfishing by 2010/2011 consistent with the status of the stocks and the requirements of the MSA of 2006").[35]  The Council and NMFS thus were operating under a tight deadline, imposed by the Magnuson-Stevens Act and the then-

---

[33] *See also Oceana v. Evans,* 384 F. Supp. 2d 203, 240-46 (D.D.C. 2005).  In *Oceana* the court found that NMFS had considered a sufficient range of alternatives to protect essential fish habitat in connection with an EIS for the Atlantic sea scallop FMP.  In doing so, the court recognized that fishery management was "exceedingly complex" and that:

> [w]hile it is true that agencies have a duty to consider "significant and viable alternatives" identified through public comments . . . the duty to consider all such alternatives does not extend to situations where the possibilities are so numerous and the goals of the action so complex that the agency cannot possibly consider every significant alternative in a reasonable time period.  Rather, in these circumstances, the agency has discretion to choose a manageable number of alternatives to present a reasonable spectrum of policy choices that meet the goals of the action.

*Id.* at 241-42 (internal citation omitted).

[34] As explained above, Amendment 16 originally was scheduled to be implemented in advance of the 2009 fishing season; however, because of new biological stock assessments, implementation was delayed until May 2010 in order to provide sufficient time to revise draft measures in Amendment 16 to meet updated biological objectives and the requirements of the Magnuson-Stevens Act.  *See* AR 889 at 52081.

[35] *See also* AR 997 at 56505:

> The measures in Amendment 16 are necessary to end overfishing and ensure that overfished stocks continue to rebuild.  The rebuilding plans in the FMP rely upon implementation of management measures beginning in FY 2010 on May 2010, otherwise the success of such rebuilding programs may be compromised.

current FMP, to complete and implement Amendment 16 – a point which Plaintiffs cannot reasonably contest.

Notwithstanding this deadline and the FEIS's explanation of limited time and resources, the New Bedford Plaintiffs claim the record "demonstrates that enough time and resources" had already been spent "to show that [the point system] alternative was feasible and reasonable." NB Mem. at 26. The record indeed evidences that, although the point system was not formally evaluated in detail as an alternative in the FEIS, the Council devoted significant time and resources to exploring it and the other alternative management proposals before deciding what measures to include in Amendment 16.[36] But after considering the point system and other alternatives, the Council, and its subcommittees and teams tasked with developing Amendment 16, had significant concerns that all of these alternative proposals feasibly could not be developed and evaluated as formal, fully analyzed alternatives, in the timeframe necessary for implementation of Amendment 16. *See* AR 51 at 5737-38 (January 18, 2007 meeting where Multi-species Oversight Committee "discussed the difficulty in developing a new management system in the time available" and noting concerns raised that some of the alternative management proposals could not "be analyzed with the tools used to analyze effort controls" (i.e., days-at-sea) and that this would "increase the workload on the [Plan Development Team] as new analytic techniques are developed."); AR 57 at 5857-70 (memo summarizing plan

---

[36] For example, the FEIS explains that

> [s]ummaries of the scoping hearings and all written scoping comments were provided to all Council members. These documents, as well as recordings of the scoping hearings, were made available to the public. The Council reviewed these comments over a six month period. The Groundfish Plan Development Team (PDT) reviewed the major management proposals on two separate occasions and provided comments and concerns on the proposals. The Multispecies (Groundfish) Committee reviewed the proposals over the course of three separate meetings, and the full Council discussed the comments at two meetings. Many of the scoping comments were incorporated into the alternatives considered in this action.

AR 773 at 047821-22.

development team meeting where questions and issues concerning proposed alternatives were discussed, including concerns regarding implementation timing).[37]

The New Bedford Plaintiffs contend that "[a]n independent economic analysis" of the point system concluded that "it was reasonable, economically robust, and flexible . . . ."  NB Mem. at 25.  In fact, the "experimental analysis" to which the New Bedford Plaintiffs refer indicated, *inter alia,* that due to the "novelty" of the point system proposal, there was "little literature upon which an assessment" could be based to address certain concerns about its implementation.  AR 421 at 23731.  The report also explained that "a pilot study would shed some light on these questions, but the logistics of creating and implementing a timely field trial are prohibitive, and results may not be available in time to be incorporated into the environmental impacts statement."  *Id.*  In addition, the report's conclusions and recommendations detailed numerous significant questions and concerns remaining regarding implementation of the proposal.  *See id.* at 23752-54.  Far from supporting Plaintiffs' argument, this analysis (completed October 31, 2008) highlights the many unanswered issues surrounding the proposal.

Moreover, the record demonstrates that even proponents of the point system proposal recognized that many aspects of the proposal remained uncertain or under development.  *See* AR

---

[37] *See also* AR 59 at 5902-15 (memorandum from groundfish plan development team outlining review of each major proposal received during Amendment 16 scoping).  This memo shows that the point system (as well as other management proposals) faced several significant hurdles, including that the "[c]ommand-and-control style of management . . . may distort fishery operation in ways that are difficult to analyze and predict."  *Id.* at 5915.  And that, as the "ultimate constraint on mortality," points "may be insufficient to protect weak-link stocks."  *Id.* Moreover, the plan development team recognized that the point system and other proposed alternatives would be difficult to analyze in the time available for Amendment 16.  *Id.* at 5903.  For instance, the memo indicated that differences between the proposed alternatives would complicate the analyses, particularly for economic and social impacts, and that the model used by the Council to evaluate impacts may not be compatible with several of the proposals.  *Id.* at 5903.  Thus the plan development team would need to develop and verify different analytic tools to evaluate these proposals, which could take considerable time.  *Id.*  The plan development teams stressed that, "[g]iven the compressed time available for this amendment, this must be considered as the Committee and the Council choose the alternatives to be developed."  *Id.*

59 at 5892 (conceding that a model would have to be created to set the point values, and

acknowledging concern that point values might have to be changed monthly to reflect changing

conditions in the fishery (and to ensure that stock were not overfished), and that "it will be

difficult to change the values quickly even if we can get the monitoring up to speed to do so.");

AR 65 at 6208 (recognizing that there could be a risk of a "derby" fishery if "point values are set

too high" and that the Council would "need to set policy guidance on what magnitude of change

in point value is acceptable.").  Indeed, the record evidences that there were significant

uncertainties concerning the point system proposal just two months before the Council decided

what formal alternative were to be evaluated in the DEIS.  *See* AR 57 at 5866; AR 76 at 6828-31

(report on June 19-21, 2007 Council meeting).

