# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| THE CITY OF NEW BEDFORD, et al., | |
| Plaintiffs, | 1:10-cv-10789-RWZ |
| v. | |
| GARY LOCKE, et al., | **Federal Defendants' Response to Food & Water Watch, Inc.'s** *Amicus* **Brief, Docket No. 87-1** |
| Defendants. | |
| | |
| LOVGREN, et al., | |
| Plaintiffs, | |
| v. | |
| GARY LOCKE, et al., | |
| Defendants. | |

**Table of Contents**

I. Introduction ........................................................................................................................... 1

II. Argument .............................................................................................................................. 1

   A. The agency properly concluded that the referendum requirement for IFQs in fisheries managed by the New England Council does not apply to the sector allocation in the groundfish fishery. ...................................................................................................................................... 1

   B. Food & Water Watch's NEPA Arguments are Without Merit ........................................... 5

      1. The FEIS complied with NEPA in its evaluation of alternatives. ................................. 6

      2. The FEIS adequately evaluated environmental impacts. ............................................... 9

III. Conclusion .......................................................................................................................... 12

**I.     INTRODUCTION**

Food and Water Watch, Inc. ("FWW") filed its original memorandum in support of summary judgment on December 1, 2010, Docket No. 67 ("FWW (1st) Mem."), before the Court had resolved its motion for intervention.  The Federal Defendants responded to FWW in our consolidated memorandum on summary judgment on January 28, 2011.  Docket No. 76 ("Def. Opp.").  After those briefs were filed, the Court denied FWW's motion for intervention and struck its original memorandum, but gave FWW leave to file a 20-page *amicus* brief.  Docket No. 78.  On February 18, 2011, FWW submitted a revised 25-page *amicus* brief (with a motion for leave to file) that also responds to many of the arguments made in our consolidated memorandum.  Docket No. 87-1 ("FWW Rev. Mem.").  In this brief, the Federal Defendants respond to the new arguments made by FWW in its revised *amicus* brief.  For the remaining arguments, which FWW had already presented in its original (now struck) brief, the Federal Defendants hereby incorporate by reference the responses set out in our consolidated memorandum, Docket No. 76.

**II.    ARGUMENT**

> **A.    The agency properly concluded that the referendum requirement for IFQs in fisheries managed by the New England Council does not apply to the sector allocation in the groundfish fishery.**

As noted in Federal Defendants' Opposition, because sectors are flexible, transient entities that do not receive a fixed allocation of fish or "permit," they are not individual fishing quotas ("IFQs" or a limited access privilege program ("LAPP") as defined in the statute. *See* 16 U.S.C. § 1802(23), (26); *see also* FWW Rev. Mem. at 8 n.15 (suggesting that Defendants properly concluded that sectors are not IFQs). Consequently, the referendum requirement does not apply to sectors.

1

Additionally, the potential sector contribution ("PSC") that vessels bring to a sector is fished for the benefit of the sector, and sector members are jointly liable for sector overages, such that fishers do not, contrary to FWW's argument, hold a "catch allowance" in the form of a PSC for their "exclusive use."[1] *Cf.* 16 U.S.C. 1802(23) (defining IFQ); *see* 75 Fed. Reg. 18,114 (sector members may also be jointly and severally liable for discarding of legal-sized fish and misreporting of catch); 75 Fed. Reg. at 18,277 (same). Likewise, a sector may carry into the next year any unused annual catch entitlement for particular stocks even if some of the sector's vessels have since left the sector, *see* 50 C.F.R. § 648.87(b)(1)(i)(C), further reinforcing the idea that the annual catch entitlement of a sector is shared for the benefit of the sector, not for the exclusive use of the individual vessel.[2] *See also* 50 C.F.R. § 648.87(b)(1)(iii)(B)(1) (explaining that a vessel may have its PSC reduced temporarily on the basis of a sector overage, regardless of its own catch). These provisions, combined with the plain language of the statute, support the agency's reasonable interpretation that the sectors in the groundfish fishery are neither LAPPs nor IFQs and that the referendum requirement does not apply. Lastly, the Court may analyze the language of the statutory exemption to the referendum requirement, 16 U.S.C. § 1853a(c)(6)(D)(vi), taking into account the agency's conclusion in 2007 as updated in the Federal Register notices promulgating Amendment 16, and note that, when Congress wrote an

