UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 10-10789-RWZ

CITY OF NEW BEDFORD, *et al.*

v.

HONORABLE GARY LOCKE, *etc.*, *et al.*

ORDER

June 30, 2011

ZOBEL, D.J.

In 2009, the Department of Commerce introduced a trio of rules and regulations, Amendment 16, Framework 44, and the sector operations rule (collectively "A16"), that regulate fishing off the coast of New England and the mid-Atlantic states. The City of New Bedford along with other parties (collectively the "New Bedford Plaintiffs") challenged A16 in this court and plaintiff James Lovgren filed a similar suit in the District of New Jersey. The Lovgren suit was transferred here and consolidated with the New Bedford litigation. (Docket # 17.) The Secretary of Commerce Gary Locke (the "Secretary"), the National Oceanic and Atmospheric Administration and its administrator Jane Lubchenco, and the National Marine Fisheries Service ("NMFS") (collectively the "Agency"), are named as defendants, joined by intervenor the Conservation Law Foundation, Inc.

Plaintiffs have cast a dragnet in this litigation, woven from a multitude of alleged failings of A16. They argue that the Agency misinterpreted the law, relied on

inaccurate facts, and acted in an arbitrary and capricious manner in implementing A16, primarily in violation of the Magnuson-Stevens Act ("MSA") and the procedural directives of the National Environmental Policy Act ("NEPA"). Now pending are the parties' cross-motions for summary judgment. Their briefs are supplemented by memoranda of amici Congressmen Barney Frank and John Tierney, the Commonwealth of Massachusetts, and Food and Water Watch, Inc., all in support of plaintiffs, and the Georges Bank Cod Fixed Gear Sector, in support of Defendants.

**I.     Background**

The Northeast multispecies fishery includes 13 species of groundfish, divided into 20 stocks, located off the coasts of New England and the mid-Atlantic states. Administrative Record ("AR") 1001 at 56717-18. These stocks have been fished for centuries and annual output peaked at more than a quarter of a million tons in the 1960s. AR 320 at 19875. Since then, as fishing technology has improved, fishing has depleted stocks and output has declined precipitously, to less than 50,000 tons in the 1990s. Some of this reduction reflects changes in the geographical boundaries of the fishery and environmental factors, but there is no dispute that current harvests are substantially below long-term sustainable levels.

Congress enacted the MSA in 1976, amended in significant part by the Sustainable Fisheries Act in 1996 and the Magnuson-Stevens Reauthorization Act of 2006, to restore this fishery to robust health. 16 U.S.C. § 1801 et seq. The MSA directs the creation of eight fishery management councils, each council representing a coastal region. Id. at § 1852. The New England Fishery Management Council

("NEFMC") represents Maine, New Hampshire, Massachusetts, Rhode Island, and Connecticut, and has authority over the fisheries in the Atlantic ocean seaward of those states. Id. Each council is required to prepare and amend as necessary a fishery management plan ("FMP") containing "conservation and management measures . . . to prevent overfishing," 16 U.S.C. § 1853, consistent with 10 "National Standards" that set forth general principles such as fairness, efficiency, and concern for fishing communities, id. at § 1851(a). An FMP is submitted to the Secretary for approval, where it is evaluated by NMFS, after which it takes effect. Id. at § 1854. The target for an FMP is the "maximum sustainable yield" ("MSY"), see id. at § 1802(33)-(34), 50 C.F.R. § 600.310(b)(2)(i), the "largest long-term average catch or yield that can be taken from a stock or stock complex," 50 C.F.R. § 600.310(e)(1)(I). See AR 997 at 56488 (listing MSY for each groundfish stock).

The NEFMC adopted the Northeast Multispecies Fishery Management Plan in 1986 ("NEFMP"). It has been amended several times in the intervening years before A16, most recently in substantial part by Amendment 13 ("A13") in 2004. 69 Fed. Reg. 22906 (Apr. 27, 2004). The NEFMP has historically limited fishing through "days-at-sea" effort restrictions, which limit the effort that fishermen expend as a proxy for total fish caught. It has been partially effective; some overfished stocks have recovered while others have shown little or no improvement. AR 550 at 31537. As of the most recent assessment, in 2009, two Haddock stocks, Redfish, and American Plaice were rebuilt to MSY with sustainable mortality, while the majority of the other stocks were

both overfished and subject to overfishing.[1]  AR 773 at 47763; see AR 320 at 18989.
The Agency has determined that dramatic decreases in fishing mortality are necessary
to restore these stocks.  AR 773 at 64.