Thus, the record shows the Council did not blindly reject the point system proposal or

other alternatives.  Rather, after reasonable consideration and analysis, the Council deferred

further detailed evaluation of them in the FEIS due to the impending deadline to implement

Amendment 16 and in light of time and resource constraints.[38]  The Council and NMFS have

extensive technical expertise in the development and implementation of fishery management

measures through the Magnuson-Stevens Act process.  Their determination of what was feasible

---

[38] The New Bedford Plaintiffs allege that NMFS "obstructed" consideration of the point system proposal by suggesting that the proposal may be considered an IFQ, which, under the Magnuson-Stevens Act, would require a referendum among permit holders.  NB Mem. at 26.  The record does not support this claim.  Rather, the record shows that at a January 18, 2007 meeting, the NEFMC Multi-species Oversight Committee asked NOAA counsel several questions about the then-recent reauthorization of the Magnuson-Stevens Act.  AR 51 at 5737.  NOAA counsel informed the Committee that "it w[ould] take time for NOAA General Counsel to interpret the Act" and that it was "not yet clear which types of Limited Access Privilege Programs (LAPPs) [would] require a referendum, who participates in the vote on an IFQ, what it means to require 'annual catch limits', how a sector differs from other kinds of LAPPS, etc." *Id.* NOAA counsel used the Point System proposal under discussion as an example of a measure that might be considered an IFQ and thus require a referendum, but indicated that he could not provide specific advice on the issue until national policy is determined. *Id.* Far from "obstructing" the Council's consideration of the point system, NOAA counsel's response simply reflected that further legal analysis was required.  Plaintiffs also point out that NOAA did not respond to the Council's request for a determination of whether the point system was an IFQ.  NB Mem. at 26.  However, the need for this determination became moot because the Council, subsequent to its February 13, 2007 request, *see* AR 55 at 5855, decided to defer consideration of the point system until Amendment 17, *see* AR 76 at 6828-31 (report on June 19-21, 2007 Council meeting).

within the timeframe governing Amendment 16 is due substantial deference under the APA's

standard of review and cannot be said to be a clear error of judgment. *See Town of Winthrop,*

535 F.3d at 9 ("An agency's decision is not arbitrary and capricious if that decision was based on

consideration of the relevant factors and if it did not commit a clear error of judgment.");

*Baltimore Gas,* 462 U.S. at 103 (court generally must be "at its most deferential" when

reviewing scientific judgments and technical analyses within the agency's expertise).

Plaintiffs rely on *Dubois v. USDA,* 102 F.3d 1273 (1st Cir. 1996), in support of their

argument that the FEIS failed to adequately consider alternatives. *See* FWW Mem. at 19. Such

reliance is misplaced, however, because the facts of *Dubois* are readily distinguishable. In

*Dubois,* commenters proposed a number of alternatives to the agency, but the agency's final EIS

"did not respond to these comments *at all*." *Id.* at 1288 (emphasis added). In fact, "[t]he agency

*did not in any way explain* its reasoning or provide a factual basis for its refusal to consider, in

general, the possibility of alternatives to using [the proposed action]." *Id.* (emphasis added).

Moreover, the final EIS contained "no description or discussion *whatsoever* as to why an

alternative . . . would be impractical." *Id.* at 1289 (emphasis added).

In stark contrast, here the FEIS described the proposals, outlined how they had been

considered, and provided a reasoned explanation – supported by the record – for the Council's

decision not to consider certain of the proposed alternatives in further detail in the FEIS. NEPA

requires no more. *See* 40 C.F.R. § 1502.14(a) (EIS shall "briefly discuss the reasons" for

elimination of alternatives from detailed study).[39]

---

[39] Food & Water Watch's reliance on *Friends of Yosemite Valley v. Kempthorne,* 520 F.3d 1024, 1029 (9th Cir. 2008), is equally unpersuasive. *See* FWW Mem. at 21. There the court found the agency had violated NEPA because all alternatives considered were "virtually indistinguishable" and "essentially identical" to each other. *Id.* at 1038-39. Here, in contrast, the FEIS considered a wide range of alternatives, including a variety of management measures not related to sectors. *See supra* at n.31; AR 773 at 47773-74; *id.* at 47927-75.

Given the wide range of alternatives that were evaluated in detail in the FEIS, coupled with the extensive consideration of the point system and other alternatives and the FEIS's reasoned account explaining why these other alternatives were not considered in detail, the FEIS's evaluation of alternatives satisfied NEPA's purpose of fostering "informed decision-making and informed public participation."  *See Headwaters, Inc.*, 914 F.2d at 1180.[40]

### 3. The EIS evaluated potential social and economic impacts in compliance with NEPA.

In addition to their similar Magnuson-Stevens Act argument, Plaintiffs claim NMFS violated NEPA by failing to sufficiently evaluate the social and economic impacts of Amendment 16.  As discussed above, *see* § IV.A.3, the FEIS rebuts Plaintiffs' claim because it contains a robust and extensive analysis of the potential social and economic impacts from both the measures adopted in Amendment 16 and the alternatives evaluated in the FEIS.  *See* AR 773 at 48382-502 (addressing economic impacts), 48502-34 (addressing social impacts).