---

[1] FWW argues that Defendants "downplay the significance of PSC by explaining that it is an attribute of the multispecies permit." *See* FWW Rev. Mem. at 9. Defendants' characterization of PSC is drawn from the text of Amendment 16. *See* 75 Fed. Reg. at 18,339 (describing PSC as "[t]he landings history for each permit includes all landings that can be attributed to that permit pursuant to this paragraph."); *id.* at 18,289 ("PSC is not a commodity or allocation unto itself that can be traded among vessels, but rather a characteristic of the permit. A permit's PSC can only be used to contribute to the ACE allocated to a sector through the participation of that permit in a particular sector.")

[2] On a somewhat related issue, FWW repeatedly argues in its brief that sector vessels "have the ability to purchase more quota . . . ." FWW Rev. Mem. at 5; *see also id.* at 6. This is not true—the total amount of quota allocated to all sectors and the common pool is fixed. Amendment 16 does allow sectors to trade their "annual catch entitlement" with other sectors. AR 997 at 56567 (codified at 50 C.F.R. § 648.87(b)(1)(viii)). Similarly, vessels in the common pool may trade their "days-at-sea." 50 C.F.R. §§ 648.82(k), (l). But the regulations do not allow sector vessels to simply buy "more quota" as FWW claims.

2

exemption for sector allocations into the statute, the only "sector allocation" in the fisheries managed by the New England Council or the Gulf of Mexico Council was the one currently at issue in the Northeast groundfish fishery.[3]

To try to complicate this simple analysis, FWW appears to have shifted positions slightly on whether the *Chevron* framework is appropriate to address any issues of statutory ambiguity in this case. *Compare* FWW (1st) Mem, Docket No. 64, at 9. But, as Defendants have already argued, while *Chevron* deference is appropriate, in any event, whether the Court uses the *Chevron* or the *Skidmore* framework, it should uphold the agency's reasonable interpretation of the relevant statutory provisions to conclude that sectors are not IFQs or LAPPs and that the referendum requirement for certain fisheries in the Northeast does not apply to Amendment 16. *See* Def. Opp. at 15-16.

FWW also attempts to discern a legislative intent to interpret the referendum requirement rather than applying the plain statutory language. *Cf. Rodriguez v. American Intern. Ins. Co. of Puerto Rico*, 402 F.3d 45, 49 (1st Cir. 2005) (reversing district court that held in favor of plaintiffs because of generalized notions of legislative intent rather than construing plain language of the statute); *United States v. Soto-Beniquez*, 356 F.3d 1, 27 (1st Cir. 2003) (refusing to entertain arguments based on legislative intent that defendants had not committed a crime when the facts of the offense constituted a crime as indicated by the plain statutory language). FWW argues that a referendum was provided so that "smaller-scale fishermen can have a voice in the fishery management scheme," without citation to relevant legislative history. *See* FWW Rev. Mem. at 2, 6, 11-12. Given that, as FWW acknowledges, the sector allocation exemption

---

[3] FWW acknowledges that "[i]n the absence of direct legislative history, it is reasonable to conclude that Congress intended 'sector allocation' to be defined as used at the time in existing regulatory schemes, such as the already existing sector allocations, or future programs that implement similar sector allocations." *See* FWW Rev. Mem. at 11 n.21.

3

from referendum provision was inserted at the last minute without explanation, arguments about legislative intent sit uncomfortably against plain statutory language and a regulatory history that expressly exempts "sector allocations" from the requirement.[4]

Lastly, FWW argues that Defendants are making a post-hoc rationalization in arguing that Amendment 16 sectors are extensions of Amendment 13 sectors such that the referendum requirement does not apply.[5] In contrast, in 2007, the agency reviewed the issue of whether the sector allocation then in the groundfish fishery (that is, the sector allocation adopted in Amendment 13) was exempt from the referendum requirement in 303A(c)(6)(D) because of the statutory exemption for "sector allocation." After a thorough review, the agency concluded that this exemption applied both because the 2006 Amendments did not disturb any "sector allocation" in effect prior to the effective date of the amendments, *see* AR 103 (citing Section 303A(h)), and because it was reasonable to interpret the term "sector allocation" in Section 303A(c)(6)(D), the provision exempting a "sector allocation" from the referendum requirement, as applying to the sector allocation in the groundfish fishery. The agency incorporated this