The three measures collectively referred to as A16 constitute the Agency's
revisions to the NEFMP to restore these overfished stocks to health.  A key part of this
amendment, and a focal point of contention in this lawsuit, is an expansion and revision
of the "sector" program introduced in A13.  Sectors are an alternative to days-at-sea
effort controls, whereby a group of fishermen jointly form a sector and are collectively
assigned a catch limit, an "Annual Catch Entitlement" ("ACE").  Fishermen who do not
join sectors continue to operate in the "common pool," subject to days-at-sea
constraints.  For two stocks, A16 also considers the annual catch of recreational
fishermen.

Under A16, each multispecies fishery permit holder is allocated a "potential
sector contribution" ("PSC") based upon its landings history.  AR 997 at 56500-01.
This is a proportional measure of the vessel's landing history relative to the total
landings over a given period of time for each stock.  PSC is not a limit on how much a
permit holder can catch.  If permit holders choose to join a sector, their PSCs are
aggregated to constitute the sector's ACE, a proportion of the total "Annual Catch Limit"
("ACL") for the entire commercial fishing sector which is a cap on annual harvest.  ACE

---

[1]Overfishing refers to a rate of mortality which exceeds MSY, while overfished refers to a biomass that is less than half that which would support MSY.  AR 320 at 18987.

4

may be traded between sectors. Sectors operate under various reporting requirements to ensure they do not exceed their ACE.

Amendment 16 implements this sector system and makes other changes to the NEFMP. AR 997. Framework 44 establishes the ACL for fishing years 2010-12. AR 1001. Sector ACEs for fishing year 2010 are implemented with the sector operations rule. AR 996. In 2010, 812 of 1477 permit holders joined one of 17 sectors. The sectors hold approximately 98% of the historical landings during the relevant PSC period. The recreational sector was allocated 27.5% of GOM haddock and 33.7% of GOM cod, but nothing of the other stocks.

## II.  Analysis

The standard of review for agency actions challenged under either the MSA or NEPA is that of the Administrative Procedures Act. 16 U.S.C. § § 1855(f); Dubois v. U.S. Dep't of Agric., 102 F.3d 1273, 1284 (1st Cir. 1996).

> The reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be – (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (D) without observance of procedure required by law.

5 U.S.C. § 706.

"An agency's decision is not arbitrary and capricious if that decision was based on consideration of the relevant factors and if it did not commit a clear error of judgment." Town of Winthrop v. FAA, 535 F.3d 1, 8 (1st Cir. 2008).

### A.    MSA

## 1. LAPP/IFQ

Plaintiffs dispute the Agency's conclusion that Amendment 16 does not create either a limited access privilege program ("LAPP") or an individual fishing quota ("IFQ"), two labels appearing in the MSA statute which, if applicable, trigger certain procedural and substantive protections. Initially, this dispute raises the threshold question of what deference is due to the Agency's interpretation of the MSA statute.

> When Congress has "explicitly left a gap for an agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation," and any ensuing regulation is binding in the courts unless procedurally defective, arbitrary or capricious in substance, or manifestly contrary to the statute.

United States v. Mead Corp., 533 U.S. 218, 227 (2001) (quoting Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 843-44 (1984)).

> "It is fair to assume generally that Congress contemplates administrative action with the effect of law when it provides for a relatively formal administrative procedure tending to foster the fairness and deliberation that should underlie a pronouncement of such force. Thus, the overwhelming number of our cases applying Chevron deference have reviewed the fruits of notice-and-comment rulemaking or formal adjudication."

Mead Corp., 533 U.S. at 230 (internal citations omitted).