Indeed, the New Bedford Plaintiffs' own brief admits as much, as it quotes extensively from the social and economic analysis contained in the FEIS.  *See* NB Mem. at 22-23.  In this regard, the focus of the New Bedford Plaintiffs' brief is not so much on any alleged lack of analysis in the FEIS, but rather on the severity of the potential impacts the FEIS acknowledged.

---

[40] Food & Water Watch also alleges that NMFS treated implementation of sectors as a "predetermined" outcome, FWW at 20; however, the documents cited do not support this claim. The first document, a January 25, 2008 press release, simply indicates the Council had decided to continue to develop the sector management program as an alternative to the then-current days-at-sea management program. AR 169 at 12270.  The second document, an April 16, 2010 letter from the NOAA Administrator, post-dates completion of the FEIS and explains that delaying the sector program on the eve of its implementation (May 1, 2010) would not be in the best interest of the fishery.  AR 1010 at 56758.  Finally, Plaintiffs' third citation is to tables in the FEIS estimating the financial impacts of potential sector contribution alternatives.  *See* AR 773 at 48393-400.  These alternatives represent only one aspect of the sector measures, which in turn represent only one component of a suite of alternative management measures evaluated in the FEIS.  None of these documents individually or collectively satisfy the high burden Plaintiffs face to establish improper predetermination under NEPA.  *See e.g., Forest Guardians v. U.S. Fish & Wildlife Serv.*, 611 F.3d 692, 714 (10th Cir. 2010) (explaining that plaintiff "must meet a high standard to prove predetermination" and holding that "predetermination occurs only when an agency irreversibly and irretrievably commits itself to a plan of action that is dependent upon the NEPA environmental analysis producing a certain outcome, before the agency has completed that environmental analysis").

*Id.* Acknowledging there may be significant or even severe impacts does not violate NEPA, however, because NEPA requires only that an agency make an informed decision; it does not require an agency to reach any particular substantive result. *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 558 (1978); *see Baltimore Gas*, 462 U.S. at 97-98 (under NEPA, "[t]he role of the courts is simply to ensure that the agency has adequately *considered and disclosed* the environmental impact of its actions and that its decision is not arbitrary or capricious.").

Nonetheless, the New Bedford Plaintiffs appear to argue that NMFS's NEPA evaluation was deficient because NMFS "could not analyze economic impact[s] because it could not determine how many vessels were going to enter sectors." NB Mem. at 22. This is not the case. The FEIS in fact did evaluate economic impacts associated with the sector measures. *See e.g.,* AR 773 at 48387-428. And in doing so, it forthrightly recognized certain inherent uncertainties in the analysis because, at the time the FEIS was finalized, it was not known for certain how many permit holding vessels would join and remain in sectors. *Id.* at 48237 ("The major cause of uncertainty in analyzing the biological, economic, and social impacts of the proposed management measures is the uncertainty over the number of vessels that will choose to participate in groundfish sectors."). FEIS section 7.1.1 provides a lengthy and well-reasoned discussion of this issue and its impacts on the analysis contained in the FEIS.[41]

---

[41] FEIS at § 7.1.1 explains, in part:

   While it would facilitate the design of effort controls and analysis of sector impacts if definitive information was available on sector participation prior to developing the management program, there are good reasons why this information is not available. As long as sector participation is voluntary, fishing vessel owners need to be provided sufficient information to make an informed business decision prior to committing to a sector. This decision cannot be made without knowing what the alternative to sectors will be, as well as what the requirements will be for sectors (with respect to monitoring, reporting, costs, etc.). To require fishermen to commit to either sectors or the effort control system without this information in hand is unreasonable. Under the current timeline, at least vessel owners will know what choices the Council makes on these issues before they are required to commit to a sector in fall 2009. While they will not know if the Council's

Under the APA's deferential standard of review, the Service's discussion and conclusions regarding potential economic impacts resulting from the sector measures, and the inherent uncertainty associated with forecasting those impacts, are due substantial deference as a technical matter within the agency's area of expertise. *Baltimore Gas*, 462 U.S. at 103 (court generally must be "at its most deferential" when reviewing scientific judgments and technical analyses within the agency's expertise); *Earthlink, Inc. v. FCC*, 462 F.3d 1, 12 (D.C. Cir. 2006) (court should conduct a "particularly deferential review" of an agency's predictive judgments). NEPA does not require analytic certainty, and Plaintiffs cite no authority to the contrary. Moreover, sector measures potential impacts were further developed and discussed in the NEPA analysis prepared in connection with the individual sector operation plans. *See e.g.,* AR 905-920 at 52378-54857; AR 922-23 at 54857-55240; *see also* AR 948 at 55785-56090 (EA for Framework Adjustment 44).

The New Bedford Plaintiffs also argue that the FEIS did not consider all costs to fishermen, such as the expenses of maintaining a sector manager, office space, and other administrative costs associated with sectors.   NB Mem. at 23.  This argument is rebutted by the FEIS, which directly addressed the potential costs of sector management to fishermen, AR 773 at 48385-6); *id.* at 48435-37, and by Plaintiffs' own brief, which admits the FEIS estimated the cost of establishing sectors, sea observers, and dockside monitoring, NB Mem. at 23.

> ### 4. The FEIS sufficiently evaluated impacts to the mid-Atlantic region.

The Lovgren Plaintiffs argue that NMFS violated NEPA because it did not evaluate impacts to the mid-Atlantic region.  Lov. Mem. at 16.  The FEIS demonstrates this claim has no

---

recommendations will be approved by NMFS, at least some information on selected alternatives will be available.