---

[4] FWW argues that one of the House Reports, issued on a bill related to the one that eventually became the law reauthorizing the Magnuson-Stevens Act, suggests that the referendum requirement was passed to ensure equity to all participants. *See* FWW Rev. Mem. at 11. First, the section of the report cited is that of the dissenting view. Second, the dissenters seemed concerned primarily that any limited-access privilege program would privatize public resources because "LAPP holders could retain their permits forever." *See* H.R. Rep. No. 109-567, at 88 (2006). This concern was addressed in the version of the bill that became law. *See* 16 U.S.C. § 1853a(f) (LAPP permits last no longer than ten years). And, as sectors are assigned annual catch entitlement annually based on a changing arrangement of vessels, they represent allocations of catch of even shorter duration than LAPP permits. The section of the Senate report cited by FWW does not directly discuss the referendum requirement. *See* S. Rep. No. 109-229, at 9 (2006).

[5] Again, FWW asserts that the method by which a portion of the total catch allocated to the groundfish fishery was distributed to the sector authorized under Amendment 13 is different than the method currently used. *See* FWW Rev. Mem. at 13 n.25. In Amendment 13, as in Amendment 16, there is no preliminary, separate allocation of ability to fish to any individual vessel based on its landing history before the sector is given its annual catch entitlement. *See* 69 Fed. Reg. at 22,915 (Apr. 27, 2004) (Amendment 13) (describing the calculation of each vessels' accumulated landings for the previous six fishing years and then summing those accumulated landings across all vessels who have decided to participate in a sector); 75 Fed. Reg. at 18,276 (Amendment 16). Also, contrary to FWW's suggestion, Amendment 13 did not require that sectors be unified by gear type or targeted fish or limit the number or size of sectors that could be authorized. *See* 69 Fed. Reg. at 22,943 (Amendment 13: describing the sectors as "self-selecting" and noting that the sector allocation may be used to "apportion part or all of groundfish fishery resources to various industry sectors.")

analysis into the final rule for Amendment 16, noting that nothing in Amendment 16 changed those conclusions. *See* 75 Fed. Reg. at 18,290. Defendants' arguments therefore echo the agency's longstanding position that sectors in the groundfish fishery are not LAPPs or IFQs or subject to the referendum requirement.[6] For all the foregoing reasons as well as the reasons in Federal Defendants' Opposition, the agency reasonably concluded that sectors, or the PSC used to calculate their annual catch entitlement, were not IFQs subject to the referendum requirement.[7]

### B.     Food & Water Watch's NEPA Arguments are Without Merit

Food & Water Watch contends that Defendants violated the National Environmental Policy Act ("NEPA") by approving Amendment 16 because Defendants allegedly (1) failed to consider reasonable alternatives to the sector measures and (2) failed to adequately analyze reasonably foreseeable adverse environmental impacts.  FWW Rev. Mem. at 16.  Defendants' consolidated memorandum (Docket No. 76) demonstrated that these claims are without merit and that NMFS fully complied with NEPA by evaluating, *inter alia,* a range of reasonable alternatives in the final environmental impact statement ("FEIS"), and by taking a "hard look" at the environmental consequences of those alternatives.  *See* Def. Opp. at 60-79.  Accordingly, Defendants briefly respond below to the new contentions set forth in Food & Water Watch's revised amicus brief.

---

[6] And, as FWW notes, even if the government had failed to make the argument in the past, which is not the case here as argued immediately above, a position articulated for the first time in a legal brief may be accorded deference. *See Chase Bank USA, N.A.  v. McCoy*, No. 09-329, --- S.Ct. ---, 2011 WL 197641, at *8 (Jan. 24, 2011) (deferring to agency interpretation provided in an *amicus* brief); *Auer v. Robbins*, 519 U.S. 453, 462 (1997).