Congress expressly delegated to the Secretary the authority to create FMPs. 16 U.S.C. §§ 1852(h), 1854. Amendment 16 to the NEFMP is the product of a highly formalized administrative procedure, including a notice-and-comment period. Id. at §§ 1852-54. Chevron deference is warranted.

IFQ and "limited access privilege" are both defined as a "federal permit" issued under a "limited access system" to harvest a quantity of fish representing a portion of

6

the total allowable catch of the fishery that may be held for exclusive use by a person. 16 U.S.C. § 1802(23) and (26). A "limited access privilege" is issued "under section 1853a" and "includes an individual fishing quota." Id. at § 1802(26). Section 1853a sets forth various requirements that a LAPP must satisfy before it may be approved by the Secretary and mandates that an IFQ program in the New England fishery be submitted to a referendum and receive 2/3 approval of fishery participants.

While it is a close call, I do not find that the Agency's conclusion that Amendment 16 implements neither a LAPP nor an IFQ, reached as part of the rulemaking process, see AR 864 at 50496-98 (FWW comment that the sector model is an IFQ and thus a LAPP); AR 997 at 56516 (Agency response to FWW comment), is manifestly contrary to statute. The agency reasons that fishermen are issued permits with an associated PSC, but that the PSC never operates as a limitation on how much the permit holder may catch and only acquires meaning when aggregated with other PSCs in a sector. AR 103; AR 997 at 56516. While a sector is, arguably, limited by an ACE to a quantity of fish within the meaning of the LAPP and IFQ definitions, sectors are "temporary, voluntary, fluid associations of vessels" that are not issued permits. AR 997 at 56499. Accordingly, there is no "permit . . . to harvest a quantity of fish." 16 U.S.C. § 1802(26).

It is literally true that the permit and the quantity limitation are assigned to different entities, but plaintiffs respond that it is a distinction without a difference: fishermen will, as a practical matter, be limited to the PSC they bring to a sector, making it a defacto quantity limitation, and to the extent a sector is so limited by

7

regulation, it is the equivalent of a permit. The effect on small-scale fishermen, plaintiffs reason, will be the same, and as the referendum requirement evidences a concern for these individuals, the sector program should be considered a LAPP.

The Agency, obviously, disagrees. It views the sector program as introducing flexibility compared to a quota or days-at-sea approach because input/effort restrictions are lifted and permit holders can allocate ACE however they prefer within a sector or transfer ACE between sectors. See, e.g., AR 901 at 52787-88; AR 1010 at 56758. On this mixed question of both statutory interpretation and the impact of sectors on the fishing industry, the court is bound by the Agency's informed conclusion, reached at Congress' express direction after an extended and formal administrative process including a notice-and-comment period.

The Agency's position that Amendment 16 is not an IFQ, subject to a referendum, binds this court for the additional reason that the statute excludes "sectors" from the referendum requirement, 16 U.S.C. § 1853a(c)(6)(D)(vi), and the Agency reasonably interpreted the exemption to apply to the A16 sector program, AR 997 at 56516. The sector exemption was introduced as part of a 2007 amendment to the MSA, after A13 was implemented. While "sector" is not defined in the statute, it is reasonable to infer Congress was referring to the existing A13 sector program, as it was the only sector program then managed by the NEFMC. There are, to be sure, differences between the A13 and A16 sector programs, but both apply quota-like allowable catch limits to sectors. 69 Fed. Reg. at 22914 (describing A13 sector regulations). It is not manifestly contrary to law to construe the "sector" exclusion as a

8

reference to the quota-like limits applicable to these sectors.

## 2. Overfishing in the Fishery

Plaintiffs raise a second issue of statutory interpretation. They argue that, contrary to the Agency's position, the statute requires a fishery to be managed only as an aggregate quantity, rather than in respect to individual stocks, when it comes to measuring MSY and the determination of overfishing. The issue arises because two of the groundfish stocks in the Northeast multispecies fishery are in robust health, while the remaining 20-odd stocks are either overfished or subject to overfishing. Conservation measures for these many threatened stocks have the practical effect of limiting catch for the two abundant stocks.