AR 773 at 48238.

basis in fact.  *See e.g.,* AR 773 at 48389-90) (discussing sector measure economic impact by homeport state); *id.* at 48398-410) (presenting data on impacts of sector measures by homeport state); *id.* at 48447-52 (evaluating economic impact of differential days-at-sea measure by, *inter alia,* homeport state); *id.* at 48534-47) (discussing impacts of proposed actions on adjacent fisheries, including those in mid-Atlantic region).[42]

The Lovgren Plaintiffs support their claim by arguing that the FEIS incorporated the affected human environment analysis from Amendment 13 (for the years 1994 through 2001) and from Amendments 5 and 7 (for the years 2001 through 2007), but that none of these Amendments included "sectors, catch shares or the impact upon the affected human environment in the Mid-Atlantic region."  Lov. Mem. at 16-17.  Not only do Plaintiffs' assertions contain factual errors, they do not even support Plaintiffs' argument.

The FEIS discusses these prior Amendments in the context of describing the human environment affected by Amendment 16 – i.e., the Northeast multi-species fishery – in order to "examin[e] how management actions and changes in fishing activity have shaped the fishing industry and fishing communities over time," and to aid in "predicting how the present action may affect the multispecies fishery."  AR 773 at 48063.  After establishing this "descriptive baseline for the fishery with which to compare actual and predicted future changes," *id.*, the FEIS goes on to discuss in detail (in the environmental impacts section) the potential impacts resulting from Amendment 16, including (as cited above) the potential impacts of the sector measures on the mid-Atlantic region.  Thus, the FEIS properly referenced prior FMP Amendments to provide context for its subsequent discussion of the potential impacts resulting from Amendment 16.

---

[42] *See also e.g.,* AR 773 at 47771, 48090-94, 48119-20, 48236, 48458-59, 48505, 748518, 48465.

The Lovgren Plaintiffs also improperly cite to a Federal Register notice dated September 10, 2010, in order to argue that NMFS violated NEPA because "rapid implementation" of the sector program made it "virtually impossible" to assess impacts, especially to the mid-Atlantic region.  Lov. Mem. at 17.  The cited Federal Register notice is not part of the administrative record in this case, post-dates the challenged agency action, and should be excluded.  Judicial review of agency action under the APA is to be based on the administrative record before the agency at the time of the challenged action.  5 U.S.C. § 706; *Camp v. Pitts,* 411 U.S. 138, 142 (1973); *Town of Winthrop,* 535 F.3d. at 14.  The Court thus should strike consideration of 75 Fed. Reg. 55305 (Sep. 10, 2010), and the argument relying on it.[43]  Moreover, as discussed above, the FEIS in fact did evaluate the potential impacts of the sectors measures, including potential impacts of those measures on the mid-Atlantic region, and in doing so, fully acknowledged the inherent uncertainty involved in forecasting their potential effects.[44]

### 5.    The FEIS sufficiently discusses the potential impacts related to distribution of potential sector contributions.

The Food & Water Watch Plaintiff-Applicants contend that NMFS violated NEPA by failing to assess the environmental impacts of the distribution of potential sector contribution allocations.  FWW Mem. at 16.  The essence of their argument is that NMFS failed to draw a

---

[43] Even if this document were part of the record, it does not support Plaintiff's NEPA claim.  The notice solicited comments on a continuing information request as required by the Paperwork Reduction Act for purposes of gathering information on impacts of fishery management measures.  The notice mentions, as an example, the difficulties in obtaining a pre-implementation baseline for Amendment 16, but in no way does it isolate this as a problem for the mid-Atlantic specifically or as a flaw in the NEPA analysis for the amendment.

[44] *See also* AR 773 at 48464:

> Another difficulty with predicting the economic impacts of sectors is that the vessels that will participate in sectors is uncertain and will not be determined until after the amendment is submitted for review and approval by NMFS. Initial indications are that over 600 permits may be enrolled in sectors, and the potential sector contribution of those permits could approach nearly 80 percent of the ACL (see section 7.5.1.2.3.2.9).  If this occurs, sectors will be the driving force for the economic performance of the fishery, for good or ill. But if the number of vessels/permits that actually commit to sectors is substantially less than this number, sectors may be a minor component of the fishery as has been the case the last few years. Finally, the economic impacts of sectors will depend on the specific operating rules within individual sectors.  These will be identified in sector operations plans that are still in development.

connection between potential sector contribution allocations and an increase in the use of bottom trawl gear, which Plaintiff-Applicants contend causes a high level of environmental damage. FWW Mem. at 16-17.  This argument relies on the presumption that, because bottom trawlers have the highest landings used to determine potential sector contributions, the sector measures will lead to increased bottom trawling and, accordingly, to increased environmental impacts.  *Id.* This argument is defective in several respects.

First, the argument relies on a number of uncertain and speculative assumptions.  For instance, it ignores analysis included in the FEIS suggesting that implementation of the sector measures will increase the efficiency of the fishery and result in *less* overall fishing effort, which, in turn, may result in less impact and would tend to counteract the adverse effects Plaintiffs reference.  *See* AR 773 at 48363-64 (§ 7.4.1.2.3) (excerpt provided below); *id.* at 48371-73; *id.* at 48299.  In addition, much of Plaintiffs' argument is based on the assumption that somehow the potential sector contribution allocations will shift to larger trawl vessels, because these larger vessels will have more buying power and will therefore acquire quota from smaller fishermen.  FWW Mem. at 17.  This assumption is speculative and ignores that larger vessels also have higher fixed costs and higher variable costs, both well-documented in the record.  *See e.g., id.* at 48454-56.  In addition, the argument is also founded on the misconceptions that "smaller scale fishermen" only use gillnet or longline gear, and that any transfer of quota from smaller vessels to larger vessels would increase the amount of trawl gear used.  This assumption is undercut by discussion and analysis in the FEIS.  AR 773 at 48454-55 (showing 117 vessels less than 50 feet in length use trawl gear); *see also id.* at 48364.[45]