[7] Federal Defendants note that FWW confines its arguments regarding the LAPP requirements to the alleged applicability of referendum requirement.

### 1. The FEIS complied with NEPA in its evaluation of alternatives.

FWW argues that Defendants violated NEPA because they did not evaluate the "full spectrum" of alternatives available to address the problem of overfishing. FWW Rev. Mem. at 17. In so arguing, FWW contends that it is "misleading" to take into account the wide range of alternatives evaluated in the FEIS, because these alternatives do not concern "effort control measures," and are thus "irrelevant" to whether the agency evaluated alternatives to the sector management system. *Id.*

FWW's argument fails for a number of reasons. First, it myopically focuses only on the sector measures evaluated in the FEIS and ignores the fact that the FEIS considered a broad and complex suite of non-sector measures and alternatives that were designed to address overfishing while providing opportunities to target healthy stocks. AR 773 at 47762; *id* at 47762-67 (summary of proposed measures); *id.* at 47773-76 (summary of alternatives evaluated). Courts apply a "rule of reason" in evaluating an agency's selection of alternatives – the "touchstone" being whether the EIS's "selection and discussion of alternatives fosters informed decision-making and informed public participation." *Headwaters, Inc. v. Bureau of Land Mgmt.*, 914 F.2d 1174, 1180 (9th Cir. 1990) (internal citation omitted). Moreover, faced with a complex fishery management plan and numerous possible management options, "the agency ha[d] discretion to choose a manageable number of alternatives to present a reasonable spectrum of policy choices that meet the goals of the action." *Oceana, Inc. v. Evans*, 384 F. Supp. 2d 203, 241-42 (D.D.C. 2005). Here, by evaluating numerous measures and alternatives in the FEIS, including non-sector measures and alternatives, the FEIS presented a reasonable spectrum of policy choices that satisfied the standard for informed decision-making and public participation.

Second, the agency did in fact evaluate meaningful alternatives to the sector measures eventually adopted in Amendment 16.  For example, the FEIS evaluated: (1) not allowing certain permits to join sectors; (2) not allowing allowable catch entitlement transfers between sectors; (3) different options for sector enforcement and monitoring requirements; and (4) three alternatives for calculating potential sector contributions.  AR 773 at 47773 (summary of sector alternatives); *see id.* at 47940-50.  And, of course, the FEIS also evaluated not revising the sector measures (the "No Action" alternative) that were then already in place in the FMP.  *Id.; see also id.* at 47972 (the No Action alternative provided for no additional sectors and no changes to the two existing sectors).  Moreover, in addition to the sector measures, the FEIS also evaluated alternatives to the Days at Sea effort control management measures.  *Id.* at 47773-74 (summarizing alternatives considered regarding Days at Sea transfer and leasing program and concerning non-sector effort control measures designed to control fishing mortality).  The FEIS thus presented a reasonable range of alternatives to the sector measures eventually adopted in Amendment 16.

Third, FWW argues that Defendants had an obligation to consider management alternatives suggested by the public and that the record does not provide a reasoned explanation for not considering certain proposed alternatives in detail.  FWW Rev. Mem. at 18.  In support, FWW contends that "[u]pon thoroughly searching the EIS," it found only a one sentence justification for not considering certain proposed alternatives – namely that the alternatives were "outside the scope of issues considered."  *Id.*

FWW's arguments are legally and factually in error.  NEPA regulations provide that "for alternatives which were eliminated from detailed study, [an EIS should] briefly discuss the

7

reasons for their having been eliminated." 40 C.F.R. § 1502.14(a).  Here, the FEIS did just that.