Plaintiffs' statutory argument relies, at core, on National Standard 1. "Conservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry." 16 U.S.C. § 1851(a)(1). "Fishery" means "(A) one or more stocks of fish which can be treated as a unit for purposes of conservation and management and which are identified on the basis of geographical, scientific, technical, recreational, and economic characteristics; and (B) any fishing for such stocks," 16 U.S.C. § 1802(13), and "overfishing" and "overfished" mean "a rate or level of fishing mortality that jeopardizes the capacity of a fishery to produce the maximum sustainable yield on a continuing basis," id. at § 1802(34). Plaintiffs read all of this together to mean that the focus is on the "fishery," which is multiple stocks of fish treated as a single unit. Thus, the measure of yield, in their view, is the aggregate of these stocks, not the health of

9

any individual stock.

While there is sufficient ambiguity in the above statutory language to encompass either the Agency's or the plaintiffs' interpretation, the rest of the MSA makes clear that the Agency must manage the health of individual stocks.[2]  National Standard 8 identifies "rebuilding of overfished stocks" as a conservation requirement.  Id. at § 1851(8).  A fishery management plan "shall" contain conservation measures "necessary . . . to prevent overfishing and rebuild overfished stocks," id. at § 1853(a), and "may" establish limitations necessary for conservation based on "species," id. at § 1853(b).  The Secretary is required to notify Congress when a fishery is overfished, and within one year the relevant Fishery Management Council must prepare a plan "to rebuild affected stocks of fish."  16 U.S.C. § 1854(e)(3).  The fishery must be rebuilt as quickly as possible, taking into account various factors including "the biology of any overfished stocks of fish," not to exceed 10 years, except where one of several conditions, including "the biology of the stock of fish," dictate otherwise.  Id. at § 1854(e)(4).  The Secretary is required to review such a plan at intervals not to exceed two years to determine if there has been adequate progress "rebuilding affected fish stocks."  Id. at § 1854(e)(7).

---

[2]It is unclear if plaintiffs rely, in part, on a provision in NMFS interpretive guidelines referred to as the "mixed stock exception," 50 C.F.R. § 600.310(m), which gives the NEFMC discretion to allow optimum harvesting of one stock that results in the overfishing of another if several conditions are met.  The choice to invoke this exception is "entirely within the province of the administrative agency and not with the court."  Mass. ex rel Div. of Marine Fisheries v. Gutierrez, 607 F. Supp.2d 284, 285 (D. Mass. 2009).  The Agency decided not to invoke the exception as part of the rebuilding strategy of A16.  AR 773 at 47838.

The Agency's interpretation is also longstanding and codified in regulation, and deserving of deference. Mead Corp., 533 U.S. at 228 (identifying consistency as a factor which weighs in favor of deference). "[M]anagement approaches to meet the objectives of National Standard 1" include guidance on criteria to determine if "stocks" are overfished and "rebuilding stocks." 50 C.F.R. § 600.310(b)(1). "The [MSA] . . . requires that . . the abundance of an overfished stock or stock complex be rebuilt." Id. at § 600.310(b)(2). Both the current and prior versions of the regulation define "overfishing" as "whenever a stock . . . is subjected to a rate or level of fishing mortality that jeopardizes the capacity of a stock . . . to produce MSY on a continuing basis." 50 C.F.R. § 600.310(d)(1)(ii) (1998); see 50 C.F.R. § 600.310(e)(2)(i)(B).

### 3. Fishery Impact Statement

An FMP must include a "fishery impact statement ["FIS"] . . . which shall assess, specify, and analyze the likely effects, if any, including the cumulative conservation, economic, and social impacts, of the conservation and management measures on, and possible mitigation measures for . . . participants in the fisheries and fishing communities affected by the plan or amendment." 16 U.S.C. § 1853(a)(9). National Standard 8 requires that conservation measures "take into account the importance of fishery resources to fishing communities by utilizing economic and social data . . . in order to (A) provide for the sustained participation of such communities, and (B) to the extent practicable, minimize adverse economic impacts on such communities." Id. at § 1851(a)(8).