---

[45] Food & Water Watch also argues that small scale fishermen employ methods such as bottom gill nets and bottom longlines, which have less impacts on bottom habitat when compared to bottom trawl gear.  FWW Mem. at 18. What Plaintiffs fail to acknowledge, however, is that these gear types have other types of environmental impacts to a greater degree than bottom trawl gear, such as impacts on marine mammals.  *See* AR 773 at 48059-63.  In addition,

Moreover, the FEIS did not ignore Food & Water Watch's concerns.  As their brief acknowledges, the FEIS directly discussed the potential indirect impacts that may result from the sector measures.  *See* FWW Mem. at 18, citing AR 773 at 48258.   The FEIS explains that the sector measures may have indirect biological impacts, but that these impacts were not possible to predict in advance of knowing details concerning sector membership and fishing practices.  AR 773 at 48258.  The FEIS further notes that any indirect impacts attributable to the sector measures will be due primarily to the transfer of annual catch entitlements between sectors, or other exchanges of fishing privileges.  *Id.*  In addition, with respect to indirect habitat impacts (such as might result from bottom trawling), FEIS § 7.4.1.2.3 explains:

> Sector administration provisions are administrative in nature and are not expected to have any direct impact on habitats designated [essential fish habitat].  It should be noted that sectors do not authorize additional fishing effort – they are merely a different way of allocating fishing privileges.  Indeed, analysis of the biological impacts of sectors suggests that sectors may actually lead to less fishing effort as vessels operate more efficiently – if this occurs, then sectors might reduce the adverse effects of fishing on essential fish habitat, but there is limited data to determine if this will actually take place.  Some concerns were raised during the public comment period that allowing [annual catch entitlement] transfers might have impacts on [essential fish habitat].  The argument is [annual catch entitlement] could be transferred from a sector that uses gear with few impacts to a sector that uses gear with more impacts.  But the reality is that such shifts in gear are not precluded by the current management system which allows [days at sea] to be transferred between any vessel of the appropriate size without regard to gear, and which allows almost any permit to use any type of gear at any time (the exceptions are handgear permits and Category D/longline permits).  As a result, when compared to the No Action alternative of not allowing [annual catch entitlement] transfers to take place, there are no differences in the possibility that catch will shift between gear types.  Any changes in fishery regulations or fishing practices that may result on the basis of sector-based management will be addressed in the regulations that implement a particular sector, and in the EIS or EA corresponding to the creation or continuation of that sector.  Such NEPA documents prepared by the sectors (an EA or EIS) will be tiered from the Amendment 16 EIS.

---

Plaintiffs state that "it is reasonable to expect that an increase in the number of large boats that use bottom trawl fishing gear will cause a significant increase in the adverse environmental impacts associated with the fishery." FWW Mem. at 18.  This argument is erroneous – there will not be any increase in the number of boats (large or small) because the number of boats is fixed by limited entry permits.  *See id.* at 48068.

*Id.* at 48364 (emphasis added).  Contrary to Plaintiffs' claim, the FEIS thus provides a reasonable assessment of the indirect impacts potentially resulting from the sector measures given the inherent uncertainties concerning sector membership and operation at the time the FEIS was completed.[46]

Food & Water Watch additionally claims that NMFS violated 40 C.F.R. § 1502.22.   This regulation, in relevant part, provides that, when an agency is evaluating reasonably foreseeable significant impacts in an EIS and information relevant to those impacts cannot be obtained because the overall costs of obtaining it are exorbitant or the means to obtain it are not known, the agency must include in the EIS: (1) a statement that such information is incomplete or unavailable; (2) a statement of the relevance of the incomplete or unavailable information to evaluating reasonably foreseeable significant adverse impacts on the human environment; (3) a summary of existing credible scientific evidence which is relevant to evaluating [such impacts], and (4) the agency's evaluation of such impacts based upon theoretical approaches or research methods generally accepted in the scientific community.  40 C.F.R. § 1502.22(b).

Food & Water Watch's claim concerning section 1502.22 fails for two primary reasons. First, the regulation applies only in the context of "reasonably foreseeable significant adverse impacts."  40 C.F.R. § 1502.22(b); *Lee v. U.S. Air Force*, 354 F.3d 1229, 1241 (10th Cir. 2004). Here, the alleged sector measure impacts – "significant increase in fishing activity [of the type] that causes adverse environmental impacts" – are not sufficiently foreseeable or significant to trigger section 1502.22.  As the FEIS explains, the sector measures are likely to decrease – rather than increase – fishing effort, and there is no greater possibility that catch will shift between gear types (i.e., to bottom trawling) as a result of the sector measures as compared to the no-action

---

[46] As the cited passage anticipated, each of the individual sector operation plans was subject to additional NEPA environmental analysis.  *See e.g.,* AR 901-13 at 52714-054857.

alternative, which represents the status quo.  AR 773 at 48364.  These conclusions are due deference from the Court and are not clearly erroneous.

Second, even if section 1502.22 were applicable, the agency complied with its requirements.  Consistent with the "rule of reason" inherent in NEPA's procedural requirements, *Public Citizen*, 541 U.S. at 767-68, this regulation should not be subject to a hyper-technical reading, *Colorado Envtl. Coal. v. Dombeck*, 185 F.3d 1162, 1172-73 (10th Cir. 1999) ("we are unwilling to give a hyper-technical reading of the regulations to require . . . a separate, formal disclosure statement in the [EIS] to the effect that . . . data is incomplete or unavailable.").  Here, the FEIS satisfies section 1502.22 by addressing the unavailability of detailed information regarding sector operations and potential transfers of annual catch entitlements and by discussing the relevance of such information in terms of evaluating potential impacts.  The FEIS further considers the information and data that is available and provides an adequate evaluation of the potential impacts based on that information.  The FEIS thus complies with section 1502.22.