The FEIS explained:

> 5.4.2 Effort Control Alternatives
> During the course of developing alternatives for effort control measures designed to control fishing mortality from commercial vessels that do not join sectors, several alternatives were considered and rejected. One alternative eliminated all trip limits and relied on DAS reductions to reduce mortality. The Council was concerned that analysis of this alternative over-estimated the mortality reductions that would be achieved because the model was not correctly predicting changes in fishing behavior. A second alternative was rejected that would have implemented a large year-round offshore closure in the Gulf of Maine. This alternative was rejected because of concerns over inequitable economic impacts.
>
> 5.4.3 Alternative Management Systems
> As described in section 3.3, the scoping notice for this action solicited suggestions for alternative management systems to replace the effort control system first adopted in Amendment 5 in 1994. A number of ideas were suggested. These included an output-based system that proposed using a points-based currency to control harvest, an area management system, and an individual fishing quota system. The Council decided not to pursue these alternatives in this action because of concerns the design of the measures could not be completed in time. The Council intends to revisit these suggestions after submitting this amendment and may decide to pursue them in a future action.

AR 773 at 47977; *see also id.* at 47822 (explaining why IFQ and Point System proposals were not considered in detail in FEIS).  Furthermore, as detailed in Defendants' opening brief, the decision to exclude these proposals from detailed evaluation in the FEIS is supported by numerous documents in the record reflecting significant concerns that the alternative proposals feasibly could not be developed and evaluated as formal, fully analyzed alternatives in the timeframe necessary for implementation of Amendment 16.  *See* Def. Opp. at 65.

This determination of what was feasible within the timeframe governing Amendment 16 is due substantial deference under the Administrative Procedure Act's ("APA") standard of review and cannot be said to be a clear error of judgment.  *See Town of Winthrop v. Fed. Aviation Admin.,* 535 F.3d 1, 8 (1st Cir. 2008) ("An agency's decision is not arbitrary and capricious if that decision was based on consideration of the relevant factors and if it did not

8

commit a clear error of judgment."); *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.,* 462 U.S. 87, 103 (1983) (court generally must be "at its most deferential" when reviewing scientific judgments and technical analyses within the agency's expertise). Moreover, it comports with prevailing First Circuit law providing that "NEPA does not require discussion of the environmental effects of alternatives when those effects cannot be ascertained readily, and when the alternatives are only remote and speculative possibilities that cannot be meaningfully explored within the time-frame of the needs to which the underlying proposal is addressed." *Seacoast Anti-Pollution League v. Nuclear Regulatory Comm'n*, 598 F.2d 1221, 1229 (1st Cir. 1979); *see also Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 551 (1978) (range of alternatives that needs to be considered in an EIS is "bounded by some notion of feasibility"); *Oceana*, 384 F. Supp. 2d at 241-42 (where goals of action are complex and agency cannot consider every significant alternative in reasonable time period, agency has discretion to choose a manageable number of alternatives to present a reasonable spectrum of policy choices that meet the goals of the action).[8]

### 2. The FEIS adequately evaluated environmental impacts.

FWW contends that the FEIS is inadequate because it fails to assess the environmental impacts of the distribution of potential sector contribution allocations to vessels employing different gear types. FWW Rev. Mem. at 21. The gist of FWW's argument is that the FEIS "failed to make the connection between PSC distributions and an increase in the use of environmentally damaging fishing gear . . ." *Id.*

---

[8] FWW's attempts to distinguish *Seacoast Anti-Pollution League* and *Oceana* are unavailing. Both stand for the well-established proposition that the adequacy of an EIS and its discussion of alternatives is evaluated according to a practical "rule of reason" given the scope, purpose, and circumstances of the proposed action. *See e.g., Vermont Yankee,* 435 U.S. at 551 ("Time and resources are simply too limited to hold that an impact statement fails because the agency failed to ferret out every possible alternative . . .")

Defendants thoroughly refuted this claim in their opening brief. *See* Def. Opp. at 73-77. FWW's theory – that PSC distributions will lead to the increased use of environmentally damaging fishing gear – relies on a number of uncertain and speculative assumptions. Nonetheless, the FEIS directly addressed this concern. *See e.g.,* AR 773 at 48364 (noting, *inter alia,* that "analysis of biological impacts of sectors suggests that sectors may actually lead to less fishing effort as vessels operate more efficiently – if this occurs, then sectors might reduce the adverse effects of fishing on essential fish habitat, but there is limited data to determine if this will actually take place."). FWW may disagree with the FEIS's assessment, but it cannot be said that the FEIS failed to discuss this concern. Moreover, the FEIS's assessment of this technical matter is due substantial deference under the APA's standard of review, notwithstanding whether or not FWW agrees with it. *Baltimore Gas*, 462 U.S. at 103 (court must be "at its most deferential" when reviewing scientific judgments and technical analyses within the agency's expertise); *Associated Fisheries of Maine, Inc. v. Daley,* 127 F.3d 104, 110 (1st Cir. 1997) ("[A] reviewing court must afford special deference to an agency's scientific expertise where, as here, that expertise is applied in areas within the agency's specialized field of competence.").