Plaintiffs argue that the combined effect of the reduced ACL and the sector

11

program will be economically ruinous for fishermen and fishing communities, and therefore the Agency failed to "assess" the economic and social impacts of A16. The FIS requirement is, however, procedural, not substantive. The Agency, through the NEMFC, produced multiple, extensive environmental assessments that more than satisfy this procedural requirement. AR 773 48382-534 (A16 FEIS); AR 882 51221-250 (environmental assessment for Framework 44); AR 898-99, 901-913, 915-16 (environmental assessments for individual sectors).

It is also clear from the record that the Agency "took into account" this information. There is no dispute that the A16 policies instituted to rebuild fish stocks will have a negative short-term economic effect on the fishery. AR 773 at 47770. The Agency concluded that the sector program, which is not a conservation measure, would increase fishing efficiency and could ameliorate some of this harm. Id.; AR 1001 at 56728; see AR 773 at 48464-65; AR 996 at 56482-84. In the long-term, "economic benefits from rebuilt stocks would mean that this action would produce the most economic benefits to affected entities once stocks rebuild when compared to the alternatives considered in this action." AR 997 at 56532.

    **4.    Allocations**

A16 establishes PSC for all stocks other than GB Cod on the basis of permit landings from 1996-2006. For GB Cod, permits that participated in the A13 sectors have a PSC calculated on the basis of landings between 1996-2001, which was the period used to determine the sector allocation under A13, while other permits have a PSC calculated using the standard 1996-2006 time frame. Plaintiffs argue this

12

distinction is arbitrary and not "fair and equitable to all fishermen."  16 U.S.C. § 1851(a)(4).

The record shows that the Agency's allocation method is rational.  The Agency used this alternate allocation for GB Cod "to promot[e] stability in the fishery and foster[] an environment where sectors can create efficient and effective business plans."  AR 658 (letter from the NEFMC Executive Committee to the Secretary).  The 1996-2001 allocation "was the basis of [the A13 sectors'] operations and planning."  Id.; see AR 773 at 48593; AR 997 at 56518.  If their PSC were not fixed, they would "be forced to revisit their business plans as a result of other fishermen deciding to form sectors several years later, or due to a Council decision to revise sector policies."  AR 773 at 48593; see AR 997 at 56518.  The NEFMC similarly intends to freeze the catch history for the A16 sector permits as of sector implementation.  AR 997 at 56518.  The two tier calculation also results in only a modest shift in PSC, 2.1% more GB Cod for the A13 sector permits, AR 773 at 48433-34, which is too slight, given this reasonable goal of stability, to be considered unfair.

Plaintiffs also object to the allocation of ACL between the commercial and recreational fleets on the basis of their relative landings from 2001-2006.  A recreational allocation is made if the recreational catch exceeds 5% of total landings.  Only GOM Cod and GOM Haddock cross this threshold. The 2001-2006 time period was selected because of concern that earlier landings data for the recreational fleet was inaccurate and less representative of present utilization of the fishery.  AR 658; AR 997 at 56514.  The inaccuracy of this earlier data is not in dispute, and it provides a

13

rational justification for the Agency's decision. It is unclear from plaintiffs' briefing why they believe using the most accurate data is unfair.

### 5.     ACL

Plaintiffs argue, in conclusory fashion, that the ACLs for some stocks are overly conservative. A reviewing court should be most deferential where an Agency is making difficult scientific predictions in its area of special expertise. Baltimore Gas & Elec. Co v. Natural Res. Def. Council, Inc., 462 U.S. 87, 103 (1983). The Agency decided upon the A16 ACL methodology after a reasoned and scientifically grounded process, including the Groundfish Assessment Review Meeting, a year-long effort by at least 18 fishery scientists to assess the health of groundfish stocks. AR 773 at 47831-42; see AR 320 (GARM III report); AR 615 (recommendations of Scientific and Statistical Committee). The ACLs are not arbitrary.