> **6.    NEPA does not require an FEIS to evaluate speculative and causally remote impacts.**

The New Bedford Plaintiffs claim that the "EIS does nothing to analyze, and does not even recognize, the impact that restrictive catch measures will have on the environment by limiting the fleet to landing less than one third of the available groundfish."  NB Mem. at 27.  This claim completely ignores the extensive analysis of biological, economic, and social impacts contained in the FEIS, not to mention the analysis specifically prepared for Framework Adjustment 44.  *See e.g.,* AR 948 at 55953-75, 55992-6004, 56014-18.  Moreover, the only specific "impacts" that Plaintiffs reference in support of this claim are remote and speculative, and thus properly omitted from consideration in the FEIS.

An EIS must consider an environmental effect only if there is "a reasonably close causal relationship" between the effect and the agency action at issue. *Public Citizen*, 541 U.S. at 767 (internal quotation marks omitted). The Supreme Court has "analogized this requirement to the familiar doctrine of proximate cause from tort law." *Id.* In this regard, NEPA does not require agencies to attempt to analyze effects that are susceptible to innumerable intervening occurrences that could break the causal chain leading from the federal action at issue. *See Metropolitan Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 772-774 (1983).

Here, the New Bedford Plaintiffs claim the FEIS violated NEPA because it did not address the alleged (1) loss of protein to consumers, including adverse health effects and costs, and diminished likelihood that they will reacquire taste for fish; (2) impacts of increased land-based protein, including potential loss of rain forests and run off from agricultural production into streams; (3) negative impact of increased domestic demand for foreign seafood, much of which is not harvested sustainably. NB Mem. at 27.

First, any argument concerning these alleged impacts should be rejected because Plaintiffs failed to raise these concerns in their comments to the draft EIS. *See Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.,* 435 U.S. 519, 553 (1978) (noting that it is "incumbent upon intervenors who wish to participate to structure their participation so that it is meaningful, so that it alerts the agency to the intervenors' position and contentions.").[47]

Second, any connections between Amendment 16 and these alleged impacts are far too attenuated to fall within NEPA's sphere. *See Metropolitan Edison*, 460 U.S. at 772-774. Indeed, Plaintiffs do not even attempt to draw a causal chain between these alleged impacts and

---

[47] *See also Public Citizen,* 541 U.S. at 764-65 (parties forfeited objection to the environmental assessment on the ground that it failed adequately to discuss potential alternatives because none of them raised this particular objection in their comments); *Valley Citizens for a Safe Env't v. Aldridge,* 886 F.2d 458, 469 (1st Cir. 1989) ("[T]he time to complain, and to complain clearly, about methodology was at the comment stage, not two years later after the EIS was complete.").

Amendment 16, perhaps because doing so necessarily would illustrate their remote, speculative, and attenuated nature.[48]   Furthermore, the FEIS provides a reasoned basis for the scope and geographic extent of its impact analysis, *see* AR 773 at 48555-57, and that determination of the proper scope and extent of analysis is due deference from the Court.  *Kleppe v. Sierra Club*, 427 U.S. 390, 413–14 (1976); *Neighbors of Cuddy Mountain v. Alexander*, 303 F.3d 1059 (9th Cir. 2002).  NEPA is intended to impose a manageable, not unlimited, obligation to consider effects proximately caused by a proposed action.  *Public Citizen*, 541 U.S. at 767-768; *Metropolitan Edison*, 460 U.S. at 774.  The New Bedford Plaintiffs' argument runs afoul of this "rule of reason" and should be rejected.

### C.      Mr. Lovgren's Fifth Amendment claim must fail.

#### 1.      Mr. Lovgren's Fifth Amendment claim should be dismissed because an adequate statutory remedy exists.

Mr. Lovgren's Fifth Amendment due process claim reprises his Magnuson-Stevens Act claims and, therefore, should be dismissed. Non-statutory causes of action are rarely implied when a statutory remedy exists. *Correctional Servs. Corp. v. Malesko*, 534 U.S. 61, 68 (2001); *see also Am. Ass'n of Commodity Traders v. Dep't of Treasury*, 598 F.2d 1233, 1236 n.2 (1st Cir. 1979) ("[j]udicial remedies are implied from the Constitution only when there is no direct means for redress already available"); Defs. Opp., Docket No. 28, at 13-15.[49] The Magnuson-Stevens Act, which subjects NMFS's determination to judicial review under the APA, provides a statutory remedy for alleged constitutional violations. 16 U.S.C. § 1855(f); 5 U.S.C. § 706(2)(B),

---

[48] For example, in alleging adverse health impacts associated with the loss of protein available to consumers, Plaintiffs fail to provide any comparison between the alleged loss of protein resulting from Amendment 16 and the total amount of protein available in the market place to supply consumers.  Plaintiffs' assertion concerning harm to "rainforests" is similarly specious – indeed, Plaintiffs do not even bother to reveal where these allegedly impacted "rainforests" are located.

[49]  The New Bedford does not move for summary judgment on its due process claim, which is based on similar allegations, NB 1st Am. Compl., Docket No. 4, at ¶¶ 61-63, and should be likewise dismissed.