Furthermore, the FEIS explains that the individual sectors are required to submit operation plans with accompanying NEPA environmental assessments to NMFS, and that "[a]ny changes in fishery regulations or fishing practices that may result on the basis of sector-based management will be addressed in the regulations that implement a particular sector, and in the EIS or EA corresponding to the creation or continuation of that sector." AR 773 at 47765. As anticipated by the FEIS, each of the individual sector operation plans was subject to additional NEPA environmental analysis, and those analyses are included in the record here. *See e.g.,* AR 901-13 at 52714-054857.

FWW asserts that evaluating the potential indirect biological impacts of sectors in these sector-specific environmental assessments is "insufficient because NEPA requires federal agencies to consider environmental impacts of an action before it occurs." FWW Rev. Mem. at 23. In so arguing, however, FWW overlooks the fact that the Amendment 16 FEIS did indeed consider the environmental impacts potentially resulting from transfers of annual catch entitlement from a sector that uses gear with few impacts to a sector that uses gear with more impacts based on the information then available. *See e.g.,* AR 773 at 48364. In doing so, it quite reasonably noted that additional environmental analysis would be prepared addressing changes in fishery practices occasioned by the sector measures when regulations for individual sectors were implemented (i.e., when additional details about a sector's specific fishing practices were known) and that these evaluations would tier to the Amendment 16 FEIS. *Id.*; *see also id.* at 48258.

Preparing a broad scale EIS for the amended FMP and then tiering subsequent environmental assessments to that EIS for implementation of the sector-specific operation plans is a reasonable approach to satisfying NEPA's requirements, and, indeed, one sanctioned by NEPA regulations. *See* 40 C.F.R. § 1502.20 ("Agencies are encouraged to tier their environmental impact statements to eliminate repetitive discussions of the same issues and to focus on the actual issues ripe for decision at each level of environmental review."); *see also* 40 C.F.R. §§ 1500.4(i), 1502.4(d), 1508.28. Moreover, because the sector-specific environmental assessments were prepared and submitted in conjunction with individual sector's implementing regulations, the environmental impacts of the sectors were indeed considered before any impacts occurred.

**III.     CONCLUSION**

For all of the reasons discussed above, Food and Water Watch has not shown that NMFS's decision to partially approve Amendment 16 was "arbitrary and capricious," and summary judgment on all of the Plaintiffs' claims should be entered on behalf of the Federal Defendants.

Respectfully submitted this 8th day of March, 2011,

IGNACIA S. MORENO, Assistant Attorney General
United States Department of Justice
Environment & Natural Resources Division
SETH M. BARSKY, Section Chief

/s/ James A. Maysonett
_____
JAMES A. MAYSONETT, D.C. Bar 463856
ANDREA E. GELATT
Wildlife & Marine Resources Section
Environment & Natural Resources Division
U.S. Department of Justice
P.O. Box 7369
Washington, D.C. 20044-7369
Tel:  (202) 305-0216 | Fax:  (202) 305-0275
Email:   james.a.maysonett@usdoj.gov

THOMAS CLARK
Acting Section Chief
BRIAN A. MCLACHLAN
D.C. Bar No. 472413
Trial Attorney
Natural Resources Section
c/o NOAA/DARC, NW
7600 Sand Point Way, N.E.
Seattle, WA  98115
Tel: (206) 526-6881
Fax: (206) 526-6665
brian.mclachlan@usdoj.gov

Counsel for Federal Defendants

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served today via the Court's CM/ECF system on all counsel of record.

/s/ James A. Maysonett
_____
JAMES A. MAYSONETT