### 6.     **Bycatch and Discards**

The New Bedford Plaintiffs separately object that bycatch and discards are not considered when calculating PSC, but are "assumed" and count against a sector's ACE. See AR 997 at 56565-66. They are assumed fleet-wide, however, only if a sector has inadequate monitoring to determine an actual sector-specific rate. AR 997 at 56502. There is also nothing arbitrary about holding fishermen accountable for bycatch and discards. See 16 U.S.C. § 1851(a)(9) (specifying that conservation

measures should "minimize bycatch").[3]

### 7. Database Data

Plaintiffs object that PSC was not calculated based "upon the best scientific information available" as required by National Standard 2. 16 U.S.C. § 1851(a)(2). Fishermen are required to submit a vessel trip report ("VTR") to NMFS for each landing. Dealers are also required to report their purchases. The database used to calculate PSC was populated with the dealer report data. There is no dispute that the database contains errors and plaintiffs argue that the dealers' original paper reports, not the database into which the information was later entered, provide the best available information.

There is, however, no evidence in support of plaintiffs' argument that the paper reports would be a more reliable source of information than the existent database. The paper reports would necessarily have to be entered into a new database, and the record does not indicate that data entry errors, as opposed to mistakes on the paper reports, are the reason for the database inaccuracies. Furthermore, the Agency advised permit holders to review their landing history data and submit requests, properly documented, for corrections. See, e.g., AR 555. The determination that this dealer report database, with corrections, is the "best data available," AR 997 at 56516, is not arbitrary.

---

[3]Plaintiff Lovgren argues that A16 does not comply with National Standard 9 because fishermen from the New York/New Jersey area will have to discard fish caught in Southern New England. He neither cites any evidence in support of this factual contention nor explains why such discards would result from A16.

### 8. Mid-Atlantic Region

The groundfish fishery extends into the geographic area of both the NEFMC and the Mid-Atlantic Fishery Management Council. By statute, the Secretary has the discretion to designate one council to prepare the fishery management plan, 16 U.S.C. § 1854(f), and has selected the NEFMC. Plaintiff Lovgren argues that the NEFMC did not involve or consider the needs of mid-Atlantic fishermen when preparing A16. This position finds no evidentiary support. To the contrary, the record contains numerous examples of input from, and consideration of, mid-Atlantic fishermen, including plaintiff Lovgren. Many such examples are set forth in the Agency's motion for summary judgment and they need not be cited again here. See Fed'l Def. Mot. for Summ. J. at 56-58, Docket # 76.[4]

### B. NEPA

NEPA creates various procedural requirements for federal actions such as A16. It requires "in every . . . report on . . . major Federal actions . . . a detailed statement" addressing several considerations, including "alternatives to the proposed action." 42 U.S.C. § 4332(2)(C)(iii). This section must "briefly discuss the reasons [why an alternative was] eliminated." 40 C.F.R. § 1502.14. Plaintiffs object that the Agency failed to consider alternatives, in particular, the "point system."[5]

---

[4] The citation therein on page 57 to AR 773 at 04279 is incorrect. See AR 773 at 48534-48546, 48550.

[5] Plaintiff Lovgren also objects that A16 violates NEPA because the A16 FEIS does not adequately address the effect on mid-Atlantic fishermen. That argument fails in the NEPA context for the same reason it failed under the MSA.

The Agency considered numerous alternatives to the measures adopted in A16. AR 773 at 47773-76; 47927-78. One alternative considered early in the process, during the "scoping" period when the NEFMC was "select[ing] a range of alternatives to be considered and analyzed," AR 18 at 4461, was the point system. See AR 59 at 5876, 5888-92. The NEFMC elected to defer consideration of the point system and other options until Amendment 17, AR 773 at 47822, "because of concerns the design of the measures could not be completed in time," AR 773 at 47977.