(D). Thus, the Court may afford substantial relief under the APA, and Mr. Lovgren's claims must be dismissed. *See, e.g.*, *Commodity Traders*, 598 F.2d at 1236 n.2; *Sky Ad, Inc. v. McClure*, 951 F.2d 1146, 1148-49 (9th Cir. 1991) (upholding dismissal of due process claim because, among other things, the availability of APA remedies precluded the constitutional claim).[50]

## 2.   Mr. Lovgren may not amend his Complaint through briefing to allege a takings claim.

In his memorandum, unlike in his Complaint, Mr. Lovgren asserts both a procedural due process claim and a takings claim. Lov. Mem. at 8-9; Lov. Compl. at ¶ 44 (asserting only a due process claim related to the agency's use of allegedly flawed landings data). Mr. Lovgren may not amend his Complaint through briefing to allege, for the first time, a takings claim. *See Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998); *Steeves v. City of Rockland*, 600 F. Supp. 2d 143, 179 (D. Me. 2009); *see also In re 2007 Novastar Fin.*, 579 F.3d 878, 884 (8th Cir. 2009) (affirming denial of leave to amend without a proposed amended complaint).[51]

## 3.   Mr. Lovgren does not allege a Fifth Amendment claim.

Even if the Court chooses to address it, Mr. Lovgren's Fifth Amendment claim fails because he does not identify a property interest. *See Board of Regents v. Roth*, 408 U.S. 564, 569 (1972); *Aponte-Rosario v. Acevedo-Vila*, 617 F.3d 1, 9 (1st Cir. 2010) (explaining that a property interest is a predicate to a due process claim); *Am. Pelagic Fishing Co. v. United States*, 379 F.3d

---

[50] Additionally, a plaintiff may only bring a stand-alone due process claim against a federal official in his individual capacity, *see Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971); *FDIC v. Meyer*, 510 U.S. 471, 486 (1994) (*Bivens* claims are unavailable against federal agencies); *Rivera v. Riley*, 209 F.3d 24, 28 (1st Cir. 2000). Mr. Lovgren names Gary Locke in his *official* capacity, Lov. Compl., 3:10-cv-02162, Docket No. 1, at ¶ 14, which is another reason the claim should be dismissed. *See Rivera*, 209 F.3d at 28.

[51] Even if the Court does allow this amendment through briefing, the takings claim, like the due process claim, is a Magnuson-Stevens Act claim dressed up as a violation of the Constitution and should be dismissed. Furthermore, Mr. Lovgren may proceed with his takings claim before this Court only if he seeks money damages (not equitable relief) and stipulates that he seeks $10,000 or less. *See* 28 U.S.C. §§ 1491(a)(1) (Tucker Act) (vesting jurisdiction for takings claims over $10,000 in the Court of Federal Claims); 1346(a)(2) (Little Tucker Act); *Roedler v. U.S. Dep't of Energy*, 255 F.3d 1347, 1351 (Fed. Cir. 2001). Lastly, the proper defendant in Tucker Act cases is the United States, which Mr. Lovgren does not name. *See* 28 U.S.C. § 1346(a)(2).

1363, 1374 (Fed. Cir. 2004) (holding that the plaintiff had no Fifth Amendment takings claim because it did not possess a property right in fishing permits or in an authorization letter allowing it to fish in a particular manner); *General Category Scallop Fishermen v. U.S. Dep't of Commerce*, 720 F. Supp. 2d 564, 575-76 (D.N.J. 2010) (holding that plaintiffs failed to establish a due process or takings claim based on a right to fish under an FMP), *appeal docketed* 10-2341 (3d Cir.). Amendment 16 does not create property rights in fishing history. As the agency explained in promulgating the regulations to implement it, "sector allocations are temporary, changeable, and do not constitute a property right in the most common use of the term, or even an allocation of fishing privileges, as such terms are used in the Magnuson-Stevens Act." 75 Fed. Reg. at 18,291. Likewise, the Act provides that even permits do not create property rights or create rights to pre-harvest fish.  16 U.S.C. § 1853a(b) (2010) (a limited access system does not create a right to compensation); 16 U.S.C. § 1853(d)(3)(D) (2000) (same). And, even if Mr. Lovgren had identified a protectable liberty or property interest, he was not denied due process because, as already discussed, NMFS's procedural protections were adequate to correct errors. *See Mathews v. Eldridge*, 424 U.S. 319, 335 (1976) (holding that a plaintiff must prove that the procedures available were inadequate). The Constitution requires no more than a fair process to contest the deprivation of a property interest. *Aponte-Rosario*, 617 F.3d at 10.

In sum, Mr. Lovgren's due process claim must be dismissed in favor of review under the Magnuson-Stevens Act and, even if the Court chooses to entertain his due process or his newly asserted takings claim, Defendants' Cross-Motion for Summary Judgment should be granted as Mr. Lovgren has not properly alleged or established either of them.

### D.     NMFS complied with the Regulatory Flexibility Act.

Several of the Plaintiffs and the *amici* argue that NMFS violated the Regulatory

Flexibility Act ("RFA") when it approved Amendment 16.[52]  NB Mem. at 27-28; Lov. Mem. at

17-18; Am. Mem. at 7 n.5.  In particular, Amendment 16 requires sectors to conduct their own

dockside and at-sea monitoring, as we discuss above, and the Plaintiffs and *amici* claim that the

costs of that monitoring are unlawful under the RFA because they are "overly burdensome,"

"clearly excessive[,] and not justifiable."[53]  Am. Mem. at 7 n.5; NB Mem. at 27-28.

The RFA, like NEPA, is "purely procedural."  *See, e.g., Associated Fisheries of Maine v.*

*Daley*, 127 F.3d 104, 114 (1st Cir. 1997); *A.M.L. Int'l v. Daley*, 107 F. Supp. 2d 90, 105 (D.

Mass. 2000); *North Carolina Fisheries Assoc. v. Gutierrez*, 518 F. Supp. 2d 62, 95 (D.D.C.

2007).  It does not prohibit regulations from having adverse economic effects on small entities or

even require agencies to minimize those effects.  *Id.*  But it does require an agency to conduct a

"regulatory flexibility analysis" whenever it proposes a rule that will have "a significant

economic impact on a substantial number of small entities."  5 U.S.C. §§ 601(6), 603, 605(b).