The determination to defer consideration of the point system was not arbitrary. Early in the process, the NEFMC Multispecies oversight committee identified specific concerns as to how a point system would integrate with existing management systems including sectors and be correlated with hard catch limits, such that "it was not clear which of the alternative systems would meet Council objectives, or which ones could be developed and implemented in the limited time available." AR 51 at 5741-42; see AR 59 at 5915 (identifying obstacles to point system implementation), 5925 (expressing "concerns about ability to implement by May 2009 given current budgets"). Timing was paramount because the statute requires that the "time period for ending overfishing and rebuilding the fishery. . . shall . . . be as short as possible," 16 U.S.C. § 1854(e)(4)(A). Prior to A16, "[s]everal groundfish stocks . . . [were] rebuilding under programs that [did] not meet the requirements of the M-S Act," AR 773 at 47816, and "[t]he rebuilding plans in the FMP rely upon implementation of management measures beginning in FY 2010 on May 1, 2010, otherwise the success of such rebuilding programs may be compromised," AR 997 at 56505.

17

## C. Regulatory Flexibility Act and Paperwork Reduction Act

Plaintiffs argue that the Agency violated the Regulatory Flexibility Act ("RFA") and the Paperwork Reduction Act ("PRA") because the costs of sector monitoring are excessive.[6] The RFA requires an agency to prepare an Initial Regulatory Flexibility Analysis and a Final Regulatory Flexibility Analysis after, respectively, proposing and promulgating a new rule. 5 U.S.C. §§ 603, 604. The Agency did prepare an IRFA and RFA for all three components of A16. AR 773 at 48616-23 (A16 IRFA); AR 997 at 56529-32 (A16 FRFA); AR 882 at 51287-90 (IRFA for FW 44); AR 1001 at 56727-30 (FRFA for FW 44); see AR 863 at 50414 (IRFA for sector operations rule); AR 996 at 56482-84 (FRFA for sector operations rule). Arguments about the substantive merits of a new rule are beyond the scope of these procedural requirements. The PRA directs agencies to "reduce information collection burdens on the public." 44 U.S.C. § 3506(b)(1). It does not create a private cause of action to enforce this mandate. Sutton v. Providence St. Joseph Med. Ctr., 192 F.3d 826, 844 (9th Cir. 1999); Ass'n of Am. Physicians & Surgeons, Inc. v. U.S. Dep't of Health & Human Servs., 224 F. Supp.2d 1115, 1128-29 (S.D. Tex. 2002).

## D. Fifth Amendment

Plaintiff Lovgren separately asserts that A16 violates the Fifth Amendment because, so far as I can discern from the convoluted briefing, there was a taking without notice and an opportunity to be heard. This claim is groundless. First, A16

---

[6]Plaintiff Lovgren asserts a claim under the Freedom of Information Act, but the basis for that claim cannot be discerned from his briefing. There is no evidence of a FOIA request or that he was denied access to any documents.

does not deprive plaintiffs of all economically beneficial use of their fishing gear. See, e.g., Franklin Mem'l Hosp. v. Harvey, 575 F.3d 121, 126 (1st Cir. 2009). It is simply the latest in a long line of rules and regulations that alter the amount of fish that a permit holder can catch. Second, as already discussed, there were numerous public meetings, committees, and a notice and comment period as part of the A16 process. Plaintiff Lovgren was, in fact, a member of one of those committees, the "Groundfish Advisory Panel." See, e.g., AR 65.

### III. Conclusion

The New Bedford Plaintiffs' motion for summary judgment (Docket # 56) is DENIED. Plaintiff Lovgren's motion for summary judgment (Docket # 61) is DENIED. Defendant Conservation Law Foundation's motion for summary judgment (Docket # 73) is ALLOWED. The Agency's motion for summary judgment (Docket # 75) is ALLOWED. The New Bedford Plaintiffs' motion to strike (Docket # 99) is DENIED. The New Bedford motion for leave to file a supplemental complaint (Docket # 108) is DENIED.[7]

|  |  |
|---|---|
| June 30, 2011 | /s/Rya W. Zobel |
| DATE | RYA W. ZOBEL |
|  | UNITED STATES DISTRICT JUDGE |

---

[7]Plaintiffs seek to add Framework 45 to this litigation. 76 Fed. Reg. 23042 (Apr. 25, 2011). Framework 45 does not alter the A16 provisions that are at the core of this dispute and render the litigation moot, and inclusion would cause significant delay. A new administrative record would have to be prepared, followed by new rounds of briefing, all subject to risk of further delay if Framework 46 is published.