The agency must prepare an "initial regulatory flexibility analysis" ("IRFA") when it publishes

the proposed rule and a "final regulatory flexibility analysis" ("FRFA") when it publishes the

final rule.  *Id.* §§ 603(a), 604(a).  That analysis must identify the "small entities" that will be

affected, *id.* § 603(b)(3), describe the "proposed reporting, recordkeeping and other compliance

---

[52] The standard of judicial review under the RFA is one of "reasonableness," not "mathematical exactitude." *Associated Fisheries of Maine*, 127 F.3d at 114.  The court examines only whether the agency "made a reasonable, good-faith effort to carry out the mandate of section 604."  *Id.*

[53] To the extent that New Bedford is also trying to pursue these claims under the Paperwork Reduction Act, NB Mem. at 28, the Court does not have the jurisdiction to hear such claims because that Act does not create a private right of action or include a waiver of sovereign immunity.  *See, e.g., Springer v. IRS*, 231 Fed. Appx. 793 (10th Cir. 2007); *Al-Sharif v. Bradley*, No. 07-50, 2008 WL 410364, at *4 (S.D. Ga. Feb. 12, 2008); *Springer v. United States*, 447 F. Supp. 2d 1235, 1239 (N.D .Okla. 2006); *Association of American Physicians & Surgeons, Inc. v. United States Dep't of Health & Human Servs.*, 224 F. Supp. 2d 1115, 1129 (S.D. Tex. 2002), *aff'd*, 67 Fed. Appx. 253 (5th Cir. 2003).

requirements of the proposed rule," *id.* § 603(b)(4), and explain "the steps the agency has taken to minimize the significant economic impact on small entities consistent with the stated objectives of the applicable statutes," *id.* § 604(a)(6).

Here, NMFS complied with the RFA.[54]  It prepared IRFAs and FRFAs for these actions. AR 874 at 50683 (IRFA for Amendment 16); AR 882 at 51287-90 (IRFA for Framework 44); AR 863 at 50423 (IRFA for sector operations rule); AR 997 at 56529-32 (FRFA for Amendment 16); AR 996 at 56482 (FRFA for sector operations rule); AR 1001 at 56727 (FRFA for Framework 44); *see also* AR 773 at 48616-23.  It identified the small entities that would be affected, described the reporting, recordkeeping, and other compliance requirements of the proposed rule, and explained the steps that it had taken to minimize the economic effects of Amendment 16 on small entities.  *See, e.g.,* AR 997 at 56529-32.

NMFS did everything that the RFA required it to do.  The Plaintiffs' and *amici's* argument that sector monitoring costs are "overly burdensome" and "clearly excessive" is irrelevant under the RFA because the RFA is a procedural statute with no substantive standards. Those claims are also not true: these monitoring costs are not "excessive" because NMFS found that they are essential to the successful operation of the sector program (and the economic benefits that it offers).  AR 997 at 56510, 56515.  For all of these reasons, the Court should reject the Plaintiffs' RFA claims.[55]

---

[54] Mr. Lovgren claims that NMFS did not follow other procedures required by the RFA.  Lov. Mem. at 17-18. These claims are false: for example, NMFS did include Amendment 16 in a regulatory agenda published in the Federal Register, as required by the RFA.  74 Fed. Reg. 64,182, 64,184-85 (Dec. 7, 2009); 5 U.S.C. § 602(a).  And NMFS did transmit its IRFA to the Small Business Administration for comment.  AR 868 at 50644; 5 U.S.C. § 603(a).  In any event, the RFA plainly excludes compliance with these provisions of the Act from judicial review, so the Court does not have jurisdiction to hear Mr. Lovgren's claims.  5 U.S.C. § 611(a)(2).

[55] Similarly, Mr. Lovgren complains that the Federal Defendants have failed to comply with the Congressional Review Act, Lov. Mem. at 18, when the record shows that they have, AR 776 at 48854-59.  He claims that they have violated Executive Order 12866, Lov. Mem. at 18-19, which creates no private right of action, and which the agency complied with, AR 754 at 47513; *see also* AR 997 at 56528; AR 996 at 56481; AR 1001 at 56727.  And he argues that the Federal Defendants have violated the Freedom of Information Act ("FOIA"), Lov. Mem. at 19-20,

## V.       CONCLUSION

For the reasons set out above, NMFS's approval of Amendment 16 should be upheld and summary judgment on all of the Plaintiffs' claims should be entered on behalf of the Federal Defendants.

Respectfully submitted this 28th day of January, 2011,

IGNACIA S. MORENO, Assistant Attorney General
United States Department of Justice
Environment & Natural Resources Division
SETH M. BARSKY, Section Chief

/s/ James A. Maysonett
_____
JAMES A. MAYSONETT, D.C. Bar 463856
ANDREA E. GELATT
Wildlife & Marine Resources Section
Environment & Natural Resources Division
U.S. Department of Justice
P.O. Box 7369
Washington, D.C. 20044-7369
Tel:  (202) 305-0216 | Fax:  (202) 305-0275
Email:  james.a.maysonett@usdoj.gov

THOMAS CLARK
Acting Section Chief
BRIAN A. MCLACHLAN
D.C. Bar No. 472413
Trial Attorney
Natural Resources Section
Environment & Natural Resources Division
United States Department of Justice
c/o NOAA/DARC, NW
7600 Sand Point Way, N.E.
Seattle, WA  98115
Tel: (206) 526-6881
Fax: (206) 526-6665
brian.mclachlan@usdoj.gov

Counsel for Federal Defendants

---

but he does not even claim that he has submitted a FOIA request for whatever documents it is that he is seeking.  All of these claims are meritless.

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing was served today via the Court's CM/ECF system on all counsel of record.

/s/ James A. Maysonett

_____

JAMES A. MAYSONETT